**E-FILED**
Friday, 01 December, 2006  02:28:21 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS -- PEORIA DIVISION

| | | |
|---|---|---|
| LYNN T. GUEVREKIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-CV-01369 |
| | ) | |
| BLOOMINGTON POLICE DEPARTMENT, | ) | |
| CITY OF BLOOMINGTON, McLEAN | ) | |
| COUNTY CENTER FOR HUMAN | ) | |
| SERVICES, HEARTLAND APARTMENT | ) | |
| MANAGEMENT, and WAYNE PELHANK, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants, HEARTLAND APARTMENT MANAGEMENT, LLC and WAYNE

PELHANK, by their attorneys, Thielen, Foley & Mirdo, LLC, submit in support of their Motion for

Summary Judgment:

**INTRODUCTION**

In her Complaint, Plaintiff asserts three claims against Defendants Heartland Apartment

Management, LLC and Wayne Pelhank: (1) that Defendants violated the "Illinois Rental Law" by

allegedly entering her residence on May 20, 2004; (2) that Defendants committed "libel" by being

listed as a witness on a police report that Plaintiff claims contains false information; and (3) that

Defendants committed "fraud/forgery" by allegedly forging her name on written lease in order to

provide a basis for their alleged unauthorized entry into Plaintiff's apartment on May 20, 2004

(Complaint [1], pp. 6-7).  Plaintiff's claims against these Defendants arise out of the same alleged

incident on May 20, 2004 that forms the basis for Plaintiff's federal question claims against

Defendants City of Bloomington and McLean County Center for Human Services.

1

## UNDISPUTED MATERIAL FACTS

1.      At the time of the occurrence alleged in her Complaint, Plaintiff resided at 620 ½ North Main Street, Apartment 6, in Bloomington, Illinois (Plaintiff's Deposition, pp. 6, 42-44). Heartland Apartment Management was the manager of that apartment at the time Plaintiff moved into it (Plaintiff's Deposition, pp. 38).

2.      On May 20, 2004, the McLean County Center for Human Services Crisis Team received a telephone call from Plaintiff's sister, who indicated that Plaintiff had threatened to kill her family one by one and had a gun in her possession (McLean County Answers to Interrogatories, #3, attached as Exhibit 1; Plaintiff's Deposition, p. 11).

3.      The McLean County Center for Human Services then contacted the Bloomington Police Department, which responded to the apartment rented to Plaintiff (City of Bloomington Answers to Interrogatories, #4 & 21, attached as Exhibit 2).

4.      After Plaintiff did not answer her door or telephone, the police officers determined that it was appropriate to enter the apartment rented to Plaintiff (City of Bloomington Answers to Interrogatories, #4).

5.      A police officer instructed a representative of Heartland Apartment Management to unlock the deadbolt of the apartment rented to Plaintiff (Plaintiff's Deposition, p. 34, attached as Exhibit 3).  Plaintiff did not witness anyone unlock the deadbolt on the apartment and does not know the identity of the person who unlocked the deadbolt (Plaintiff's Deposition, pp. 35-36).

6.      Kevin Forrester is a maintenance and repair contractor who was working for Heartland Apartment Management as an independent contractor on May 20, 2004 (Affidavit of Kevin Forrester, ¶ 1, attached as Exhibit 4).

7.      On May 20, 2004, Mr. Forrester was contacted by the Bloomington Police Department and asked to meet police officers at the building where Plaintiff lived with keys to the building (Affidavit of Kevin Forrester, ¶ 2).

8.      When Mr. Forrester arrived at the building, a police officer informed Mr. Forrester that the officer had reason to believe that a person inside Apartment #6 posed a present danger to herself or others, and instructed Mr. Forrester to unlock the door of that apartment  (Affidavit of Kevin Forrester, ¶ 3).

9.      At the direction of the police officer, Mr. Forrester attempted to unlock the door of Apartment #6 on May 20, 2004, but the door did not open (Affidavit of Kevin Forrester, ¶ 4).  A police officer then pushed against the door until the lock broke and the apartment door opened (Affidavit of Kevin Forrester, ¶ 5; City of Bloomington Answers to Interrogatories, #6).

10.     Neither Mr. Forrester, nor any representative of Heartland Apartment Management, participated in breaking the lock and opening the door of the apartment rented to Plaintiff on May 20, 2004 (Affidavit of Kevin Forrester, ¶ 6; Plaintiff's Deposition, pp. 52-53).

11.     Neither Mr. Forrester, nor any Representative of Heartland Apartment Management, entered the apartment rented to Plaintiff on May 20, 2004 (Affidavit of Kevin Forrester, ¶ 7; Plaintiff's Deposition, pp. 33, 36-37).

12.     Wayne Pelhank was out of town on May 20, 2004, and was not present at or outside the apartment rented to Plaintiff at the time of the events alleged in Plaintiff's Complaint (Affidavit of Kevin Forrester, ¶ 9).

13.     Other than providing his name and address, Kevin Forrester did not supply any information to police officers for their report (Affidavit of Kevin Forrester, ¶ 10).  Mr. Forrester has never seen copies of any written reports that may have been made by the Bloomington Police

Department or McLean County Center for Human Services in connection with the events which occurred on May 20, 2004 at the apartment rented to Plaintiff (Affidavit of Kevin Forrester, ¶ 11).

14.    Plaintiff does not know the identity of the alleged employee of Heartland Management whose name is listed on the police report as a witness (Plaintiff's Deposition, pp. 15-16).  Plaintiff does not know whether that person provided any information to the Bloomington Police Department, or whether that person merely was listed on the police report because he was present at the time of the events described in the report (Plaintiff's Deposition, pp. 14-15, 57).

15.    Plaintiff did not observe Wayne Pelhank or any representative of Heartland Apartment Management place her name on the written lease dated April 1, 2004 (Plaintiff's Deposition, pp. 40).

16.    Plaintiff received a copy of the April 1, 2004 written lease in the course of her eviction proceeding (Plaintiff's Deposition, pp. 39).

17.    On April 7, 2005, Heartland Apartment Management filed a Complaint in Forcible Entry and Detainer against Plaintiff in McLean County Case No. 05-LM-227 (See Certified Complaint, attached as Exhibit 5).

18.    The written lease dated April 1, 2004 between Lynn Guevrekian and Heartland Apartment Management was attached to and incorporated into the Complaint in McLean County Case No. 05-LM-227 as Exhibit 1  (See Certified Complaint, attached as Exhibit 5).

19.    On April 22, 2005, Plaintiff appeared in person before the Court in  McLean County Case No. 05-LM-227 and admitted to all allegations made in the Complaint in Forcible Entry and Detainer (See Certified Record Sheet, attached as Exhibit 6).

20.    On April 22, 2005, the Circuit Court of McLean County, Illinois entered a Judgment and Order for Possession against Plaintiff and in favor of Heartland Apartment Management in

McLean County Case No. 05-LM-227 (See Certified Judgment, attached as Exhibit 7).  In part, the Judgment entered against Plaintiff in McLean County Case No. 05-LM-227 awarded damages to Heartland Apartment Management for unpaid rent under the April 1, 2004 written lease (See Certified Judgment and Certified Complaint, attached as Exhibits 5 & 7).

## ARGUMENT

A motion for summary judgment should be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  When confronted with a motion for summary judgment, the party who bears the burden of proof on a particular issue may not rest on his pleadings, but must affirmatively demonstrate, by specific factual assertions, that there is a genuine issue of material fact which requires trial.  Beard v. Whitley County REMC, 840 F.2d 405, 410 (7th Cir. 1988).  The mere existence of scintilla of evidence in support of the nonmoving party's position is insufficient to create a dispute about a material fact so as to preclude summary judgment; there must be evidence on which jury reasonably could find for that party.  Cortright v. Thompson, 812 F. Supp. 772 (N.D. Ill. 1992).  Metaphysical doubt about material facts of a case is insufficient to preclude summary judgment.  Beard, id.; Guillermo v. Brennan, 691 F. Supp. 1151 (N.D. Ill. 1988).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Beard, id. (citation omitted).  "The court should neither 'look the other way' to ignore genuine issue of material fact, nor 'strain to find' material fact issues where there are none." Id. (citation omitted).

## I.     "Illinois Rental Law" Claim

Plaintiff's claim that Heartland Apartment Management, LLC and Wayne Pelhank violated the "Illinois Rental Law" is based on her belief that they opened the door of the apartment that was rented to her without an "emergency" being present (Plaintiff's Deposition, pp. 59).

As an initial matter, there is no Illinois statute known as the "Illinois Rental Law."  Plaintiff offers no valid citation to legal authority for her assertion that these Defendants violated any legal duty owed to Plaintiff, and her claim therefore fails to state a cause of action.  .

Further, the undisputed evidence demonstrates that neither Heartland Apartment Management, LLC nor Wayne Pelhank were responsible for opening the door to the apartment rented to Plaintiff on May 20, 2004.  Mr. Pelhank was not present, and in fact was not even in town, at the time of the events alleged in the Complaint (Affidavit of Kevin Forrester, ¶ 9).  Kevin Forrester was present outside the apartment in question for *some* of the events alleged in Plaintiff's Complaint, but Mr. Forrester is an independent contractor, whose actions may not subject Heartland Apartment Management, LLC to liability under Illinois law (Affidavit of Kevin Forrester, ¶ 1).  Gomien v. Wear-Ever Aluminum, Inc., 50 Ill. 2d 19, 21, 276 N.E.2d 336, 338 (1971).

Finally, the undisputed evidence demonstrates that, even if the actions of Mr. Forrester could be attributed to Defendant Heartland Apartment Management, LLC, Mr. Forrester's actions violated no duty owed to Plaintiff and resulted in no potential injury to Plaintiff.  Although Mr. Forrester *attempted* to unlock the door of the apartment rented to Plaintiff, after being directed to do so by a police officer, it is undisputed that the door did not open in response to Mr. Forrester's attempt to unlock it (Affidavit of Kevin Forrester, ¶¶ 3 & 4).  The door opened only after the lock was broken by a police officer (Affidavit of Kevin Forrester, ¶ 5; City of Bloomington Answers to Interrogatories, #6).  Neither Mr. Forrester, nor any representative of Heartland Apartment Management, LLC participated in breaking the lock and opening the door of the apartment (Affidavit of Kevin Forrester, ¶ 6; Plaintiff's Deposition, pp. 52-53).  Neither Mr. Forrester, nor any representative of Heartland Apartment Management, LLC entered the apartment (Affidavit of Kevin Forrester, ¶ 7; Plaintiff's Deposition, pp. 33, 36-37).  Mr. Forrester had no duty to conduct an

independent investigation into the accuracy of the information provided to the McLean County Center for Human Services and/or the Bloomington Police Department, but was entitled to rely upon the facially valid information and instructions given to him by the police officers in (unsuccessfully) attempting to unlock the door to the apartment rented to Plaintiff.

Plaintiff simply is unable to raise a genuine issue of material fact indicating that either Heartland Apartment Management, LLC or Wayne Pelhank breached any legal duty owed to Plaintiff, or that any breach of duty by these Defendants was the proximate cause of any injury allegedly sustained by Plaintiff. Defendants therefore are entitled to judgment as a matter of law with respect to Plaintiff's claim of violation of the "Illinois Rental Law."

II.    **"Libel"**

Plaintiff's claim that Heartland Apartment Management, LLC and Wayne Pelhank have libeled her is based on her belief that an employee of Heartland Apartment Management is listed as a witness on a police report that Plaintiff believes contains false information (Complaint [1], pp. 6-7; Plaintiff's Deposition, pp. 14-16, 63).

In order to make out a claim for defamation/libel, Plaintiff must set out facts sufficient to show that (1) the defendants made a false statement about her, (2) that there was an unprivileged publication of that false statement to a third party through the fault of defendants, and (3) that the publication of the false statement caused damage to Plaintiff. Krasinski v. United Parcel Service, Inc., 124 Ill. 2d 483, 490, 530 N.E.2d 468, 471 (1988). Plaintiff is unable to raise a genuine issue of material fact indicating that these Defendants made any false statement about Plaintiff, that these Defendants were responsible for an unprivileged publication of that false statement to any third party, or that Plaintiff has sustained any damage to her reputation as a result of the publication of the false statement.

The undisputed evidence is that neither Wayne Pelhank, nor any employee of Heartland Apartment Management, LLC, was present at the time of the events described in the allegedly-libelous police report (Affidavit of Kevin Forrester, ¶s 1 & 9). Although Kevin Forrester was present for some of the events described in the police report, the undisputed evidence is that Mr. Forrester is not an employee of Heartland Apartment Management, LLC, and that he did not contribute in any way to the contents of the police report that Plaintiff claims is inaccurate, except to provide his name and address to a police officer (Affidavit of Kevin Forrester, ¶¶ 1, 10 & 11). Plaintiff can come forward with no evidence that either of these Defendants published the police report to any third party, or that Plaintiff's reputation suffered any damage as a result of such publication. Plaintiff simply is unable to raise a genuine issue of material fact on *any* of the required elements of a cause of action for libel, and Defendants therefore are entitled to judgment as a matter of law with respect to that claim.

### III.    "Fraud/Forgery"

Plaintiff's claim that Heartland Apartment Management, LLC and Wayne Pelhank committed fraud and forgery is based on her belief that she never signed a written lease with Heartland Apartment Management, and that the signature that appears at the bottom of the written apartment lease between Lynn Guevrekian and Heartland Apartment Management dated April 1, 2004 is not her signature (Plaintiff's Deposition, pp. 40, 63-64).

There is no civil cause of action for "forgery" under Illinois law. The cause of action for common law fraud requires a plaintiff to demonstrate (1) that the defendant made a statement of material fact as opposed to opinion; (2) that the statement was untrue; (3) that the party making the statement knew or believed it to be untrue; (4) that the opposing party believed and relied upon the statement and had a right to do so; (5) that the statement was made for the purpose of inducing the

other party to act; and (6) that the other party's reliance on the statement led to his injury. <u>Younger v. Revelle</u>, 78 Ill. App. 3d 1, 4, 397 N.E.2d 221, 223 (5th Dist. 1979).

Plaintiff's Complaint asserts that Wayne Pelhank forged her signature on the written lease after the May 20, 2004 incident in order to provide a basis for Heartland Apartment Management's entry into her apartment on that date (Complaint [1], p. 7). The undisputed evidence is that no representative of Heartland Apartment Management entered Plaintiff's apartment on May 20, 2004 (Affidavit of Kevin Forrester, ¶ 7; Plaintiff's Deposition, pp. 33, 36-37). The existence or non-existence of a valid written lease therefore is irrelevant to the issue Plaintiff is attempting to raise through her "forgery" claim. In any event, Plaintiff is unable to come forward with any evidence that Wayne Pelhank or any representative of Heartland Apartment Management, LLC placed her name on the April 1, 2004 written lease between her and Heartland Apartment Management (Plaintiff's Deposition, pp. 40). Plaintiff further can come forward with no evidence that she relied upon the alleged forgery of her name to her detriment, or that her reliance led to any form of damages.

In the alternative, Plaintiff is precluded from asserting that her signature on the April 1, 2004 lease was forged because the validity of that lease was fully litigated in McLean County Case No. 05-LM-227, and that issue was resolved in favor of Heartland Apartment Management, LLC and against Plaintiff. The undisputed evidence is that Heartland Apartment Management filed a Complaint in Forcible Entry and Detainer against Plaintiff in McLean County Case No. 05-LM-227 on April 7, 2005 (See Certified Complaint, attached as Exhibit 5). That Complaint asserted that Plaintiff was indebted to Heartland Apartment Management for back rent, late fees, and collection costs *pursuant to the terms of a written lease dated April 1, 2004, which was attached to the Complaint as Exhibit 1* (See Certified Complaint, attached as Exhibit 5). Plaintiff acknowledges that she received a copy of the written lease in question in the course of her "eviction" proceeding

(Plaintiff's Deposition, pp. 39). Plaintiff further appeared before the Court in McLean County Case No. 05-LM-227 and admitted all allegations of the Complaint (See Certified Record Sheet, attached as Exhibit 6), which necessarily included the validity of the written lease and its binding effect upon her. On April 22, 2005, the Circuit Court of McLean County, Illinois further entered a Judgment and Order for Possession against Plaintiff and in favor of Heartland Apartment Management in McLean County Case No. 05-LM-227, awarding possession of the apartment at issue in this lawsuit to Heartland Apartment Management *and awarding damages in the amount of $2,140.00 plus costs to Heartland Apartment Management, LLC* (See Certified Judgment, attached as Exhibit 7).

In order for the Court in McLean County Case No. 05-LM-227 to order Plaintiff to pay damages to Heartland Apartment Management, LLC under the terms of the written lease, it was essential for the Court in the prior litigation to determine that the written lease dated April 1, 2004 was a valid and enforceable contract that Plaintiff actually entered with Defendant, and that Plaintiff breached the terms of the written lease. The time for Plaintiff to assert that her signature on the written lease was a forgery was in the prior litigation between the parties, as the validity of the contract was an essential element of the cause of action and any alleged forgery was an affirmative defense to Plaintiff's liability under the terms of the written lease. Because the issue of the validity of the written lease, and its binding effect on Plaintiff, was actually and necessarily litigated between the parties in McLean County Case No. 05-LM-227, Plaintiff is barred from now attempting to assert a contrary claim. See Washington Group Int'l, Inc. v. Bell, Boyd & Lloyd, LLC, 383 F.3d 633 (7th Cir. 2004).

## CONCLUSION

Defendants HEARTLAND APARTMENT MANAGEMENT, LLC and WAYNE PELHANK are entitled to summary judgment in their favor because the uncontested evidence, even

when viewed in the light most favorable to Plaintiff, demonstrates that no rational trier of fact could conclude that these Defendants breached any legal duty owed to Plaintiff or that any breach of duty by Defendants was the proximate cause of any injury allegedly sustained by Plaintiff with respect to any of the claims Plaintiff has attempted to assert in her Complaint.  Further, with respect to Plaintiff's claim of "forgery," the issue of the validity of the written lease between the parties already has been fully and finally litigated in Defendant's favor, and Plaintiff is precluded from collaterally challenging that judgment by now asserting that her signature on the lease was a forgery.

WHEREFORE, Defendants HEARTLAND APARTMENT MANAGEMENT, LLC and WAYNE PELHANK respectfully request that this Court grant their Motion for Summary Judgment and award them their costs incurred herein.

S/ BARBARA SNOW MIRDO
Illinois Attorney No. 06230302
Attorney for Defendants
THIELEN, FOLEY & MIRDO, LLC
207 W. Jefferson St., Ste. 600
Bloomington, IL 61701
Phone: 309/820-0040
Fax: 309/820-0041
E-mail: mirdo.b@thielenlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on **December 1, 2006**, I electronically filed this **Memorandum of Law in Support of Defendants' Motion for Summary Judgment** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Peter R. Jennetten                              ***Attorney for Bloomington Police***
Amanda J. Watson                             ***Department and City of Bloomington***
Quinn, Johnston, Henderson & Pretorius
227 N.E. Jefferson Street
Peoria, IL 61602-1211
Phone: (309) 674-1133
Fax: (309) 674-6503
E-mail: pjennetten@qjhp.com
E-mail: mwatson@qjhp.com


J. Casey Costigan                               ***Attorney for McLean County Center***
Dominic A. Salvati                             ***for Human Services***
Costigan & Wollrab, P.C.
P.O. Box 3127
Bloomington, IL 61702-3127
Phone: (309) 828-4310
Fax: (309) 828-4325
E-mail: ccostigan@cwlawoffice.com
E-mail: dsalvati@cwlawoffice.com


Eitan Weltman                                   ***Attorney for Heartland Apartment***
802 N. Clinton St., Suite A                   ***Management and Wayne Pelhank***
Bloomington, IL 61701-3229
Phone: (309) 829-4422
Fax: (309) 829-1079
E-mail: EitanW@aol.com


and I hereby certify that on **December 1, 2006**, I mailed a copy of this document by United States Postal Service to the following non-registered participants:

Lynn T. Guevrekian                            ***Pro se Plaintiff***
c/o Helping Hands
200 South 11th Street
Springfield, IL 62703
Phone: (309) 807-4851


                                     S/     *Barbara Snow Mirdo*
                                     Barbara Snow Mirdo (Illinois Bar No. 6230302)
                                     Attorney for Defendant
                                     THIELEN, FOLEY & MIRDO, LLC
                                     207 W. Jefferson St., Suite 600
                                     Bloomington, IL 61701
                                     Phone: (309) 820-0040
                                     Fax: (309) 820-0041
                                     E-mail: mirdo.b@thielenlaw.com

E-FILED
Friday, December, 2006 02:36:09 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| LYNN T. GUEVREKIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05 CV 01369 |
| | ) | |
| BLOOMINGTON POLICE DEPARTMENT, | ) | |
| MCLEAN COUNTY CENTER FOR HUMAN | ) | |
| SERVICES, HEARTLAND APARTMENT | ) | |
| MANAGEMENT, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT MCLEAN COUNTY CENTER FOR HUMAN SERVICES' ANSWERS TO INTERROGATORIES

NOW COMES the Defendant, McLean County Center for Human Services, by

and through its attorneys, Costigan & Wollrab, P.C., and hereby provides the following

Answers to Interrogatories propounded by the Plaintiff:

1. On May 20, 2004, how old was Nicole Piggush, A.K.A. Nicole Wilder?

ANSWER: Ms. Wilder was 25 years old.

2. How much time did Nicole Wilder spend in the presence of Lynn Guevrekian on May 20, 2004?

ANSWER: Ms. Wilder spent approximately 30-45 minutes in the presence of Plaintiff.

3. What evidence does Nicole Wilder have that Lynn Guevrekian has a "prior homicidal perpetration?"

ANSWER: The McLean County Center for Human Services Crisis Team received a telephone call from Ms. Guevrekian's sistaer, who indicated Ms. Guevrekian threatened to kill family one by one and that she had a gun in her possession. Ms.Guevrekian admitted to this wile speaking to Nicole Wilder on May 20, 2004.

4.    On May 20, 2004 ,did Nicole Wilder ever pass the threshold of Lynn Guevrekian's door and enter Lynn Guevrekian's apartment without Lynn Guevrekian's permission?

ANSWER:    When the police advised her to come forward, Ms. Wilder stuck her head in the door to notify Ms. Guevrekian that she was there and she wanted to speak to Ms. Guevrekian.  Ms. Wilder waited in the hallway until Ms. Guevrekian came out of the bathroom, at which time she invited Ms. Wilder into her residence.

5.    On May 20, 2004, how long had Nicole Wilder been a licensed social worker?

ANSWER:    Ms. Wilder had been a licensed social worker for approximately 8 months.

6.    How much time is needed before a licensed social worker may properly "diagnose" a person?

ANSWER:    This Defendant is not aware of any time limit that is required before a licensed social worker may make diagnoses.

7.    Please state the definition of a 309.9 diagnosis as found on Nicole Wiider's May 20, 2004 report?

ANSWER:    See attachment.

8.    Please state the definition of a global axis of 47, as found on Nicole Wilder's May 20, 2004 report?

ANSWER:    See attachment.

McLean County Center for Human Services,Inc.
Defendant, by its attorneys,
Costigan & Wollrab, P.C.,

By:    _____
       Dominic A. Salvati

## **ATTESTATION**

STATE OF ILLINOIS          )
                           )SS.
COUNTY OF MCLEAN           )

      Thomas F. Barr, Executive Director, being first duly sworn on oath, deposes and says that he is an agent of Defendant; he has read the above and foregoing Answers to Interrogatories by him subscribed; and under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, certifies that the statements set forth in these Answers are true and correct.

                            Thomas F. Barr, Executive Director
                            McLean County Center for Human Services, Inc.

Subscribed and sworn to before me
this *5th* day of *October*, 2006.

Notary Public

> "OFFICIAL SEAL"
> Darlene K. Small
> Notary Public, State of Illinois
> My Commission Expires *11-01-2008*

Casey Costigan Bar Number  6206724
Dominic A. Salvati Bar Number 6283922
Attorneys for McLean County Center for Human Services
Costigan & Wollrab, P.C.
308 E. Washington Street
Bloomington, Illinois 61701
(309) 828-4310 phone
(309) 828-4325 fax
ccostigan@cwlawoffice.com
dsalvati@cwlawoffice.com

3



# Adjustment Disorders

## Adjustment Disorders

A. The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s).

B. These symptoms or behaviors are clinically significant as evidenced by either of the following:

(1) marked distress that is in excess of what would be expected from exposure to the stressor

(2) significant impairment in social or occupational (academic) functioning

C. The stress-related disturbance does not meet the criteria for another specific Axis I disorder and is not merely an exacerbation of a preexisting Axis I or Axis II disorder.

D. The symptoms do not represent Bereavement.

E. Once the stressor (or its consequences) has terminated, the symptoms do not persist for more than an additional 6 months.

Specify if:

**Acute:** if the disturbance lasts less than 6 months

**Chronic:** if the disturbance lasts for 6 months or longer. By definition, symptoms cannot persist for more than 6 months after the termination of the stressor or its consequences. The Chronic specifier therefore applies when the duration of the disturbance is longer than 6 months in response to a chronic stressor or to a stressor that has enduring consequences.

---

285

Adjustment Disorders are coded based on the subtype, which is selected according to the predominant symptoms. The specific stressor(s) can be specified on Axis IV.

**309.0   With Depressed Mood:** when the predominant manifestations are symptoms such as depressed mood, tearfulness, or feelings of hopelessness

**309.24 With Anxiety:** when the predominant manifestations are symptoms such as nervousness, worry, or jitteriness, or, in children, fears of separation from major attachment figures

**309.28 With Mixed Anxiety and Depressed Mood:** when the predominant manifestation is a combination of depression and anxiety

**309.3   With Disturbance of Conduct:** when the predominant manifestation is a disturbance in conduct in which there is violation of the rights of others or of major age-appropriate societal norms and rules (e.g., truancy, vandalism, reckless driving, fighting, defaulting on legal responsibilities)

**309.4   With Mixed Disturbance of Emotions and Conduct:** when the predominant manifestations are both emotional symptoms (e.g., depression, anxiety) and a disturbance of conduct (see above subtype)

**309.9   Unspecified:** for maladaptive reactions (e.g., physical complaints, social withdrawal, or work or academic inhibition) to stressors that are not classifiable as one of the specific subtypes of Adjustment Disorder

**Coding note:** In a multiaxial assessment, the nature of the stressor can be indicated by listing it on Axis IV (e.g., Divorce).

# Global Assessment of Functioning (GAF) Scale

Consider psychological, social, and occupational functioning on a hypothetical continuum of mental health–illness. Do not include impairment in functioning due to physical (or environmental) limitations.

**Code** (**Note:** Use intermediate codes when appropriate, e.g., 45, 68, 72.)

100
| Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms.
91

90
| Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members).
81

80
| If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).
71

70
| Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.
61

60
| Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).
51

*(continued)*

47

48

**Code** (**Note:** Use intermediate codes when appropriate, e.g., 45, 68, 72.)

50
| Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).
41

40
| Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).
31

30
| Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).
21

20
| Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute).
11

10
| Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death.
1

0  Inadequate information.



## DSM-IV Global Assessment of Functioning (GAF)
### Psychological Functioning

| Code | Psychological Functioning | | | |
|---|---|---|---|---|
| 100 | • No psychiatric symptoms.<br>• Superior functioning in a wide range of activities. | | | |
| 91 | • Life's problems never seem to get out of hand. | | | |
| 90 | • Absent or minimal psychiatric Symptoms.<br>• Good functioning in all functional areas.<br>• Generally satisfied with life. | | | |
| 81 | • Mild anxiety before an exam. | | | |
| 80 | • Transient symptoms in response to psychosocial stressors. | | | |
| 71 | • Difficulty concentrating after argument with family members. | | | |
| 70 | • Mild psychiatric symptoms.<br>• Depressed mood.<br>• Mild Insomnia | | | |
| 61 | | | | |
| 60 | • Moderate psychological symptoms.<br>• Flat affect<br>• Occasional panic attacks. | | | • Minimal impairment in communication.<br>• Mild Thought disorder<br>• Circumstantial speech |
| 51 | | | | |
| 50 | • Serious psychological symptoms.<br>• Frequent shoplifting<br>• Severe obsessional rituals. | • Suicidal ideation<br>• Passive thoughts of wanting to die | | |
| 41 | | | | |
| 40 | • Major impairment in several functional areas.<br>• Some impairment in reality testing or communication<br>• Major impairment in mood, thinking or judgment.<br>• Speech is at times illogical, obscure, or irrelevant. | • Suicidal ideation with thoughts of means.<br>• Thoughts of hurting others. | • Delusions or Hallucinations<br>• Delusions or Hallucinations do not affect behavior. | • Some impairment in communication.<br>• Speech not understandable at times. |
| 31 | | | | |
| 30 | • Behavior is considerably influenced by delusions or hallucinations<br>• Serious impairment in judgment<br>• Acts grossly inappropriate | • Suicidal Preoccupation<br>• Violence with serious consequences | • Delusions or Hallucinations<br>• Behavior is affected by Delusions or Hallucinations | • Serious impairment in communication.<br>• Speech sometimes incoherent |
| 21 | | | | |
| 20 | • Occasionally fails to maintain minimal personal hygiene<br>• Manic excitement | • Some danger of hurting self or others.<br>• Suicide attempts without clear expectation of death. | | • Gross impairment in communication.<br>• Largely Incoherent or mute. |
| 11 | | | | |
| 10 | • Persistent inability to maintain minimal personal hygiene<br>• Inability to maintain minimal personal hygiene | • Serious suicidal acts with clear expectation of death.<br>• Persistent danger of severely hurting self or others. | | |
| 1 | | | | |

• Inadequate information

## DSM-IV Global Assessment of Functioning (GAF)
### Social Functioning

| Code | Social Functioning | Examples | | | | GARF |
|---|---|---|---|---|---|---|
| 100–91 | • Is sought out by others because of his or her many positive qualities. • Superior functioning | • Good friendships with many people. | • Excellent family and marital relationships. | • Demonstrates good social skills and understanding of social conventions. | • Is involved and functions well in many activities or social events. | • Relational unit is functioning satisfactorily from self-report of participants and from perspectives of observers. |
| 90–81 | • Interested and involved in a wide range of activities. • Socially effective. • Only everyday social problems occur. | | • Occasional arguments with family members. | | | |
| 80–71 | • Only slight social impairment. | • Arguments with friends affect relationships. | | | • Decrease in social activities due to stressors. | • Functioning of rel unit is somewhat unsatisfactorily. Over time, many but not all difficulties are resolved without complaint. |
| 70–61 | • Some social difficulties. | • Have some meaningful interpersonal relationships. | • Theft within the household. | | • Loss of meaningful activities due to difficulties. | |
| 60–51 | • Moderate social impairment. | • Few Friends. | | | • Withdrawn and socially isolated. | • Rel unit only occasionally satisfying and functional; dysfunctional, unsatisfying relationships predominate. |
| 50–41 | • Serious social impairment. | • No friends. | • Regular arguments with partner or spouse. | • Minor violations with the law such as misdemeanors. | • Withdrawn and socially isolated. | |
| 40–31 | • Major impairment in social and family functioning. | • Few acquaintances | • Explosive arguments with partner or spouse. • Neglects family. • Emotional abuse of children. | | • Avoids social contact. | • Rel unit is obviously and seriously dysfunctional; forms and time periods of satisfactory relating are rare. |
| 30–21 | • Serious impairment in communication or judgment. • No home. | • No meaningful relationships with others | • Explosive arguments with threats of violence or harm. • Emotional abuse of children. | • Significant violations of the law. | • Stays in bed all day. | |
| 20–11 | • Unable to sustain social contact. • Gross impairment in communication. | | • Domestic violence. • Child abuse or neglect. | • Sociopathic violations of the law. | | • Relational unit has become too dysfunctional to retain continuity of contact and attachment. |
| 10–1 | • No ability to maintain social functioning. | | • Significant life-threatening Domestic violence, child abuse or neglect. | | | |
| 0 | • Inadequate information | | | | | |




## DSM-IV Global Assessment of Functioning (GAF)
### Occupational Functioning

| Code | Occupational Functioning | Examples | | |
|------|--------------------------|----------|---|---|
| 100 91 | • Superior functioning in occupations. | • Excellent work functioning. | • Excellent functioning in academic setting. | • Excellent functioning in hobbies volunteers duties, activities, or interests. |
| 90 81 | • Only occasional occupational problems occur. | • Only minor, occasional conflicts at work. | | |
| 80 71 | • Only slight occupational. Impairment. | • Temporarily falling behind in work. | • Some difficulties with managing studies. | • Some lack of interest in hobbies, activities. |
| 70 61 | • Some occupational. Difficulties. | • Occasional missing work due to emotional distress. | • Poor performance in some subjects. • Poor grades occasionally. | |
| 60 51 | • Moderate occupational. Impairment. | • Conflicts with peers or co-workers. | • Failing some subjects. • Needs additional tutoring or help with learning. | • Limited involvement in once-pleasurable activities. |
| 50 41 | • Serious occupational. Impairment. | • Able to find work, though unable to keep a job for significant period of time. | • Significant learning disabilities or cognitive problems. • Requires additional help to perform adequately with academics. • Behavioral problems or conflicts at school. | • Few hobbies, activities, or other interests that are self-initiated. |
| 40 31 | • Major impairment in occupational. Functioning. | • Does not look for work. • Is unable to work by self. • May require sheltered workshop or job coach. | • Failing out of academic placement. • Serious behavioral problems at school. • Mental retardation. | • Avoids even pleasurable activities or interests. |
| 30 21 | • Major impairment in occupational functioning. | • No job due to impairment. • Requires workshop, job coach, or other rehabilitative support such as day treatment to work successfully. | • Struggles even with remedial academic placements. | • Seeks out activities only if structured or prompted to by others. |
| 20 11 | • Few, if any, occupational activities. | • Unable to work. • Considered disabled. • May be in sheltered workshop, day treatment, etc. but unable to work. | • Cannot successfully attend academic placement. | • Requires occupational therapy to engage productively in hobbies, activities. |
| 10 1 | • No ability to maintain occupational functioning. | • Institutionalized | • Institutionalized | • Cannot participate meaningfully in activities. |
| 0 | • Inadequate information | | | |

**E-FILED**
Friday, 01 December, 2006  02:36:37 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| LYNN T. GUEVREKIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-1369 |
| | ) | |
| BLOOMINGTON POLICE DEPARTMENT, | ) | |
| CITY OF BLOOMINGTON, McLEAN | ) | |
| COUNTY CENTER FOR HUMAN | ) | |
| SERVICES, HEARTLAND APARTMENT | ) | |
| MANAGEMENT and WAYNE PELHANK, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | **CONSOLIDATED FOR** |
| LYNN T. GUEVREKIAN, | ) | **DISCOVERY ONLY** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-1370 |
| | ) | |
| BLOOMINGTON POLICE DEPARTMENT, | ) | |
| CITY OF BLOOMINGTON, HEARTLAND | ) | |
| APARTMENT MANAGEMENT and | ) | |
| WAYNE PELHANK, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS CITY OF BLOOMINGTON,
## ANSWERS TO INTERROGATORIES IN 05-1369

NOW COME the Defendants, CITY OF BLOOMINGTON, by its attorneys, Quinn,

Johnston, Henderson & Pretorius, and as and for their Answers to Plaintiff's Interrogatories, state as

follows:

1.    How much time did Sergeant Randall Wikoff from the Bloomington Police
Department spend in the presence of Lynn Guevrekian on May 20, 2004?

**ANSWER:    A matter of minutes.**

2.    Did the Bloomington Police ever explain to Lynn Guevrekian why they were at her apartment on May 20, 2004?

**ANSWER:    Ms. Guevrekian was informed that Human Services was there to speak to her and was also informed of the reported threat.**

3.    How much time passed between the initial start time of the incident as reported on the Mclean County Incident Report No. 200406831 on May 20, 2004, and the time the Police Officer reports that he determined entry into the number 6 apartment was appropriate?

**ANSWER:    Unable to give an exact time frame other than the information provided on the report.**

4.    What emergency existed that the Bloomington Police Department thought it appropriate to enter Lynn Guevrekian's apartment without permission from Lynn Guevrekian?

**ANSWER:    The Bloomington Police Department was contacted by the McLean County Center for Human Services after they received a phone call reporting that a threat had been made by Ms. Guevrekian and that she had threatened to start shooting people. After defendant did not answer her door or her telephone, police determined it was appropriate to enter her apartment.**

5.    Did any Bloomington Police Officer unlock Lynn Guevrekian's apartment door with an apartment key on May 20, 2004?

**ANSWER:    No Bloomington Police Officer is believed to have unlocked Lynn Guevrekian's apartment door on May 20, 2004.**

6.    On May 20, 2004, did a Bloomington Police Officer pound loudly against the apartment door until the chain lock broke and the apartment door opened?

**ANSWER:    Sgt. Randall Wikoff pushed against the door until the chain lock broke and the apartment door opened.**

7. Did any Bloomington Police Officer enter Lynn Guevrekian's apartment without an invitation from Lynn Guevrekian?

**ANSWER:    Yes.**

8. How long has Officer Randall Wikoff bee a Sergeant for the Bloomington Police Department?

**ANSWER:    Randall Wikoff has been a Sergeant for the Bloomington Police Department since 2003.  He has served as a Bloomington Police Officer for over 18 years.**

9. What specific information did the Bloomington Police have that incited uninvited entry into the 620 North Main Street, Number 6 apartment on May 20, 2004?

**ANSWER:    See Answer to No. 4 above.**

10. What elements would be necessary to determine that a person would have the "means" to murder another person who was between 1100 and 1300 miles away?

**ANSWER:    Police officers would make a determination based upon the totality of the circumstances involved in the case.**

11. Could you please define the word "furious"?

**ANSWER:    Merriam Webster's Collegiate Dictionary, 10th Edition, defines furious as  one of the following:**
**1a(1): exhibiting or goaded by anger; (2): indicative of or proceeding from anger; b: giving a stormy or turbulent appearance; c: marked by noise, excitement, activity or rapidity; 2:  intense.**

12. What specific damage was done to the 620 Main Street #6 apartment that initiated the McLean County Property Damage Report No. 200406831 to be made?

**ANSWER:    The door to Plaintiff's apartment was damaged when the chain lock was broken.**

13. If someone is threatening homicide, what typical police action is taken?

3

**ANSWER:**     **The Police Department will make all efforts to prevent said homicide.**

14.     If a person presents a threat of murder, is this a serious crime in Bloomington, Illinois?

**ANSWER:**     **Yes.**

16.     What is the name(s) of the person(s) who hired Quinn, Johnston, Henderson & Pretorius to defend the City of Bloomington in this present Peoria District Court Case Number 05-1369?

**ANSWER:**     **This information is protected by the Attorney/Client Privilege.**

17.     What are the names of the people who are responsible for the City of Bloomington?

**ANSWER:**     **Objection.  An answer to said question would require the listing of all taxpayers and voters within the City of Bloomington.**

18.     What is the name of the City of Bloomington's Mayor?

**ANSWER:**     **Steve Stockton.**

19.     What is the name of the Bloomington, Illinois City Manager?

**ANSWER:**     **Tom Hamilton.**

20.     On May 20, 2004, how many times did Sergeant Randolph Wikoff enter Lynn Guevrekian's apartment located at 620 North Main Street, apartment number 6, without an invitation from Lynn Guevrekian?

**ANSWER:**     **Twice.**

21.     Who called the Bloomington Police Department to 620 North Main Street, Apartment Number 6 on May 20, 2004?

**ANSWER:**     **McLean County Center for Human Services.**

4

22.     Could you please state who is responsible for the Bloomington Police Department's actions?

**ANSWER:     Defendant objects to interrogatory #22 because the phrase "responsible for" in this context is vague and ambiguous. Defendant further objects that the interrogatory is a question of law, not fact. Defendant further notes that the City of Bloomington is not a separate entity from the Bloomington Police Department, but is a department within the City of Bloomington, a municipal corporation.**

23.     Is the City of Bloomington, Illinois responsible for the actions of the Bloomington\ Police Department?

**ANSWER:     The City of Bloomington and  Bloomington Police Department are not separate entities.  See answer to Interrogatory #22.**

24.     How many police officers showed up at the 620 North Main Street, number 6 apartment on May 20, 2004?

**ANSWER:     Four.**

25.     How does the City of Bloomington take responsibility for the Bloomington Police Department?

**ANSWER:     The City of Bloomington and Bloomington Police Department are not separate entities. See answer to Interrogatory #22.**

26.     Could you please state the responsibilities of the Mayor of the City of Bloomington?

**ANSWER:     See statutes and relevant ordinances, including the Illinois Municipal Code and Bloomington City Code.**

27.    Could you please state the responsibilities of the Bloomington City Manager?

**ANSWER:    See statutes and relevant ordinances. including the Illinois Municipal Code and Bloomington City Code.**

28.    On May 20, 2004, did any Bloomington Police Officer(s) enter Lynn Guevrekian's apartment without permission from Lynn Guevrekian?

**ANSWER:    Yes.  See answer to Interrogatory #4.**

29.    Following the Mary 20, 2004 incident involving the Bloomington Police, did the Bloomington Police ever ask Lynn Guevrekian to come to the police station?

**ANSWER:    No.**

By:    _Todd Greenburg_

Todd Greenburg,
For the City of Bloomington

Subscribed and sworn to before me
27th day of October, 2006

_Janice J Scherff_

Notary Public

OFFICIAL SEAL
JANICE L SCHERFF
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 03-07-07

Peter R. Jennetten (Illinois Bar No. 6237377)
Amanda J. Watson (Illinois Bar No. 6284222)
QUINN, JOHNSTON, HENDERSON & PRETORIUS
227 N.E. Jefferson Street
Peoria, IL  61602-1211
Telephone:  (309) 674-1133
Facsimile:  (309) 674-6503
E-mail: pjennetten@qjhp.com
M:\Civil\Guevrekian v. Bloomington 101 292 005\guevrekian cob ati.wpd

6

E-FILED
Friday, 01 December, 2006  02:38:01 PM
Clerk, U.S. District Court, ILCD

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
 2
 3   LYNN T. GUEVREKIAN,              )
                        Plaintiff,   )
 4                                   )
              VS.                    ) No. 05 L 1369
 5   BLOOMINGTON POLICE              )
     DEPARTMENT, CITY OF             )
 6   BLOOMINGTON, McLEAN COUNTY      )
     CENTER FOR HUMAN SERVICES,      )
 7   HEARTLAND APARTMENT             )
     MANAGEMENT and WAYNE PELHANK,)
 8                     Defendants. )
 9   LYNN T. GUEVREKIAN,              )
                        Plaintiff,   )
10           VS.                     ) No. 05 L 1370
     BLOOMINGTON POLICE              )
11   DEPARTMENT, CITY OF             )
     BLOOMINGTON, HEARTLAND          )
12   APARTMENT MANAGEMENT, and       )
     WAYNE PELHANK,                  )
13                     Defendants. )
14           The deposition of LYNN T.
15   GUEVREKIAN, called for examination pursuant to
16   the provisions of the Federal Rules of Civil
17   Procedure of the United States District Courts
18   as they apply to the taking of depositions,
19   taken before Paula A. Morsch, C.S.R., in the
20   State of Illinois, on the 6th day of
21   September, 2006, at 1:00 p.m., at 207 West
22   Jefferson, in the City of Bloomington, County
23   of McLean, State of Illinois.
```

**2**

1  PRESENT:
2      QUINN, JOHNSTON, HENDERSON &
       PRETORIUS, CHTD.,
3      BY: Amanda J. Watson, Esq.
       227 N.E. Jefferson Avenue
4      Peoria, Illinois 61602
       for Defendant Bloomington Police
5      Department, City of Bloomington;
6      THIELEN, FOLEY & MIRDO, LLC
       BY: Gregory J. Berg, Esq.
7      207 West Jefferson Street, Suite 600
       Bloomington, Illinois 61701
8      for Defendant Heartland Apartment
       Management and Wayne Pelhank;
9
       COSTIGAN & WOLLRAB, P.C.,
10     BY: Dominic A. Salvati, Esq.
       308 East Washington Street
11     Bloomington, Illinois 61702-3127
       for Defendant McLean County Center
12     for Human Services.
13
14
15
16
17
18
19
20
21
22
23

**3**

1          I N D E X
2  WITNESS                         PAGE
3  LYNN T. GUEVREKIAN
       Direct By Ms. Watson ............  4
4      Direct By Mr. Berg  ............  33
       Direct By Mr. Salvati ...........  131
5      Redirect By Ms. Watson ..........  164
       Redirect By Mr. Berg ............  180
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**4**

1          LYNN T. GUEVREKIAN
2  called by the Defendants,
3  being first duly sworn,
4  was examined and testified
5  as follows:
6
7      DIRECT EXAMINATION
8  BY MS. WATSON:
9      Q   Ms. Guevrekian, am I pronouncing
10 that right, Guevrekian?
11     A   Close enough, sure.
12     Q   Can you state your full name and
13 spell it out for us?
14     A   Lynn Guevrekian, L-Y-N-N,
15 Guevrekian, G as in George, U-E-V as in
16 Victor, R-E-K-I-A-N.
17     Q   For the record, this is the
18 discovery deposition of Lynn Guevrekian taken
19 on September 6, 2006, pursuant to proper
20 notice and all applicable court rules.
21         Lynn, do you mind if I call you
22 Lynn?
23     A   No, not at all.

**5**

1      Q   I'm Mandy Watson.  I'm one of the
2  attorneys for the City of Bloomington.  Have
3  you ever given a deposition before?
4      A   No, ma'am.
5      Q   Basically the ground rules are
6  everything is under oath so you will need to
7  answer truthfully and fully to all of our
8  questions.  Also, give verbal answers.  I know
9  I'm oftentimes tempted to shake my head or
10 nod, but she can't take that down.  It needs
11 to be a verbal yes or no.  And also if you
12 answer a question, I'll assume you've
13 understood what I've asked.  If you don't
14 understand anything I say, please do not
15 hesitate to ask me to repeat myself or
16 clarify.
17     A   All right.
18     Q   Okay.  A few general questions to
19 begin with.  What's your date of birth?
20     A   June 24th, 1964.
21     Q   Which makes you how old today?
22     A   42 years old.
23     Q   And what's your current address?

Pages 2 to 5

**6**

1      A   I don't have an address.  I use a
2   P.O. box.  It's P.O. Box 1114, Bloomington,
3   Illinois, 61702.
4      Q   Do you live in Bloomington?
5      A   Yes.
6      Q   Where do you live?
7      A   I'm homeless right now.
8      Q   Okay.  Now, you had a different
9   residence at the time of the occurrences of
10   March 28, 2004 -- or 2005 and May 20th, 2004?
11      A   Yes.
12      Q   What was that address?
13      A   That was 620 North Main Street in
14   Bloomington, Apartment No. 6.
15      Q   Okay.  Are you married?
16      A   No.
17      Q   Do you have any children or
18   dependents?
19      A   No, I don't.
20      Q   Did you complete high school?
21      A   No, I did not.  I got a G.E.D.
22      Q   Ever been in the military?
23      A   No, ma'am.

**7**

1      Q   Are you presently employed?
2      A   No.
3      Q   Were you employed at the time of
4   either the incidents at issue today in 2004 or
5   2005?
6      A   No, I was not.
7      Q   All right.  I'll get to the first
8   date at issue, which I believe is May 20th,
9   2004.  It's the subject of one of the two of
10   your complaints, and I believe on this date
11   there was an incident at the address that you
12   gave on North Main.  Could you in your own
13   words describe what occurred that day which is
14   the subject of your complaint?
15      A   I was in my apartment alone.  I was
16   taking a shower.  There was some violent
17   knocking, some loud knocking on the door, and
18   then all of a sudden people broke into my door
19   and the police officer was in the bathroom
20   where I was taking a shower, just came into
21   the bathroom.  I asked the police officer what
22   was it about.  He said come out, get dressed,
23   come out.

**8**

1      When I came out, I asked them what
2   is this about.  I took charge immediately.  I
3   said, "What is this about?  Who called you?
4   Why are you here?"  And they told me more or
5   less that they had got a call from my sister,
6   Anna, and that they -- something to the effect
7   of I threatened to kill the entire family,
8   something to that effect.  I don't have a word
9   for word.  I told them right away that it was
10   a prank and it was a stunt.  I told them that
11   my father had an inheritance and that I got
12   cut out.  They threw me some chicken feed
13   money and then they cut me out of the
14   inheritance and they were being very
15   secretive.  They wouldn't answer the
16   telephone.  I didn't get an answer from them.
17   They were just not responding and I left them
18   a voice mail message that said, hey, I want my
19   share or I'm going to file in Suffolk County
20   to get my share of dad's inheritance.  So I
21   explained to them that this was a prank and a
22   stunt done to make sure that I couldn't get
23   any money from my father's inheritance.

**9**

1      They were okay with that.  Nobody
2   questioned me.  Nobody acted like anything was
3   strange.  They were just pretty much more or
4   less, okay, go finish your shower because they
5   had pulled me out of the shower early and I
6   had like hurried and quickened and I came out
7   and like my shoes were untied and my hair was
8   still wet, and I took the towel out of my hair
9   and everybody just seemed okay when they left
10   with it.
11      And then in order -- I didn't have
12   any -- I was very shocked with everything that
13   happened, but I wasn't checking on anyone.  I
14   was not following up to check on the police
15   officer or the social worker or anything like
16   that.  I was simply trying to keep up with my
17   sister who had pulled the prank.  I was trying
18   to get the documents that I got, get the
19   report so that if she were to try to pull any
20   more stunts, I had what was done and that's
21   all.
22      Q   I think we're getting a little bit
23   off May 20th.

10

1    A    Okay.  Well, keep me directed,
2    that's fine, because I've got a lot to say.
3    It'll just come right out.
4        Q    So to your understanding, and you
5    would admit that your sister had called, was
6    it the Crisis Center in Bloomington that day?
7        A    They told me she called.  I was
8    never able to confirm that she called.
9        Q    Okay.
10       A    They told me she did.
11       Q    Had you spoken to her that day, May
12   20th, or had you spoken to her previously?
13       A    I had never -- I had not spoken to
14   my sister since maybe 2000, the year 2000 or
15   possibly nearing 2001.
16       Q    Okay.  Had you spoken to anyone else
17   in your family in Florida?
18       A    Not prior, no.
19       Q    Okay.  On that date precipitating
20   the phone call from your sister, had you
21   spoken to anybody in your family?
22       A    No, I left a voice mail message that
23   I was hanging out in my apartment cleaning up

11

1    and that she could give me a call if she
2    wants.  In fact, I thought that she was going
3    to perhaps call me.
4        Q    But it was your understanding that
5    she had called the Crisis Center in
6    Bloomington and said that you had threatened
7    the family?
8        A    Threatened to kill the family one by
9    one or something like that and she was afraid
10   for her life.
11       Q    Okay.  What's the name of your
12   sister who evidently called that day?
13       A    Anna, and then the same last name as
14   me but she's married.  Her last name is
15   Strien.
16       Q    How do you spell that?
17       A    S-T-R-I-E-N, Strien.
18       Q    And how old is she?
19       A    She's four years younger than me so
20   that puts her at 38.
21       Q    Now, does she currently reside in
22   Florida?
23       A    She lives in Florida, yes.

12

1        Q    Whereabouts, do you know?
2        A    The last time I knew she lived in an
3    Oakland Park area which is like a subdivision
4    of Ft. Lauderdale.
5        Q    Now, when did your father pass away?
6        A    October 8th, I believe it was.  I'd
7    have to look at the paper.  I don't have it
8    memorized, but it was in the year 2003.
9        Q    Okay.  So the October prior to this
10   May incident?
11       A    Yes.
12       Q    Okay.  And Suffolk County, is that
13   New York?
14       A    Yes.
15       Q    Okay.  And according to the police
16   report, which I've got your disclosures here,
17   the documents that you have produced to the
18   defendants, to all the parties, I've got the
19   police report that was filled out that day by
20   who I believe is Sergeant Randall Wycoff.
21   This was page 91 in one of your disclosures.
22   The disclosure that's labeled 1 through 139,
23   page 91 of that is the McLean County incident

13

1    report, as I said, evidently filled out by
2    Sergeant Wycoff.  In that at that time and I
3    believe also in your complaint you admitted on
4    May 20th, 2004, to owning two handguns, is
5    that correct?
6        A    Yes.
7        Q    To which you had a valid FOID card?
8        A    Yes.
9        Q    Also you disclosed a number of
10   reports; well, not a number but this
11   particular report as to the events of
12   May 20th, 2004, that were completed by the
13   Bloomington Police Department which are 90, I
14   think pages 90 and 91 of your disclosure and
15   then I believe there was also a supplement
16   done to that.  Oh, no, excuse me.  Strike
17   that.
18       Are you claiming that anything in
19   this report prepared by the Bloomington Police
20   Department contained false information?
21       A    Yes, ma'am.
22       Q    Okay.  What specifically -- and I
23   believe you speak of the narrative portion?

14

1    A   Yes.
2    Q   In your complaint.  What
3    specifically in the narrative portion of the
4    incident report are you claiming to be false
5    information?
6    A   It's a little too complex.  I have
7    notes.  I didn't bring anything with me today.
8    There are so many things that are inaccurate,
9    specific details, and I have notes and I can
10   line them up with papers.  It's a little bit
11   too intricate for me to just go off the top of
12   my head.  I don't recall.  I haven't memorized
13   anything.
14   Q   Let me double check another note
15   here.  On another disclosure you made which is
16   71 out of that same set of disclosures, you
17   say the name of the false witness on the
18   police report was blacked out.  Are you
19   stating from that that there's some type of
20   false information with regards to the witness
21   that is named on the report?
22   A   I'm referring to if there is a
23   witness that they're putting on something that

15

1    I'm calling a false report, then the witness
2    is part of the false report.  If there's a
3    witness that says, is saying something that
4    I'm saying is false and I'm a witness to that,
5    then I'm saying they're part of that false
6    statement.  If that's inaccurate, then I need
7    to be corrected.  If he was merely listed as a
8    witness because he was present but it does not
9    apply to the report, then I'm in error to
10   think that the witness is part of the false
11   report.
12   Q   If I gave you a chance to look at
13   this narrative report right now, could you
14   possibly point out a few items that you
15   believe to be false in this report?
16   A   Not without my notes, no, I'm sorry.
17   Q   Also in another paper you disclose,
18   I can't put my finger on it right now but you
19   mentioned the identity of this witness who was
20   blocked out of the report you requested.  Do
21   you have any idea who that witness was?
22   A   No.  Well, apparently he was listed
23   in the disclosure and all that I could say for

16

1    sure was that he was an employee of Heartland
2    Apartment Management because it said.  Other
3    than that, I'm not sure, no.
4    Q   But it's not anybody that you've
5    ever had a conversation with or a conversation
6    with since May 20th, 2004?
7    A   There was a utility guy in my
8    presence but I wouldn't know if it was him or
9    not.  So there was no friendly basis.  There
10   was another guy that worked on the place and
11   he was very friendly and I would recognize him
12   if I saw him, and we talked and he's a really
13   nice guy and so I could say yes, oh, I know
14   you, but I don't know if it's him or not.
15   Q   Okay.  You spoke about this a little
16   bit previously, but do you remember the
17   specific contact you had with the Bloomington
18   police officers that responded to your
19   apartment that day, May 20th, 2004, any
20   specific conversations you may have had with
21   them?
22   A   They were standing in the hallway
23   when I was talking to the social worker and

17

1    then they were standing over me when I was
2    getting my firearms card.  I made small talk.
3    I told them that my brother and my cousin were
4    both police officers.  I said something to the
5    one police officer about him wearing blue in
6    my apartment because I had a white cat with
7    white hair and when I looked over, I saw that
8    he had accumulated already several cat hairs.
9    So I made small talk, and that's all I can
10   recall at this time.
11   Q   And with regards to the May 20th
12   incident, did you follow up with the
13   Bloomington Police Department or the City of
14   Bloomington in any way?
15   A   Yes, I called the two officers,
16   officer I was supposed to ask for or was told
17   to ask for, Wamsley and Melton, so I called
18   them.
19   Q   Do you recall what the time was when
20   you called them?
21   A   In my notes is the date and the time
22   because I kept a date time record, but off the
23   top of my head, no, I don't have it.

18

1    Q    Did you disclose, the notes that
2 you're speaking of, have you disclosed those
3 to all the parties?  I mean are they in the
4 paperwork you've already disclosed?
5    A    The time date record, yes.
6    Q    Also I note that you made a request
7 for public records on June 21st, 2004.  Was
8 that request complied with by the City of
9 Bloomington?
10    A    Yes.  Any request I made they
11 produced.
12    Q    Okay.  I also note, which is page 80
13 of your disclosure is another report that on
14 May 26, 2004, you came into the Bloomington
15 Police Department to file a disorderly conduct
16 report?
17    A    That sounds right, but I'd have to
18 look at it for the dates but that sounds
19 right, yes.
20    Q    And you did file such a report?
21    A    Yes.
22    Q    Okay.  And what was the subject
23 matter of the disorderly conduct charge?

19

1    A    I was complaining about my sister
2 calling the Department of Human Services and
3 reporting that I had a gun and I was going to
4 kill the family.
5    Q    Lastly with regards to the May 20th
6 I note, and you may not be for sure on the
7 date but I note on June 21st, 2004, you made a
8 supplemental report to a Gary Norman of the
9 Bloomington Police Department?
10    A    Yes.
11    Q    And if you'd like to see this, I
12 have no problem showing it to you, but what
13 was the supplement?  What was the addition?
14    A    I did write it down because I wrote
15 it down and then I went there with it written
16 down, like I wrote down exactly what I wanted
17 to say and I brought it there and I have that
18 in my notes.  I wrote it down the exact word
19 for word, exactly what I said.
20    Q    And this, if I quote this document,
21 says Lynn, and I quote, "Lynn stated that her
22 sister, Anna Strien, had informed Crisis that
23 she had a gun and would harm herself, along

20

1 with family members.  Lynn also stated that
2 her family has told Crisis that she has mental
3 problems and she is a harm to society.  Lynn
4 states that she has no history of mental
5 problems and that all the information that is
6 provided to Crisis is false."  And that's the
7 end of the quote.  Would that be the gist
8 of --
9    A    No, it would not be the gist of it.
10 It's something entirely different.
11    Q    Okay.  Are you saying, are you
12 alleging then that this was a false report?
13    A    Yes, ma'am.
14    Q    That the supplemental report made on
15 June 21st was a false report?
16    A    Yes, ma'am.
17    Q    Did you say these things to the
18 Bloomington Police Department?
19    A    No, ma'am.
20    Q    Okay.  What was the sum of what you
21 supplemented, if you can recall, or give some
22 kind of summary as to what you supplemented in
23 June of that year?

21

1    A    I don't have the exact words but
2 they're different.  Yeah, I have it written
3 down.  I have it to the T written down because
4 I wrote it down and then I brought it with me,
5 but I don't have my notes with me today.  I
6 can give you a copy of it, you bet.  I'd be
7 happy to send you a copy of it.
8    Q    Great.  Is there any summary, can
9 you just give me a general idea of what you
10 said or what you said in difference to this or
11 why you went back in June and what
12 precipitated you to go back in June and make a
13 further report?
14    A    I didn't say the same thing on the
15 first report, but I thought it could be
16 misconstrued.  Somebody could have translated,
17 that happens all the time.  It's a normal,
18 everyday thing.  I didn't make the statement
19 that they presented on the first disorderly
20 conduct complaint.  I didn't say that but it
21 seems reasonable that somebody could have just
22 translated differently, so I went back the
23 second time to be clear and that's why I'm

Pages 18 to 21

22

1  being clear now because I did write it down.
2      Q   So you're saying that the supplement
3  would have had to do with the disorderly
4  conduct charge itself?
5      A   Yes.
6      Q   Okay.  And the report filed with
7  regard to the disorderly conduct report?
8      A   Yeah.
9      Q   Not the incident report of May 20th,
10  rather the disorderly conduct report you filed
11  with regards to your sister?
12     A   Yes, it was strictly for my sister.
13     Q   Now, with regards to May 20th, and I
14  don't find this clear in your complaint so
15  I'll ask you to go ahead and explain what
16  specifically you're claiming as injuries due
17  to the incident of May 20th, 2004, whether
18  that be some type of emotional distress or
19  some type of physical injury or property
20  damage.  What are specifically the injuries
21  you're claiming due to that day's events?
22     A   These people have made records in
23  society that call me a mental patient and a

23

1  criminal, and that's harmful.  That's
2  terrible, and that's the gist of it.  They're
3  false and they're terrible; a criminal and a
4  mental patient.
5      Q   So would you categorize that as
6  emotional distress due to the events of
7  May 20, 2004?
8      A   Yes, ma'am.
9      Q   All right.  Let me move forward to
10  March 28th, 2005, which is another, the date
11  subject to your other complaint.  Can you
12  describe to me what occurred on that day as
13  alleged in your complaint?
14     A   I was lying down.  I had taken some
15  medication called Ultracet so I was lying
16  down.  I was not prepared for company.  I
17  wasn't expecting company and the landlord
18  tried to key in.  When he tried to key in, it
19  hit a nerve with me.  I didn't think that was
20  right.  I don't want anybody keying on me.  I
21  understand the law to say that when you rent,
22  they're not allowed to key in.  Just from the
23  getgo there was hostility and the landlord

24

1  said, you know, that he could come in, he's
2  allowed to come in any time, and right away
3  there was controversy because I said no, you
4  can't just walk in any time you want.  So he
5  informed me that he was going to come back and
6  break open the door.  So I turned on the
7  camcorder so when he came back and he attacked
8  the door, I had the camcorder on.
9      Q   Do you know what precipitated this
10  action by the landlord?
11     A   No, I don't know.  I mean, I was
12  late on my rent, but that's not reason to
13  attack a door.  I don't know.
14     Q   Do you know how the police became
15  involved that day?
16     A   I called the police.  I called
17  9-1-1.
18     Q   And how long after you called did
19  the police arrive?
20     A   The actual time can actually be
21  recorded from the videotape.  You can watch
22  the videotape and take notes for the actual
23  time, but they were there pretty quick.  There

25

1  wasn't that much of a delay.
2      Q   When the police arrived, what was
3  the landlord doing?  I mean what actions was
4  he taking at that time?
5      A   He had stopped attacking the door
6  per se.
7      Q   What occurred once the police
8  arrived that day?
9      A   The police officer handed me a
10  five-day notice to evict through the door.  I
11  asked them if I could fill out a harassment
12  report and they said no.  I asked them if I
13  could fill out an illegal entry attempt report
14  or harass report and they just said no, you
15  have to do it through legal or something.  The
16  exact words are on the transcript, the exact
17  to the word of the police officer.
18     Q   And, of course, you disclosed that
19  transcript.  Now, did you prepare that
20  transcript or was it prepared by someone else?
21     A   I prepared it.
22     Q   Did you ever follow up with the City
23  or the City of Bloomington's Legal Department

Pages 22 to 25

26

1    regarding making a complaint for illegal entry
2    or property damage?
3        A    No, ma'am.
4        Q    Did anyone ever enter your apartment
5    that day?
6        A    No, they only broke the door open.
7        Q    How did they slip the eviction
8    notice into you?  Did the door open a little
9    bit or was there a slot for it?
10        A    The door was broken open enough and
11    then it stopped from the chain lock or
12    whatever it was on there.  It came open enough
13    that you could see each other and the paper
14    would go through.
15        Q    And that damage had already been
16    done once the police had arrived?
17        A    Yes.
18        Q    And I also notice in your
19    disclosures that you were on April 15th and
20    this was, I think it was page 31 and 29 of
21    your disclosure sets labeled as 1 through 62,
22    on April 15th you were served with a summons
23    to appear in court regarding the, I believe it

27

1    was the legal or the detainer action filed by
2    your landlord, is that correct?
3        A    I'd have to check the dates but
4    around that time, yes, I was served with
5    papers.
6        Q    And how were you served with those
7    papers?
8        A    He left them on the outside of the
9    door.
10        Q    Were you home at the time that he
11    left those?
12        A    Yes, I was.
13        Q    You said that you had taken the
14    medication Ultracet that day.  What is that
15    medication?
16        A    It's a pain -- supposedly from what
17    I know, it's a synthesized opiate and it's a
18    painkiller, supposedly nonnarcotic.
19        Q    And what was the cause for taking
20    that that day?
21        A    I have an arm injury and it causes
22    me a lot of pain.
23        Q    And when did that injury occur, do

28

1    you recall?
2        A    June 7th, 2004.
3        Q    And was Ultracet something you had
4    been taking since the date of injury?
5        A    Yes, or near so.
6        Q    I just have a couple questions about
7    some of the exhibits you disclosed.  73 of the
8    first set of exhibits is what appears to be an
9    article entitled Multi-Axial Assessment.  Just
10    by looking at it, I just wondered where you
11    had gotten the article.
12        A    I photocopied it from the
13    official -- I'd have to look for the exact
14    name because I really don't know, but it's the
15    official diagnosis book.  They have it as a
16    reference book at the library.  You can't
17    check it out but they will let you look at it.
18        Q    And when disclosing this, what are
19    you referring to as relevant in the article?
20        A    Well, they have a -- I'm not sure
21    which paper you're looking at.
22        Q    Sure, (Indicating).
23        A    Oh, they're showing that there's an

29

1    axis one through five that they use with
2    specific subject matters for which a social
3    worker or a therapist may diagnose a patient
4    with, and they put them in categories axis one
5    through six.  So I'm showing this is,
6    according to the law, when a social worker or
7    official person uses this system to diagnose
8    something, they have given the person under
9    law a mental order, a mental disorder, like
10    they're classifying.  So when they use this
11    system, in reference this is something I would
12    use.  I threw that in there because it's
13    showing what the axes are.  So if you refer to
14    specific parts, like axis one is clinical
15    disorders so somebody gives you some kind of
16    diagnosis on this axis, that's what it would
17    mean.
18        Q    So this is, you're saying this is
19    relevant to your contesting the mental health
20    diagnosis by the social worker?
21        A    Yes, ma'am.
22        Q    Okay.  Now, and I've already asked
23    you this question with regards to May 20th and

Pages 26 to 29

30

1  it may very well be a lot of the same, but
2  with regard to March 28th, 2005, what
3  specifically were your injuries that day or
4  were you claiming to be your injuries from the
5  incident of that day?
6      A   I'm sorry.  I lost you because you
7  jumped from one to the other.
8      Q   Okay.  I'll repeat it again then.
9  With regards to the more recent incident which
10 I believe is March 28th, 2005, which we just
11 discussed, what are your claimed injuries from
12 that day?  I know that for May 20th you had
13 said numerous things and said that emotional
14 distress was one of the injuries.  Is that the
15 same for March 28th, 2005?
16     A   Yes.  My civil rights were
17 drastically broken.
18     Q   Just some general conclusory things
19 from my end anyway.  Have you ever filed any
20 prior claims or lawsuits before these two
21 complaints?
22     A   No, ma'am.
23     Q   So you have no other lawsuits out

31

1  there right now?
2      A   No, ma'am.  Oh, okay.  Let me back
3  it up.  On June 3rd, 2005, I filed against the
4  Normal Public Library for the arm injury.  Did
5  that meet with your question?
6      Q   Yes.
7      A   Okay.  But other than that, I've
8  never filed a suit anywhere.  That's what I
9  thought you were asking me.  Okay.
10     Q   I take it that had to do with the
11 arm injury?
12     A   Yes.
13     Q   Is that resolved or still going on?
14     A   It's on appeal.
15     Q   Do you drink alcohol?
16     A   Sure.
17     Q   How often, how much?
18     A   A few times a year.
19     Q   Do you take any prescription drugs
20 or over-the-counter drugs on a regular basis?
21     A   No, but I need to.  I'm going
22 without right now for my arm injury.
23     Q   And would that be the Ultracet you

32

1  described before, or what other types of
2  medication do you believe that you should be
3  on?
4      A   The Ultracet would help and there's
5  a suggestion that a small dose of
6  Amitriptyline could benefit my condition.  A
7  doctor has suggested that.
8      Q   How do you pronounce that?
9      A   Amitriptyline, A-M-I-T-R-Y-P-T-I --
10 I'm sorry.  I'm lost.  But it's Elavil.  It's
11 a non-psychotropic medication but they use it
12 to redirect pain.  It's worth a try.  They use
13 very low doses, maybe then somewhere between
14 10 and 15 milligrams and it's supposed to
15 redirect pain.  It's been suggested to me.
16     Q   Who's the doctor that suggested that
17 to you, do you recall?
18     A   Dr. Harmon.
19     Q   Is he here in Bloomington-Normal?
20     A   It's a she and I think she has her
21 own practice in Lincoln, Illinois.
22     Q   Ever been convicted of a felony?
23     A   No.

33

1      Q   Ever been accused of a misdemeanor
2  involving dishonesty?
3      A   No.
4          MS. WATSON:  That's all I have
5  for right now.
6
7          DIRECT EXAMINATION
8  BY MR. BERG:
9      Q   Lynn, my name is Greg Berg and I
10 represent Heartland Apartment Management.  I'm
11 just going to ask you a few questions.
12     A   Okay.
13     Q   Let's start with the first incident.
14 The first incident occurred on May 20th, 2004,
15 is that right?
16     A   Yes.
17     Q   Okay.  In that incident did anyone
18 from Heartland Apartment Management or Wayne
19 Pelhank enter your apartment on that date?
20     A   No.
21     Q   In the first incident, the one that
22 occurred on May 20th, 2004, is it your
23 understanding that someone from Heartland

34

1  Apartment Management opened your door or keyed
2  the door?
3      A   Yes.
4      Q   Okay.  What's your understanding as
5  to what occurred as far as the nature of what
6  someone from Heartland Apartment Management
7  did?
8      A   They are instructed to key open a
9  deadbolt lock and they did.
10     Q   When you say they were instructed
11 to --
12     A   Apparently -- oh, I'm sorry, go
13 ahead.
14     Q   That's okay.  When you say they were
15 instructed to key open a deadbolt lock, do you
16 mean an individual from Heartland Apartment
17 Management was instructed to do so?
18     A   I believe they were, yes.
19     Q   And you believe they were by whom?
20 Who gave them that instruction?
21     A   I believe a police officer did.
22     Q   Is this something that you overheard
23 or is it something that you learned later?

35

1      A   I read it.  It was something that I
2  learned later.
3      Q   And you learned it later from
4  reading the police report.  Is that what
5  you're saying?
6      A   I was there and I had a deadbolt
7  lock on my door and I'm the only one that has
8  a key and the apartment management has a key.
9  The deadbolt was open.  I witnessed it that
10 they -- I had a key and the apartment
11 management had a key.  Therefore, the
12 apartment people were like responsible for
13 opening the door.  That's a given.  That's
14 all.  No one had a key but me and the
15 apartment management, and my deadbolt was
16 unlocked.
17     Q   Okay.  Is it your testimony that
18 your deadbolt was locked?
19     A   Yes.
20     Q   And someone else unlocked it?
21     A   Yes.
22     Q   Did you actually witness anyone
23 unlocking it?

36

1      A   No.
2      Q   At least on that May 20th, 2004,
3  date?  That's a no?
4      A   I'm sorry.  Could you ask it again?
5      Q   Sure.  On May 20th, 2004, did you
6  actually witness someone unlocking your
7  deadbolt?
8      A   No.
9      Q   Did you learn later that someone
10 from Heartland Apartment Management unlocked
11 your deadbolt?
12     A   Yes.
13     Q   Who unlocked your deadbolt?
14     A   Oh, I don't know.
15     Q   Okay.  Do you know if it was Wayne
16 Pelhank?
17     A   No, I don't.  I don't know who he
18 is.
19     Q   Do you know if it was an employee of
20 Heartland Apartment Management?
21     A   Right, I don't know.  I don't know
22 who it was specifically.
23     Q   Whoever it was didn't proceed to

37

1  enter your apartment on that date, is that
2  correct?
3      A   Yes, that is correct.
4      Q   On May 20th, 2004, it's my
5  understanding of your testimony that in
6  addition to having the deadbolt closed or
7  locked, you also had a chain lock on the door,
8  is that right?
9      A   Yes.
10     Q   Is that chain lock something that
11 was in place, in position, locked in other
12 words, on the date of the incident?
13     A   Yes.
14     Q   And is that something that you
15 installed on that door?
16     A   No, it came with the apartment.
17     Q   Okay.  Let's talk about the
18 apartment.  When did you move into that
19 apartment?
20     A   In my notes I have the exact move-in
21 date, but I believe it was around March 1st
22 of -- sorry, I really need my stuff in front
23 of me.  Okay, March 1st, around March 1st,

Pages 34 to 37

38

1    2004.
2        Q    So that same year of the incident is
3    when you moved in?
4        A    Well, yes.  That was March and then
5    it would be April and then May was the
6    incident.
7        Q    Okay.  So about two months, roughly
8    two and a half months before the incident,
9    that first incident on March 20th -- or
10   May 20th, 2004, is when you moved into the
11   apartment, is that correct?
12       A    Yes.
13       Q    Okay.  When you moved in in March of
14   2004, did you sign a lease?
15       A    No.
16       Q    When you moved in in March 2004, was
17   Heartland Apartment Management the manager of
18   that apartment?
19       A    Yes.
20       Q    Anytime between March 1, 2004, and
21   May 20th, 2004, at any time in that period of
22   time did you sign a lease?
23       A    No, I did not.

39

1        Q    My understanding, and I believe this
2    is something that you produced in your
3    discovery responses, there's a Heartland
4    Apartment Management lease form that is dated
5    4/1/04.  First of all, is this something that
6    you produced?
7        A    It was given to me through the
8    eviction.
9        Q    So this is something you produced in
10   your discovery responses as well, is that
11   right?
12       A    Yes, I did.
13       Q    At the bottom of this lease is a
14   name that appears to be your name and a
15   signature that appears to be your signature.
16   First of all, is that your signature?
17       A    No.
18       Q    Okay.  Had you ever seen this lease
19   prior to it being given to you when you were
20   evicted?
21       A    No.
22       Q    Did you sign this lease?
23       A    No.

40

1        Q    Are you claiming that your signature
2    on this lease has been forged?
3        A    Yes, sir.
4        Q    And who are you claiming forged your
5    signature?
6        A    Heartland Apartment Management and
7    Wayne Pelhank.
8        Q    Is this something you actually
9    observed them doing?
10       A    No.
11       Q    And your claim is based on the fact
12   that what appears to be a signature under the
13   line for lessee appears to be your signature
14   but you're denying that you ever signed this
15   form, is that right?
16       A    Yes.
17       Q    You never signed, at least your
18   testimony today is you never signed a lease
19   between yourself and Heartland Apartment
20   Management, is that right?
21       A    Yes.
22       Q    Had you ever signed a lease with any
23   other apartment management agency for the

41

1    property where the incident occurred?
2        A    Yes.
3        Q    What was the name of that apartment
4    management company?
5        A    Remax.
6        Q    Remax.  Do you know when you signed
7    that?
8        A    I'd have to get the exact date, but
9    I can say that it was around September of 2001
10   or something like that.
11       Q    Okay.  September of 2001?
12       A    I think so, around, approximately.
13       Q    Okay.  I just want to make sure
14   we're clear on the record because my
15   understanding is you moved into the apartment
16   on March 1, 2004, is that right?
17       A    That specific apartment, yes.
18       Q    Okay.  So you had lived at a
19   different apartment prior to March 1, 2004,
20   but in the same complex?
21       A    Yes.
22       Q    The apartment that you had lived in,
23   you did sign a lease for that apartment, is

Pages 38 to 41

42

1  that right?
2      A   Yes.
3      Q   What was the apartment number?
4      A   Number, apartment No. 5.
5      Q   What were the circumstances of you
6  moving to a different apartment?
7      A   The man next to me was vomiting all
8  over himself to such extent that there was a
9  stench of vomit that came out into the hallway
10  and then entered my apartment, and I had to
11  get out of the apartment.
12      Q   So it was the man or a tenant in the
13  next apartment?
14      A   Yes, in the neighboring apartment.
15      Q   What apartment was that?
16      A   No. 4.
17      Q   Where was apartment No. 6 in
18  relation to 4 and 5?
19      A   At the very end of the hallway.
20      Q   A little bit further away from the
21  vomiting man, in other words?
22      A   Yes, yes.
23      Q   And you made that move in March of

43

1  2004, is that correct?
2      A   Yes.
3      Q   Other than moving from one apartment
4  to the other, is there any understanding
5  between either you and Remax or you and
6  Heartland as to any changes in the terms of
7  your existing lease?
8      A   I'm sorry. I missed you. I missed
9  your question.
10      Q   Would you read it back?
11          (Record read as requested.)
12      Q   Do you understand the question?
13      A   No, I don't. I'm missing something.
14      Q   Well then please let me rephrase it
15  or explain it for you. My understanding --
16  first of all, your testimony was that you had
17  an existing lease with, a lease with Remax at
18  the time that you moved from one apartment to
19  the next, from apartment 5 to apartment 6. Am
20  I right so far?
21      A   Yes.
22      Q   And my understanding is you had
23  signed that lease sometime around the time

44

1  that you moved into apartment No. 5 in that
2  same complex, is that correct?
3      A   Yes.
4      Q   And that that agreement was between
5  you and Remax, is that right?
6      A   Yes.
7      Q   Do you know when Remax left the
8  management of that apartment complex?
9      A   I could probably produce the date
10  because I have some paperwork for it, but off
11  the top of my head, no, I'm sorry.
12      Q   Okay. And I think you did produce
13  the date in your discovery responses. There's
14  correspondence that's directed to you as a
15  tenant of apartment 5 at 620 and 1/2 North
16  Main Street, Bloomington, Illinois, that's
17  dated February 22nd, 2002, and it's signed or
18  at least there's a signature line for W.A.
19  Pelhank and it notes at least that Heartland
20  Apartment Management is taking over?
21      A   Yes.
22      Q   Okay. So would you agree that
23  sometime in February 2002 is when Heartland

45

1  took over from Remax?
2      A   Sure, yes.
3      Q   Was it your understanding that the
4  terms of your pre-existing lease would carry
5  over?
6      A   No.
7      Q   What was your understanding?
8      A   That I would just rent month to
9  month until an issue -- if an issue arose, I
10  would address it. That's all.
11      Q   Okay. Even though the
12  correspondence says that the lease was
13  transferred to different management, it was
14  your understanding that there was no lease?
15      A   If I didn't sign a lease with this
16  company, then there is no lease with this
17  company. That's all I would understand it to
18  mean.
19      Q   You would agree that you received
20  this correspondence?
21      A   I did receive it, sure.
22      Q   And you would agree that this
23  correspondence says that your lease has been

46

1  transferred to Heartland.  Would you agree
2  with that?
3      A   Sure.  I mean, you know, they could
4  say whatever they want.  That's a guy that's
5  owned it and I should write my rent checks to.
6  I'm good with that.  I don't agree to anything
7  or sign anything.  So in a legal fashion there
8  is no -- there's nothing there.
9      Q   Did you contest this correspondence?
10     A   No, I did not.
11     Q   Did you make an issue about the fact
12 that you didn't sign a direct lease agreement
13 with Heartland?
14     A   No, I did not.
15     Q   At any time between February 22nd,
16 2002, and February -- May 20th rather of 2004,
17 did you contest the fact that your lease was
18 transferred to Heartland?
19     A   No, I did not.
20     Q   As far as the lease that you signed
21 with Remax, I believe it's a Seller's Real
22 Estate Management also known as Remax Property
23 Management, first of all.  Would you agree

47

1  with that?
2      A   Yes, that's mine.
3      Q   Is this the only page of that lease?
4      A   No.
5      Q   I was unable to find the second page
6  of that lease in the discovery responses that
7  you produced.
8      A   There's more.  I photocopied the
9  front page.
10     Q   Do you have another page?
11     A   There's several pages.
12     Q   Did you produce those?
13     A   No.
14     Q   Okay.
15     A   I have them but I didn't put them in
16 there.
17     Q   Okay.  We'll need those as well.
18     A   You may have them.
19     Q   Okay.  Do you know what the terms of
20 that lease are?
21     A   No.
22     Q   Do you know what the terms regarding
23 entry into the apartment are in that lease?

48

1      A   No.
2      Q   You're homeless now, is that right?
3      A   Yes.
4      Q   Where do you stay?
5      A   Excuse me.  I'm going to turn the
6  tape.  I'm sorry.
7          (Short pause.)
8      A   Okay.  I slept on the ground for
9  three weeks and now I'm sleeping in a shed.
10     Q   Where's that?
11     A   I don't wish to disclose the
12 location.  I'm hiding.
13     Q   From?
14     A   Just anybody knowing where I am.
15 You know, I'm sleeping on the street.  It's
16 dangerous to sleep on the street or be outside
17 anyway, and it's private information.
18     Q   You have a post office box, is that
19 right?
20     A   Yes.
21     Q   What do you pay for the post office
22 box?
23     A   I don't remember off the top of my

49

1  head, but I think it's something like $58 a
2  year or something like that.
3      Q   You're not currently employed, are
4  you?
5      A   No.
6      Q   What's your source of income?
7      A   I don't have a source of income.
8      Q   And your post office box is paid up
9  for the rest of the year, is that right?
10     A   Yes.
11     Q   Do you still have your guns?
12     A   No, I do not.
13     Q   What did you do with them?
14     A   I sold my guns for money.
15     Q   When?
16     A   I do have exact dates, but I don't
17 have the dates in front of me.
18     Q   When did you get your G.E.D.?
19     A   I'd have to look in my papers, but
20 it was shortly after I would have graduated
21 from high school.
22     Q   Where did you attend high school?
23     A   In New York.

Pages 46 to 49

50

1    Q    Are you originally from New York?
2    A    No, I was born and raised in New
3    Jersey.
4    Q    Whereabouts?
5    A    East Windsor, New Jersey.
6    Q    When the police came into your
7    bathroom on 5/20/04, my understanding is your
8    testimony is they actually came running into
9    the bathroom, is that right?  First of all, is
10   that correct?
11   A    Yes.
12   Q    Who came in?
13   A    A dark haired police officer.
14   Q    Was it just the officer?
15   A    Yes.
16   Q    Was it a male or a female?
17   A    A male officer.
18   Q    Do you know what that officer's name
19   is?
20   A    No.
21   Q    Did anybody else enter the apartment
22   at that time?
23   A    The social worker spoke to me from

51

1    the kitchen.
2    Q    Okay.  So she was in the apartment
3    in your kitchen?
4    A    Yes, sir.
5    Q    What was her name?
6    A    Nicole Wilder or Nicole Pickens,
7    depending on which name she'd be referred to.
8    Q    And what did she say to you?
9    A    Something to the effect of "We're
10   right here, Lynn," something like that.
11   Q    What did you think she meant by
12   that?
13   A    I really did not know honestly.
14   Q    Was she offering counseling
15   assistance, was that your understanding?
16   A    I'm losing you.  She was trying to
17   superimpose services on me when I came out,
18   but at that point she wasn't offering
19   anything.  She was just there.
20   Q    How was she trying to superimpose
21   services on you?
22   A    After, you mean after I saw her in
23   person?

52

1    Q    Yes.
2    A    After out of the shower?
3    Q    Yes.
4    A    Well, she didn't seem to want to
5    stop.  I held up my hand and I said I don't
6    need services from the center, thank you
7    anyway, and she was very persistent in
8    questioning, in trying to question me and she
9    seemed to have a stance that she believed that
10   I did need services, and that's what I call
11   persistent.
12   Q    Is it your understanding that the
13   police, Bloomington Police Department actually
14   broke the chain on your door and made a
15   forceable entry into your apartment on
16   5/20/04?
17   A    Yes.
18   Q    It's your understanding that the
19   lease, the representative of Heartland had
20   nothing to do with at least forcibly entering
21   your apartment by breaking the chain, is that
22   right?
23   A    I don't believe so, no.

53

1    Q    That's correct then?
2    A    Yes.
3    Q    As far as your allegation that
4    someone was a false witness on a police
5    report, I'm still not understanding what
6    you're meaning by that.
7    A    The police officer made false
8    statements on a report and at the bottom of
9    the report they're labeling a witness.  I was
10   able to see some of the information about the
11   witness.
12       As I tried to explain, if there's a
13   separateness -- if that witness, if somebody
14   can show me that that witness was not in
15   reference to the police report but just listed
16   because they were present that day, then I am
17   in error to call the witness a false witness.
18   It would be my own error.  Because it's
19   listing it on something, on a document that's
20   prepared falsely, I'm assuming that they're
21   also like, yes, that's right, that happened
22   and they're part of it.
23   Q    In other words, if they've signed

Pages 50 to 53

54

1    that report, then they're endorsing whatever
2    statement is in that report?
3        A   Yes, sir.
4        Q   Is that what you're saying?
5        A   Yes, that they're a part of it, yes.
6        Q   Do you know if anyone from Heartland
7    Apartment Management signed the police report?
8        A   No, I do not.
9        Q   Do you know if Mr. Pelhank signed
10   the police report?
11       A   I don't know.
12       Q   Okay.  What's the name of the
13   witness that you saw in the police report?
14       A   I couldn't identify the name.  It
15   looked like K-E and then maybe an I, part of
16   some digit.  I couldn't make it out.
17       Q   And what you're saying is if the
18   police actually wrote down that name, then
19   your allegation regarding that witness being a
20   false witness on the police report would be
21   unfounded, is that correct?
22       A   Yes, that is correct.
23       Q   Okay.

55

1        A   That's right.
2        Q   So only if that witness actually
3    wrote down the name and said I agree with
4    everything in this police report would your
5    allegation at least, at least in your mind
6    have some basis?
7        A   No, that wouldn't be correct.
8        Q   Okay.  I'm misunderstanding then.  I
9    don't mean to misstate your testimony.
10       A   Okay.  Explain what I'm talking
11   about?
12       Q   Please.
13       A   There's been an official police
14   report made.  There's name on the police
15   report.  My allegation is that the false
16   witness is a false witness and that he is on
17   the police report.  It stays, but if somebody
18   gives me something else and shows me -- I
19   don't care whether he signed or not.  His name
20   is on the report.  It's official.  It's a
21   charge.  But if somebody would give me more
22   information, somebody would come forward and
23   say I'm not saying that, here's the testimony,

56

1    I didn't say that, somebody put my name on it,
2    I'm done.  I drop my allegation.
3            But there's a public document with a
4    witness on it.  It's already listed.  I've
5    already seen it.  It's an established fact.
6    It's objective.  If somebody gives me
7    something else that says if this person that's
8    on there, the witness with this Social
9    Security number and other identifying
10   information comes forward and says I wasn't
11   supposed to be on there, I can't charge him
12   because that means the police officer just put
13   his name on there and he had nothing to do
14   with it, you know.  He just went, oh, okay,
15   we'll put this on here and it's done.
16           He said so many lies in the report
17   already, why not lie again?  I mean who's
18   telling the truth?  I don't know.  I'm telling
19   the truth.  That's what I know.  If there's
20   more information to produce, then I must drop
21   the charge because the person that's on there
22   would not be responsible for, he wouldn't be
23   somebody that was agreeing to a false

57

1    statement.  That's the best way I can put it.
2    It's the fairest way.
3        Q   Okay.  I guess I'm understanding
4    what you're saying.
5        A   It is a little confusing.
6        Q   Yeah.  If someone else put down a
7    witness's name in the police report; in other
8    words, a police officer put it down in the
9    police report and that witness never concurred
10   with what was in the body of the police
11   report, never was asked what was in the body
12   of the police report, what you're saying is
13   your allegations are unfounded, is that
14   correct?
15       A   Yes.
16       Q   Okay.  But if they were asked and
17   they said yep, that's exactly what I saw too,
18   then what you're saying is you have a basis
19   for your allegations that this is a false
20   witness?
21       A   Yes, sir.
22       Q   I'm glad we're on the same page
23   then.  As far as your May 20th, 2004 incident,

Pages 54 to 57

58

1  first of all, and I know you've been asked
2  this question, but in your own words can you
3  please say what your injuries were or what
4  your damages are?
5     A  Both the police officer and the
6  social worker made false reports saying that I
7  was a criminal, a very serious criminal, a
8  criminal that would not only participate in a
9  homicidal perpetration but a homicidal
10 perpetration to my family and made a false
11 report saying I was a mental patient.  So
12 they've turned me into, on documents they've
13 turned me into both a criminal and a mental
14 patient.
15    The Heartland Apartment Management
16 was involved in a situation more or less and
17 the lease that was produced was forged.  So
18 somebody has forged my name and forgery is
19 fraud.  It's against the law.  Somebody took
20 it upon himself to sign my name on a document
21 for whatever reasons, and I guess that's all.
22    Q  Okay.  So I guess I'm trying to
23 understand because the incident took place,

59

1  and we're just talking about the first
2  incident on May 20th, 2004, and your
3  allegations at least against Heartland
4  Apartment Management and Wayne Pelhank are
5  that they violated the Illinois Rental Law for
6  entrance into a residence, is that correct?
7     A  Yes.
8     Q  And what's the basis for that
9  allegation?
10    A  There was no -- nobody knocked on
11 the door and waited and said can I come in.
12 You can't just key in.  There was no
13 emergency.  The whole thing was false.
14 Therefore, there was no emergency.  In an
15 emergency, perhaps they could key in.  So
16 there was nobody that said -- it gets a little
17 bit confusing, but nobody should have unlocked
18 my deadbolt to begin with because it's illegal
19 to just key in.  There wasn't anything really
20 happening so there was no substantial reason
21 for them to key in.  Am I sidetracking?  I may
22 be.  Did I answer your question?
23    Q  I'm not done with my questioning.

60

1     A  No, just that one question, did I
2  cover it?
3     Q  I think so.
4     A  Okay.
5     Q  We'll just elaborate a little bit on
6  it here.  My understanding is your allegation
7  is that no one knocked on the door, is that
8  right?
9     A  That is right.
10    Q  And we're talking specifically about
11 May 20th, 2004, is that correct?
12    A  They pounded on the door and then
13 broke open the door but I'm talking about
14 knock, wait, give somebody a chance to come to
15 the door.  I almost took the towel out of
16 my -- I always put a towel on my shampooed
17 hair, thinking there was an emergency in the
18 building and like ran out.  I considered doing
19 that and I was like no.  But I almost did, so
20 to just knock and then break open a door is
21 unreasonable.  Nobody knocked and waited or
22 chilled it out or gave me a chance to call or
23 said something or something like that.  They

61

1  decided that it was time to come in and they
2  pounded on the door and broke open the door.
3  They didn't knock or say anything through the
4  door, say Lynn, this is the police or anything
5  like that or, Lynn, can we come in or what's
6  up or anything.  They were being very
7  secretive and sneaky about it and when they
8  pounded on the door, they decided if I didn't
9  answer in five seconds, that was it, and then
10 they broke open the door.
11    Q  How much time elapsed from the time
12 that they pounded on the door until they
13 entered the apartment?
14    A  Just not -- just, you know, seconds,
15 seconds.  It was loud rapping on the door.
16 They pounded on the door.  I could tell
17 something was going on.  I couldn't hear them
18 but their voices were up and then they busted
19 the door so it was just seconds.  They didn't
20 like pound and then knock or wait or anything
21 like that.  They just decided it's time to
22 come in so --
23    Q  Did you hear everything from the

62

1  time that they started pounding on the door
2  until they broke down the door?
3      A   Did I hear what?  I'm sorry.
4      Q   I'll strike the question.  Were you
5  in the shower the entire time until they came
6  to the bathroom?
7      A   I didn't know it was them but I
8  heard somebody in the hallway prior, yes.
9      Q   Did you hear someone in the hallway
10  knocking on your door prior?
11     A   No, no one knocked on my door.
12     Q   And then you entered the shower
13  after you heard somebody in your hallway?
14     A   Yes.
15     Q   And then you proceeded to take a
16  shower, is that right?
17     A   Yes.
18     Q   And then at some point during your
19  shower, that's when you heard them pounding on
20  the door, is that correct?
21     A   Yes.
22     Q   And at some point you heard them
23  breaking down the door, is that right?

63

1      A   Yes, it was very loud.
2      Q   And at some point did you hear
3  them -- or strike that.
4          At some point you believe the door
5  was keyed open by someone from Heartland, is
6  that correct?
7      A   Yes.  I believe so, yes.
8      Q   Because it's your testimony that the
9  door was at least deadbolted prior to you
10  entering the shower, is that right?
11     A   Yes.
12     Q   Okay.  And chained shut, correct?
13     A   Yes.
14     Q   As far as your other allegations of
15  libel which is your second allegation against
16  Heartland Apartment Management and Wayne
17  Pelhank, the basis for that allegation is what
18  we've already discussed and that's the false
19  witness on the police report, is that correct?
20     A   Yes.
21     Q   We've already cleared that up, and
22  as far as the fraud and forgery allegation,
23  this is again pertaining to, my understanding

64

1  is it's pertaining to the 5/20/04 incident, is
2  that correct?
3      A   Yes.
4      Q   What's the basis for that
5  allegation?
6      A   I never signed a lease.
7      Q   Okay.  So your allegation is that
8  your name, at least the name that appears at
9  the bottom of a lease that's dated 4/1/04, the
10  signature at the bottom left hand corner of
11  that Heartland Apartment Management apartment
12  lease agreement is not your signature, is that
13  correct?
14     A   Yes.
15     Q   And your further allegation is that
16  if you didn't sign it, somebody else must have
17  signed your name?
18     A   Yes.
19     Q   Let's talk about the second
20  incident.  That second incident occurred in
21  2005, is that right?
22     A   Yes.
23     Q   And that would be March 28th, 2005?

65

1      A   Yes.
2      Q   Tell me what occurred on that date.
3      A   In the morning I was lying down and
4  Wayne Pelhank tried to key into my apartment
5  and then he told me that -- I said something
6  like you can't key in or something like that,
7  but he said that he would come back and bust
8  down the door, and I turned on the camcorder
9  and recorded him attacking, violently
10  attacking my door with a crowbar.  So I called
11  9-1-1 and the police came and when the police
12  came, they didn't want to let me make a
13  disorderly conduct report.
14     Q   I'm going to back you up because
15  you've already gone over some of this and I
16  don't want to rehash what you've already
17  testified to.
18     A   Okay.
19     Q   You had a camcorder in your
20  apartment, is that right?
21     A   Yes.
22     Q   Did you own that?
23     A   Yes, I did.

66

1    Q    Do you still own it?
2    A    No, I don't.
3    Q    I just want to make sure the record
4 is clear. You have a tape recorder with you
5 today, is that right?
6    A    Yes.
7    Q    And you're taping today's
8 deposition, is that correct?
9    A    Sure, yes.
10    Q    What did you do with the camcorder?
11    A    It broke and I threw it away.
12    Q    On 3/28/05 my understanding is Wayne
13 Pelhank tried to key into your apartment. Do
14 you know about what time you -- at least
15 according to your testimony that's what you
16 said so far. Do you know about what time that
17 occurred?
18    A    I don't have an exact time, but it
19 was shortly before the incident so it was
20 probably a little bit after ten.
21    Q    10:00 a.m.?
22    A    Yeah. Ten in the morning, yes.
23    Q    At that time you didn't work, is

67

1 that right?
2    A    Yes.
3    Q    Were you asleep?
4    A    Yes, I was.
5    Q    You were asleep on the couch?
6    A    On my bed.
7    Q    On your bed, okay. How did you know
8 that Wayne was trying to key in?
9    A    I heard the deadbolt unlock. I
10 jumped up. I looked. I saw he opened the
11 door. He pulled the door shut and spoke
12 through the door so I recognized him by his
13 voice.
14    Q    He actually opened the door?
15    A    Yes, but the deadbolt stopped it
16 from going any further.
17    Q    I'm sorry. The deadbolt did?
18    A    I mean, pardon me, the chain lock.
19    Q    So the chain lock was on on that
20 date as well?
21    A    A new chain lock, yes.
22    Q    Okay. The other one had been
23 broken?

68

1    A    Yes.
2    Q    Had you replaced it?
3    A    Yes, I put another chain lock on
4 there.
5    Q    You didn't put the first one on, did
6 you?
7    A    It was broken. I have it still.
8 It's busted. It won't work.
9    Q    You purchased a new chain lock and
10 you installed it yourself?
11    A    No, I had a chain lock already.
12    Q    Okay.
13    A    I had an old chain lock in my tool
14 bag and I put it on there.
15    Q    You installed the second chain lock
16 on your door?
17    A    Yes, I did.
18    Q    Did you get permission to install
19 that second chain lock on your door?
20    A    No, I did not.
21    Q    By permission, what I meant was did
22 you ask Heartland Apartment Management or
23 Wayne Pelhank whether or not you could install

69

1 the chain lock on your door?
2    A    No, I didn't.
3    Q    Was it your understanding that you
4 could install a chain lock on your door?
5    A    Sure, yes.
6    Q    Was it your understanding there was
7 anything in your lease, either your
8 pre-existing lease or the one that Heartland
9 Apartment Management has that you produced
10 that's this lease entitled Heartland Apartment
11 Management Lease, that there's anything
12 prohibiting you from installing a lock in the
13 door?
14    A    Not that I know of.
15    Q    You heard the deadbolt unlock and
16 you were in bed. Was your bed in the same
17 room?
18    A    Yes.
19    Q    And it's the front door?
20    A    Yes.
21    Q    Was that the only entranceway into
22 your apartment?
23    A    No, there was another door in the

Pages 66 to 69

**70**

1  kitchen, but I didn't use it. It's a door.
2  You could use it if you wanted to.
3      Q    Prior to you hearing the deadbolt
4  unlock, did you hear any knocking?
5      A    It was simultaneous knocking
6  opening. It was not an official knock or wait
7  it was just one, two, and open at the same
8  time.
9      Q    Was anything announced?
10     A    No.
11     Q    So nothing stated by Mr. Pelhank or
12  whoever was attempting to open your door?
13     A    Oh, as he knocked, I believe he said
14  landlord and he knocked and keyed in at the
15  same time.
16     Q    Did he say anything other than
17  landlord?
18     A    I don't know. I don't think so, no.
19     Q    You don't know what else he said?
20     A    I don't remember hearing anything
21  else, no. I don't remember actually.
22     Q    You don't remember, okay. Do you
23  recall if he gave a reason why he was knocking

**71**

1  or trying to enter your apartment?
2      A    There was no reason given.
3      Q    That's something you recall
4  specifically, is that right?
5      A    Yes.
6      Q    At that time in March, on
7  March 28th, 2005, what was the status of your
8  rent payment to Heartland Apartment
9  Management?
10     A    I'd have to look exactly for
11  details, but I was behind in my rent.
12     Q    How many months?
13     A    I'd have to check exactly but at
14  least three months rent.
15     Q    Three months rent?
16     A    I believe so, yes.
17     Q    Between the incident that occurred
18  on May 20th, 2004, and the incident that
19  occurred on March 28th, 2005, did you sign a
20  lease with Heartland?
21     A    No.
22     Q    Was it your understanding that you
23  were still on a month to month lease?

**72**

1      A    Yes.
2      Q    What did you pay month to month?
3      A    $375 a month.
4      Q    Who did you pay?
5      A    Heartland Apartment Management.
6      Q    Did you write checks or pay cash?
7      A    Sometimes I wrote checks and
8  sometimes I paid money order, if money order
9  is considered cash.
10     Q    And they were always drafted to
11  Heartland Apartment Management?
12     A    Yes.
13     Q    At least as --
14     Q    Oh, I'm sorry.
15     Q    That's okay. At least as of
16  sometime in 2002 when Heartland took over, is
17  that correct?
18     A    Yes, sounds right.
19     Q    When you say at least three months
20  overdue in rent or behind in rent, had you
21  paid any portion of the rent during those at
22  least three months?
23     A    There was some payments being made

**73**

1  but the exact amounts are in my notes. Small
2  increment of payments had been made.
3      Q    What amount just generally?
4      A    Insignificant to the whole, small
5  amounts, very small.
6      Q    Five dollars, ten dollars?
7      A    No. Well, I was paying 50 at a time
8  but there was a very low, like $25 payment
9  too. I don't think there was anything less
10  than $25.
11     Q    Do you know when you made the last
12  payment of 25 to 50?
13     A    I do have a record of it officially.
14     Q    How many days or months before
15  3/28/05 did you make that last incremental
16  payment?
17     A    I'm sorry. It's in my notes but I
18  can produce that if you want.
19     Q    You don't have a recollection of
20  that?
21     A    No.
22     Q    You think it was over a month before
23  the incident occurred?

74

1    A   I'm sorry. I honestly don't
2 remember. I'd have to look to see the exact
3 dates.
4    Q   Could it have been over a month
5 before the incident occurred?
6    A   I'm sorry. I don't know without
7 looking at my papers.
8    Q   Had you had any conversations during
9 that at least three months prior to the
10 3/28/05 incident with either Wayne or anyone
11 from Heartland Apartment Management regarding
12 your past due rent?
13    A   Yes.
14    Q   What was the nature of those
15 conversations?
16    A   There was no conversation. I left a
17 voice mail that I was injured and that I was
18 seeking help. I left a handwritten note that
19 I was seeking help. That's pretty much all.
20 I didn't go into details. I tried to stay
21 away from details.
22    Q   You left a voice mail with Wayne
23 Pelhank?

75

1    A   With the official apartment
2 management answering service, yes.
3    Q   When you say you were injured and
4 seeking help, was it a situation where you
5 were seeking medical help or financial
6 assistance, or were you specific?
7    A   I said something to the effect that
8 I was injured and I wasn't working and I was
9 trying to get financial assistance for the
10 rent. It was strictly financial assistance
11 for rent, for his rent.
12    Q   Was the injury that you were
13 referring to in the voice mail message, was
14 that the library injury?
15    A   Yes, it was.
16    Q   At any time during the time that you
17 lived at the 620 and 1/2 North Main Street
18 apartment complex either in apartment 5 or
19 apartment 6 did you work?
20    A   Yes, I did.
21    Q   Where did you work?
22    A   Several different places. Would you
23 like them all?

76

1    Q   Sure, yes.
2    A   Let's see. A Clothesline laundry
3 mat, a Walgreen's. I guess that's all.
4    Q   Walgreen's in Bloomington?
5    A   Yes.
6    Q   On Main Street?
7    A   No, the one -- there's another one
8 on Veterans.
9    Q   The one on North Veterans?
10    A   GE Road.
11    Q   Where was the Clothesline?
12    A   It's up on Hershey and something.
13    Q   Do you know if --
14    A   The one that I worked -- the main
15 thing. The one that I worked at was South
16 Center Street. I don't know the exact
17 address.
18    Q   Do you know from when to when you
19 worked at Clothesline?
20    A   No, I don't have a record. I might
21 be able to dig up a record, but I don't have
22 one.
23    Q   Do you know generally the last year

77

1 you worked at Clothesline?
2    A   I really don't remember. I do have
3 a record. I should have a record of it.
4    Q   Do you think it was sometime before
5 2004 that you last worked at Clothesline?
6    A   Yes. Yeah, sure.
7    Q   It was?
8    A   Yes, it was.
9    Q   The last time you worked at
10 Walgreen's, was that sometime before 2004?
11    A   Yes, it was.
12    Q   The last time you were employed in
13 any capacity, was that sometime before 2004?
14    A   I was not employed in 2003. Does
15 that help?
16    Q   Okay. Let's go back to 2003.
17    A   Okay.
18    Q   Were you employed in any capacity
19 before 2003 and from 2003 through to 2005?
20    A   Okay, good. That's easy to answer.
21 Yes, I was employed before 2003 but no, I was
22 not employed after 2003.
23    Q   And why is that?

78

1     A    The beginning of 2003 the
2  Bloomington police towed my car and wouldn't
3  give it back.  It was February.  It was
4  zero degrees so I started walking everywhere
5  that I needed to go and I could not find a job
6  right away.  I did not spring back quick
7  enough in zero degree weather to find a job
8  and some time passed that year and so I did
9  not work in 2003.  At the end of 2003 I got a
10  chunk of money and I wanted to try to make
11  some changes in my life so I did not work, but
12  I was very productive.  In 2004 I was injured
13  so I got completely thrown on my butt with an
14  injury, and I haven't worked since.  Does that
15  help?
16     Q    You got a chunk of money.  Was that
17  from your inheritance?
18     A    Yes, I got a partial amount of
19  money, $20,000.
20     Q    And that's what you lived on at
21  least for the next year?
22     A    Yes.
23     Q    My understanding, at least according

79

1  to your testimony, is that after Mr. Pelhank
2  attempted to key the door open, he was able to
3  unlock the deadbolt, is that right?  This is
4  on 5 -- the second date, 5/28.  3/28/05, I'm
5  sorry.
6     A    I'm sorry.  After he what?  I'm
7  sorry.  I missed the question.
8     Q    Strike the question.  It was a bad
9  question.
10     A    Oh, was it?  Okay, good then.
11     Q    On 3/28/05 --
12     A    Okay.
13     Q    -- it's my understanding that
14  Mr. Pelhank, at least according to your
15  testimony, your testimony is that he keyed the
16  door and my understanding from your testimony
17  is he put a key in the deadbolt lock from the
18  outside of your apartment and turned the
19  deadbolt key, is that right?
20     A    Yes.
21     Q    At that time, at least prior to
22  doing that or at the same time he was knocking
23  and saying landlord, is that right?

80

1     A    Yes.
2     Q    You don't recall specific
3  conversations between you and Mr. Pelhank at
4  least before 3/28/05 in those three or
5  four months before that date, is that right?
6     A    We had no specific conversations.
7  There were none but my two communications I've
8  already told you about, leaving a note and
9  leaving a voice mail message.
10     Q    What did the note say?
11     A    I honestly don't remember but
12  something to the effect of I was here, because
13  I made a trip in person to see him, and the
14  reason for this is I was next door at
15  Community Action trying to get help with my
16  rent.  So the lady said it would be a few
17  minutes and I said I'll be right back.  So I
18  walked over to Heartland Apartment Management
19  but he wasn't in the office, and I wrote
20  something to the effect of, something to the
21  effect of Lynn Guevrekian was here, I'm trying
22  to get help with my late rent, my rent being
23  late or something like that, but I don't

81

1  remember what I wrote, just something to that
2  effect.  That was the purpose of my note, you
3  know, to show that I had been there to try to
4  communicate that I was late and that I was
5  working on it.
6     Q    Did you receive any correspondence
7  from Heartland or Mr. Pelhank prior to 3/28/05
8  regarding your late rent?
9     A    I have to look at my notes, but I
10  did receive a correspondence that said
11  something to the effect of after you catch up
12  on your rent, pay all the late fees, I'll
13  reduce your rent to 350, something like that.
14     Q    But you never verbally discussed
15  that with Mr. Pelhank?
16     A    No.
17     Q    Did you receive a five day Notice to
18  Pay Rent or Quit?
19     A    Yes.
20     Q    How did you receive that?
21     A    The police officer handed it to me.
22     Q    When did you receive that?
23     A    On the same, March 28th, 2005

82

1  incident.
2      Q   Did Mr. Pelhank ever say that was
3  the reason why he was trying to enter your
4  apartment?
5      A   No, he did not.
6      Q   He was not able to enter your
7  apartment on that date, is that correct?
8      A   Yes.
9      Q   He wasn't able to open the door past
10 the chain lock, is that right?
11     A   Yes.
12     Q   And my understanding of your
13 testimony is that after he attempted to open
14 the door, he left and that's when you set up
15 the video camera, is that correct?
16     A   Yes.
17     Q   And between the time that he left
18 and the time that he returned, what did you
19 do?
20     A   I turned on the camera just in case,
21 and I went and sat down at a table that was in
22 the same room.  I may have made some coffee or
23 something.

83

1      Q   When he first started knocking on
2  the door, did that wake you?
3      A   Yes.
4      Q   Did you say anything to him as he
5  was attempting to open the deadbolt lock?
6      A   Something to the effect of you don't
7  just key in.  I was angry that he was keying
8  in.
9      Q   Did he respond to that?
10     A   Yes.
11     Q   What did he say?
12     A   "I'll come in any time I want,
13 bitch."  It was completely hostile and that's
14 why there was no communication because it was
15 hostile from the getgo.
16     Q   When you say the getgo, what do you
17 mean?
18     A   Well, he didn't say something like I
19 have a five-day notice I want to give you and
20 I could have cracked the door and just took
21 the notice or he could have left it there or I
22 could have went to his office to get it, just
23 something normal.  Because of the hostility,

84

1  there was no communication.
2      Q   So you didn't respond to that?
3      A   No, I just set up the video camera
4  after he left.
5      Q   Did he say that and then leave?
6      A   Yes.
7      Q   So he made that statement and then
8  he left, is that correct?
9      A   He said he was coming back to break
10 down the door after that and then he left.
11     Q   Did he say anything else?
12     A   I don't think so.
13     Q   My understanding is he said
14 landlord, he said I'll come in any time I
15 want, bitch, and he said I'm coming back to
16 break down the door, is that correct?
17     A   Yeah, he said you watch it.
18     Q   You watch it?
19     A   Like afterwards, as if you watch me
20 break down the door.
21     Q   But you watch it was what he said?
22     A   Yeah, you watch it, something like
23 that, yeah.

85

1      Q   Did he say anything else?
2      A   I don't think so.
3      Q   How long was he gone?
4      A   I don't know exact time.
5      Q   It was enough time for you to set up
6  the video camera?
7      A   Yes.
8      Q   It was enough time for you to
9  contact the police?
10     A   Yes, I could have, sure.
11     Q   Did you?
12     A   No.
13     Q   Did you still have your guns at that
14 time?
15     A   Yes, I did.
16     Q   Did you keep them loaded?
17     A   Yes, they were loaded with the
18 safety on.  You bet.
19     Q   Tell me what happened next.  The
20 video camera was on?
21     A   I called 9-1-1.
22     Q   When did you call 9-1-1; before he
23 came back?

**86**

1    A    Okay.  When he came back -- no, I
2    stayed.  I turned on the video camera just in
3    case he was serious about breaking open the
4    door, and when he came back I called 9-1-1 as
5    he started to crowbar the door.
6    Q    Did you see him with the crowbar?
7    A    No, but I saw the crowbar.
8    Q    Did you see it through the door?
9    A    Yes.
10    Q    Was your door deadbolted by that
11    time?  Did you re-deadbolt the lock?
12    A    Yes, I always kept my door
13    deadbolted.
14    Q    Was it still chained?
15    A    Yes, it was chained.
16    Q    Had you gone up and closed the
17    deadbolt again after he opened it?
18    A    He closed it himself with a key I
19    guess.
20    Q    Do you recall if he closed it or if
21    you closed it?
22    A    He closed it.
23    Q    When you saw him come back, and my

**87**

1    understanding is you have a videotape of this,
2    is that when you saw the crowbar?
3    A    You can see the crowbar on the
4    videotape.
5    Q    Where did you see it?
6    A    Inside through the door crowbarring
7    to get the door open, sticks through into the
8    apartment.
9    Q    Was it at the area where the chain
10    lock was?
11    A    I'd actually have to view the video
12    to get the exact location, but it was inside
13    the apartment having to do with trying to open
14    the door.
15    Q    Was he saying anything at that time?
16    A    I'd have to review the transcript
17    because it is on the transcript word for word,
18    but off the top of my head I don't have it
19    memorized or anything.
20    Q    I'm just asking what you recall from
21    that date.  This is about a year ago.
22    A    I asked him if he understood what he
23    was -- I told him that I didn't want him to

**88**

1    come in and I asked him if he understood and
2    he said, well, you don't understand, we're
3    coming in.  Off the top of my head, that's one
4    thing I remember him saying.
5    Q    Was there more than one person
6    outside your door?
7    A    I believe there was another person,
8    yes.
9    Q    Do you know if it was someone from
10    Heartland?
11    A    I don't know.  I guess that it was a
12    utility guy, but I have no idea.
13    Q    When this was taking place, the
14    second attempt to try to get into your
15    apartment, where were you?
16    A    I was in the same room but standing
17    back from the door.
18    Q    Behind the video camera obviously?
19    A    Actually I was to the side of the
20    video camera, probably alongside the video
21    camera.
22    Q    How long did that second attempt
23    take place?  How much time elapsed; a minute,

**89**

1    two minutes?
2    A    I honestly don't know.  More than
3    two minutes.
4    Q    Other than the crowbar, did
5    Mr. Pelhank or anybody else from Heartland
6    make it into your apartment at that time?
7    A    No, they did not.
8    Q    Okay.  What did you do while those
9    attempts were being made?
10    A    I stayed on the line with the 9-1-1
11    operator.
12    Q    At what point did you call 9-1-1?
13    A    I have to watch the video but as
14    soon as it was established that he was
15    attacking the door, I called 9-1-1.  I gave it
16    a second to see whatever, if it was just some
17    noise outside the door, but as soon as it was
18    established he was attacking the door I called
19    9-1-1.
20    Q    And what did you say to the 9-1-1
21    operator?
22    A    That Wayne Pelhank, my landlord, was
23    attacking my door with a crowbar.  The word

90

1  for word is on the transcript. It's to the T.
2  It's recorded exactly as what's on the video.
3    Q   It's my understanding that
4  Mr. Pelhank never made it into your apartment
5  at least before the police arrived, is that
6  correct?
7    A   Yes.
8    Q   And did he discontinue his efforts
9  to try to enter your apartment at some point
10  while you're still on the 9-1-1 call or at
11  some point after you hung up?
12    A   He settled while I was still on the
13  9-1-1 call, as I recall.
14    Q   He stopped trying to enter your
15  apartment, is that correct?
16    A   Yes.
17    Q   And what happened after that?
18    A   It was sort of like as the police
19  were coming there was a rest outside the door,
20  and then the police came and obviously he
21  stopped and then he was done. When the police
22  left, he left. He was finished.
23    Q   When the police left he left, what

91

1  do you mean? When the police arrived he left?
2    A   Well, the police arrived but then
3  after they gave me the five-day notice they
4  left, and when he left Mr. Pelhank left, Wayne
5  Pelhank left.
6    Q   Okay. Did Mr. Pelhank enter your
7  apartment when the police arrived?
8    A   No.
9    Q   Did he ever enter your apartment on
10  that date?
11    A   No.
12    Q   He never crossed the threshold of
13  your apartment, is that correct?
14    A   He did with his crowbar.
15    Q   Okay. Did he physically cross the
16  threshold?
17    A   No.
18    Q   Did you ever say anything to
19  Mr. Pelhank about your guns?
20    A   No, I did not.
21    Q   Did you ever threaten him?
22    A   No.
23    Q   You were handed the five-day notice

92

1  when the police arrived by the police, is that
2  correct?
3    A   Yes.
4    Q   And the five-day notice is what you
5  produced in your discovery responses, is that
6  right?
7    A   Yes, that looks right.
8    Q   And the amount that's shown owing,
9  due and owing is $1,513.21, is that correct?
10  First I'm just asking you to identify the
11  document. Is that the correct amount on the
12  document?
13    A   Okay. The amount on the document
14  that you're saying is the right amount that
15  you're saying, but it's not what I owed him.
16    Q   Okay. What did you owe Heartland on
17  March 23rd, 2005, or March 28th, 2005?
18    A   I can produce that information but I
19  have no idea right now.
20    Q   You think it was less than 1,513.21?
21    A   Yes, it was. Yes, it was.
22    Q   Do you know how much less?
23    A   I can produce exact figures but I

93

1  have to have my notes and stuff.
2    Q   Do you think it was more than $100
3  less?
4    A   I can produce the exact figures and
5  be glad to send them to you if you would like
6  to have them.
7    Q   Sure. Is one of your allegations
8  that the amount that at least was indicated in
9  the Notice to Pay Rent or Quit that's dated on
10  March 23rd, 2005, that you admit was served on
11  you on March 28th of 2005 is an incorrect
12  amount?
13    A   That's right, yes.
14    Q   And by incorrect, it's too high an
15  amount, is that correct?
16    A   Yes.
17    Q   Did you pay that amount?
18    A   No, I did not.
19    Q   Did you pay any amount?
20    A   On the five-day notice, no.
21    Q   Okay. Did you leave the apartment?
22    A   Yes, I did.
23    Q   When?

94

1      A   I'd have to check my calendar but it
2   was like that first week of May I left.  The
3   exact date, I don't have it.  I have the exact
4   date but I don't have it in front of me, but
5   it was the first week in May.
6      Q   Did you pay any amount between
7   March 28th and the first week of May?
8      A   No.
9      Q   Have you paid any of the amount that
10   you owed, either the amount that you had in
11   your mind that you owed Heartland or the
12   amount that they indicated that you owed?
13      A   No.
14      Q   And you haven't paid that today, to
15   date as of today's date, is that right?
16      A   Yes.
17      Q   Have you ever been sent to
18   collections with regard to that amount owed?
19      A   Not that I know of.
20      Q   Did you have any conversations with
21   Mr. Pelhank after March 28th, 2005?
22      A   No.
23      Q   Did you leave any more messages with

95

1   Mr. Pelhank with regard to paying or agreeing
2   to pay any amount?
3      A   No.
4      Q   Did you receive any other
5   correspondence from Mr. Pelhank regarding your
6   leaving the apartment after March 28th, 2005?
7      A   No.
8      Q   How did you come to leave on the
9   first week of May?
10      A   How did I come to leave?
11      Q   What were the circumstances of you
12   leaving on that week?
13      A   I left and went to a homeless
14   shelter.  I exited the apartment.  I was no
15   longer there.  I went to a homeless shelter.
16      Q   Was this something you were told to
17   do or just something you took upon yourself to
18   do?
19      A   I had nowhere to go and I didn't
20   have any money so I went ahead and went to the
21   homeless shelter.
22      Q   You stayed there through the month
23   of April of 2005 though, is that right?

96

1      A   Yes, I did.  I stayed in the
2   apartment in April, yes.
3      Q   During that time were there any
4   conversations between you and anyone from
5   Heartland with regard to you either paying the
6   past due amount or April's rent?
7      A   No.
8      Q   I don't know if anybody told you,
9   but at any time you need to take a break, just
10   let us know.
11      A   I would love to have one right now.
12      Q   Let's take one.  Is that okay with
13   everybody?
14          MS. WATSON:  Yeah, definitely.
15
16   (Whereupon a 10-minute break was taken.)
17      (Last question and answer read.)
18   BY MR. BERG:
19      Q   My understanding is that the
20   allegations with regard to the second
21   incident, the March 28th, 2005 incident at
22   least against Heartland Apartment Management
23   and Wayne Pelhank included the following,

97

1   violence to which you demand the arrest and
2   official police report filed against
3   Mr. Pelhank, is that correct?
4      A   Yes.
5      Q   Did you ever actually file any
6   criminal charges against Mr. Pelhank?
7      A   I attempted to file a disorderly
8   conduct report but the police wouldn't allow
9   me to.  I attempted to file an attempted
10   illegal entry to make reference to the
11   separate or same report or however it does,
12   but the police would not allow me to.  Other
13   than that, no.  I don't know where I would go
14   other than the police.
15      Q   You attempted to file those on the
16   date of the incident?
17      A   Yes, it's on the video.
18      Q   Okay.  With the police that
19   responded to the scene?
20      A   Yes.
21      Q   Did you ever go to the Bloomington
22   Police Department after the police left the
23   scene?

98

1    A    No.
2    Q    So the only attempts were verbal
3  attempts with the officers that responded?
4    A    Yes.
5    Q    You didn't ever file a written
6  complaint against Mr. Pelhank or Heartland
7  Management, is that correct?
8    A    Yes.
9    Q    Is the violence that you're
10  referring to in your allegations in your
11  complaint, is that specifically the attempts
12  to open your door?
13    A    Yes.
14    Q    Is that what you're referring to?
15    A    Yes.
16    Q    There was no actual physical
17  violence against you, is that right?
18    A    Yes, there was.  That is against me.
19  That's my door.  If I live there, if I occupy
20  it, that's my space.  That's an extension of
21  me.  If you're smashing my door, you're in my
22  space.  You're violently attacking something
23  that's in my space.

99

1    Q    It would be violence against your
2  door?
3    A    Yes.
4    Q    Is that right?
5    A    Yes.
6    Q    You also allege harassment and
7  malice.  What's the basis for those
8  allegations?
9    A    Well, I do need to elaborate on a
10  lot of stuff.  I do have a lot of work that I
11  put into text.  It's chicken scratch but it
12  goes into text.  It's a hate crime what he
13  did.  Malice is defined as -- you know,
14  violently attacking somebody's door is the
15  root of a hate crime.  It's malice.  It's an
16  ugly thing to do to someone, and that's the
17  basis that I'm viewing it as.
18    Q    This happened on more than one
19  occasion?
20    A    No, it was just the one.
21    Q    Just the one occasion.  And it's my
22  understanding the attempts to open your door
23  discontinued when the police were notified, is

100

1  that right?
2    A    Actually they kept up a little bit
3  while I was on the 9-1-1 operator's telephone.
4  They were still going on.  As the operator was
5  on the telephone with me, they were still
6  keeping up, but the operator asked me, "Is
7  that him?"  And I said yes.  "Is that banging
8  sound him?"  And I said yes.
9    Q    What's the basis for your
10  interference with peace and enjoyment of the
11  apartment allegation?
12    A    Everybody that rents an apartment is
13  granted that, something having to do with the
14  covenant of peaceful enjoyment or something
15  like that.  I don't know the exact technical
16  citation for that yet, but I've got it in
17  notes.
18    Q    The basis for that interference was
19  the pounding on your apartment or the attempts
20  to open the door?
21    A    The acting like a maniac, yeah.  I
22  would say that attacking a door was not
23  reasonable or peaceful or nice, a nice thing

101

1  to do.  So that's the upsetting of it.  It's
2  not an enjoyable thing.
3    Q    The illegal key entry attempt,
4  what's the basis for that allegation?
5    A    There's no reason that he should
6  just key in.
7    Q    And you're asserting at least that
8  there was no --
9    A    It's reasonable if there was an
10  emergency but other than that, it's not
11  reasonable.
12    Q    So if there's an emergency, it would
13  have been reasonable for him to key in, is
14  that right?
15    A    I believe so, yes.  If there was a
16  real actual emergency, actual emergency, yes,
17  I think that would be okay.
18    Q    But it's your position at least that
19  if it wasn't an actual emergency, then it's an
20  illegal attempt?
21    A    Yes.
22    Q    All right.  Inappropriate delivery
23  of the five-day notice to evict to which there

102

1  was no announcement. What's the basis for
2  that allegation?
3      A   Well, the inappropriate is just side
4  by side with the whole smashing of the door
5  thing. It's an inappropriate way to deliver
6  and if he had, before he started if he had
7  said something like I want to give you a
8  five-day notice or I want to give you a paper,
9  I have to give you this paper or something
10 like that, he would have been giving an
11 announcement as to what he was doing. I
12 didn't know why he was doing it. I thought he
13 was just on a power trip or I think he's
14 crazy. Maybe he was just doing it because he
15 was crazy and crazy people do crazy things.
16     So I don't know why but there was no
17 announcement. He didn't say I have to give
18 you a paper for the apartment, I have to serve
19 you a five-day notice, you know, or something
20 like that. There was no announcement.
21     Q   The basis for you saying that you
22 think he's crazy are just the actions that you
23 believe he took on the May -- strike that; the

103

1  March 28th, 2005, date?
2      A   No, there's a little bit more to it.
3      Q   What's more?
4      A   He polices up and down. He was
5  policing up and down the hallway quite a bit,
6  and I don't know what he was doing but the guy
7  that lived before me had a video camera
8  outside his door and there was something going
9  on that wasn't quite right, and I heard him
10 knock and key into other places a couple times
11 and that's not right. That's not the way to
12 handle things. It's not professional. It's
13 not business like. There's no need to do it.
14     All the laws that are in place will
15 allow you to do everything right with your
16 business without you having to do erratic
17 behavior. Everything is there. You don't get
18 ripped off. Things are in place. There's no
19 reason to be in people's business like that or
20 anything like that. He did a lot of policing
21 up and down the hallway.
22     Q   What do you mean?
23     A   Walking up and knocking on doors,

104

1  "landlord, landlord," and he did a lot of
2  that.
3      Q   Knocking on your door?
4      A   No, he left my door alone; the doors
5  to the side of me, but it's very loud. If you
6  don't just knock regularly and you like pound
7  on a door, it echoes throughout the hallway so
8  like you hear right away somebody else
9  knocking, boom, boom, boom, if you pound hard
10 on the door.
11     Q   Prior to March 28th, 2005, he never
12 knocked on your door before. Is that what
13 you're saying?
14     A   No, but he is a very rude man. He
15 taped a rent escalation notice to my door. He
16 taped a rent escalation on my door, didn't
17 mail it to me in the mail. He didn't say
18 anything verbally. It's very rude to do that.
19 He raised my rent by $40 a month just because
20 he could. It's a rudeness to it. Here's the
21 place that I live in. I'm paying my rent
22 every month. I'm a good tenant. I don't
23 bother anybody and he's taping a rent

105

1  escalation notice to my door. It's rude.
2      Q   When was that done?
3      A   I don't know the exact date, but I
4  actually have a copy of the notice so it would
5  be dated on that.
6      Q   Sometime before March 28th, 2005?
7      A   Yes, but you're asking me are there
8  reasons why I would think that he would, you
9  know, be a little crazy or erratic behavior
10 type thing and I'm telling you the reasons.
11 I'm giving you other examples.
12     Q   Sure. Any other examples that you
13 can think of?
14     A   Not that I can think of, no.
15     Q   At some point prior to March 28th,
16 2005, he taped a rent escalation notice on
17 your door, is that right?
18     A   Yes.
19     Q   And that was the notice that he
20 increased the rent by $40 a month, is that
21 right?
22     A   Yes.
23     Q   Do you know if it was more than a

106

1  year before this event?
2      A   I have to look at the exact dates.
3  I have to look at the exact dates.  I don't
4  know.
5      Q   You don't know?
6      A   I don't know offhand.  I can produce
7  the exact date and answer your question
8  precisely and factually, but I don't have it
9  in front of me.
10     Q   You have no independent recollection
11  other than it occurred sometime before
12  March 28th, 2005, is that right?
13     A   Yeah.
14     Q   You also allege discrimination.
15  What do you mean?
16     A   I thought it was pretty clear when I
17  wrote it.  He's charging somebody else in the
18  building with the same kind of apartment as me
19  350 and he's charging me 375 per month, and
20  the exact apartment that I just left and paid
21  $375 for he's now renting to somebody else for
22  350.  That's discrimination.
23     Q   How do you know that?

107

1      A   Because I'm smart.  I'm a smart
2  girl.  When you pick and choose, when you pick
3  and choose of the same goods of services,
4  you're discriminating.
5      Q   Maybe you misunderstood my question.
6  How do you know he's charging a different
7  amount to other tenants?
8      A   Oh, pardon me.  Yeah, I heard that
9  wrong.  Newspaper.  It was in the newspaper.
10     Q   It was in the newspaper that he
11  advertised at a different rate per month?
12     A   For the apartments, yeah.
13     Q   Do you know if he actually rented at
14  that rate?
15     A   He advertised it for a different
16  rate and then I know that he rented the
17  apartment.  That's all.
18     Q   And this was sometime after the
19  incident, is that correct?
20     A   Actually I think it was before the
21  incident, but I have to look at my dates.  It
22  was just a coinci -- I had bought some things.
23  I made some purchases out of some papers and I

108

1  left a stack.  I accumulated a stack and when
2  I went back to check some stuff, I just
3  noticed it.  I wasn't really keeping track but
4  I looked for it.  I noticed it by accident and
5  then I looked for it in a pile of newspapers
6  and I found it.
7          He allowed me to pay 375 and then
8  the next person that moved in after raising my
9  rent $40, the next person that moved in he
10  advertised at 350 and apparently he rented the
11  place because they moved in.  Emily Elber,
12  Matt Corbensen, a couple different names, I
13  remember seeing them on the mailbox.  They
14  rented.
15     Q   My understanding is you paid $375 or
16  that was what you were supposed to pay as of
17  March 2005, is that correct, as far as your
18  monthly rate of rent?
19     A   Yes.  When he increased it, yes.  He
20  put it in writing so it was official.
21     Q   So there was an agreement between
22  you and Heartland that you were going to be
23  paying $375 a month sometime before 3/28/05,

109

1  correct?
2      A   There was no agreement.  I wrote my
3  check for 375.  If I want to stay there, I
4  want the roof over my head, pay 375.  If you
5  want to leave, then leave, honey.  That's how
6  it goes.  There was no agreement.  There was
7  no discussion.  There was no communication.
8  There was no polite letter.  There was
9  nothing.  It was just I'm raising your rent.
10  You pay it or leave.  That's what you do in
11  life.  What am I going to do?  Hey, that's too
12  much money, I don't want to pay it?  Then
13  move, then move out.
14     Q   The only notice you got of that was
15  a posting on your door?
16     A   Yes.
17     Q   You never had a conversation with --
18     A   No.
19     Q   -- with anyone from Heartland
20  regarding the increase in your rent?
21     A   No.
22     Q   And it increased from, you say it
23  increased $40 up to 375?

Pages 106 to 109

110

1    A   Yes.
2    Q   And you don't know when that
3  increase took place?
4    A   No, I do, but I don't have it in
5  front of me.  I mean --
6    Q   It wasn't in 2005; it was before
7  2005?
8    A   Yes.  It was before 2005, yes.
9    Q   So you were paying 335 and then it
10  increased to 375 and your contention is that
11  because someone who rented an apartment after
12  you left and paid or may have paid less than
13  375, that's in some way discrimination.  Is
14  that what you're saying?
15    A   Yes.
16    Q   Because they are being charged a
17  different amount than you were being charged?
18    A   Yes, a lesser amount.
19    Q   A lesser amount?
20    A   Yes.
21    Q   Do you know if that -- strike that.
22      Any other basis for that
23  discrimination claim other than whoever moved

111

1  in after you left may be paying less than you
2  were paying?
3    A   I think it was a sexual
4  discrimination going on as far as gender based
5  male/female, and I tried to put that together
6  in the amended complaint, because he's calling
7  me a bitch.  He's treating me with hostility,
8  and I've never done anything wrong to this
9  man.  I've never treated him unkindly, never
10  talked to him impolitely.  I did not scream in
11  his face or anything when the guy vomited all
12  over himself.  I've always been a cooperative,
13  peaceful renter who tried to pay my rent on
14  time every month.  Where is it coming from?
15  Does he have a bad marriage?  Does he have a
16  bad life?  Oh, well, whatever.  I say it was a
17  gender discrimination that he's calling me a
18  bitch and he's screaming at me because it's a
19  male/female thing.  I didn't participate in it
20  so I would say the discrimination was gender
21  based as well.
22    Q   You believe the discrimination is
23  the fact that he may have charged a lesser

112

1  amount to a tenant that moved in after you
2  moved out?
3    A   No. I'm sorry, I didn't mean to cut
4  you off.  Go ahead.  But no, you're saying is
5  there any other discrimination that I think
6  was present and I'm saying yes but not in
7  connection with the rent, no.
8    Q   Okay.  There was no discrimination
9  in connection with the rent.  Is that what
10  you're saying?
11    A   No.  I was saying there's
12  discrimination in connection with the rent but
13  a different type of discrimination in
14  connection with Wayne Pelhank himself.  I
15  think he just has discriminations flying all
16  over the place.
17    Q   I'm trying to get to the root of
18  your complaint.  I'm trying to figure out why
19  you're alleging that, a count of
20  discrimination.  You have allegations of
21  discrimination against my clients and I'm
22  trying to figure out why, what the basis for
23  that is.  And I don't want to misstate what

113

1  you've already testified to, but it's my
2  understanding the basis for your testimony is
3  that you were being charged $375 in rent at
4  least at the time that you still lived at that
5  location.  Am I right so far?
6    A   Yes.
7    Q   And that you learned, and this is
8  what I'm not clear on, sometime after you
9  moved out that someone was being charged less
10  than $375, is that correct?
11    A   Yes.
12    Q   Okay.  And you learned that from a
13  newspaper ad that was advertising an apartment
14  at the same location for 350 a month, is that
15  correct?
16    A   Yes.
17    Q   Do you know if it was the same
18  apartment, the one that you lived in?
19    A   Yes.
20    Q   Okay.  How do you know that?
21    A   Because I lived there and it was the
22  only one free and it was in the paper and then
23  somebody moved in.

114

1    Q   And how long after you moved out in
2    May of 2005 did you see that ad?
3    A   Actually the ad is from before the
4    May incident.
5    Q   Okay.  The ad was before you moved
6    out?
7    A   Uh-huh.
8    Q   Do you know how long before you saw
9    that ad in the paper?
10   A   No, the actual newspaper articles
11   are dated for when they are.
12   Q   Okay.  What you're saying is there
13   was an ad in the paper before you even left
14   the apartment for your apartment?
15   A   Yes.
16   Q   And how do you know it was your
17   apartment?
18   A   Because it was the only empty -- it
19   gave the address and it was the only empty
20   apartment in the building and I had just
21   exited.  Everybody else had a name on their
22   mailbox, and somebody moved in and brought all
23   their furniture up the stairs and moved in and

115

1    then the ad went out of the newspaper because
2    I was right there and that's how I know.
3    Q   I guess I'm not understanding your
4    testimony because you said yours was the only
5    empty apartment but you saw the ad before you
6    moved out, is that correct?
7    A   I'm sorry.  I got confused on that
8    one.  Well, I had moved from apartment 5 to
9    apartment 6.  So when I moved from 5 to 6,
10   there was one empty apartment and that's what
11   I'm referring to.  I'm still in the building
12   but I'm not in the apartment that I lived in.
13   So I'm right next to it.  I'm at the end of
14   the hall and that's when it happened.  That's
15   what I'm referring to.
16   Q   Okay.  My understanding is you moved
17   from apartment 5 to apartment 6 in early March
18   of 2005, is that right, or was it 2004?
19   A   It was 2004.
20   Q   On March 1st, 2004, you moved from
21   apartment 5 to apartment 6, correct?
22   A   Yes.  Around that time, yes.
23   Q   And around that time that's when you

116

1    saw an ad for apartment 5 for 350 a month, is
2    that right?
3    A   Yes.
4    Q   And that's when you saw somebody
5    move into apartment 5 and that's why you
6    assumed that the people that moved into
7    apartment 5 that replaced you next to the
8    vomiting guy; right?
9    A   Yes.
10   Q   -- were paying 350 a month as
11   opposed to 375, is that right?
12   A   Yes.
13   Q   So what you're saying is sometime
14   before you moved from apartment 5 to apartment
15   6 your rent had already been increased to 375?
16   A   Yes, and I -- yes.
17   Q   And what you're saying is that
18   somehow discriminates against you because
19   whoever moved in paid less money?
20   A   Yes.
21   Q   And the basis for that is an
22   advertisement that you saw in the newspaper as
23   opposed to knowing personally from the people

117

1    that moved in what they were paying per month,
2    is that correct?
3    A   Yes.
4    Q   Have you ever discussed it with the
5    people that moved into apartment 5?
6    A   No.
7    Q   Do you know who moved into apartment
8    5?
9    A   Emily Elber.
10   Q   That's a female?
11   A   Uh-huh.
12   Q   Is that a yes?
13   A   Yes.  I'm sorry.
14   Q   How well do you know Emily?
15   A   Only very -- I do not know Emily.
16   It's very acquaintance, just a passing hi, how
17   are you doing, in the building.  That's all.
18   Q   Does she still live there?
19   A   No.
20   Q   Do you know where she lives now?
21   A   I don't know.
22   Q   At the time of either the first
23   incident in 2004 or the second incident in

118

1  2005 were you living with anyone?
2    A   No, single, by myself.
3    Q   And when you say that there was some
4  sex discrimination, what you're saying is that
5  has nothing to do with the increase in rent,
6  is that correct?
7    A   Yes.
8    Q   Okay.  The basis for your allegation
9  of discrimination at least is that someone
10  else in another apartment was being charged a
11  lesser amount when they moved in after you
12  vacated that apartment?
13    A   Yes.
14    Q   Is that correct?
15    A   Yes.
16    Q   Do you have any allegations of
17  sexual discrimination against Mr. Pelhank?
18    A   No.  The reference I made was a
19  gender discrimination only, not some kind of
20  sexual discrimination.  It was a gender based
21  discrimination on sex, male or female, not
22  sexual.
23    Q   Okay.  Gender based discrimination?

119

1    A   Yes.
2    Q   And specifically do you have any
3  allegations with regard to gender based
4  discrimination against Mr. Pelhank?
5    A   Yes, I do.  The hostility coming out
6  of him was ridiculous.  That's discrimination.
7  It's ridiculous.
8    Q   Hostility that he expressed on the
9  date at least on 3/28/05 when he was knocking
10  on your door?
11    A   Yes.
12    Q   And when he said the word bitch?
13    A   Yes.
14    Q   Is that correct?
15    A   The whole of the situation, not just
16  one particular part.
17    Q   Did he say anything other than that
18  term to give you the indication that there was
19  a gender based discrimination?
20    A   I don't think he would have been
21  doing that to a man.  I think he may have
22  feared the man opening the door and like doing
23  something in retaliation directly to him.  I

120

1  don't think he would have the nerve or the
2  guts or the spine to do it to a man.  I think
3  he did it because I was female.  He thought he
4  could get away with it and he's not right in
5  his head.  I don't think he would have done it
6  to a man, and this way I say gender based in
7  this fashion.  So sex has to do with it, male
8  and female.
9    Q   Did you observe him doing it to
10  anyone else?
11    A   No.
12    Q   But you did observe him knocking on
13  other people's doors?
14    A   I observed him being like obnoxious
15  I would say is the word.
16    Q   To men and women?
17    A   Yes.
18    Q   You also alleged that he didn't
19  return your deposit, is that correct?
20    A   Yes.
21    Q   What was the deposit amount?
22    A   $335.
23    Q   Was that the amount that you

121

1  deposited when you first moved into the
2  apartment and were paying $335 per month?
3    A   Yes.
4    Q   So it was like a one month rent as a
5  deposit, damage deposit?
6    A   Yes.
7    Q   Was there any indication in the
8  original lease that you signed about the
9  return or reasons for not returning a deposit?
10    A   I don't know without looking at it
11  and studying it.  I don't know for sure but
12  there was no indication that I shouldn't have
13  been returned my lease upon exit of the
14  apartment, and I had rented that apartment
15  before from the Moran Estate and they returned
16  my deposit when I left.  So there was no
17  reason I wouldn't expect that building to not
18  return my deposit.
19    Q   When was it managed by a different
20  apartment managing company and you had been
21  returned that amount before?
22    A   W.J. Moran Estate, yeah.
23    Q   When was that?

Pages 118 to 121

122

```
 1     A   Just over the years I lived in the
 2   building, like a total of 11 years.
 3     Q   That same building?
 4     A   Yeah.
 5     Q   How many other apartments did you
 6   live in?
 7     A   I was in No. 4.
 8     Q   So you've been --
 9     A   Briefly in No. 9 and the No. 5 and
10   the No. 6. I was familiar with the building.
11     Q   Did you live there continuously?
12     A   For eight years straight and then I
13   left the state, and when I came back I tried
14   to rent a couple of apartments around town and
15   rented some paper mache place, and I went back
16   there because it was very solid there.  It's
17   small but I had always been happy on the third
18   floor and it's solid.
19     Q   And that's where apartments 4, 5,
20   and 6 are, on the third floor?
21     A   Uh-huh.
22     Q   That's a yes?
23     A   Yes, I'm sorry.
```

123

```
 1     Q   At least when you moved back in
 2   sometime in 2001 or 2002, that's when you left
 3   the deposit, is that correct?
 4     A   Yes.
 5     Q   What condition did you leave the
 6   apartment in?
 7     A   Immaculate, clean, sparkling, steam
 8   cleaned, dusted and shiny clean windows.
 9     Q   Steam cleaned?
10     A   Yes, sir.
11     Q   Did you rent a steam cleaner or did
12   you pay somebody?
13     A   I own a steam cleaner.
14     Q   Do you still have that?
15     A   No.
16     Q   Have you filed a lawsuit against the
17   library?
18     A   Yes, sir, I have.
19     Q   What's the status of that suit?
20     A   It's on appeal.
21     Q   Was it dismissed and then you
22   appealed that dismissal?
23     A   Yes.
```

124

```
 1     Q   Are you represented in that case?
 2     A   No.
 3     Q   You're pro se?
 4     A   Yes.
 5     Q   It's filed in state court?
 6     A   It was originally the county court
 7   and it would have to be moved to the Fourth
 8   District of Springfield Appellate Court the
 9   way that I understand it.
10     Q   What injuries or damages are you
11   claiming from the second incident?
12     A   Again my civil rights were
13   drastically violated.  Laws that rightfully
14   belong to me were broken.  The situation
15   itself was terribly distressful.  I think that
16   covers it.
17     Q   Okay.  The distress that you
18   experienced, has that impacted your life in
19   any way?
20     A   Yes, it has.
21     Q   In what way?
22     A   It stands still until it's fixed.
23   When you allow somebody to abuse you or
```

125

```
 1   violate you, it stands still in time until
 2   justice comes.  You cannot allow the world to
 3   kick you in the face in that fashion and
 4   continue life as a regular person like nothing
 5   happened.  It stands still until it's fixed.
 6   Time passing will not fix it.  It needs to be
 7   fixed.
 8     Q   What specifically are you referring
 9   to as far as what needs to be fixed?
10     A   Wayne Pelhank needs to be arrested
11   for attacking my door.  Somebody needs to tell
12   me they're sorry, and I want a large sum of
13   money for my pain and for being treated for
14   such a ridiculous, just being treated
15   ridiculously like garbage, like not a regular
16   person that has a life and values and
17   concerns.  I want vindication.  The reports
18   have to be clarified, the first reports.  They
19   could have fixed those a long time ago
20   without -- there's a very easy way to do it.
21   If I can think of it, I don't know why they
22   can't think of it.  They need to be clarified,
23   and that social worker should not become,
```

Pages 122 to 125

126

1  should not be a social worker. Any social
2  worker that tries to hurt somebody doesn't
3  belong in the field.
4      Q   What pain have you experienced?
5      A   I am totally alienated from a town
6  that I've lived in for over 15 years. I
7  cannot trust the police in this town. I can
8  never use the human resources place and
9  they've got a record over there calling me a
10  mental patient. If I should ever get in a
11  funny or tricky situation, they've got a funny
12  record over there with me. I would never be
13  able to explain myself. It would be
14  ridiculous.
15      I have no future in Bloomington. I
16  want to make that clear. Everybody should see
17  it. I have no future in Bloomington. I can't
18  trust the city I live in, City Hall, the
19  police. I can never get help anywhere. I
20  have no future. God forbid I ever even want
21  to walk into the Normal Public Library again
22  because I've sued them. There's no future
23  here. They've totally made it so I can't live

127

1  in a town. That's huge. That's ridiculous.
2  That's also absurd. I want vindication for
3  being just me to leave a town because you've
4  been so abused and there's been just so much
5  wrongdoing.
6      Q   Other than the two incidents that
7  you're alleging against my clients, Heartland
8  and Wayne Pelhank, were there any other
9  situations or any other occurrences that
10  you're alleging alienated you or caused you
11  pain?
12      A   Yes. Every party, including the
13  Normal Public Library, have alienated me and
14  caused me a great deal of pain besides an
15  actual physical injury that causes me a great
16  deal of pain every day. Every day that I get
17  up in the morning I deal with pain throughout
18  the whole day every day. In my sleep I deal
19  with the pain. That's why I'm not letting go.
20  My life has turned into a day of pain.
21      Q   The pain that you're experiencing is
22  physical pain?
23      A   It's emotional and physical.

128

1      Q   At least the physical pain you're
2  experiencing, you're attributing that to your
3  incident at the library, is that correct?
4      A   Yes, it's a physical injury. It's
5  completely on a physical level.
6      Q   And it's completely unrelated to the
7  lawsuit that you brought against the parties
8  in this case, is that right?
9      A   Yes, it is.
10      Q   As far as the alienation that you
11  feel from the police department at least, did
12  you also feel that alienation when they
13  impounded your car prior to this incident?
14      A   Yes, I did. I absolutely did. You
15  bet. You bet your boots I did.
16      Q   And that's one of the reasons, at
17  least according to your testimony, as to why
18  you weren't able to work for a time after that
19  incident, is that right?
20      A   I was able to work. I just did
21  not -- I didn't get with the program with it,
22  no. I was able to work. I tried to find
23  jobs. I had put applications out but it was

129

1  like a ridiculous struggle without my car to
2  just be thrust into that situation from one
3  day to the next.
4      Q   And then after the inheritance you
5  didn't need to work for a time period, is that
6  right?
7      A   Right.
8      Q   You were able to pay your rent on
9  time?
10      A   Yes.
11      Q   And then after the library incident,
12  that's when you had problems paying your rent,
13  is that right?
14      A   Yes.
15      Q   But again the library incident had
16  nothing to do with anything that Heartland
17  Management did or Wayne Pelhank did, is that
18  right?
19      A   I went to the library to find out
20  legal information about what happened to me on
21  May 20th. I went to the library to find out
22  law books, to check out law books. That's the
23  only relation that there is. I went to the

130

1  library to find out information and while I
2  was looking up something on the card catalog,
3  this sign fell.
4      Q   The sign fell on your arm?
5      A   While I was researching personal
6  injury topics and law topics, the sign fell on
7  me.
8      Q   Okay.  That was sometime after
9  May 20th, 2004?
10     A   A hop, skip, and a jump after May
11 20th, right, because it was June 7th, so it
12 would have been about whatever that is,
13 two weeks or so.
14     Q   It was well before March 28th, 2005,
15 correct?
16     A   Yes.
17         MR. BERG:  I may have some
18 more, but go ahead.  You've got to go.
19         MR. SALVATI:  All right.
20         MR. BERG:  Do you need to turn
21 your tape over?
22         MS. GUEVREKIAN:  No, there's
23 still -- thank you.

131

1          DIRECT EXAMINATION
2  BY MR. SALVATI:
3      Q   My name is Dominic Salvati and I
4  represent the Center for, McLean County Center
5  for Human Services.  Do you have a cell phone?
6      A   I don't currently have them.  I've
7  had them in the past.
8      Q   But not currently?
9      A   No.
10     Q   From May 20th up until the present
11 time have you had -- I know you said you
12 weren't married, but have you had a
13 significant other or dated anyone?
14     A   No.
15     Q   You initially said that you were --
16 how many siblings do you have?
17     A   I have five siblings, four living.
18     Q   Okay.  And were you I guess in an
19 argument with all those other siblings as to
20 your father's inheritance?
21     A   Yes.
22     Q   Okay.  And did you call, were you
23 making calls to each of them regarding that?

132

1      A   No.  I only had my two sisters'
2  phone numbers.  I didn't have my brothers'
3  phone numbers.  They had different numbers.
4  There was no argument per se but they weren't
5  responding and I was leaving them messages
6  like, hey, what's going on over there type
7  thing and also just calling to talk.
8      Q   So there wasn't a point when you
9  were I guess fairly upset about what was going
10 on?
11     A   Oh, I was upset.  There was quite a
12 duration of time that I was upset.  You bet.
13 I was very upset.  I felt very left out from
14 my family.
15     Q   But today as you sit here and
16 testify, you're testifying that you never said
17 anything about shooting anybody?
18     A   Certainly not.
19     Q   You never left a message on
20 anyone's --
21     A   I certainly did not.
22     Q   You never left a message on anyone's
23 voice mail or answering machine?

133

1      A   No.
2      Q   So if your sister, Anna, would come
3  forward with a tape, a tape out of her
4  answering machine that had that type of
5  message, how would you explain that?
6      A   You're funny.  No such thing exists.
7  It never happened.
8      Q   When the police arrived, and I'm
9  strictly talking about the May 20th, 2004
10 alleged incident, you said you heard loud
11 banging before you got into the shower on the
12 door?
13     A   No, it was after I was in the
14 shower.  I was already in the shower.  I could
15 hear the banging from the shower and loud
16 voices.
17     Q   Did you ever hear a telephone ring?
18     A   Yes, my phone rang once and I turned
19 off the ringer.
20     Q   When did it ring?
21     A   It rang around that time but I don't
22 know exactly.  It rang around that time.  It
23 was a little while or longer, I don't really

134

1  know, but my phone rang and there was somebody
2  in the hallway. I've lived in the building
3  for a long time and there was just something
4  not right in the hallway. That's all I could
5  put it. I got an idea that there wasn't
6  something right because there was steps in the
7  hallway that were funny and when my phone
8  rang, I turned off my ringer because I was,
9  like, something is going on in the hallway and
10  I actually was wondering if my sister might
11  call me that day and I didn't want to talk, I
12  didn't want to converse with something going
13  on in the hallway and be distracted. I just
14  turned my ringer off and I was going to get to
15  it later, turn it back on later I mean.
16     Q   Did the phone ring before or after
17  the knocking?
18     A   The phone rang before the knocking,
19  one ring.
20     Q   And then you shut it off?
21     A   Yeah.
22     Q   What was the duration of time
23  between the telephone ringing and the door

135

1  knocking?
2     A   I don't know.
3     Q   Would you say seconds?
4     A   No, not seconds, but there was a
5  lapse of time but I don't know. I don't know.
6  My cell, they called my cell phone too.
7     Q   Did you have a home residence
8  telephone too?
9     A   Yeah, two phones. I had a cell
10  phone.
11     Q   Okay. Your home phone rang as well?
12     A   My home phone was the main line.
13  That's the one that rang once and I turned it
14  off because I had no answering machine. My
15  answering machine broke and I just didn't get
16  another one so I turned off the ringer, and I
17  also had a cell phone and I turned off the
18  ringer of the cell phone too but for another
19  reason. I was just in a computer system and
20  they kept calling me every day and ringing it.
21  It's called CCI. It's for the Pantagraph. I
22  had to call them up and ask them to stop it.
23  I just had the ringer off that because it was

136

1  annoying for a computer to keep calling the
2  phone, so until that resolved my phone just
3  lit up when it rang.
4     My other phone just had a regular
5  ringer. Because there was something weird
6  going on in the hallway, I didn't want to
7  answer the phone or have a conversation. I
8  turned the ringer off for a second, and they
9  called my cell phone too, but I didn't see it.
10  I didn't see it lit up and nobody left a voice
11  mail message either. It lights up only.
12  Actually it might even beep once but if you're
13  doing something, you won't hear it.
14     Q   Did the two phones ring pretty close
15  in proximity in time to each other?
16     A   I don't know the exact time since I
17  didn't see the phone go off for the one that
18  was light, but the other phone just rang one
19  time. There was a ring and then I turned it
20  off. It rang exactly one time.
21     Q   And the reason you shut off the
22  ringer on the other phone is because something
23  funny was going on in the hallway?

137

1     A   I didn't want to answer my phone. I
2  didn't want to sit there and listen to it
3  ringing because I was afraid of being
4  disturbed during a telephone conversation. I
5  thought it might be my sister, Anna, calling.
6  I hadn't talked to her for a long time. I
7  left her a message that morning that I was --
8  I just said I'm cleaning up my apartment. I
9  should be here all day. You can give me a
10  call if you want. It was a very nice,
11  sisterly, regular normal message just telling
12  her that I would be home and that she could
13  call me. I received a phone call shortly
14  before the incident as well that there's
15  somebody on the line, but they didn't say
16  anything and I hung up. Maybe an hour before
17  everything happened I received a phone call.
18  There was nobody on the line and I hung up.
19     So then after there was something
20  funny in the hallway, I was just wondering if
21  it could be Anna. I didn't want to go, like I
22  hadn't talked to her in years, pick up the
23  phone and go something is going on in the

138

1  hallway, like disrupt the phone conversation
2  and have it be like awkward and stuff so I
3  just turned off the ringer so I won't have to
4  hear it ringing. I was going to just let
5  whatever was going on in the hallway finish
6  and I'd probably turn my phone back on.
7      Q   So you had left messages for -- when
8  was the last time you had talked to your
9  sister?
10     A   I think it was 2001. It might have
11 been 2000 or it was maybe between 2000 and
12 2001.
13     Q   And you had left messages for her
14 from that time up until May 20th, 2004, on her
15 answering machine?
16     A   Yes, I had.
17     Q   And then on this particular day you
18 thought that it was going to be her and you
19 didn't want to answer because there was
20 something funny going on in the hallway?
21     A   Yes.
22     Q   Okay. Why do you think -- explain
23 why you thought something funny was going on

139

1  in the hallway.
2      A   There was weird stepping and there
3  was several people in the hallway and there
4  was weird stepping and there was just a
5  shuffle or a scuffle in the hallway. I
6  thought something might have been going on
7  with the mental like patient in the No. 4
8  apartment that was vomiting on himself. That
9  was my best guess, and I just didn't want an
10 excursion to be happening so I just turned off
11 the ringer and waited another minute.
12     Q   Okay.
13     A   I didn't want to be distracted by
14 something funny going on in the hallway.
15     Q   And I guess when -- did I guess the
16 funniness in the hallway, did that stop at
17 some point and then you got in the shower?
18     A   Yeah, everything -- it just seemed
19 like, yeah, it did. It got quiet. There
20 wasn't anything weird going on.
21     Q   So at that point in time you got
22 into the shower?
23     A   Yes.

140

1      Q   Okay. It wasn't until you were in
2  the shower that you actually heard the
3  knocking on the door?
4      A   Yes.
5      Q   Did you know it was your door that
6  they were knocking on?
7      A   Yes.
8      Q   And you didn't yell anything at that
9  point in time?
10     A   There was no time to yell but no, I
11 didn't yell.
12     Q   How long did the knocking occur?
13     A   It was less than 30 seconds I would
14 say.
15     Q   And you can't estimate how long
16 after your phones had rung that the knocking
17 had begun?
18     A   There was some kind of lapse of time
19 but I honestly don't know. It wasn't like two
20 minutes or anything. There was a lapse of
21 time, but I don't know.
22     Q   Did the phone ever ring again while
23 you were in the shower?

141

1      A   No, I turned the ringer off.
2      Q   Once -- who was the person that you
3  saw, the first person you saw once they had
4  gotten into your apartment?
5      A   The door came open, a police
6  officer.
7      Q   Do you know who it was that
8  actually, and I think we may have hinted on
9  this, but who it was that actually broke into
10 the door?
11     A   No.
12     Q   In some of your pleadings you have
13 that it was the police, Bloomington Police
14 Department that battered, I think battered and
15 rammed your door was one of the -- but you
16 don't know for sure that it was them?
17     A   No, I didn't see it.
18     Q   So the first person you saw when you
19 were in the bathroom was one of the
20 Bloomington policemen?
21     A   Yes.
22     Q   What did you say to him?
23     A   What is this about?

142

1    Q    That's when he told you to get
2  dressed and come out and talk to him?
3    A    Yes.
4    Q    What did you do at that point?
5    A    I finished, I got the shampoo out of
6  my hair. I hurried. I put on clothes. I
7  went to go out to get clothes and I was in too
8  much of a hurry. There was a shirt hanging on
9  a metal, on a bar that goes across. I grabbed
10  the shirt. I actually put on -- I didn't get
11  fresh clothes. I actually put on the clothes,
12  except for the shirt, I put them on and I came
13  straight out like it was an emergency.
14    Q    So you just grabbed clothes that
15  were in the bathroom?
16    A    No, there was a shirt hanging. I
17  meant to go out to the front room but it was
18  awkward and there was people that just came
19  in, so I grabbed the shirt that was hanging on
20  a hanger already that was unironed and put the
21  stuff that I discarded, I put it back on
22  because it was an emergency. I just needed to
23  get dressed.

143

1    Q    Okay. Could you see the kitchen
2  area from the bathroom?
3    A    No.
4    Q    Could you see the living room area
5  from the bathroom?
6    A    No, not unless you're in the doorway
7  to look.
8    Q    How did you know there were other
9  people in the apartment at that point in time?
10    A    I only know that there was one other
11  person because I could hear. She spoke to me
12  from my kitchen area.
13    Q    How do you know she was in your
14  kitchen area?
15    A    Because I've lived in the building
16  for years and when you hear somebody's voice,
17  you understand that they're on the interior of
18  your apartment or in the hallway or at the
19  doorway or maybe it's a dubious spot in
20  between the two or maybe they're in the
21  doorway. You can differentiate that. It's a
22  smaller place and I've spent years living in
23  the building.

144

1    Q    How far is the kitchen area where
2  you are, I guess, alleging she was from the
3  door?
4    A    I don't know an exact measurement.
5    Q    You testified your apartment was
6  small so it probably wasn't that far away
7  from --
8    A    No, that's the whole idea. It's
9  very small. It's two rooms, a hallway, a
10  walk-in closet and a bathroom, but it is
11  small. That's why there was no mistake. It's
12  too small to mistake. They're either in your
13  apartment or they're not. They're in your
14  apartment or they're in the hallway. It's not
15  something that you miss.
16    Q    But you never saw her in the kitchen
17  area?
18    A    No.
19    Q    And then when you came out into the
20  living room area, you invited the social
21  workers in at that point in time?
22    A    Yes.
23    Q    Because they were out in the

145

1  hallway?
2    A    Yes.
3    Q    Just so I have this correct, you
4  never actually observed the social workers in
5  the apartment?
6    A    No.
7    Q    When you did come out, then you
8  invited them into your home?
9    A    Yes.
10    Q    Your first cause of action against
11  the McLean County Center for Human Services is
12  trespass, illegal entry into a residence
13  without permission, the breaking of the Fourth
14  Amendment rights and also the Illinois State
15  Bill of Rights, correct?
16    A    Yes, that sounds right.
17    Q    As you sit here today, you can't
18  tell me who broke in, who I guess broke your
19  chain on your door, correct?
20    A    No, I didn't see that.
21    Q    The police report that was discussed
22  earlier by Sergeant Randall Wycoff, the
23  narrative portion of that, he states in there

146

1   that it was actually he that determined that
2   forceable entry was appropriate so he pushed
3   the door open until the chain gave way.
4       A   Oh, right.  He says he did it, yes.
5       Q   Would that be one of the statements
6   that you would say that he has falsified?
7       A   No, I wouldn't use that.  I saw --
8   no.  I answered you, okay?  No.
9       Q   So as far as that statement in this
10  police report goes, you would testify that
11  that's accurate?
12      A   I wouldn't testify to the accuracy
13  of it but I wouldn't use it as a false
14  statement.  I'm not interested in making that
15  true or false.  I would just leave that alone.
16      Q   Well, if you're alleging that
17  someone illegally entered your apartment, I'm
18  just trying to figure out how you would make
19  that allegation since you didn't see it.
20      A   I heard the banging.  A man came
21  into my bathroom wearing a police uniform and
22  then he was sweating, I mean he was just
23  sweating and it appeared that he's the one

147

1   that broke the door because there was too
2   much -- the other police officer wasn't
3   sweating like that.  He was just all, I mean
4   he was labored and his attitude and his
5   disposition were all worked up like he was
6   just like pumped, you know.  So I speculated
7   because he was just pumped up, he was all
8   worked up and he was dripping, so I just
9   speculated that he was the one because I saw
10  him, he came into the bathroom, that pounded
11  open the door and came in.  It seemed
12  reasonable to assume that.
13          If he says in the report that he did
14  it and there was a police officer that I saw
15  come into my bathroom, I suppose that it's
16  true.  Basically he can lie about anything he
17  wants.  I don't care.  Just take my name off
18  that report.  I'm not here to find the truth
19  or the falseness of everybody and correct the
20  whole world.  Just don't lie about me.  Leave
21  me out of it is my point.  So if he lies
22  throughout that report, it's not so much my
23  concern.  It's my concern that he put my name

148

1   on a terrible report and by showing the
2   falseness of the things that he says, I may
3   also show that he's lying about me.  That's
4   all.
5       Q   How can you show that what he says
6   is false?
7       A   I have it in my notes.  You will get
8   it through the court, through the process.
9       Q   Now, you've mentioned the group of
10  notes throughout the deposition today.  So
11  you're going to send all the counsel involved
12  all of the notes that you have, correct?
13      A   I have to do a statement and I have
14  to make it official, yeah.  If I'm going to
15  file it, you have to have everything that's
16  mine.  I don't believe I'm allowed to withhold
17  anything.  Yes, it has to be out in the open.
18  It has to be clear.
19      Q   Right, but I want to make sure it's
20  clear.  I don't want you to summarize what you
21  have and only give us the summary.  You can do
22  both if you want but --
23      A   I'm sorry.  What?

149

1       Q   It sounds like what you're going to
2   do is summarize what notes you have.
3       A   Okay.
4       Q   And then give us the summary.  We
5   can actually go off for a second.
6
7           (Whereupon an off the record
8            discussion was held.)
9
10          MR. BERG:  I would agree with
11  counsel that you've been referring to notes
12  throughout the course of today's deposition in
13  saying that I can't testify accurately, I'd
14  have to consult my notes to give accurate
15  testimony, is that correct?
16          MS. GUEVREKIAN:  Yeah, sure.
17          MR. BERG:  Okay.
18          MS. GUEVREKIAN:  Yes.
19          MR. BERG:  I think as part of
20  the discovery process, what we're doing and
21  I'm joining with counsel --
22          MS. WATSON:  I will also.
23          MR. BERG:  -- that you produce

150

1  those notes; that you referring to the fact
2  that you didn't come prepared with them today
3  leaves us at a loss today because you're not
4  able to answer questions because you're not
5  able to specifically refer to those notes.  So
6  what we'd like to see are those notes as well
7  as a couple of other things that we referred
8  to during the course of the deposition.
9        MS. GUEVREKIAN:  Papers that
10  are missing.
11        MR. BERG:  Papers that are
12  missing in your discovery and the second and
13  third pages from your lease from previously.
14        MS. GUEVREKIAN:  The receipts
15  from March and April, yeah, I'm aware.  I've
16  got a list.
17        MR. BERG:  Great.  Just so that
18  we have that understanding and that
19  understanding is on the record --
20        MS. GUEVREKIAN:  Okay, sure.
21        MR. BERG:  -- that you will
22  produce that.
23        MS. GUEVREKIAN:  Sure, yes.

151

1  BY MR. SALVATI:
2     Q   So the first time that you saw
3  anyone from the McLean County Center for Human
4  Services when you got out of the shower, they
5  were still in the hallway, correct?
6     A   I'm going to turn my tape.
7        (Short pause.)
8     A   I'm good.  Thank you.
9     Q   And I'll repeat the question.  The
10  first time that -- you came out of the shower
11  on May 20, 2004, and the first time that you
12  saw anyone from the McLean County Center for
13  Human Services they were out in the hallway
14  outside of your apartment, correct?
15     A   Yes, that's -- yes.
16     Q   And you never saw or observed who
17  actually forced the entry into your apartment?
18     A   Right, yes.
19     Q   The second count you have against
20  the Center for Human Services is malpractice,
21  fraud and false accusation of crime.  I guess
22  in your pleadings you make mention of some
23  objective evidence you have that will prove

152

1  that the statements are false.  What objective
2  evidence do you have that proves that the
3  Center for Human Services' statements were
4  false?
5     A   It's part of the notes, and you have
6  a lot of it.  If you look at it and you can
7  sort it out in your head, you can see some of
8  it yourself, but you probably can't.  You
9  probably don't see it.
10     Q   Okay.
11     A   But I have to make it clear.  You
12  must explain everything and that's what I mean
13  by notes.  They're in my head.  I'm going to
14  put them down on paper.  I have reference to
15  them.  It's not any kind of notes.  It's just
16  a reference, like each one I've listed on a
17  list what I gave you and that's what I'm
18  calling my notes too.  It's very simple.  It's
19  just a reference and so far you don't
20  understand the significance maybe of
21  everything just because you don't, but I do,
22  and when I put it all together it shows.  It
23  shows.  It's objective.  It's a fact

153

1  objectively with evidence that shows.
2     Q   So the objective facts you have are
3  the list that you don't have with you today,
4  correct?
5     A   Yes, and to be still put down.  I've
6  still got work to do.
7     Q   Okay.  What objective, and this may
8  be the same answer, but what objective answer
9  do you have that proves the reports were
10  deliberately falsified with the intention to
11  mislead?
12     A   I think it's an accumulation of my
13  stuff.  I really couldn't tell you.  I really
14  can't answer you right now.  It's accumulation
15  of the body of stuff that I have that will
16  show it.
17     Q   And these are things that you have
18  not disclosed to us as of yet?
19     A   Yeah.  Tactic and technique haven't
20  really been made known because it's not time
21  yet.
22     Q   Okay.
23     A   Not appropriate.  It's not time.  I

154

1  laid a whole bunch of stuff on the table so
2  you can see it but you don't give everything.
3  You wait. It's not proper for the procedure
4  of the litigation.
5      Q   So there's a lot of discoverable
6  information that you have not provided to
7  counsel yet?
8      A   There's some. There's not a lot.
9  There's some simply, not really -- I'm not
10 really trying to withhold anything. I just
11 wasn't organized enough and didn't include it.
12     Q   Because as far as the May 20th, 2004
13 incident would go, the only thing I saw in
14 your discovery were the actual reports that
15 the Center for Human Services had created.
16     A   Actually discovery is not completed.
17 You're talking about disclosure.
18     Q   No, I'm just trying to figure out,
19 I'm asking you what objective evidence you
20 have and you're saying it's an accumulation of
21 things and what you've already provided as far
22 as this allegation goes, what you've already
23 provided us with is just the reports that the

155

1  Center for Human Services did.
2      A   Oh, I see what you're saying. Well,
3  I'll give you an example of what I'm talking
4  about. Abraham Lincoln did a case and there
5  was a man that said he saw a murder and he
6  said that he saw another man do a murder and
7  the man was going to be in trouble. Well,
8  when they went to trial, how he proved that
9  the man was lying is he used the Almanac.
10     So if somebody said give us your
11 stuff during the course of litigation, he
12 probably wouldn't have gave it to him, but he
13 picked up the Almanac and the way he proved
14 him false was the man said that he saw him by
15 the moonlight. That's how he saw the man kill
16 the other man, and there was no moon out
17 there. There wasn't even a slither. There
18 was no moon out that night; therefore, the man
19 was lying. That's how he won his case.
20     So when you say objective evidence,
21 you're showing something to be false and the
22 truth is something that's absolute. That's
23 how you prove it to be wrong. The truth is an

156

1  absolute defense or prosecution so you're
2  showing something to be false. So what I'm
3  saying, I will show the objective evidence.
4  For instance, as an example, I don't have
5  three siblings. I have four siblings. If
6  that woman had sat down and talked to me,
7  where is she getting three siblings from? I
8  didn't graduate high school, a G.E.D. Those
9  are two examples right now I'm giving you,
10 that I'm showing you that she's writing down
11 false things. She's making up stuff as she
12 goes. If she had actually sat down and talked
13 to me, she would have different information.
14     I offered to sit down and talk with
15 this woman and clear things up and she didn't
16 want to do that, and this is part of how I'll
17 show that it was like purposely or
18 intentionally involved because why wouldn't
19 she come down, sit down and talk to me? If
20 she felt that her life is threatened, she
21 could have got some help from her place or
22 something like that. We could have had a
23 discussion or conversation. She could have

157

1  been covering two bases at once, herself as a
2  job and if she had any kind of doubts or
3  whatever, she could have clarified them right
4  then and there. She chose not to and the
5  choosing of not doing it, she's showing that
6  they're intentionally done. She doesn't care
7  about anybody but God knows what. She didn't
8  care about me. She decided to just write
9  everything down and just go to town with it,
10 and this way you show that's intentionally
11 done. It's an intentional thing. She refused
12 to come in and speak with me. It's an
13 intentional type thing.
14     So I would elaborate on -- those
15 would be starters and I would elaborate minus
16 maybe some of the -- I'm going to make a
17 statement. It's going to be a doozy but I
18 would be able to edit it on my own because
19 I'll sit down so you don't get all the extra
20 crap. I get to take that out and make it a
21 little bit less taxing.
22     Q   Okay. I guess with the third
23 allegation in the complaint that has to do

158

1  with the professional incompetence, negligence
2  and malice, I guess what were the instances of
3  the professional incompetence?
4      A   Yes, the making of the report
5  incorporates -- first of all, the not checking
6  out valid information is an incompetent act,
7  period.
8      Q   Are you talking about as far as when
9  she didn't check out whether or not what your
10 sister had said to them was true?
11     A   Yeah, you bet, and then next when
12 I'm telling her it's a prank, why isn't she
13 listening to me?  What's up with that?  And
14 then when she continues to make the report, it
15 just incorporates this thing.
16         What she did was a very like
17 malicious thing.  If you write a report
18 calling somebody a mental patient, say they
19 have scary symptoms of something and then they
20 had criminal behavior with prior criminal
21 behavior, that's malice.  You're doing
22 something very bad to someone.  That's hurting
23 them.  You don't say somebody is a mental

159

1  patient when they're not.  You don't say
2  they're a criminal when they're not.  You
3  don't make reports that are false.  That's
4  malice.  That's what I'm saying.  I'm
5  incorporating malice.  It's a malicious act.
6      Q   As far as the objective evidence
7  that you said you had regarding those
8  allegations, that will be in the statement, in
9  the notes?
10     A   Yes.
11     Q   Okay.  The last one looks like it
12 was defamation, and I guess how were you
13 defamed?
14     A   We dispute the meaning of that.  The
15 first thing that she did, the first thing that
16 was done by the McLean Center anyway was that
17 without checking out the validity of a very
18 serious charge or accusation of threat, they
19 told officials.  They spread it first to the
20 police officer.  Now, those written reports, I
21 believe, are a written form of defamation
22 because if they should pop out at any time,
23 they would hurt me.  Those are bad things.

160

1  She said bad things about me.  They're bad
2  things.  They're understood by all as being
3  bad and in this way it's harmful.
4      Q   Other than what you said that the
5  defamatory statements, whether they're written
6  or oral, were communicated to the police
7  officers, do you have any personal knowledge
8  of them being communicated to any other
9  person?
10     A   No.
11     Q   Do you have any explanation or why
12 that you believe that the office for the
13 Center for Human Services falsified all these
14 reports?
15     A   I don't know.  I speculate that they
16 thought they were going to get in trouble and
17 so they had to come up with a good reason for
18 what they did so they just ran with it.  They
19 probably thought I would never see the
20 reports.  That's my speculation.  It's only
21 speculative.  I really don't know.  I don't
22 know why they did it.
23     Q   Were you on any medications on

161

1  May 20th, 2004?
2      A   No.
3      Q   Do you know your sister's, Anna's
4  current phone number?
5      A   I don't know any numbers by heart.
6  I may still -- I have something on it with a
7  number that I did actually call her with.
8  That's all.
9      Q   Have you tried to call her since
10 these occurrences?
11     A   Yes, I did.
12     Q   Did you get her answering machine?
13     A   Yes.
14     Q   When was the last time you tried to
15 call her?
16     A   I don't know, but I did try.  I
17 tried like you would not believe to get with
18 my family.  I wanted them to come forward and
19 clear them in the family.  I tried both
20 sisters repeatedly.  I tried to communicate
21 with them.  I told them that there would be a
22 way that we could clear it up and they
23 wouldn't get in trouble and could at least

162

1   come forth. I was concerned about it being in
2   our family.
3        Other than just the concern about it
4   being something written about me, I was
5   concerned about it, an ugly thing like that.
6   My sister did a very ugly thing and it's in
7   our family so I tried to talk to them
8   repeatedly. I made repeated attempts, I
9   didn't write down the dates or anything, but
10  repeated attempts since May 20th.
11       Q   So by your sister doing an ugly
12  thing, it sounds like you don't have, you
13  don't I guess -- you accept the fact that she
14  called the Center for Human Services and made
15  those allegations?
16       A   I don't know, but I'm going to guess
17  that it was accurate, yeah. I don't know.
18  You want to know the funny thing? It could
19  have been Anna. It could have been Sarah. It
20  could have been Natalie, okay? I don't know.
21  It could have been any one of them. They're
22  all capable of doing something like that. It
23  could have been my sister, Sarah, my sister

163

1   Anna, or my sister-in-law Natalie. They all,
2   each one of them could have done it and I
3   wouldn't know. No indication of who actually
4   did it. I'm just going to go with it
5   because --
6        Q   Have your sisters ever lived in
7   Bloomington?
8        A   Yes.
9        Q   They have?
10       A   Oh, yes.
11       Q   They still have friends here that
12  you have personal knowledge of?
13       A   Oh, no, not that I know of.
14       Q   Do you have any other family that
15  lives in Bloomington?
16       A   No.
17       Q   On May 20th, 2004, when the police
18  came to your apartment and when you initially
19  got to speak with them, they explained to you
20  that the reason they were there was that your
21  sister, Anna, had called the Center for Human
22  Services, correct?
23       A   No, they didn't explain anything.

164

1        Q   At no point in time they told you
2   what the reason for them being there was?
3        A   No.
4        Q   Did the Center for Human Services?
5        A   Yes, the Center for Human Services
6   spoke, sure.
7        Q   And they were the ones that
8   explained to you that the reason they were
9   here, the reason that they had all shown up at
10  your apartment was because your sister, Anna,
11  had called them and had stated that you had
12  threatened to shoot them?
13       A   Yes.
14       MR. SALVATI: Okay. That's all
15  I have.
16       MR. BERG: Go off the record
17  for a second.
18       (Whereupon an off the record
19       discussion was held.)
20
21       REDIRECT EXAMINATION
22  BY MS. WATSON:
23       Q   I have just a couple follow-ups. As

165

1   we sit here today with the information you
2   have before you today, you cannot, it's my
3   understanding that you cannot point to any
4   specific falsehoods in the Bloomington Police
5   Department reports, correct?
6        A   Not without my notes, right, sure.
7        Q   Also --
8        A   I could but I don't want to mess up
9   my tactic for presentation. I'll be glad to
10  say something. I would glad to say anything.
11  It's just not proper. It's not an appropriate
12  time. It should be organized and displayed
13  properly and not kind of blotched off. I
14  didn't just recently move into my apartment.
15  I remember this off the top of my head. I had
16  been there since March. Why would I tell them
17  I just moved over there? Why would I tell
18  them I had an argument with my sister when I
19  didn't even speak to my sister, okay, that
20  type of thing.
21       I've got a couple of them, but I
22  have a way to put it together that makes it
23  easy and non-taxing and I don't want to just

166

1  put it over there.  You can spend time and
2  pick it apart if you want.  I'll give it to
3  you but it just seems it's disorganized to
4  just do it that way.
5      Q   One thing that has been said
6  numerous times today, and I've looked over
7  this report and maybe I'm misunderstanding and
8  maybe you're just speaking about one of the,
9  what is it, health services reports, I'm not
10  sure, that was completed by the social worker,
11  but on numerous occasions you said that I
12  believe the police report terms you as a
13  mental patient.  I simply don't see it in the
14  report.  I mean if I gave this to you, could
15  you point it out to me where that is?
16      A   I don't recall ever saying that.
17      Q   Okay.
18      A   But criminal, there's a criminal
19  accusation in there.  Anybody that threatens
20  to kill -- if the police, if a police officer
21  walks into a bank and somebody is robbing the
22  bank and then they find out and then he goes,
23  oh, hi, how are you doing, I was just having a

167

1  bad day or, shoot, there was no bullets in the
2  gun, the police officer doesn't just walk out
3  of the bank and they say, oh, heck, he's
4  having a bad day, there was no bullets in the
5  gun.  He didn't mean to do it.  There was no
6  means for him to actually shoot anybody in
7  that robbery and walk away.
8      Here this police officer says she's
9  threatening to kill her entire family with a
10  gun but everything will be okay because she
11  has no means to get over there to Florida to
12  do it.  I don't think so.  That's not how it
13  works.  There's an arrest made or you need to
14  do something about it because they're
15  dangerous.  So he's labeling me as being
16  somebody that's not right.  If you're going to
17  threaten to kill anybody and especially your
18  family, you are not right.  You are mentally
19  not right.  There's something wrong with you.
20  So I don't recall saying anything about a
21  mental patient because this is separate from
22  the McLean Center.
23      Q   Uh-huh.

168

1      A   But he's making me out to be a
2  criminal and in this criminal charge too
3  you're a nut job.  I'm sorry but if you
4  threaten to kill your entire family, you're a
5  nut job and a half, okay?  And so if I
6  insinuated, that's only an insinuation but no,
7  he really doesn't say anything about me being
8  some kind of mental patient.
9      Q   Would you agree though that he said,
10  and you would agree with this statement that
11  you had no plans, no intentions, and no means
12  to go to Florida to carry out any such action?
13      A   I had plenty of means.  I had a car.
14  I had money.  I can get on an airline.  I can
15  go to Florida in five seconds.  I lived in
16  Florida.  I know the streets of Florida.  I
17  can make my way anywhere around Florida.  I
18  can drive there with 16 guns if I wanted to
19  go.
20      Q   Okay.  So you're saying --
21      A   But I don't agree, no.
22      Q   You don't agree with that statement?
23      A   No, absolutely not.  I had plenty of

169

1  means to go to Florida.  I can go to Florida
2  any time I wanted, whole bunch of money in the
3  bank.
4      Q   Okay.
5      A   I want that report gone.  I want it
6  like it didn't exist.  I want my name off that
7  report.  It just seems the opportune time to
8  mention it.  I don't mean to interrupt you.
9      Q   That's okay.  That's okay.  You
10  agree though that again he reports, "Crisis
11  was content that she posed no threat?"  Do you
12  agree with that statement in the report?
13      A   Yeah, because everybody was content.
14  Nobody said anything to me like there was a
15  problem or anything, no.  They laughed.  I
16  made a joke.  I made a joke about something
17  and they laughed about it, and they said go
18  finish your shower because they knew they
19  pulled me out of it and they said thank you
20  for talking to us.  That's what they said and
21  they left.
22      Q   And he also notes, "There was no
23  compelling reason to seize her weapons," and

Pages 166 to 169

170

1  you would agree with that statement; there was
2  no compelling reason to seize your weapons?
3      A  Sure.  Yes, I agree.
4      Q  As to March 28th, 2005, the more
5  recent date, you said that you had requested
6  the police to file a report making claims
7  against Wayne Pelhank that day, correct?
8      A  Yes.
9      Q  Okay.  And one of the officers had
10  said to you, you need to see legal or the
11  legal department to do that, correct?
12      A  His exact words are on the
13  transcript.  You need to do that through legal
14  I think it was.
15      Q  But you admit that you never
16  followed up with filing a report?
17      A  Yes.
18      Q  Why did you not follow up?
19      A  I don't trust the Bloomington
20  police.  This is the second incident.  No way.
21      Q  Also I want to clear up, and you may
22  have stated this before, but that you
23  mentioned the towing of your car.  In neither

171

1  of these two claims, neither of these two
2  complaints though are you seeking damages for
3  that; that's not a part of these two claims,
4  correct?
5      A  Right.  It's only being used to show
6  custom.
7      Q  Generally do you have any reason to
8  believe why, a reason to think that anyone in
9  the Bloomington Police Department or the City
10  of Bloomington would falsify any report or not
11  include your statements in any report?
12      A  Yes.
13      Q  And what are those?
14      A  Because it's such a liability.  It
15  opens them up to liability, whereas in
16  changing the statements they make it -- they
17  cover the liability.  In saying, oh, she was
18  going to harm herself, they changed the nature
19  of the situation like they did me a favor.  We
20  were only looking out for your well being.  We
21  were only caring about you.  We were only
22  busting open your door because we were
23  concerned about you.

172

1      Those people really weren't
2  concerned about anything.  They were on like a
3  witch hunt.  They were chasing down the fox is
4  what they were doing, you know, and when they
5  made their reports afterwards, they just
6  validated that they weren't concerned about
7  anybody.  There was no real genuine caring or
8  concern, you know.  They did what they did and
9  the law protects them from that error but
10  apparently they did not know the law.  The law
11  will say you may make blunders, you may make
12  errors and we're not going to persecute you
13  for it.
14      Q  Are you alleging that the human
15  services or the police department should
16  have -- because you've already admitted that
17  someone, a family member called and made some
18  allegations and that's how the human services
19  and police department got involved.  Are you
20  alleging that those allegations that were made
21  against you should have been investigated more
22  before acted upon by the police department?
23  Is that what you're alleging?

173

1      A  That's part of it, yes.  It
2  definitely is.  You bet.
3      Q  Lastly for my side, have you made
4  any, have you spoken to anyone that we haven't
5  talked about today about your claims, made any
6  statements to anybody about these claims?
7      A  I'm shooting my mouth off as fast
8  and as big as I possibly can because I don't
9  want to be swept under the carpet.  If
10  somebody wants to bring justice to my front
11  door, I'll shut my mouth up.  It's not a
12  problem.  I'm not an activist, a Civil Rights
13  leader or anything like that, but I'm gun-ho.
14  These are terrible things that happened in my
15  life and I'm not going to just let them
16  happen.  That's it.  So, yeah, everywhere all
17  over the place, churches -- well, lawyers are
18  an exception because you're supposed to when
19  you seek legal help; churches, organizations,
20  just small organizations.  I need help.  I'm
21  sleeping on the ground for three weeks.  I'm
22  sleeping in a shed, okay?  I've got to get
23  help.  I want what's mine.

Pages 170 to 173

174

1    Q   Are you saying you've made numerous
2  statements?
3    A   Oh, yeah.
4    Q   To numerous parties about these
5  cases?
6    A   Oh, yeah, all over the place.  I'm
7  going as fast as I can.  I can only do so much
8  at once.  I have a web site.  You want my web
9  site address?  I have a web site.
10   Q   Certainly.
11   A   I'm packing it on.  It's just the
12 http thing.
13   Q   Do you know it?
14   A   Yeah.
15   Q   By heart?
16   A   Yeah.
17   Q   Can you give it to us now?
18   A   Yeah.  It's
19 ladybugsflyhi.50megs.com.
20   Q   Is 50 numeric?
21   A   5-0, 5-0 dot M-E-G-S.  So it's
22 ladybugsflyhi, H-I, dot 50megs.com.
23   Q   Is 50megs one word, or I mean is

175

1  there any period?
2    A   50megs is one word.
3    Q   Okay.
4    A   But there's a dot before that when
5  you go ladybugsflyhi.50megs.com.
6        MR. BERG:  Just so I'm clear,
7  it's 50, M as in Mary?
8        MS. GUEVREKIAN:  Yeah.
9        MR. BERG:  E-G-S?
10       MS. GUEVREKIAN:  Yeah.
11       MR. BERG:  Dot com?
12       MS. GUEVREKIAN:  Yeah, yes.
13       MR. BERG:  Thank you.
14 BY MS. WATSON:
15   Q   Has your communication with these
16 numerous parties been through letters or
17 telephone calls or face to face meetings?
18   A   Some face to face and some through
19 E-mails.  I've been trying the E-mails.  I've
20 been going to the churches and talking to the
21 pastors.  Pastors are holy people.  Most of
22 them won't care about any of this.  They don't
23 care about anything.  They just care about

176

1  what's right and what's wrong and what's going
2  on in God's land.  So I'm cutting through all
3  the chase.  I'm going to the churches.  I need
4  help.  I need somewhere to stay.  I'm 42 years
5  old.
6    Q   Have you made any statements to the
7  newspapers or anything like that?
8    A   I've tried to make, not statements
9  but I've tried to say look at this court file,
10 look at this court file, and they haven't
11 touched it.  I've written every paper and
12 said, like through the E-mail and said like
13 look at this case number, McLean County and
14 stuff like that, but as far as I know,
15 nobody's taken it.
16   Q   Now, you realize that if any of
17 that -- I mean if you have any of that in
18 print and everything, that's all discoverable
19 and should be disclosed to us if you've got
20 copies of letters.  If you've got copies of
21 E-mails, I mean I'm going to request that we
22 get copies of all of that if you have it.
23   A   I should have some E-mails if you

177

1  want it but the rest of the stuff I don't
2  have, and in person is actually a confidential
3  thing.  It's actually a confidential thing
4  with everything I say to a pastor.  Can't
5  touch it.  That's why I'm there.
6    Q   Can you describe what's on your web
7  site?
8    A   Sure.
9    Q   With regards to these two cases?
10   A   Yeah, it's simple reference.  It
11 includes the complaint in full, the names of
12 the parties.  A little bit of reference to the
13 library too is on there but that doesn't
14 really follow.  It's extra.  I guess that's
15 it.  It's got the complaint, the initial
16 complaints for those two cases.  I guess
17 that's really it.  I'm not messing with that
18 right now because it's where it should be.
19 It's proper so I'm not messing really with it.
20   Q   Where do you access the internet?
21   A   The Bloomington Public Library.
22 They don't hang anything from the ceiling.  I
23 hope that it's safe.  I've been going there

178

1  for 15 years.
2    Q    Would there be any other references
3  that you know of on the internet regarding
4  these two cases?
5    A    Yes, there's also some other web --
6  there's also some other web sites that I made.
7  I started writing them like -- I don't know.
8  There's several.  There's a number of them.  I
9  went to an Armenian site and made an ad.
10    Q    Sorry.  Armenian?
11    A    I'm Armenian.
12    Q    Oh, the nationality?
13    A    Yeah.  So I went to an Armenian site
14  and there's a couple other sites.  There's a
15  site that I started but I couldn't figure out
16  how to use their editor, so there's a little
17  notation there but like I dumped it because it
18  was too much work.  I've only got so much
19  time.  I was like, oh, okay.  Wait 20 minutes
20  for that?  No.
21    Q    Do you know the addresses to any of
22  these sites or could you disclose them to us
23  later if you don't have them?

179

1    A    If you punch in my name, you can get
2  some yourself.  It comes up on the search.
3    Q    So say I google Lynn Guevrekian?
4    A    Yeah, you will get googled.
5    Q    So specifically you can recall two
6  other sites?  Other than the ladybugsflyhi
7  site, there's at least two other sites where
8  references were made to these two cases?
9    A    Yeah.
10    Q    Okay.  And possibly more than those
11  two?
12    A    Yeah, but I've written everything
13  down.  I'd have to find where it is.  I've
14  kept track of everything.  That's a password
15  to everything so everything can be taken down
16  too if you want it down.  If somebody wants it
17  down, it can be taken down is the thing I
18  guess.
19        MS. WATSON:  Okay.  That's all
20  I have for right now.
21        MR. BERG:  Just a couple
22  follow-up.
23

180

1        REDIRECT EXAMINATION
2  BY MR. BERG:
3    Q    Damage to the door on 3/28/05, at
4  least according to your prior testimony, was
5  done when the police arrived, is that right?
6    A    Yes.
7    Q    Did the police break the door open
8  further when they arrived on 3/28/05 or did
9  you let them in?
10    A    They didn't break it open further
11  and I never let them in because the issue
12  never arose.  They just handed me the paper
13  through the door and then they left.
14    Q    The chain holding the door closed
15  was still intact when the police arrived?
16    A    Yes.
17    Q    You never had to replace the second
18  chain, is that correct?
19    A    Yes.
20    Q    And the damage to the door, was that
21  ever repaired?
22    A    I don't know.
23    Q    What damage was there to the door?

181

1    A    The original lock was just bent like
2  it was unusable so I put in another lock.
3    Q    You put in another deadbolt?
4    A    Yes.  The one that was in it was not
5  usable.  It was just too bent out of shape.
6    Q    Did you have permission from the
7  landlord to put in another deadbolt?
8    A    No.
9    Q    Did you tell the landlord about
10  damage to the deadbolt?
11    A    No.
12    Q    So sometime between 3/28/05 and the
13  time you moved out sometime in that first week
14  of May of 2005 you had a different deadbolt
15  with a different key to the apartment No. 6
16  that you lived in, is that correct?
17    A    I didn't understand the question.
18  Sorry.
19    Q    What didn't you understand about it;
20  any of the question?
21    A    I didn't understand the question.
22  I'm sorry.  If you repeat it, I'll try again.
23    Q    I'm going to have her repeat it

182

1   because I don't remember what I said.
2        (Record read as requested.)
3    A   Okay.  Yes.
4    Q   Did you ever give the landlord or
5   anyone from Heartland Apartment Management a
6   key to your apartment?
7    A   Yes.
8    Q   When?
9    A   The day I moved out I sent it to him
10  Registered Mail.
11   Q   But not prior to that date, is that
12  correct?
13   A   Yes.
14   Q   Did you ever inform anyone from
15  Heartland Apartment Management that you had
16  changed the lock on your door after 3/28/05?
17   A   No.
18   Q   And the only reason you changed the
19  lock was because the deadbolt was damaged or
20  bent, is that right?
21   A   Yes, I left it in the apartment.  It
22  was broken.
23   Q   Anything other than the deadbolt

183

1   bent as far as damage to the door?
2    A   The frame was just wrecked.  It was
3   completely wrecked.  I wouldn't even trust the
4   deadbolt that I put on because it was fried,
5   needed to be fixed and repaired.  It was a
6   mess.  It was just chipped away and bent out
7   of shape and partially gutted out, excuse me.
8   So the door was a mess.  The door frame, the
9   actual door frame and like the part of the
10  door itself, it was just a mess.  It was a
11  beat up mess.
12   Q   And it wasn't like that before
13  3/28/05?
14   A   No.
15   Q   It was in perfect condition before
16  that date?
17   A   Actually, no.  It looked to me that
18  it was a little bit beat up.  There was some
19  stuff going on there.  It was not in perfect
20  condition, no.  It's an old building.  It's
21  been there for a long time.  It's at least
22  100 years old, but it was intact and
23  functionable, and after the incident it was not

184

1   functionable.
2    Q   Until you replaced it?
3    A   It was dramatically chipped and it
4   was not functionable.
5    Q   Until you replaced the deadbolt?
6    A   No.  Actually, no.  I replaced the
7   deadbolt because it didn't work but I didn't
8   trust the deadbolt.  I felt you could just
9   push it open and it would just go on in.  It
10  was not reliable.  It wasn't sound, no.  Does
11  that answer it?  I'm sorry.
12   Q   I don't know.  It was not sound.
13  Did it keep the door closed?
14   A   Yes, it kept the door closed but not
15  secure.
16   Q   Did it keep the door locked?
17   A   It didn't keep the door secure, no,
18  but closed, yes.
19   Q   Did it keep the door locked?
20   A   Yes.
21   Q   As far as your sisters and your
22  sister-in-law, Anna, Sarah, and Natalie, did
23  you have a good relationship with any of them?

185

1    A   Yes.
2    Q   Do you still have a good
3   relationship with any of them?
4    A   No, there's no relationship.
5    Q   Okay.  When did the relationship
6   between any of them sour; after the
7   inheritance after your dad died?
8    A   No.  There was a barrier when I left
9   Florida.  I lived in Florida for a while and
10  they didn't like me leaving.  There was a
11  resentment for me to leave.
12   Q   Why is that?
13   A   I don't know.
14   Q   You have absolutely no history of
15  mental illness, is that right?
16   A   Yes.
17   Q   And no history of psychological or
18  psychiatric treatment, is that correct?
19   A   Yes.
20   Q   You've had no medical or psychiatric
21  treatment since either the 5/20/04 incident or
22  the 3/28/05 incident, is that correct?
23   A   Yes, and I don't expect to have any.

186

1    Q   Okay.  You weren't physically
2  injured in either the 5/20/04 incident or the
3  3/28/05 incident, is that correct?
4    A   No.
5    Q   That's not correct?
6    A   No.  My injury happened after the
7  first incident on May 20th, two weeks or so,
8  from May 20th to June 7th.  I was already
9  injured from June 7th.  That's why I fell
10 behind on my rent.
11   Q   My question is were you physically
12 injured in either the 5/20/04 incident or the
13 3/28/05 incident?
14   A   Oh, I'm sorry.  There's a double
15 meaning to that.  I heard it wrong because I
16 have a physical injury.  There's a double --
17 that question can be interpreted two ways.
18 Okay, no problem.
19   Q   Do you understand my question?
20   A   Yes.  You're asking was I injured in
21 each of the incidents, and of course I was
22 injured.
23   Q   Were you physically injured -- let

187

1  me break up the question, okay?
2    A   Oh, I see.
3    Q   Were you physically injured in any
4  way in the 5/20/04 incident that we're here
5  today to discuss?
6    A   No.
7    Q   Were you physically injured in any
8  way in the 3/28/05 incident?
9    A   No.
10   Q   I understand you had a physical
11 injury in the library?
12   A   Yes, and I ran it together so your
13 question had another meaning.  You're saying
14 were you physically injured and I'm saying
15 yes, I have a physical injury.  See how it
16 carried over?  Okay.
17   Q   Okay.  But you weren't physically
18 injured as a result of either --
19   A   No, sir.
20   Q   -- the 5/20/04 or 3/28/05 incidents,
21 is that correct?
22   A   Yes.
23   Q   Do you currently have a cell phone?

188

1    A   No.
2    Q   Did anyone from the Heartland
3  Apartment Management repair your door after
4  3/28/05 and before you moved out?
5    A   No, but there was an offer to repair
6  the door.
7    Q   When was that made?
8    A   I may have it written down but I
9  don't know.  A maintenance, a person
10 announcing themselves as maintenance offered
11 to come and repair the door.
12   Q   Okay.  And did you decline that
13 offer?
14   A   I asked him what his name was and he
15 wouldn't answer me and then didn't really
16 decline.  He kind of just went away.
17   Q   But sometime after 3/28/05 the offer
18 was made by someone who represented themselves
19 as being maintenance from Heartland Apartment
20 Management?
21   A   Yes.
22   Q   And the offer was to repair your
23 door, is that correct?

189

1    A   Yes.
2    Q   But as far as you know, the door was
3  never repaired after 3/28/05 at least until
4  you moved out in May of 2005, correct?
5    A   Yes.
6    Q   Other than the repairs that you made
7  yourself?
8    A   Yes.
9        MR. BERG:  Okay.
10       MS. WATSON:  I have no more.
11       MR. BERG:  Signature?
12       MS. WATSON:  I'll waive.
13       MR. BERG:  As far as do you
14 want to explain it to her?
15       MS. WATSON:  You can reserve
16 signature which means that you can review the
17 transcript prior to signing off on its
18 accuracy.  You can't make substantive changes
19 but if there's like grammatical errors and
20 things like that, you can change that before
21 signing off on the transcript.
22       MS. GUEVREKIAN:  Okay.  I would
23 like to reserve or review.  Is that what it's

190

1  called?
2        MS. WATSON:  Yeah, reserve
3  signature.
4        MS. GUEVREKIAN:  Reserve
5  signature.
6        MR. BERG:  The only issue is
7  that the court reporter needs to know, and she
8  has your post office box number, where to mail
9  the transcript and you will need to return the
10  transcript to her after you've had an
11  opportunity to review it and make any changes
12  as far as grammatical changes, spelling
13  changes.  You understand that you can't make
14  changes to the substance of your testimony?
15        MS. GUEVREKIAN:  Yes.
16        MR. BERG:  Okay.  And if that's
17  okay to mail it to your post office box and
18  you will agree to return it back to the court
19  reporter in a timely fashion.
20        MS. GUEVREKIAN:  Yes, that's
21  fine.
22      WITNESS FURTHER SAYETH NOT;
23      BY AGREEMENT, SIGNATURE NOT WAIVED.

191

1  STATE OF ILLINOIS  )
                       )
2  COUNTY OF PEORIA  )
3      I, PAULA A. MORSCH, Certified
4  Shorthand Reporter and Officer of the Court
5  authorized to report depositions, do hereby
6  certify that heretofore, to-wit, on the 6th
7  day of September, 2006, at the hour of
8  1:00 p.m., LYNN T. GUEVREKIAN personally
9  appeared before me at 207 West Jefferson, in
10  the City of Bloomington, County of McLean,
11  State of Illinois.
12      I further certify that the said
13  witness was by me first duly sworn to testify
14  to the truth, the whole truth and nothing but
15  the truth in the cause aforesaid, that the
16  testimony then given by said witness was
17  reported stenographically by me in the
18  presence of said witness and afterwards
19  reduced to typewriting, and the foregoing is a
20  true and correct transcript of the testimony
21  so given by said witness as aforesaid.
22      I further certify that the signature
23  of the witness to the deposition was not

192

1  waived by agreement of counsel.
2      I further certify that I am not
3  counsel for nor in any way related to any of
4  the parties to this suit, nor am I in any way
5  interested in the outcome thereof.

6

7  _Paula Morsch_ C.S.R.
8

193

1          SIGNATURE PAGE
2  LYNN T. GUEVREKIAN,      )
                            )
3        Plaintiff,  )
                      )
4              ) No. 05 L 1370
   VS.         ) No. 05 L 1369
5              )
6  BLOOMINGTON POLICE      )
   DEPARTMENT, CITY OF     )
   BLOOMINGTON, McLEAN COUNTY  )
7  CENTER FOR HUMAN SERVICES,  )
   HEARTLAND APARTMENT      )
8  MANAGEMENT and WAYNE PELHANK,)
9        Defendants. )
10
11
12
13      I have read the foregoing transcript
14  of my deposition and the questions asked and
15  the answers given are true and correct as
16  recorded, with the addition of any
17  corrections/amendments thereto.
18
19
20  _____
      LYNN T. GUEVREKIAN, Deponent
21
22
23

E-FILED
Friday, 01 December, 2006  02:38:15 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS -- PEORIA DIVISION

| | | |
|---|---|---|
| LYNN T. GUEVREKIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-CV-01369 |
| | ) | |
| BLOOMINGTON POLICE DEPARTMENT, | ) | |
| CITY OF BLOOMINGTON, McLEAN | ) | |
| COUNTY CENTER FOR HUMAN | ) | |
| SERVICES, HEARTLAND APARTMENT | ) | |
| MANAGEMENT, and WAYNE PELHANK, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF KEVIN FORRESTER

I, KEVIN FORRESTER, being first duly sworn, do hereby attest and state that I have personal knowledge of the following matters, and if called as a witness herein, I could and would competently testify as follows:

1.    On May 20, 2004, I was a maintenance and repair contractor who was working for Heartland Apartment Management as an independent contractor.

2.    On that date, I received a telephone call from the Bloomington Police Department, requesting that I meet police officers at 620½ North Main Street, Bloomington, Illinois with keys to the building.

3.    Upon my arrival at the building, a police officer told me that he had reason to believe that a person inside Apartment #6 posed a present danger to herself or others, and instructed me to unlock the door of that apartment.

4.    When I attempted to unlock the door of the Apartment #6 with a key, the door would not open.

5.      A police officer pushed against the door until the lock broke and the apartment door opened.

6.      Neither I, nor any representative of Heartland Apartment Management, participated in breaking the lock and opening the door to Apartment #6 on May 20, 2004.

7.      Neither I, nor any representative of Heartland Apartment Management, entered Apartment #6 on May 20, 2004.

8.      After the police officers opened the door and entered Apartment #6, I left the building.

9.      Wayne Pelhank was out of town on May 20, 2004, and was not present at or outside Apartment #6 when I was there.

10.      Other than my name and address, I did not supply any information to the officers from the Bloomington Police Department for their report.

11.      I have never seen copies of any written reports that may have been made by the Bloomington Police Department or McLean County Center for Human Services in connection with the events which occurred on May 20, 2004 at 620½ North Main Street, Apartment #6.

FURTHER AFFIANT SAYETH NAUGHT.

KEVIN FORRESTER

SUBSCRIBED AND SWORN TO BEFORE
me this    29th    day of
    November    , 2006.

NOTARY PUBLIC

"OFFICIAL SEAL"
JUNE E WATT
Notary Public, State Of Illinois
My Commission Expires 03/25/10

E-FILED
Friday, 01 December, 2006  02:38:33 PM
Clerk, U.S. District Court, ILCD

State of Illinois
In The Circuit Court of The Eleventh Judicial Circuit
County of McLean

| | | |
|---|---|---|
| Heartland Apartment Management, | ) | |
| Plaintiff, | ) | Case No. |
| vs. | ) | |
| Lynn Guevrekian, | ) | 05 LM 227 |
| Defendant(s). | ) | |

## COMPLAINT IN FORCIBLE ENTRY AND DETAINER

HEARTLAND APARTMENT MANAGEMENT, Plaintiff, alleges that he is entitled to possession of the following described premises, situate in the City of Bloomington, McLean County, Illinois, to wit:

### 620 ½ North Main #6

that the defendant(s) unlawfully withhold(s) possession thereof from Plaintiff and furthermore is/are indebted to Plaintiff for unpaid rent and late charges **as of April 6, 2005** in the amount of **$1,888.21**, as per the attached lease marked as Plaintiff's Exhibit #1, in addition to rent in the amount of **$375.00 plus late fees** for each month subsequent to **April 2005** along with collection costs and/or attorney fees in the amount of **$750.00** as per provision **12** of said lease. That a Five Day Notice was served upon the Defendant(s) and the Defendant(s) has/have failed to pay the amount of rent demanded. Said Notice is attached herewith and marked as Plaintiff's Exhibit #2.

WHEREFORE, Plaintiff prays for Judgment against Defendant(s), **Lynn Guevrekian,** for possession of said described premises, for unpaid rent and late charges for the sum of **$1,888.21 in addition to rent in the amount of $375.00 plus late fees for each month subsequent to April 2005 with collection costs and/or attorney fees in the amount of $750.00** and costs of suit.

STATE OF ILLINOIS
COUNTY OF McLEAN
I, the undersigned Clerk of the Circuit Court in and for the County of McLean, State of Illinois, do hereby certify that the foregoing is a true copy of the original instrument filed in my office.
Given under my hand and seal this 22
day of September, 2006.

Clerk of the Circuit Court

Deputy

Dated: April 6, 2005

Eitan Weltman, Attorney for Plaintiff

Wayne Pelhank, agent for Plaintiff

FILED
McLEAN          COUNTY
APR 0 7 2005
CIRCUIT CLERK

**Eitan Weltman
Attorney at Law
802 N. Clinton, Suite A
Bloomington, IL 61701
(309) 829-4422
Reference No. HL5G0006**

# AFFIDAVIT OF RENT DUE

**Wayne Pelhank**, being duly sworn, on oath says he, the agent for the plaintiff in the within cause, that the demand of the plaintiff in said cause is for possession of the said premises and unpaid rent that the amount due to said plaintiff from the defendant(s) in said cause and after allowing to said defendant(s) all just decisions, credits and setoffs, if any, is **$1,888.21 in addition to rent in the amount of $375.00 plus late fees for each month subsequent to April 2005,** collection costs and/or attorney fees of **$750.00,** and costs of suit.

_____
**Wayne Pelhank**, agent for Plaintiff

Verification of collection costs and/or attorney
fees to be charged:

_____
Eitan Weltman, Attorney for Plaintiff

Signed and sworn to before me this __6th__ day of
__April_____, 2005.

_____
(Notary Public)

OFFICIAL SEAL
AMY E. SWANSON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4-20-2008

_____
(Clerk of the Circuit)

**Eitan Weltman**
**Attorney at Law**
**802 N. Clinton, Suite A**
**Bloomington, IL 61701**
**(309) 829-4422**

## NOTICE

Unless you notify this office within 30 days after receiving this complaint that you dispute the validity of this debt or any portion thereof, this office will assume that this debt is valid. If you notify this office in writing within 30 days from receiving this complaint, this office will obtain verification of the debt and mail you a copy of such verification. If you request this office in writing within 30 days from receiving this complaint, this office will provide you with the name and address of the original creditor, if different from the current creditor.

**Eitan Weltman**
**Attorney for Plaintiff**
**802 N. Clinton – Suite A**
**Bloomington, IL 61701**
**(309) 829-4422**
**Reference No. HL5G0006**

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

# HEARTLAND APARTMENT MANAGEMENT, LLC

901 E. Grove St. Sui   Bloomington IL 61701   309-828-8105

## Apartment Lease Agreement

**Exhibit #1**

This agreement made and entered into on _4/1/04_____, by and between Heartland Apartment Management, hereinafter referred to as LESSOR

and _Lynn Guberekian_____ hereinafter referred to as LESSEE.

1. **PREMISES LEASED.**
LESSOR hereby grants LESSEE Apt. No. _6_ in the premises known as _620½ N. Main St. Bloomington IL_ which shall be unfurnished by LESSOR.

2. **TERM.** The term of this lease shall commence on _April 1   2004_ and shall expire on _March 31   2005_.
LESSEE is required to give thirty (30) days WRITTEN notice prior to vacating the premises. Should LESSEE remain in possession of the premises with the consent of LESSOR, a new month-to- month tenancy shall be created between the LESSOR and LESSEE which shall be subject to all the terms and conditions hereof, termination of which requires thirty(30) days WRITTEN notice from the 1st of the month by either LESSOR or LESSEE on the other party.

3. **RENT. A:** LESSEE agrees to pay LESSOR the sum of $_4,000_ as rental. This sum is to be paid as follows: $_325_ the _1st_ day of _April_
_2005_, then $___325___ on the 1ST day of each month. Payments not received in the office of the LESSOR 5 days after due date will be assessed a 10% late charge on the 6th day of the month, and shall be increased an additional $1.00 per day for every day thereafter in which the full amount remains unpaid. If LESSEE's check is dishonored by the bank, an additional service charge of $25.00 will be assessed in addition to the accrued late charge, if any, from the 6th day of the month until the date on which the insufficient check is redeemed. If LESSEE gives LESSOR any checks returned for nonpayment during the term of this lease, then all future rent shall be payable by cash, money order, or bank check only. A service fee of $25.00 will be assessed to LESSEE for any and all legal notices served upon LESSEE. Any and all outstanding charges for security deposit, late charges, damage, repairs, or service fees and charges will be first deducted from any monies tendered before being applied to rent.

**B:** Joint Rental Responsibility: The term "LESSEE" as used herein shall be construed to mean "LESSEES" who shall be jointly and severally liable for all rental payments. It being the understanding that each LESSEE shall be individually liable for any and all rental payments due and owing and that all LESSEES shall be liable until such payments are made.

4. **SECURITY DEPOSIT.** Upon signing this lease, LESSEE shall deposit with LESSOR the total sum of $_335_ as a security deposit held in the LESSOR's non-interest bearing business account. LESSEE waves having money held in an escrow interest-bearing account. All refunds shall be mailed to LESSEE if LESSEE provides LESSOR with a stamped, self-addressed envelope. Such refund shall be made after inspection of the premises by LESSOR, but not later than 30 days after expiration of the lease. LESSOR's assessment of any such loss or damage shall be binding upon the parties hereto.

5. **UTILITIES.** LESSOR agrees, at LESSOR's expense, to furnish the following utility services to the premises:
( ) ELECTRICITY   ( √ ) HEAT   ( √ ) GAS   ( √ ) WATER & SEWER   ( √ ) GARBAGE COLLECTION
LESSEE shall provide and pay for all other utilities from the first day of occupancy. LESSEE shall keep heat high enough to prevent pipes from freezing. LESSEE shall supply their own light bulbs, shower curtain, and smoke detector batteries.

6. **OCCUPANCY OF PREMISES.** The premises shall be used by LESSEE only as a private residence. The premises will be occupied only by {all adults & children must be listed}: _Lynn Guberekian_____

No animals, birds, or pets of any kind will be permitted upon the premises or elsewhere within the apartment complex under any circumstances. LESSOR may remove pets without notice. LESSOR not responsible for removed pets and may release to outdoors. LESSEE shall pay LESSOR upon written demand the sum of $50.00 for this violation plus $10.00 per day for each day thereafter that LESSEE violates this rule.

7. **ACCEPTANCE OF PREMISES:** LESSEE has examined and accepted the premises. LESSEE has the right to report, in writing, defects and damages within seventy-two hours after possession of the premises and to complete and return to LESSOR the Move-In Inspection Sheet. Defects and damages not thus reported to LESSOR shall be presumed to have first occurred during LESSEE's occupancy of the premises.

8. **USE AND CARE OF PREMISES: A:** Said premises shall be used solely for residential purposes and kept in a clean, neat, and odorfree condition. Further, LESSEE shall not permit any unlawful or immoral practices to be committed upon the premises, nor use the premises for any purpose that will increase the insurance rate thereon. Further, the use of the premises by LESSEE hall be in a manner consistent with the rights of other residents of said building or adjoining properties and so as not to cause undue disturbance. LESSEE shall not allow any other persons to occupy said remises rented, excepting casual visits of friends or guests limited to a three (3) day stay maximum in any one month. Absolutely no lock changes are permitted by LESSEE. Any request to change locks must be paid for in full prior to installation. Any and all painting, remodeling, wall papering and/or paper boardering MUST be approved by LESSOR in writing prior to starting work.

**B:** LESSEE shall be liable for any damage to the premises, furnishings, and appliances within said unit. Upon termination of said lease, the unit including furnishings and appliances shall be left by LESSEE in sanitary, clean condition, suitable for immediate lease to another tenant and any loss, cost or expense occasioned by LESSEE's failure to do so shall be charged against the aforesaid security deposit. LESSOR's and/or AGENT's decision as to said condition and the necessity of expense to render said unit in usable condition shall be binding upon the parties hereto.

9. **DAMAGE TO LESSEE'S PROPERTY: A:** LESSOR shall not be liable for any loss or damage to LESSEE's personal property caused by fire, theft, actions or omissions of other lessees or occupants, failure to maintain plumbing, water, gas steam, or other pipes or toilets or failure to make any other repairs on the premises.

**B:** LESSEE covenants and agrees to make no claim against LESSOR, its agents, or employees for any damage, personal injury or loss of use occasioned thereby.

10. **ENTRY:** The LESSEE agrees that at reasonable times prior to termination of this lease, the LESSOR or its agents may enter the premises without prior notice for the purpose of inspection, cleaning, remodeling, or repairs; or to show the same to prospective new tenants or buyers.

11. **ASSIGNMENT AND SUBLETTING:** LESSEE shall not assign or sublease these premises without first obtaining LESSOR'S prior written consent. Subleasing fee is $100.00 per transaction.

12. **DEFAULTS:** Upon the non-payment of the whole or any portion of rental herein or breach of any term or condition of this lease by LESSEE, the LESSOR may at his election, either distrain for said rent due, or declare this lease at an end and recover possession as if the same were held by forcible detainer, the Lessee hereby waiving any notice of said election or any demand for the possession of said premises. LESSEE shall pay all collection costs, all reasonable attorneys fees and expenses of LESSOR incurred in enforcing any of the obligations of LESSEE or any provisions of the lease. It is further covenanted and agreed that in case of any default by the Lessee in the payment of the rent or otherwise, the lessor or his agents shall have the right to re-enter and take full and absolute possession of the above premises, either by forcible entry, detainer proceedings or otherwise, and hold and enjoy the same fully and absolutely, without such re-entry working a forfeiture of the rents to be paid and the covenants to be performed by said lessee during the full term of this lease.

13. **ILLINOIS HUMAN RIGHTS ACT:** It is illegal for the LESSOR to refuse to rent to any person due to race, color, religion, national origin, sex, ancestry, age, marital status, physical or mental handicap, familial status, unfavorable military discharge, discharge status, or any other class protected by Article 3 of the Illinois Human rights Act.

14. **SPECIAL PROVISIONS OR ADDITIONAL AGREEMENTS:** _____

**READ THIS ENTIRE INSTRUMENT BEFORE SIGNING**

LESSEE(S)   MANAGER: _____

_Lynn Guberekian_   Heartland Apartment Management, LLC

_____

Exhibit #2

# 5 DAY NOTICE TO PAY RENT OR QUIT

TO:    Lynn Guevrekian                                    March 23, 2005

620 ½ N. Main St. Apt. 6

Bloomington IL 61701

Notice to you and all others in possession of the below premises, that the Lessor hereby demands that you pay all rent due as listed below within 5 days of the delivery of this notice. If you fail to make full payment as required, the Lessor will consider your possessory interest under the lease terminated, and will sue for possession and damages. The property covered by the lease is described as:

620 ½ N. Main St. Apt. 6
Bloomington IL 61701

This notice is provided due to non-payment of rent. The present rent arrearage is in the amount of **$1,513.21.**  Only FULL PAYMENT within **5 days,** of the rent demanded in this notice will waive the landlord's right to terminate your possessory interest under this notice, unless the landlord agrees in writing to continue possession in exchange for receiving partial payment.

In the event you fail to comply with this notice or vacate the premises, we shall immediately take legal action to evict you and recover rents and damages for the unlawful detention of said premises together with such other rents as may be due us for breach of your agreement.  **Failure to comply with this notice will cause you to be evicted.**

**HEARTLAND APARTMENT MANAGEMENT, LLC**

**BY :** _____
901 E. Grove St. Suite 3A Bloomington IL 61701  309.828.8105

### PROOF OF SERVICE

I, the undersigned, being at least 18 years of age, declare under penalty of perjury that I served the within notice to pay or quit, of which this is a true copy, on the above named tenant in the manner indicated below on _____ March 28 _____, 2005:

✓_____   I personally delivered a copy of the notice to tenant or residence.

_____   I mailed a true copy of the notice to tenant by certified mail, return receipt requested.

_____   I posted a true copy of this notice on the premises door.

Executed on _____ 3/28 _____, 05, at _____ 10:45 A.M. .

By : _____

E-FILED
Friday, 01 December, 2006  02:38:44 PM
Clerk, U.S. District Court, ILCD

# RECORD SHEET

Case No. _____05 LM 227_____

Nature of Case _____FORCIBLE DETAINER_____

Attorneys _____EITAN WELTMAN_____

HEARTLAND APARTMENT MANAGEMENT

VS

LYNN GUEVREKIAN

RECEIPT # 576464

| DATE | | | JUDGE AND REPORTER | | COSTS | |
|---|---|---|---|---|---|---|
| | | | | | Dollars | Cents |
| 04 | 07 | 05 | | COMPLAINT AND PRAECIPE FILED | 108 | 00 |
| APR 1 3 | 2005 | | | MOTION W/ ORDER FOR PPS | | |
| APR 1 3 | 2005 | | | SUMMONS ISSUED BY PPS 4-22-05 @ 9:00 | | |
| 4 22 05 | WEPA | | | Defendant(s) _____ appear(s) and admits to all allegations in the complaint. defendant(s) admit(s) to wrongfully withholding possession of the following premises: s/o | | |
| | | | | Judgement is entered for the rent past due in the sum of $ 2,140.00 , plus cost of the suit. Order for possession is stayed until 5-6-05 . See order. | | |
| | | | | Summons filed | | 25— |
| | | | | Order filed | | |

STATE OF ILLINOIS
COUNTY OF McLEAN
I, the undersigned Clerk of the Circuit
Court in and for the County of McLean,
State of Illinois, do hereby certify that the
foregoing is a true copy of the original
instrument filed in my office.
Given under my hand and seal this _____
day of _____
_____
Clerk of the Circuit Court
_____
Deputy

E-FILED
Friday, 01 December, 2006  02:38:57 PM
Clerk, U.S. District Court, ILCD

State of Illinois
In The Circuit Court of The Eleventh Judicial Circuit
County of McLean

Heartland Apartment Management,
                    Plaintiff,                                    Case No. 05 LM 227
        vs.
Lynn Guevrekian,
                    Defendant(s).

## JUDGMENT AND ORDER FOR POSSESSION

FILED
APR 22 2005
McLEAN COUNTY
CIRCUIT CLERK

**THIS CAUSE COMING ON TO BE HEARD** upon the Complaint of the Plaintiff, **Heartland Apartment Management,** and the issues thereof having been heard and determined by the Court, and said Court having found Plaintiff is entitled to the possession of the premises described herein.

### IT IS THEREFORE ORDERED AND ADJUDGED:

1.  That the Plaintiff have and recover of and from the Defendant(s), **Lynn Guevrekian,** the possession of the following described premises:

        **620 ½ North Main #6, City of Bloomington, McLean County, Illinois**

2.  That the Plaintiff have and recovery of and from the Defendant(s), **Lynn Guevrekian,** damages in the sum of $ 2,140-00 and its costs in its behalf expended.

3.  Enforcement of this Judgment is stayed until MAY 6, 2005 . Said Order to be enforced by the McLean County Sheriff.

DATE: 4-22-05

William T. Caisley
JUDGE

Lynn Guevrekian

4/22/05

STATE OF ILLINOIS
COUNTY OF McLEAN
I, the undersigned Clerk of the Circuit Court in and for the County of McLean, State of Illinois, do hereby certify that the foregoing is a true copy of the original instrument filed in my office.
Given under my hand and seal this 22
day of September, 2006.
Sandra K Parker
Clerk of the Circuit Court
Deputy

**Eitan Weltman**
**Attorney for Plaintiff**
**802 N. Clinton, Suite A**
**Bloomington, Illinois 61701**
**(309) 829-4422**
**Ref. No. HL5G0006**