**E-FILED**
Monday, 04 December, 2006  02:42:35 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| LYNN T. GUEVREKIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-1369 |
| | ) | |
| BLOOMINGTON POLICE DEPARTMENT, | ) | |
| CITY OF BLOOMINGTON, McLEAN | ) | |
| COUNTY CENTER FOR HUMAN | ) | |
| SERVICES, HEARTLAND APARTMENT | ) | |
| MANAGEMENT and WAYNE PELHANK, | ) | |
| | ) | |
| Defendants. | ) | |

## CITY OF BLOOMINGTON'S
## MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendant, CITY OF BLOOMINGTON, by its attorneys, QUINN, JOHNSTON, HENDERSON & PRETORIUS, and for its Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56, states:

### I.  INTRODUCTION

Guevrekian's sister called the Center for Human Services and reported that Guevrekian threatened to kill her family. The Center reported to the police that the resident of 620 North Main, Apartment 5, Lynn Guevrekian, said she was going to start shooting people.  Bloomington police officers were dispatched to Guevrekian's apartment.  Though Guevrekian was obviously home, she did not answer her door or telephone calls.  Bloomington police officers who responded determined that forced entry was appropriate.  Guevrekian then spoke with staff from the Center.  After it was determined that Guevrekian was not a threat to herself or others, the Bloomington police officers and Center staff left the scene.  The City of Bloomington is entitled to summary judgment because there

is no evidence that the city breached a duty to Lynn Guevrekian and because the facts do not establish a constitutional violation.

## II.   STATEMENT OF UNDISPUTED FACTS

1.      On May 20, 2004, a female identifying herself as Lynn Guevrekian's sister, Anna Strein, contacted McLean County Center for Human Services (the "Center") and reported that Lynn Guevrekian threatened to shoot her family one by one.  Exhibit 1, Deposition of Lynn Guevrekian ("Dep.") at 8, 10-11, 164; Exhibit 2[1] ("Production") at 50, 61; Exhibit 3, Affidavit of Sergeant Randall Wikoff at ¶2.  Guevrekian admits that she left a voice mail message cursing at her sister. Production at 61; Dep. at 10.  Guevrekian denies making any threat, but does not dispute that her sister reported a threat.

2.      In a letter to Robert Keller and Tom Barr dated June 21, 2004, Guevrekian described the report: "My sister... called the crisis center here in Bloomington, telling them I was mentally ill and had a gun and was threatening to kill her and the family."  Production at 61.  Guevrekian felt that this was a "false report" which she wanted expunged.  Production at 63.  She stated that her sister "did a very ugly thing."  Production at 63.

3.      The Center reported to the Bloomington Police Department that Guevrekian threatened to shoot members of her family. Production at 50; Wikoff Affidavit at ¶¶2-3.  They did not report that the call originated out of state or that the threatened family members were in another state. Production at 91 (Report indicating that initial call was that resident was going to start shooting people and stating that they learned during interview that Guevrekian had an argument with a sister

---

[1]This is a collection of documents with numbered pages 1-139 produced by Guevrekian. Selected portions are attached as a group exhibit (Exhibit 2).  Page references are to the page numbers placed on the documents by Plaintiff.

in Florida).  Bloomington police were asked to accompany the Crisis Team to Guevrekian's residence.

4.    On May 20, 2004, a number of Bloomington police officers were dispatched to Lynn Guevrekian's residence at 620 North Main Street in Bloomington.  The initial call was that the resident of Apartment 5 said that she was going to start shooting people. Wikoff Affidavit at ¶2.

5.    Upon arrival at the location, officers were present with crisis team members from the Center.  Wikoff Affidavit at ¶¶3, 8-9; Production at 50.

6.    Officers knocked on Guevrekian's door but received no response.  Dep. at 7, 62, Wikoff Affidavit at ¶¶4, 6.  Metcom called Ms. Guevrekian via telephone, which the officers heard ringing from the hallway.  Wikoff Affidavit at ¶4.  Guevrekian turned off the ringer and did not answer the phone.  Dep. at 133-135.

7.    One of the Bloomington police officers telephoned Heartland Apartment Management. They made arrangements for a maintenance man to come unlock the apartment so that the police officers could check on Guevrekian's welfare.  Maintenance arrived and unlocked the apartment door. Wikoff Affidavit at ¶5; Dep. at 63.

8.    The door was chain locked from the inside.  Since there was no other door to the unit, the officers surmised that someone was in the apartment.   Wikoff Affidavit at ¶5.

9.    Maintenance advised that tenants are prohibited from affixing chain locks to the doors. The representative of Heartland Apartment Management told the officers that if they felt the need to force the door open, he would repair it without complaint.  Wikoff Affidavit at ¶5.

10.    Officers Wamsley, Day and Melton and Sgt. Wikoff knocked on the door and called to Ms. Guevrekian by name. She still did not respond.  At this time, Sgt. Wikoff determined that

forced entry was appropriate so he pushed the door open until the chain gave way.  Wikoff Affidavit at ¶6.

11.    Upon entry to the apartment, the officers discovered that Ms. Guevrekian was in the shower.  Sgt. Wikoff called to her.  She poked her head around the shower curtain and agreed to get dressed and speak to the police officers.  Sgt. Wikoff did not look behind the shower curtain or stay in the bathroom after speaking to her.  Wikoff Affidavit at ¶7; Dep. at 7-8, 141-142.

12.    Sgt. Wikoff called the McLean County Center for Human Services Crisis Team forward and they were invited into the apartment.  Wikoff Affidavit at ¶8; Dep. at 144-145.  The other officers and Sgt. Wikoff remained in the hallway because of the gun threat. Wikoff Affidavit at ¶8.

13.    Ms. Guevrekian was interviewed as the officers listened.  Wikoff Affidavit at ¶9.

14.    The interview was brief.  The police officers and counselors were at the apartment for less than 25 minutes.  Production at 61.  She spoke to the counselors for about 12 minutes.  Production at 4 (Amended Complaint at 4).

15.    Guevrekian also confirmed that she did have guns in the apartment and that she had a valid  Firearm Owners Identification Card (FOID). Production at 5, 91; Wikoff Affidavit at ¶10.

16.    The officers and the Human Services crisis team felt that Ms. Guevrekian posed no threat and left the residence.  Wikoff Affidavit at ¶10.

17.    Guevrekian was unable to identify any untruthful statements in the report at her deposition that would amount to defamation or libel. Dep. at 14-16.  She appeared at the Bloomington Police Department and made subsequent reports to correct the alleged errors. Dep. at 18-20; Production at 78-89.

4

### III.  ARGUMENT

**A.    The City of Bloomington did not commit a trespass against the Plaintiff or violate her Fourth Amendment rights.**

To the extent that Guevrekian has attempted to allege a Fourth Amendment violation, her claim fails.  Police officers may enter a dwelling without a warrant under two circumstances: (1) to make an arrest or effect a search if exigent circumstances are present or (2) in an emergency situation. According to the Seventh Circuit, "Only 'exigent circumstances' - few in number and carefully delineated - will justify a warrantless entry into a home for the purpose of making an arrest or effecting a search." *Sheik-Abdi v. McClellan,* 37 F.3d 1240, 1243-1244 (7th Cir. 1994) (citations omitted) (finding that an emergency situation justified warrantless entry).  "A related, though not identical, line of cases also has recognized that emergency situations sometimes arise and on such occasions a warrantless entry into a home will be appropriate for a purpose other than to arrest a suspect or search for evidence of a crime." *Id.* at 1244 (citations omitted).  The Supreme Court held: "[T]he emergency or exigency doctrine may be stated as follows: police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *Root v. Gauper,* 438 F.2d 361, 364 (1971).  The logic behind this rule was described by future Chief Justice Warren Burger while he served on the D.C. Circuit Court:

> Breaking into a home by force is not illegal if it is reasonable in the circumstances. ...[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found.  Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But

the business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms 'exigent circumstances'... e.g., smoke coming out a window or under a door, the sound of gunfire in a house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within. *Wayne v. United States,* 318 F.2d 205, 212 (D.C. Cir. 1962) (citations omitted).

Much like the officers in this case, the officers in *Sheik-Abdi* were called to the scene by paramedics. The Bloomington officers were contacted by the McLean County Center for Human Services to assist the crisis response team. They went to the scene with the Center's personnel. There was an emergency – a concern reported by a family member that Guevrekian was preparing to kill some of her family members. Given the report, they were also justified in being concerned for Guevrekian. They knew the apartment was occupied because the chain lock was hooked and there was no other entrance. They could not get her to answer the phone or her door. Entry into her apartment was justified for both reasons: exigent circumstances because of the threat to her family and an emergency because of concerns for Guevrekian's own welfare when she did not answer the phone or door. The officers were not intending to arrest Guevrekian. They went with the counselors and immediately allowed them to interview Guevrekian when she was located. The officers did not search the apartment. They did not physically restrain Guevrekian. They participated with the counselors to investigate the threats allegedly made by Guevrekian. Once they confirmed that there was no danger, they left.

The City also prevails on any Section 1983 claims for Fourth Amendment violations because there is no evidence that the alleged violations arise from an official custom or policy of the City of Bloomington. To state any cause of action at all against a municipality under § 1983, the plaintiff

6

must plead and prove that her injury resulted from an "official custom or policy" of the municipality. *Monell v. Department of Social Services,* 436 U.S. 658 (1978); *Henry v. Farmers City State Bank*, 808 F.2d 1228, 1237 (7th Cir. 1986). There is no evidence of any unconstitutional custom or policy of the City of Bloomington to break into homes without justification. The facts disclosed include only a single incident. There is no evidence of a formal or informal official policy, nor are there allegations that would demonstrate the existence of an official policy of the CITY OF BLOOMINGTON. Plaintiff's allegations are similar to *Henry*, in which the plaintiff attempted to impose liability upon the city based upon the a single warrantless seizure of their business property. The Seventh Circuit described an "official policy or custom" in *Henry* as follows:

> To the extent that the Henrys seek to impose liability under § 1983 on the City in its own right, they must prove that the constitutional deprivation was caused by an official municipal policy or custom. *To establish a municipal policy or custom, the plaintiff must allege a specific pattern or series of incidents that support the general allegation of a custom or policy; alleging one specific incident in which the plaintiff suffered a deprivation will not suffice.* The amended complaint alleges only one unconstitutional act committed by the City and fails to include even a general allegation that this act was in furtherance of an official municipal policy or custom. The §1983 claim against the City w as properly dismissed. *Henry,* 808 F.2d at 1237 (citations omitted) (italics added).

It is insufficient for Plaintiff "merely to identify a conduct properly attributable to" the CITY OF BLOOMINGTON. *Bd. Comm'rs. Bryan County, Okla. v. Brown*, 117 S. Ct. 1382, 1388 (1997). Plaintiff must show "that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* (emphasis in original). Because there is no evidence of an unconstitutional official custom or policy of the City, Guevrekian's Section 1983 claims fail.

The City's police officers did not commit a trespass when they entered Guevrekian's apartment. The City is also immune from any claims for trespass. A public employee is not liable for

an injury arising out of his entry upon any property where such entry is expressly or impliedly authorized by law.  745 ILCS 10/2-209.  Furthermore, a local public entity (City of Bloomington) is not liable for an act or omission of an employee where the employee is not liable.  745 ILCS 10/2-109.  As set forth above, the officers were legally authorized (if not compelled) to take the actions that they did, so the city is entitled to immunity.

In the current case, the police officers who responded to Plaintiff's residence were dispatched due to an alleged threatening phone call made by the Plaintiff to her sister.  Such a threat, as communicated to the police department by the McLean County Center for Human Services, provided the police with cause to enter Plaintiff's residence on May  20, 2004.  Their entry was expressly or impliedly authorized by law and neither the City nor the police officers are liable for any injuries arising from this incident.  As such, summary judgment is appropriate on this issue.

**B.      The City of Bloomington did not exert excessive force on May 20, 2004.**

Guevrekian's claim is not really an excessive force claim.  An excessive force claim arises when an officer uses excessive force against a person. *E.g.,  Smith v. Ball State Univ.*, 295 F.3d 763, 770-771 (7th Cir. 2002) (finding that officers who forcibly removed a potentially intoxicated driver from his car were entitled to summary judgment); *Meyer v. Robinson,* 992 F.2d 734, 739 (7th Cir. 1993) (officer wrapped gauze around arrestee's mouth:  "no injury gives weight to the assertion of no excessive force.").  Guevrekian claims that police used excessive force against the door of her apartment, an inanimate object.  Thus, it is not an excessive force claim.  No force was used against Guevrekian.  A representative from McLean County Center for Human Services was invited in and spoke with Guevrekian.  She and the police officers were satisfied that Guevrekian was not a danger

and they left. Guevrekian was never physically restrained or injured. The pertinent inquiry, addressed above, is whether officers violated her rights by entering the apartment.

If this were an "excessive force" claim, factors that a Court should examine to determine whether the force used was reasonable under the circumstances include (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the arrestee was actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 US 386, 388, 396-397 (1989). The reasonableness standard requires that a court examine all of the facts and information available to the officer at the time the force was used under a totality of circumstances approach. *Jones by Jones v. Webb,* 45 F.3d 178 (7th Cir. 1995). The calculus of reasonableness must also embody allowance for the fact that the police officers are often forced to make split second judgments - in circumstances that are tense, uncertain and rapidly evolving - about the amount of force that is necessary in a particular situation. *Graham,* 490 US at 396-397 (1989).

The Bloomington Police were presented with facts indicating an imminent threat. The call from the McLean County Center for Human Services reported that a resident of 620 North Main, Lynn Guevrekian, said she was going to start shooting people. When attempts were made to simply knock at her door or call her via telephone, Ms. Guevrekian failed to respond. Police officers determined that the reasonable course of action was to break the chain locked door to her apartment, with the assurance that it would be fixed without complaint by the apartment manager. At no time, did the police officers use force against Ms. Guevrekian's person. Therefore, there was no discernable injury inflicted upon Plaintiff. Their conduct was reasonable under the circumstances.

As such, the police did not use excessive force when responding to the phone call and threat made by Ms. Guevrekian and summary judgment is appropriate at this time.

As with the claims addressed in the previous section, any Section 1983 claims for "excessive force" fail because there is no evidence of an unconstitutional "custom or policy" of using excessive force. Guevrekian has not disclosed any official policy or custom, nor any pattern of conduct that would support a *Monell* claim against the City.

With respect to any such state law claims, the Bloomington Police had cause to enter the residence of Plaintiff on May 20, 2004, therefore neither the police officers nor the City of Bloomington can be held liable for any claimed injury arising out of this entry upon Plaintiff's property. 745 ILCS 10/2-209 ("A public employee is not liable for an injury arising out of his entry upon any property where such entry is expressly or impliedly authorized by law."); 10/2-201 ("a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused").

### C.    The City of Bloomington did not breach a duty to the Plaintiff.

Plaintiff alleges that the City of Bloomington breached a duty to acquire valid information to substantiate any need to break open a door or to even make Lynn Guevrekian "a valid suspect of anything at all". Plaintiff fails to establish that any such duty exists and summary judgment is appropriate on this issue. A party cannot recover under a theory of common law negligence wilful and wanton misconduct unless a defendant breaches a duty of care owed to the plaintiff. *Bialek v. Moraine Valley Community College School Dist. 524,* 267 Ill.App.3d 857, 860, 642 NE2d 825, 827-828 (1st Dist. 1994). In situations in which no duty is owed to a plaintiff, the defendant is entitled

10

to judgment as a matter of law. *Millerick v. Village of Tinley Park.* 272 Ill.App.3d 738, 740, 652 NE2d 17, 19 (1ˢᵗ Dist. 1995). The longstanding rule in Illinois is that a municipality and its employees owe no duty of care to individual members of the public to provide governmental services including police and fire protection. *Huey v Town of Cicero,* 41 Ill.2d 361, 243 NE2d 214 (1968). This is called the Public Duty Rule.

Furthermore, the officers were under no duty to conduct an extensive investigation. Once they received information that warranted action, they were permitted (if not required) to act upon that information. The officers were under no obligation to conduct any further inquiry. *See e.g., Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 524 (7ᵗʰ Cir. 2001); *Woods v. City of Chicago*, 234 F.3d 979, 997 (7ᵗʰ Cir. 2001). As the Seventh Circuit explained:

> Woods also asserts that there is no documentation showing that the officers attempted to corroborate Flores complaint in any way... However, police officers have no constitutional obligation to conduct any further investigation before making an arrest if they have received information from a reasonably credible victim or eyewitness sufficient to supply probable cause. This is true even if sound police technique would have required such further investigation. *Woods v. City of Chicago*, 234 F.3d 979, 997 (7ᵗʰ Cir. 2001).

If there had been a problem (Guevrekian preparing to harm her family, or in danger herself), a further delay to allow such investigation could be fatal. Guevrekian has no evidence showing that the City of Bloomington owed a duty to undertake any additional investigation before speaking with her. Therefore, summary judgment is appropriate.

11

**D.      The City of Bloomington did not libel the Plaintiff and is immune from an action for libel.**

First, the City and its officers are entitled to common law absolute immunity either under the immunity for statements made by government officials within the scope of their duties or for statements made in connection with a judicial or quasi-judicial proceeding.  *See, Harris v. News-Sun,* 269 Ill.App.3d 648, 651-653, 646 N.E.2d 8, 10-12 (2nd Dist. 1995) (holding that absolute privilege applied to statements made by a detective regarding his investigation).  Guevrekian is complaining about statements made by Sgt. Wikoff in his report regarding the incident.  Those statements are absolutely privileged.  *Id.*

Second, the City is entitled to absolute immunity from such claims pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/2-107.  The Act states that a local public entity "is not liable for injury caused by any action of its employees that is libelous or slanderous".   This immunity is absolute and is fatal to plaintiff's libel claim.  *See, Ramos v. City of Peru,* 333 Ill.App.3d 75, 80, 775 N.E.2d 184, 188 (3rd  Dist.2002), *app. den.* 202 Ill.2d 661, 787 N.E.2d 169.

Even if there were no immunity, the statements are not libelous.  "Over the years, the Illinois courts have discerned four categories of words which constitute libel per se: (1) those imputing the commission of a criminal offense; (2) those imputing infection with a communicable disease of any kind to which, if true, would tend to exclude one from society; (3) those imputing inability to perform or want of integrity in the discharge of duties of office or employment; and (4) those prejudicing a particular party in his profession or trade."  *Newell v. Field Enterprises, Inc.* 91 Ill.App.3d 735, 741, 415 N.E.2d 434, 441 (1st Dist. 1980).  A statement may constitute libel per quod "if it requires an innuendo to give  it a libelous meaning."  *Id.* at 741-742, 415 N.E.2d at 441.

12

Guevrekian only identifies the allegedly libelous statements in her "Statement of Plaintiff," which asserts that Sgt. Wikoff "lies repeatedly" in his incident report. The "lies" are trivial discrepancies at best. First, she disputes statements regarding which apartment she lived in and whether she told the officer which apartment she lived in. Such statements do not fit any of the four categories of libel and therefore cannot support a cause of action. Second, she complains that Sgt. Wikoff "records fictitious criminal behavior by Lynn Guevrekian." His report (Production at 91) indicates that her sister reported the threat. The report states (and Guevrekian denies) that Guevrekian admitted making the threatening statements to her sister. The report does not assert that Guevrekian committed a crime. She was not arrested and was not charged with any crime. The report reflects that Crisis was content that she posed no threat, that the officers saw no reason to seize her guns, and that the BPD terminated their involvement. This is not defamatory. The remaining discrepancies in her Statement also do not fall within the definition of libel and are not actionable.

Furthermore, the substantial truth of the matter asserted is a defense to libel. Constitution of the State of Illinois, Art. 1, Sec. 4; *Gist v. Macon County Sheriff's Dept.*, 284 Ill.App.3d 367, 371-372, 671 N.E.2d 1154, 1157-1158 (4th Dist. 1996) (finding that allegedly defamatory statements were substantially true). Pursuant to the Affidavit of Randall Wikoff, none of the statements made in the report regarding the May 20, 2005 incident were libelous, to the contrary they were true. Furthermore, Plaintiff was unable to identify any untruthful statements in the report at her deposition that would amount to defamation or libel. Therefore, there is no question of material fact as to the truthfulness of the statements in the police report regarding May 20, 2004 and summary judgment is appropriate.

13

### E.   The City of Bloomington did not obstruct justice.

Plaintiff alleges that the City of Bloomington obstructed justice when they allegedly changed words on a police report she requested to be filed about her sister, who Plaintiff alleges made a prank call on May 20, 2004.  There is no civil cause of action for "obstruction of justice."  This is a criminal offense which is enforceable by the state, not private parties.

Guevrekian's "obstruction of justice" claim seems to be a charge that her complaints were not transcribed accurately when she presented at the police station to make a complaint about her sister. Her Amended Complaint at page 6 alleges that:  "Someone changed my words on the report and left it 'administratively closed.'"  This is not actionable.

While Guevrekian may want her sister to be charged with and prosecuted for disorderly conduct, the State's attorney is not required to do so.  She does not have a right to demand that her sister be arrested or that any other action be taken.  Whether to pursue the investigation or prosecute the case is left to the discretion of the police and prosecutors.  *See, e.g.* ***Collins v. Bd. Fire and Police Comm'rs of City of Genoa,*** 84 Ill.App.3d 516, 521, 405 N.E.2d 877, 880 (2nd Dist. 1980) ("...the decision whether to arrest or not for driving while under the influence of intoxicating liquor lies within the discretion of the arresting officer.").

There is no duty to arrest the alleged perpetrator of a crime that is enforceable by an individual.  *See,* ***Town of Castle Rock v. Gonzales***, 545 U.S. 748, 125 S.Ct. 2796 (2005).  The Supreme Court held that officers were not required to make an arrest, even where the domestic violence statute appeared to make such an arrest mandatory.  The Court further held that the injured plaintiff would not have standing to enforce the requirement even if the statute made an arrest mandatory.  ***Id.*** at 2809-2810.

Further, there is no evidence that Guevrekian suffered any damages as a result of the alleged errors in the report.  She appeared at the Bloomington Police Department and made subsequent reports to correct the alleged errors.  Dep. at 18-20; Production at 78-89.  Even if errors remained, there is no tangible harm to her.

The Tort Immunity Act also applies to any state law claims.  A public employee acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation or the provision of information either orally, in writing, by computer or any other electronic transmission, or in a book or any form of library material.  745 ILCS 10/2-210.  A local public entity is not liable for an act or omission of an employee where the employee is not liable.  745 ILCS 10/2-109.

Guevrekian cannot present any facts to make a showing that the harassment report contains false information or is a negligent misrepresentation of what she told the public employee on the day she filed the report. Even if Plaintiff were able to present facts showing that the alleged harassment report contained inaccuracies or was a negligent misrepresentation of her statements to the alleged public employee, neither the employee or the City of Bloomington could be liable for such an act or omission pursuant to the Tort Immunity Act.

WHEREFORE, Defendant, CITY OF BLOOMINGTON, respectfully prays that the Court enter judgment in its favor, that it have its costs, and for such other relief as the Court deems proper.

CITY OF BLOOMINGTON, Defendant

By:  _____*s/Peter R. Jennetten*_____
                  Peter R. Jennetten
         QUINN, JOHNSTON, HENDERSON & PRETORIUS

15

Peter R. Jennetten (Illinois Bar No. 6237377)
QUINN, JOHNSTON, HENDERSON & PRETORIUS
227 N.E. Jefferson Street
Peoria, IL  61602-1211
Telephone:  (309) 674-1133
Facsimile:  (309) 674-6503
E-mail: pjennetten@qjhp.com
I:\1\Civil\Guevrekian v. Bloomington 101 292 005\guevrekian msj.wpd

**CERTIFICATE OF SERVICE**

I hereby certify that on **December 4, 2006**, I electronically filed **CITY OF BLOOMINGTON'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| J. Casey Costigan | ***Attorneys for McLean County Health Department*** |
| Dominic A. Salvati | |
| Costigan & Wollrab, P.C. | |
| P.O. Box 3127 | |
| Bloomington, IL  61702-3127 | |
| Telephone:  (309) 828-4310 | |
| Facsimile:  (309) 828-4325 | |
| E-mail:  ccostigan@cwlawoffice.com | |
| E-mail:  dsalvati@cwlawoffice.com | |

| | |
|---|---|
| Eitan Weltman | ***Attorney for Heartland Apartment Management*** |
| Attorney at Law | ***and Wayne Pelhank*** |
| 802 N. Clinton St. | |
| Suite A | |
| Bloomington, IL  61701-3229 | |
| Telephone:  (309) 829-4422 | |
| Facsimile:  (309) 829-1079 | |
| E-mail:  EitanW@aol.com | |

| | |
|---|---|
| Brian P. Thielen | ***Attorneys for Heartland Apartment Management*** |
| Barbara Snow Mirdo | ***and Wayne Pelhank*** |
| Joseph W. Foley | |
| Thielen, Foley & Mirdo, LLC | |
| 207 W. Jefferson St. | |
| Suite 600 | |
| Bloomington, IL  61701 | |
| Telephone:  (309) 820-0040 | |
| Facsimile:  (309) 820-0041 | |
| E-mail:  mirdo.b@thielenlaw.com | |
| E-mail:  foley.j@thielenlaw.com | |

And I hereby certify that on **December 4, 2006**, I mailed a copy of this document by United States Postal Service to the following non-registered participants:

| | |
|---|---|
| Lynn T. Guevrekian | ***Pro se Plaintiff*** |
| c/o Helping Hands | |
| 200 S. 11th St. | |
| Springfield, IL  62703 | |
| Telephone:  (309) 807-4851 | |

_s/Peter R. Jennetten_
Peter R. Jennetten (Illinois Bar No. 6237377)
QUINN, JOHNSTON, HENDERSON & PRETORIUS
227 N.E. Jefferson Street
Peoria, IL  61602-1211
Telephone:  (309) 674-1133
Facsimile:  (309) 674-6503
E-mail: pjennetten@qjhp.com

17

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
 2

 3   LYNN T. GUEVREKIAN,        )
                 Plaintiff,     )
 4                              )
          VS.                   ) No. 05 L 1369
 5   BLOOMINGTON POLICE         )
     DEPARTMENT, CITY OF        )
 6   BLOOMINGTON, MCLEAN COUNTY )
     CENTER FOR HUMAN SERVICES, )
 7   HEARTLAND APARTMENT        )
     MANAGEMENT and WAYNE PELHANK,)
 8              Defendants.     )

 9   LYNN T. GUEVREKIAN,        )
                 Plaintiff,     )
10                              )
          VS.                   ) No. 05 L 1370
11   BLOOMINGTON POLICE         )
     DEPARTMENT, CITY OF        )
12   BLOOMINGTON, HEARTLAND     )
     APARTMENT MANAGEMENT, and  )
     WAYNE PELHANK,             )
13              Defendants.     )

14        The deposition of LYNN T.

15   GUEVREKIAN, called for examination pursuant to

16   the provisions of the Federal Rules of Civil

17   Procedure of the United States District Courts

18   as they apply to the taking of depositions,

19   taken before Paula A. Morsch, C.S.R., in the

20   State of Illinois, on the 6th day of

21   September, 2006, at 1:00 p.m., at 207 West

22   Jefferson, in the City of Bloomington, County

23   of McLean, State of Illinois.
```

**Page 2**

```
 1   PRESENT:

 2        QUINN, JOHNSTON, HENDERSON &
          PRETORIUS, CHTD.,
 3        BY:  Amanda J. Watson, Esq.
          227 N.E. Jefferson Avenue
 4        Peoria, Illinois  61602
          for Defendant Bloomington Police
 5        Department, City of Bloomington;

 6        THIELEN, FOLEY & MIRDO, LLC
          BY:  Gregory J. Berg, Esq.
 7        207 West Jefferson Street, Suite 600
          Bloomington, Illinois  61701
 8        for Defendant Heartland Apartment
          Management and Wayne Pelhank;

 9        COSTIGAN & WOLLRAB, P.C.,
10        BY:  Dominic A. Salvati, Esq.
          308 East Washington Street
11        Bloomington, Illinois 61702-3127
          for Defendant McLean County Center
12        for Human Services.
```

**ORIGINAL**

**Page 3**

```
 1   WITNESS

 2

 3   LYNN T. GUEVREKIAN
          Direct By Ms. Watson  .............   4
 4        Direct By Mr. Berg  .............   33
          Direct By Mr. Salvati  ...........  131
 5        Redirect By Ms. Watson  ..........  164
          Redirect By Mr. Berg  ............  180
```

E-FILED
Monday, 04 December, 2006 02:43:47 PM
Clerk, U.S. District Court, ILCD

**Page 4**

```
 1             LYNN T. GUEVREKIAN

 2        called by the Defendants,

 3        being first duly sworn,

 4        was examined and testified

 5        as follows:

 6

 7             DIRECT EXAMINATION

 8   BY MS. WATSON:

 9   Q   Ms. Guevrekian, am I pronouncing

10   that right, Guevrekian?

11   A   Close enough, sure.

12   Q   Can you state your full name and

13   spell it out for us?

14   A   Lynn Guevrekian, L-Y-N-N,

15   Guevrekian, G as in George, U-E-V as in

16   Victor, R-E-K-I-A-N.

17   Q   For the record, this is the

18   discovery deposition of Lynn Guevrekian taken

19   on September 6, 2006, pursuant to proper

20   notice and all applicable court rules.

21        Lynn, do you mind if I call you

22   Lynn?

23   A   No, not at all.
```

**EXHIBIT**

**1**

**Page 5**

1    Q   I'm Mandy Watson. I'm one of the
2    attorneys for the City of Bloomington. Have
3    you ever given a deposition before?
4    A   No, ma'am.
5    Q   Basically the ground rules are
6    everything is under oath so you will need to
7    answer truthfully and fully to all of our
8    questions. Also, give verbal answers. I know
9    I'm oftentimes tempted to shake my head or
10   nod, but she can't take that down. It needs
11   to be a verbal yes or no. And also if you
12   answer a question, I'll assume you've
13   understood what I've asked. If you don't
14   understand anything I say, please do not
15   hesitate to ask me to repeat myself or
16   clarify.
17   A   All right.
18   Q   Okay. A few general questions to
19   begin with. What's your date of birth?
20   A   June 24th, 1964.
21   Q   Which makes you how old today?
22   A   42 years old.
23   Q   And what's your current address?

**Page 6**

1    A   I don't have an address. I use a
2    P.O. box. It's P.O. Box 1114, Bloomington,
3    Illinois, 61702.
4    Q   Do you live in Bloomington?
5    A   Yes.
6    Q   Where do you live?
7    A   I'm homeless right now.
8    Q   Okay. Now, you had a different
9    residence at the time of the occurrences of
10   March 28, 2004 -- or 2005 and May 20th, 2004?
11   A   Yes.
12   Q   What was that address?
13   A   That was 620 North Main Street in
14   Bloomington, Apartment No. 6.
15   Q   Okay. Are you married?
16   A   No.
17   Q   Do you have any children or
18   dependents?
19   A   No, I don't.
20   Q   Did you complete high school?
21   A   No, I did not. I got a G.E.D.
22   Q   Ever been in the military?
23   A   No, ma'am.

**Page 7**

1    Q   Are you presently employed?
2    A   No.
3    Q   Were you employed at the time of
4    either the incidents at issue today in 2004 or
5    2005?
6    A   No, I was not.
7    Q   All right. I'll get to the first
8    date at issue, which I believe is May 20th,
9    2004. It's the subject of one of the two of
10   your complaints, and I believe on this date
11   there was an incident at the address that you
12   gave on North Main. Could you in your own
13   words describe what occurred that day which is
14   the subject of your complaint?
15   A   I was in my apartment alone. I was
16   taking a shower. There was some violent
17   knocking, some loud knocking on the door, and
18   then all of a sudden people broke into my door
19   and the police officer was in the bathroom
20   where I was taking a shower, just came into
21   the bathroom. I asked the police officer what
22   was it about. He said come out, get dressed,
23   come out.

**Page 8**

1         When I came out, I asked them what
2    is this about. I took charge immediately. I
3    said, "What is this about? Who called you?
4    Why are you here?" And they told me more or
5    less that they had got a call from my sister,
6    Anna, and that they -- something to the effect
7    of I threatened to kill the entire family,
8    something to that effect. I don't have a word
9    for word. I told them right away that it was
10   a prank and it was a stunt. I told them that
11   my father had an inheritance and that I got
12   cut out. They threw me some chicken feed
13   money and then they cut me out of the
14   inheritance and they were being very
15   secretive. They wouldn't answer the
16   telephone. I didn't get an answer from them.
17   They were just not responding and I left them
18   a voice mail message that said, hey, I want my
19   share or I'm going to file in Suffolk County
20   to get my share of dad's inheritance. So I
21   explained to them that this was a prank and a
22   stunt done to make sure that I couldn't get
23   any money from my father's inheritance.

**Page 9**

1 They were okay with that. Nobody
2 questioned me. Nobody acted like anything was
3 strange. They were just pretty much more or
4 less, okay, go finish your shower because they
5 had pulled me out of the shower early and I
6 had like hurried and quickened and I came out
7 and like my shoes were untied and my hair was
8 still wet, and I took the towel out of my hair
9 and everybody just seemed okay when they left
10 with it.
11 And then in order -- I didn't have
12 any -- I was very shocked with everything that
13 happened, but I wasn't checking on anyone. I
14 was not following up to check on the police
15 officer or the social worker or anything like
16 that. I was simply trying to keep up with my
17 sister who had pulled the prank. I was trying
18 to get the documents that I got, get the
19 report so that if she were to try to pull any
20 more stunts, I had what was done and that's
21 all.
22 Q I think we're getting a little bit
23 off May 20th.

**Page 10**

1 A Okay. Well, keep me directed,
2 that's fine, because I've got a lot to say.
3 It'll just come right out.
4 Q So to your understanding, and you
5 would admit that your sister had called, was
6 it the Crisis Center in Bloomington that day?
7 A They told me she called. I was
8 never able to confirm that she called.
9 Q Okay.
10 A They told me she did.
11 Q Had you spoken to her that day, May
12 20th, or had you spoken to her previously?
13 A I had never -- I had not spoken to
14 my sister since maybe 2000, the year 2000 or
15 possibly nearing 2001.
16 Q Okay. Had you spoken to anyone else
17 in your family in Florida?
18 A Not prior, no.
19 Q Okay. On that date precipitating
20 the phone call from your sister, had you
21 spoken to anybody in your family?
22 A No, I left a voice mail message that
23 I was hanging out in my apartment cleaning up

**Page 11**

1 and that she could give me a call if she
2 wants. In fact, I thought that she was going
3 to perhaps call me.
4 Q But it was your understanding that
5 she had called the Crisis Center in
6 Bloomington and said that you had threatened
7 the family?
8 A Threatened to kill the family one by
9 one or something like that and she was afraid
10 for her life.
11 Q Okay. What's the name of your
12 sister who evidently called that day?
13 A Anna, and then the same last name as
14 me but she's married. Her last name is
15 Strien.
16 Q How do you spell that?
17 A S-T-R-I-E-N, Strien.
18 Q And how old is she?
19 A She's four years younger than me so
20 that puts her at 38.
21 Q Now, does she currently reside in
22 Florida?
23 A She lives in Florida, yes.

**Page 12**

1 Q Whereabouts, do you know?
2 A The last time I knew she lived in an
3 Oakland Park area which is like a subdivision
4 of Ft. Lauderdale.
5 Q Now, when did your father pass away?
6 A October 8th, I believe it was. I'd
7 have to look at the paper. I don't have it
8 memorized, but it was in the year 2003.
9 Q Okay. So the October prior to this
10 May incident?
11 A Yes.
12 Q Okay. And Suffolk County, is that
13 New York?
14 A Yes.
15 Q Okay. And according to the police
16 report, which I've got your disclosures here,
17 the documents that you have produced to the
18 defendants, to all the parties, I've got the
19 police report that was filled out that day by
20 who I believe is Sergeant Randall Wycoff.
21 This was page 91 in one of your disclosures.
22 The disclosure that's labeled 1 through 139,
23 page 91 of that is the McLean County incident

**Page 13**

1 report, as I said, evidently filled out by
2 Sergeant Wycoff. In that at that time and I
3 believe also in your complaint you admitted on
4 May 20th, 2004, to owning two handguns, is
5 that correct?
6    A  Yes.
7    Q  To which you had a valid FOID card?
8    A  Yes.
9    Q  Also you disclosed a number of
10 reports; well, not a number but this
11 particular report as to the events of
12 May 20th, 2004, that were completed by the
13 Bloomington Police Department which are 90, I
14 think pages 90 and 91 of your disclosure and
15 then I believe there was also a supplement
16 done to that. Oh, no, excuse me. Strike
17 that.
18      Are you claiming that anything in
19 this report prepared by the Bloomington Police
20 Department contained false information?
21    A  Yes, ma'am.
22    Q  Okay. What specifically -- and I
23 believe you speak of the narrative portion?

**Page 14**

1    A  Yes.
2    Q  In your complaint. What
3 specifically in the narrative portion of the
4 incident report are you claiming to be false
5 information?
6    A  It's a little too complex. I have
7 notes. I didn't bring anything with me today.
8 There are so many things that are inaccurate,
9 specific details, and I have notes and I can
10 line them up with papers. It's a little bit
11 too intricate for me to just go off the top of
12 my head. I don't recall. I haven't memorized
13 anything.
14    Q  Let me double check another note
15 here. On another disclosure you made which is
16 71 out of that same set of disclosures, you
17 say the name of the false witness on the
18 police report was blacked out. Are you
19 stating from that that there's some type of
20 false information with regards to the witness
21 that is named on the report?
22    A  I'm referring to if there is a
23 witness that they're putting on something that

**Page 15**

1 I'm calling a false report, then the witness
2 is part of the false report. If there's a
3 witness that says, is saying something that
4 I'm saying is false and I'm a witness to that,
5 then I'm saying they're part of that false
6 statement. If that's inaccurate, then I need
7 to be corrected. If he was merely listed as a
8 witness because he was present but it does not
9 apply to the report, then I'm in error to
10 think that the witness is part of the false
11 report.
12    Q  If I gave you a chance to look at
13 this narrative report right now, could you
14 possibly point out a few items that you
15 believe to be false in this report?
16    A  Not without my notes, no, I'm sorry.
17    Q  Also in another paper you disclose,
18 I can't put my finger on it right now but you
19 mentioned the identity of this witness who was
20 blocked out of the report you requested. Do
21 you have any idea who that witness was?
22    A  No. Well, apparently he was listed
23 in the disclosure and all that I could say for

**Page 16**

1 sure was that he was an employee of Heartland
2 Apartment Management because it said. Other
3 than that, I'm not sure, no.
4    Q  But it's not anybody that you've
5 ever had a conversation with or a conversation
6 with since May 20th, 2004?
7    A  There was a utility guy in my
8 presence but I wouldn't know if it was him or
9 not. So there was no friendly basis. There
10 was another guy that worked on the place and
11 he was very friendly and I would recognize him
12 if I saw him, and we talked and he's a really
13 nice guy and so I could say yes, oh, I know
14 you, but I don't know if it's him or not.
15    Q  Okay. You spoke about this a little
16 bit previously, but do you remember the
17 specific contact you had with the Bloomington
18 police officers that responded to your
19 apartment that day, May 20th, 2004, any
20 specific conversations you may have had with
21 them?
22    A  They were standing in the hallway
23 when I was talking to the social worker and

1  then they were standing over me when I was
2  getting my firearms card. I made small talk.
3  I told them that my brother and my cousin were
4  both police officers. I said something to the
5  one police officer about him wearing blue in
6  my apartment because I had a white cat with
7  white hair and when I looked over, I saw that
8  he had accumulated already several cat hairs.
9  So I made small talk, and that's all I can
10 recall at this time.
11     Q   And with regards to the May 20th
12 incident, did you follow up with the
13 Bloomington Police Department or the City of
14 Bloomington in any way?
15     A   Yes, I called the two officers,
16 officer I was supposed to ask for or was told
17 to ask for, Wamsley and Melton, so I called
18 them.
19     Q   Do you recall what the time was when
20 you called them?
21     A   In my notes is the date and the time
22 because I kept a date time record, but off the
23 top of my head, no, I don't have it.

1      Q   Did you disclose, the notes that
2  you're speaking of, have you disclosed those
3  to all the parties? I mean are they in the
4  paperwork you've already disclosed?
5      A   The time date record, yes.
6      Q   Also I note that you made a request
7  for public records on June 21st, 2004. Was
8  that request complied with by the City of
9  Bloomington?
10     A   Yes. Any request I made they
11 produced.
12     Q   Okay. I also note, which is page 80
13 of your disclosure is another report that on
14 May 26, 2004, you came into the Bloomington
15 Police Department to file a disorderly conduct
16 report?
17     A   That sounds right, but I'd have to
18 look at it for the dates but that sounds
19 right, yes.
20     Q   And you did file such a report?
21     A   Yes.
22     Q   Okay. And what was the subject
23 matter of the disorderly conduct charge?

1      A   I was complaining about my sister
2  calling the Department of Human Services and
3  reporting that I had a gun and I was going to
4  kill the family.
5      Q   Lastly with regards to the May 20th
6  I note, and you may not be for sure on the
7  date but I note on June 21st, 2004, you made a
8  supplemental report to a Gary Norman of the
9  Bloomington Police Department?
10     A   Yes.
11     Q   And if you'd like to see this, I
12 have no problem showing it to you, but what
13 was the supplement? What was the addition?
14     A   I did write it down because I wrote
15 it down and then I went there with it written
16 down, like I wrote down exactly what I wanted
17 to say and I brought it there and I have that
18 in my notes. I wrote it down the exact word
19 for word, exactly what I said.
20     Q   And this, if I quote this document,
21 says Lynn, and I quote, "Lynn stated that her
22 sister, Anna Strien, had informed Crisis that
23 she had a gun and would harm herself, along

1  with family members. Lynn also stated that
2  her family has told Crisis that she has mental
3  problems and she is a harm to society. Lynn
4  states that she has no history of mental
5  problems and that all the information that is
6  provided to Crisis is false." And that's the
7  end of the quote. Would that be the gist
8  of --
9      A   No, it would not be the gist of it.
10 It's something entirely different.
11     Q   Okay. Are you saying, are you
12 alleging then that this was a false report?
13     A   Yes, ma'am.
14     Q   That the supplemental report made on
15 June 21st was a false report?
16     A   Yes, ma'am.
17     Q   Did you say these things to the
18 Bloomington Police Department?
19     A   No, ma'am.
20     Q   Okay. What was the sum of what you
21 supplemented, if you can recall, or give some
22 kind of summary as to what you supplemented in
23 June of that year?

**Page 21**

1    A  I don't have the exact words but
2 they're different. Yeah, I have it written
3 down. I have it to the T written down because
4 I wrote it down and then I brought it with me,
5 but I don't have my notes with me today. I
6 can give you a copy of it, you bet. I'd be
7 happy to send you a copy of it.
8    Q  Great. Is there any summary, can
9 you just give me a general idea of what you
10 said or what you said in difference to this or
11 why you went back in June and what
12 precipitated you to go back in June and make a
13 further report?
14    A  I didn't say the same thing on the
15 first report, but I thought it could be
16 misconstrued. Somebody could have translated,
17 that happens all the time. It's a normal,
18 everyday thing. I didn't make the statement
19 that they presented on the first disorderly
20 conduct complaint. I didn't say that but it
21 seems reasonable that somebody could have just
22 translated differently, so I went back the
23 second time to be clear and that's why I'm

**Page 22**

1 being clear now because I did write it down.
2    Q  So you're saying that the supplement
3 would have had to do with the disorderly
4 conduct charge itself?
5    A  Yes.
6    Q  Okay. And the report filed with
7 regard to the disorderly conduct report?
8    A  Yeah.
9    Q  Not the incident report of May 20th,
10 rather the disorderly conduct report you filed
11 with regards to your sister?
12    A  Yes, it was strictly for my sister.
13    Q  Now, with regards to May 20th, and I
14 don't find this clear in your complaint so
15 I'll ask you to go ahead and explain what
16 specifically you're claiming as injuries due
17 to the incident of May 20th, 2004, whether
18 that be some type of emotional distress or
19 some type of physical injury or property
20 damage. What are specifically the injuries
21 you're claiming due to that day's events?
22    A  These people have made records in
23 society that call me a mental patient and a

**Page 23**

1 criminal, and that's harmful. That's
2 terrible, and that's the gist of it. They're
3 false and they're terrible; a criminal and a
4 mental patient.
5    Q  So would you categorize that as
6 emotional distress due to the events of
7 May 20, 2004?
8    A  Yes, ma'am.
9    Q  All right. Let me move forward to
10 March 28th, 2005, which is another, the date
11 subject to your other complaint. Can you
12 describe to me what occurred on that day as
13 alleged in your complaint?
14    A  I was lying down. I had taken some
15 medication called Ultracet so I was lying
16 down. I was not prepared for company. I
17 wasn't expecting company and the landlord
18 tried to key in. When he tried to key in, it
19 hit a nerve with me. I didn't think that was
20 right. I don't want anybody keying on me. I
21 understand the law to say that when you rent,
22 they're not allowed to key in. Just from the
23 getgo there was hostility and the landlord

**Page 24**

1 said, you know, that he could come in, he's
2 allowed to come in any time, and right away
3 there was controversy because I said no, you
4 can't just walk in any time you want. So he
5 informed me that he was going to come back and
6 break open the door. So I turned on the
7 camcorder so when he came back and he attacked
8 the door, I had the camcorder on.
9    Q  Do you know what precipitated this
10 action by the landlord?
11    A  No, I don't know. I mean, I was
12 late on my rent, but that's not reason to
13 attack a door. I don't know.
14    Q  Do you know how the police became
15 involved that day?
16    A  I called the police. I called
17 9-1-1.
18    Q  And how long after you called did
19 the police arrive?
20    A  The actual time can actually be
21 recorded from the videotape. You can watch
22 the videotape and take notes for the actual
23 time, but they were pretty quick. There

Page 25

1  wasn't that much of a delay.
2  Q  When the police arrived, what was
3  the landlord doing?  I mean what actions was
4  he taking at that time?
5  A  He had stopped attacking the door
6  per se.
7  Q  What occurred once the police
8  arrived that day?
9  A  The police officer handed me a
10  five-day notice to evict through the door.  I
11  asked them if I could fill out a harassment
12  report and they said no.  I asked them if I
13  could fill out an illegal entry attempt report
14  or harass report and they just said no, you
15  have to do it through legal or something.  The
16  exact words are on the transcript, the exact
17  to the word of the police officer.
18  Q  And, of course, you disclosed that
19  transcript.  Now, did you prepare that
20  transcript or was it prepared by someone else?
21  A  I prepared it.
22  Q  Did you ever follow up with the City
23  or the City of Bloomington's Legal Department

Page 26

1  regarding making a complaint for illegal entry
2  or property damage?
3  A  No, ma'am.
4  Q  Did anyone ever enter your apartment
5  that day?
6  A  No, they only broke the door open.
7  Q  How did they slip the eviction
8  notice into you?  Did the door open a little
9  bit or was there a slot for it?
10  A  The door was broken open enough and
11  then it stopped from the chain lock or
12  whatever it was on there.  It came open enough
13  that you could see each other and the paper
14  would go through.
15  Q  And that damage had already been
16  done once the police had arrived?
17  A  Yes.
18  Q  And I also notice in your
19  disclosures that you were on April 15th and
20  this was, I think it was page 31 and 29 of
21  your disclosure sets labeled as 1 through 62,
22  on April 15th you were served with a summons
23  to appear in court regarding the, I believe it

Page 27

1  was the legal or the detainer action filed by
2  your landlord, is that correct?
3  A  I'd have to check the dates but
4  around that time, yes, I was served with
5  papers.
6  Q  And how were you served with those
7  papers?
8  A  He left them on the outside of the
9  door.
10  Q  Were you home at the time that he
11  left those?
12  A  Yes, I was.
13  Q  You said that you had taken the
14  medication Ultracet that day.  What is that
15  medication?
16  A  It's a pain -- supposedly from what
17  I know, it's a synthesized opiate and it's a
18  painkiller, supposedly nonnarcotic.
19  Q  And what was the cause for taking
20  that that day?
21  A  I have an arm injury and it causes
22  me a lot of pain.
23  Q  And when did that injury occur, do

Page 28

1  you recall?
2  A  June 7th, 2004.
3  Q  And was Ultracet something you had
4  been taking since the date of injury?
5  A  Yes, or near so.
6  Q  I just have a couple questions about
7  some of the exhibits you disclosed.  73 of the
8  first set of exhibits is what appears to be an
9  article entitled Multi-Axial Assessment.  Just
10  by looking at it, I just wondered where you
11  had gotten the article.
12  A  I photocopied it from the
13  official -- I'd have to look for the exact
14  name because I really don't know, but it's the
15  official diagnosis book.  They have it as a
16  reference book at the library.  You can't
17  check it out but they will let you look at it.
18  Q  And when disclosing this, what are
19  you referring to as relevant in the article?
20  A  Well, they have a -- I'm not sure
21  which paper you're looking at.
22  Q  Sure, (Indicating).
23  A  Oh, they're showing that there's an

Page 29

1  axis one through five that they use with
2  specific subject matters for which a social
3  worker or a therapist may diagnose a patient
4  with, and they put them in categories axis one
5  through six. So I'm showing this is,
6  according to the law, when a social worker or
7  official person uses this system to diagnose
8  something, they have given the person under
9  law a mental order, a mental disorder, like
10  they're classifying. So when they use this
11  system, in reference this is something I would
12  use. I threw that in there because it's
13  showing what the axes are. So if you refer to
14  specific parts, like axis one is clinical
15  disorders so somebody gives you some kind of
16  diagnosis on this axis, that's what it would
17  mean.
18  Q  So this is, you're saying this is
19  relevant to your contesting the mental health
20  diagnosis by the social worker?
21  A  Yes, ma'am.
22  Q  Okay. Now, and I've already asked
23  you this question with regards to May 20th and

Page 30

1  it may very well be a lot of the same, but
2  with regard to March 28th, 2005, what
3  specifically were your injuries that day or
4  were you claiming to be your injuries from the
5  incident of that day?
6  A  I'm sorry. I lost you because you
7  jumped from one to the other.
8  Q  Okay. I'll repeat it again then.
9  With regards to the more recent incident which
10  I believe is March 28th, 2005, which we just
11  discussed, what are your claimed injuries from
12  that day? I know that for May 20th you had
13  said numerous things and said that emotional
14  distress was one of the injuries. Is that the
15  same for March 28th, 2005?
16  A  Yes. My civil rights were
17  drastically broken.
18  Q  Just some general conclusory things
19  from my end anyway. Have you ever filed any
20  prior claims or lawsuits before these two
21  complaints?
22  A  No, ma'am.
23  Q  So you have no other lawsuits out

Page 31

1  there right now?
2  A  No, ma'am. Oh, okay. Let me back
3  it up. On June 3rd, 2005, I filed against the
4  Normal Public Library for the arm injury. Did
5  that meet with your question?
6  Q  Yes.
7  A  Okay. But other than that, I've
8  never filed a suit anywhere. That's what I
9  thought you were asking me. Okay.
10  Q  I take it that had to do with the
11  arm injury?
12  A  Yes.
13  Q  Is that resolved or still going on?
14  A  It's on appeal.
15  Q  Do you drink alcohol?
16  A  Sure.
17  Q  How often, how much?
18  A  A few times a year.
19  Q  Do you take any prescription drugs
20  or over-the-counter drugs on a regular basis?
21  A  No, but I need to. I'm going
22  without right now for my arm injury.
23  Q  And would that be the Ultracet you

Page 32

1  described before, or what other types of
2  medication do you believe that you should be
3  on?
4  A  The Ultracet would help and there's
5  a suggestion that a small dose of
6  Amitriptyline could benefit my condition. A
7  doctor has suggested that.
8  Q  How do you pronounce that?
9  A  Amitriptyline, A-M-I-T-R-Y-P-T-I --
10  I'm sorry. I'm lost. But it's Elavil. It's
11  a non-psychotropic medication but they use it
12  to redirect pain. It's worth a try. They use
13  very low doses, maybe then somewhere between
14  10 and 15 milligrams and it's supposed to
15  redirect pain. It's been suggested to me.
16  Q  Who's the doctor that suggested that
17  to you, do you recall?
18  A  Dr. Harmon.
19  Q  Is he here in Bloomington-Normal?
20  A  It's a she and I think she has her
21  own practice in Lincoln, Illinois.
22  Q  Ever been convicted of a felony?
23  A  No.

Page 33

1   Q   Ever been accused of a misdemeanor
2 involving dishonesty?
3   A   No.
4        MS. WATSON: That's all I have
5 for right now.
6
7        DIRECT EXAMINATION
8 BY MR. BERG:
9   Q   Lynn, my name is Greg Berg and I
10 represent Heartland Apartment Management. I'm
11 just going to ask you a few questions.
12   A   Okay.
13   Q   Let's start with the first incident.
14 The first incident occurred on May 20th, 2004,
15 is that right?
16   A   Yes.
17   Q   Okay. In that incident did anyone
18 from Heartland Apartment Management or Wayne
19 Pelhank enter your apartment on that date?
20   A   No.
21   Q   In the first incident, the one that
22 occurred on May 20th, 2004, is it your
23 understanding that someone from Heartland

Page 34

1 Apartment Management opened your door or keyed
2 the door?
3   A   Yes.
4   Q   Okay. What's your understanding as
5 to what occurred as far as the nature of what
6 someone from Heartland Apartment Management
7 did?
8   A   They are instructed to key open a
9 deadbolt lock and they did.
10   Q   When you say they were instructed
11 to --
12   A   Apparently -- oh, I'm sorry, go
13 ahead.
14   Q   That's okay. When you say they were
15 instructed to key open a deadbolt lock, do you
16 mean an individual from Heartland Apartment
17 Management was instructed to do so?
18   A   I believe they were, yes.
19   Q   And you believe they were by whom?
20 Who gave them that instruction?
21   A   I believe a police officer did.
22   Q   Is this something that you overheard
23 or is it something that you learned later?

Page 35

1   A   I read it. It was something that I
2 learned later.
3   Q   And you learned it later from
4 reading the police report. Is that what
5 you're saying?
6   A   I was there and I had a deadbolt
7 lock on my door and I'm the only one that has
8 a key and the apartment management has a key.
9 The deadbolt was open. I witnessed it that
10 they -- I had a key and the apartment
11 management had a key. Therefore, the
12 apartment people were like responsible for
13 opening the door. That's a given. That's
14 all. No one had a key but me and the
15 apartment management, and my deadbolt was
16 unlocked.
17   Q   Okay. Is it your testimony that
18 your deadbolt was locked?
19   A   Yes.
20   Q   And someone else unlocked it?
21   A   Yes.
22   Q   Did you actually witness anyone
23 unlocking it?

Page 36

1   A   No.
2   Q   At least on that May 20th, 2004,
3 date? That's a no?
4   A   I'm sorry. Could you ask it again?
5   Q   Sure. On May 20th, 2004, did you
6 actually witness someone unlocking your
7 deadbolt?
8   A   No.
9   Q   Did you learn later that someone
10 from Heartland Apartment Management unlocked
11 your deadbolt?
12   A   Yes.
13   Q   Who unlocked your deadbolt?
14   A   Oh, I don't know.
15   Q   Okay. Do you know if it was Wayne
16 Pelhank?
17   A   No, I don't. I don't know who he
18 is.
19   Q   Do you know if it was an employee of
20 Heartland Apartment Management?
21   A   Right, I don't know. I don't know
22 who it was specifically.
23   Q   Whoever it was didn't proceed to

Page 37

1 enter your apartment on that date, is that
2 correct?
3    A  Yes, that is correct.
4    Q  On May 20th, 2004, it's my
5 understanding of your testimony that in
6 addition to having the deadbolt closed or
7 locked, you also had a chain lock on the door,
8 is that right?
9    A  Yes.
10    Q  Is that chain lock something that
11 was in place, in position, locked in other
12 words, on the date of the incident?
13    A  Yes.
14    Q  And is that something that you
15 installed on that door?
16    A  No, it came with the apartment.
17    Q  Okay. Let's talk about the
18 apartment. When did you move into that
19 apartment?
20    A  In my notes I have the exact move-in
21 date, but I believe it was around March 1st
22 of -- sorry, I really need my stuff in front
23 of me. Okay, March 1st, around March 1st,

Page 38

1 2004.
2    Q  So that same year of the incident is
3 when you moved in?
4    A  Well, yes. That was March and then
5 it would be April and then May was the
6 incident.
7    Q  Okay. So about two months, roughly
8 two and a half months before the incident,
9 that first incident on March 20th -- or
10 May 20th, 2004, is when you moved into the
11 apartment, is that correct?
12    A  Yes.
13    Q  Okay. When you moved in in March of
14 2004, did you sign a lease?
15    A  No.
16    Q  When you moved in in March 2004, was
17 Heartland Apartment Management the manager of
18 that apartment?
19    A  Yes.
20    Q  Anytime between March 1, 2004, and
21 May 20th, 2004, at any time in that period of
22 time did you sign a lease?
23    A  No, I did not.

Page 39

1    Q  My understanding, and I believe this
2 is something that you produced in your
3 discovery responses, there's a Heartland
4 Apartment Management lease form that is dated
5 4/1/04. First of all, is this something that
6 you produced?
7    A  It was given to me through the
8 eviction.
9    Q  So this is something you produced in
10 your discovery responses as well, is that
11 right?
12    A  Yes, I did.
13    Q  At the bottom of this lease is a
14 name that appears to be your name and a
15 signature that appears to be your signature.
16 First of all, is that your signature?
17    A  No.
18    Q  Okay. Had you ever seen this lease
19 prior to it being given to you when you were
20 evicted?
21    A  No.
22    Q  Did you sign this lease?
23    A  No.

Page 40

1    Q  Are you claiming that your signature
2 on this lease has been forged?
3    A  Yes, sir.
4    Q  And who are you claiming forged your
5 signature?
6    A  Heartland Apartment Management and
7 Wayne Pelhank.
8    Q  Is this something you actually
9 observed them doing?
10    A  No.
11    Q  And your claim is based on the fact
12 that what appears to be a signature under the
13 line for lessee appears to be your signature
14 but you're denying that you ever signed this
15 form, is that right?
16    A  Yes.
17    Q  You never signed, at least your
18 testimony today is you never signed a lease
19 between yourself and Heartland Apartment
20 Management, is that right?
21    A  Yes.
22    Q  Had you ever signed a lease with any
23 other apartment management agency for the

Page 41

1  property where the incident occurred?
2     A   Yes.
3     Q   What was the name of that apartment
4  management company?
5     A   Remax.
6     Q   Remax.  Do you know when you signed
7  that?
8     A   I'd have to get the exact date, but
9  I can say that it was around September of 2001
10  or something like that.
11     Q   Okay.  September of 2001?
12     A   I think so, around, approximately.
13     Q   Okay.  I just want to make sure
14  we're clear on the record because my
15  understanding is you moved into the apartment
16  on March 1, 2004, is that right?
17     A   That specific apartment, yes.
18     Q   Okay.  So you had lived at a
19  different apartment prior to March 1, 2004,
20  but in the same complex?
21     A   Yes.
22     Q   The apartment that you had lived in,
23  you did sign a lease for that apartment, is

Page 42

1  that right?
2     A   Yes.
3     Q   What was the apartment number?
4     A   Number, apartment No. 5.
5     Q   What were the circumstances of you
6  moving to a different apartment?
7     A   The man next to me was vomiting all
8  over himself to such extent that there was a
9  stench of vomit that came out into the hallway
10  and then entered my apartment, and I had to
11  get out of the apartment.
12     Q   So it was the man or a tenant in the
13  next apartment?
14     A   Yes, in the neighboring apartment.
15     Q   What apartment was that?
16     A   No. 4.
17     Q   Where was apartment No. 6 in
18  relation to 4 and 5?
19     A   At the very end of the hallway.
20     Q   A little bit further away from the
21  vomiting man, in other words?
22     A   Yes, yes.
23     Q   And you made that move in March of

Page 43

1  2004, is that correct?
2     A   Yes.
3     Q   Other than moving from one apartment
4  to the other, is there any understanding
5  between either you and Remax or you and
6  Heartland as to any changes in the terms of
7  your existing lease?
8     A   I'm sorry.  I missed you.  I missed
9  your question.
10     Q   Would you read it back?
11        (Record read as requested.)
12     Q   Do you understand the question?
13     A   No, I don't.  I'm missing something.
14     Q   Well then please let me rephrase it
15  or explain it for you.  My understanding --
16  first of all, your testimony was that you had
17  an existing lease with, a lease with Remax at
18  the time that you moved from one apartment to
19  the next, from apartment 5 to apartment 6.  Am
20  I right so far?
21     A   Yes.
22     Q   And my understanding is you had
23  signed that lease sometime around the time

Page 44

1  that you moved into apartment No. 5 in that
2  same complex, is that correct?
3     A   Yes.
4     Q   And that that agreement was between
5  you and Remax, is that right?
6     A   Yes.
7     Q   Do you know when Remax left the
8  management of that apartment complex?
9     A   I could probably produce the date
10  because I have some paperwork for it, but off
11  the top of my head, no, I'm sorry.
12     Q   Okay.  And I think you did produce
13  the date in your discovery responses.  There's
14  correspondence that's directed to you as a
15  tenant of apartment 5 at 620 and 1/2 North
16  Main Street, Bloomington, Illinois, that's
17  dated February 22nd, 2002, and it's signed or
18  at least there's a signature line for W.A.
19  Pelhank and it notes at least that Heartland
20  Apartment Management is taking over?
21     A   Yes.
22     Q   Okay.  So would you agree that
23  sometime in February 2002 is when Heartland

Page 45

1 took over from Remax?
2    A   Sure, yes.
3    Q   Was it your understanding that the
4 terms of your pre-existing lease would carry
5 over?
6    A   No.
7    Q   What was your understanding?
8    A   That I would just rent month to
9 month until an issue -- if an issue arose, I
10 would address it. That's all.
11    Q   Okay. Even though the
12 correspondence says that the lease was
13 transferred to different management, it was
14 your understanding that there was no lease?
15    A   If I didn't sign a lease with this
16 company, then there is no lease with this
17 company. That's all I would understand it to
18 mean.
19    Q   You would agree that you received
20 this correspondence?
21    A   I did receive it, sure.
22    Q   And you would agree that this
23 correspondence says that your lease has been

Page 46

1 transferred to Heartland. Would you agree
2 with that?
3    A   Sure. I mean, you know, they could
4 say whatever they want. That's a guy that's
5 owned it and I should write my rent checks to.
6 I'm good with that. I don't agree to anything
7 or sign anything. So in a legal fashion there
8 is no -- there's nothing there.
9    Q   Did you contest this correspondence?
10    A   No, I did not.
11    Q   Did you make an issue about the fact
12 that you didn't sign a direct lease agreement
13 with Heartland?
14    A   No, I did not.
15    Q   At any time between February 22nd,
16 2002, and February -- May 20th rather of 2004,
17 did you contest the fact that your lease was
18 transferred to Heartland?
19    A   No, I did not.
20    Q   As far as the lease that you signed
21 with Remax, I believe it's a Seller's Real
22 Estate Management also known as Remax Property
23 Management, first of all. Would you agree

Page 47

1 with that?
2    A   Yes, that's mine.
3    Q   Is this the only page of that lease?
4    A   No.
5    Q   I was unable to find the second page
6 of that lease in the discovery responses that
7 you produced.
8    A   There's more. I photocopied the
9 front page.
10    Q   Do you have another page?
11    A   There's several pages.
12    Q   Did you produce those?
13    A   No.
14    Q   Okay.
15    A   I have them but I didn't put them in
16 there.
17    Q   Okay. We'll need those as well.
18    A   You may have them.
19    Q   Okay. Do you know what the terms of
20 that lease are?
21    A   No.
22    Q   Do you know what the terms regarding
23 entry into the apartment are in that lease?

Page 48

1    A   No.
2    Q   You're homeless now, is that right?
3    A   Yes.
4    Q   Where do you stay?
5    A   Excuse me. I'm going to turn the
6 tape. I'm sorry.
7      (Short pause.)
8    A   Okay. I slept on the ground for
9 three weeks and now I'm sleeping in a shed.
10    Q   Where's that?
11    A   I don't wish to disclose the
12 location. I'm hiding.
13    Q   From?
14    A   Just anybody knowing where I am.
15 You know, I'm sleeping on the street. It's
16 dangerous to sleep on the street or be outside
17 anyway, and it's private information.
18    Q   You have a post office box, is that
19 right?
20    A   Yes.
21    Q   What do you pay for the post office
22 box?
23    A   I don't remember off the top of my

Page 49

1　head, but I think it's something like $58 a
2　year or something like that.
3　　Q　You're not currently employed, are
4　you?
5　　A　No.
6　　Q　What's your source of income?
7　　A　I don't have a source of income.
8　　Q　And your post office box is paid up
9　for the rest of the year, is that right?
10　　A　Yes.
11　　Q　Do you still have your guns?
12　　A　No, I do not.
13　　Q　What did you do with them?
14　　A　I sold my guns for money.
15　　Q　When?
16　　A　I do have exact dates, but I don't
17　have the dates in front of me.
18　　Q　When did you get your G.E.D.?
19　　A　I'd have to look in my papers, but
20　it was shortly after I would have graduated
21　from high school.
22　　Q　Where did you attend high school?
23　　A　In New York.

Page 50

1　　Q　Are you originally from New York?
2　　A　No, I was born and raised in New
3　Jersey.
4　　Q　Whereabouts?
5　　A　East Windsor, New Jersey.
6　　Q　When the police came into your
7　bathroom on 5/20/04, my understanding is your
8　testimony is they actually came running into
9　the bathroom, is that right?  First of all, is
10　that correct?
11　　A　Yes.
12　　Q　Who came in?
13　　A　A dark haired police officer.
14　　Q　Was it just the officer?
15　　A　Yes.
16　　Q　Was it a male or a female?
17　　A　A male officer.
18　　Q　Do you know what that officer's name
19　is?
20　　A　No.
21　　Q　Did anybody else enter the apartment
22　at that time?
23　　A　The social worker spoke to me from

Page 51

1　the kitchen.
2　　Q　Okay.  So she was in the apartment
3　in your kitchen?
4　　A　Yes, sir.
5　　Q　What was her name?
6　　A　Nicole Wilder or Nicole Pickens,
7　depending on which name she'd be referred to.
8　　Q　And what did she say to you?
9　　A　Something to the effect of "We're
10　right here, Lynn," something like that.
11　　Q　What did you think she meant by
12　that?
13　　A　I really did not know honestly.
14　　Q　Was she offering counseling
15　assistance, was that your understanding?
16　　A　I'm losing you.  She was trying to
17　superimpose services on me when I came out,
18　but at that point she wasn't offering
19　anything.  She was just there.
20　　Q　How was she trying to superimpose
21　services on you?
22　　A　After, you mean after I saw her in
23　person?

Page 52

1　　Q　Yes.
2　　A　After out of the shower?
3　　Q　Yes.
4　　A　Well, she didn't seem to want to
5　stop.  I held up my hand and I said I don't
6　need services from the center, thank you
7　anyway, and she was very persistent in
8　questioning, in trying to question me and she
9　seemed to have a stance that she believed that
10　I did need services, and that's what I call
11　persistent.
12　　Q　Is it your understanding that the
13　police, Bloomington Police Department actually
14　broke the chain on your door and made a
15　forceable entry into your apartment on
16　5/20/04?
17　　A　Yes.
18　　Q　It's your understanding that the
19　lease, the representative of Heartland had
20　nothing to do with at least forcibly entering
21　your apartment by breaking the chain, is that
22　right?
23　　A　I don't believe so, no.

Page 53

1   Q   That's correct then?
2   A   Yes.
3   Q   As far as your allegation that
4 someone was a false witness on a police
5 report, I'm still not understanding what
6 you're meaning by that.
7   A   The police officer made false
8 statements on a report and at the bottom of
9 the report they're labeling a witness. I was
10 able to see some of the information about the
11 witness.
12       As I tried to explain, if there's a
13 separateness -- if that witness, if somebody
14 can show me that that witness was not in
15 reference to the police report but just listed
16 because they were present that day, then I am
17 in error to call the witness a false witness.
18 It would be my own error. Because it's
19 listing it on something, on a document that's
20 prepared falsely, I'm assuming that they're
21 also like, yes, that's right, that happened
22 and they're part of it.
23   Q   In other words, if they've signed

Page 54

1 that report, then they're endorsing whatever
2 statement is in that report?
3   A   Yes, sir.
4   Q   Is that what you're saying?
5   A   Yes, that they're a part of it, yes.
6   Q   Do you know if anyone from Heartland
7 Apartment Management signed the police report?
8   A   No, I do not.
9   Q   Do you know if Mr. Pelhank signed
10 the police report?
11   A   I don't know.
12   Q   Okay. What's the name of the
13 witness that you saw in the police report?
14   A   I couldn't identify the name. It
15 looked like K-E and then maybe an I, part of
16 some digit. I couldn't make it out.
17   Q   And what you're saying is if the
18 police actually wrote down that name, then
19 your allegation regarding that witness being a
20 false witness on the police report would be
21 unfounded, is that correct?
22   A   Yes, that is correct.
23   Q   Okay.

Page 55

1   A   That's right.
2   Q   So only if that witness actually
3 wrote down the name and said I agree with
4 everything in this police report would your
5 allegation at least, at least in your mind
6 have some basis?
7   A   No, that wouldn't be correct.
8   Q   Okay. I'm misunderstanding then. I
9 don't mean to misstate your testimony.
10   A   Okay. Explain what I'm talking
11 about?
12   Q   Please.
13   A   There's been an official police
14 report made. There's a name on the police
15 report. My allegation is that the false
16 witness is a false witness and that he is on
17 the police report. It stays, but if somebody
18 gives me something else and shows me -- I
19 don't care whether he signed or not. His name
20 is on the report. It's official. It's a
21 charge. But if somebody would give me more
22 information, somebody would come forward and
23 say I'm not saying that, here's the testimony,

Page 56

1 I didn't say that, somebody put my name on it,
2 I'm done. I drop my allegation.
3       But there's a public document with a
4 witness on it. It's already listed. I've
5 already seen it. It's an established fact.
6 It's objective. If somebody gives me
7 something else that says if this person that's
8 on there, the witness with this Social
9 Security number and other identifying
10 information comes forward and says I wasn't
11 supposed to be on there, I can't charge him
12 because that means the police officer just put
13 his name on there and he had nothing to do
14 with it, you know. He just went, oh, okay,
15 we'll put this on here and it's done.
16       He said so many lies in the report
17 already, why not lie again? I mean who's
18 telling the truth? I don't know. I'm telling
19 the truth. That's what I know. If there's
20 more information to produce, then I must drop
21 the charge because the person that's on there
22 would not be responsible for, he wouldn't be
23 somebody that was agreeing to a false

Page 57

1  statement. That's the best way I can put it.
2  It's the fairest way.
3    Q. Okay. I guess I'm understanding
4  what you're saying.
5    A. It is a little confusing.
6    Q. Yeah. If someone else put down a
7  witness's name in the police report; in other
8  words, a police officer put it down in the
9  police report and that witness never concurred
10 with what was in the body of the police
11 report, never was asked what was in the body
12 of the police report, what you're saying is
13 your allegations are unfounded, is that
14 correct?
15   A. Yes.
16   Q. Okay. But if they were asked and
17 they said yep, that's exactly what I saw too,
18 then what you're saying is you have a basis
19 for your allegations that this is a false
20 witness?
21   A. Yes, sir.
22   Q. I'm glad we're on the same page
23 then. As far as your May 20th, 2004 incident,

Page 58

1  first of all, and I know you've been asked
2  this question, but in your own words can you
3  please say what your injuries were or what
4  your damages are?
5    A. Both the police officer and the
6  social worker made false reports saying that I
7  was a criminal, a very serious criminal, a
8  criminal that would not only participate in a
9  homicidal perpetration but a homicidal
10 perpetration to my family and made a false
11 report saying I was a mental patient. So
12 they've turned me into, on documents they've
13 turned me into both a criminal and a mental
14 patient.
15      The Heartland Apartment Management
16 was involved in a situation more or less and
17 the lease that was produced was forged. So
18 somebody has forged my name and forgery is
19 fraud. It's against the law. Somebody took
20 it upon himself to sign my name on a document
21 for whatever reasons, and I guess that's all.
22   Q. Okay. So I guess I'm trying to
23 understand because the incident took place,

Page 59

1  and we're just talking about the first
2  incident on May 20th, 2004, and your
3  allegations at least against Heartland
4  Apartment Management and Wayne Pelhank are
5  that they violated the Illinois Rental Law for
6  entrance into a residence, is that correct?
7    A. Yes.
8    Q. And what's the basis for that
9  allegation?
10   A. There was no -- nobody knocked on
11 the door and waited and said can I come in.
12 You can't just key in. There was no
13 emergency. The whole thing was false.
14 Therefore, there was no emergency. In an
15 emergency, perhaps they could key in. So
16 there was nobody that said -- it gets a little
17 bit confusing, but nobody should have unlocked
18 my deadbolt to begin with because it's illegal
19 to just key in. There wasn't anything really
20 happening so there was no substantial reason
21 for them to key in. Am I sidetracking? I may
22 be. Did I answer your question?
23   Q. I'm not done with my questioning.

Page 60

1    A. No, just that one question, did I
2  cover it?
3    Q. I think so.
4    A. Okay.
5    Q. We'll just elaborate a little bit on
6  it here. My understanding is your allegation
7  is that no one knocked on the door, is that
8  right?
9    A. That is right.
10   Q. And we're talking specifically about
11 May 20th, 2004, is that correct?
12   A. They pounded on the door and then
13 broke open the door but I'm talking about
14 knock, wait, give somebody a chance to come to
15 the door. I almost took the towel out of
16 my -- I always put a towel on my shampooed
17 hair, thinking there was an emergency in the
18 building and like ran out. I considered doing
19 that and I was like no. But I almost did, so
20 to just knock and then break open a door is
21 unreasonable. Nobody knocked and waited or
22 chilled it out or gave me a chance to call or
23 said something or something like that. They

**Page 61**

```
 1   decided that it was time to come in and they
 2   pounded on the door and broke open the door.
 3   They didn't knock or say anything through the
 4   door, say Lynn, this is the police or anything
 5   like that or, Lynn, can we come in or what's
 6   up or anything.  They were being very
 7   secretive and sneaky about it and when they
 8   pounded on the door, they decided if I didn't
 9   answer in five seconds, that was it, and then
10   they broke open the door.
11   Q   How much time elapsed from the time
12   that they pounded on the door until they
13   entered the apartment?
14   A   Just not -- just, you know, seconds,
15   seconds.  It was loud rapping on the door.
16   They pounded on the door.  I could tell
17   something was going on.  I couldn't hear them
18   but their voices were up and then they busted
19   the door so it was just seconds.  They didn't
20   like pound and then knock or wait or anything
21   like that.  They just decided it's time to
22   come in so --
23   Q   Did you hear everything from the
```

**Page 62**

```
 1   time that they started pounding on the door
 2   until they broke down the door?
 3   A   Did I hear what?  I'm sorry.
 4   Q   I'll strike the question.  Were you
 5   in the shower the entire time until they came
 6   to the bathroom?
 7   A   I didn't know it was them but I
 8   heard somebody in the hallway prior, yes.
 9   Q   Did you hear someone in the hallway
10   knocking on your door prior?
11   A   No, no one knocked on my door.
12   Q   And then you entered the shower
13   after you heard somebody in your hallway?
14   A   Yes.
15   Q   And then you proceeded to take a
16   shower, is that right?
17   A   Yes.
18   Q   And then at some point during your
19   shower, that's when you heard them pounding on
20   the door, is that correct?
21   A   Yes.
22   Q   And at some point you heard them
23   breaking down the door, is that right?
```

**Page 63**

```
 1   A   Yes, it was very loud.
 2   Q   And at some point did you hear
 3   them -- or strike that.
 4       At some point you believe the door
 5   was keyed open by someone from Heartland, is
 6   that correct?
 7   A   Yes.  I believe so, yes.
 8   Q   Because it's your testimony that the
 9   door was at least deadbolted prior to you
10   entering the shower, is that right?
11   A   Yes.
12   Q   Okay.  And chained shut, correct?
13   A   Yes.
14   Q   As far as your other allegations of
15   libel which is your second allegation against
16   Heartland Apartment Management and Wayne
17   Pelhank, the basis for that allegation is what
18   we've already discussed and that's the false
19   witness on the police report, is that correct?
20   A   Yes.
21   Q   We've already cleared that up, and
22   as far as the fraud and forgery allegation,
23   this is again pertaining to, my understanding
```

**Page 64**

```
 1   is it's pertaining to the 5/20/04 incident, is
 2   that correct?
 3   A   Yes.
 4   Q   What's the basis for that
 5   allegation?
 6   A   I never signed a lease.
 7   Q   Okay.  So your allegation is that
 8   your name, at least the name that appears at
 9   the bottom of a lease that's dated 4/1/04, the
10   signature at the bottom left hand corner of
11   that Heartland Apartment Management apartment
12   lease agreement is not your signature, is that
13   correct?
14   A   Yes.
15   Q   And your further allegation is that
16   if you didn't sign it, somebody else must have
17   signed your name?
18   A   Yes.
19   Q   Let's talk about the second
20   incident.  That second incident occurred in
21   2005, is that right?
22   A   Yes.
23   Q   And that would be March 28th, 2005?
```

Page 65

1  A  Yes.
2  Q  Tell me what occurred on that date.
3  A  In the morning I was lying down and
4  Wayne Pelhank tried to key into my apartment
5  and then he told me that -- I said something
6  like you can't key in or something like that,
7  but he said that he would come back and bust
8  down the door, and I turned on the camcorder
9  and recorded him attacking, violently
10  attacking my door with a crowbar. So I called
11  9-1-1 and the police came and when the police
12  came, they didn't want to let me make a
13  disorderly conduct report.
14  Q  I'm going to back you up because
15  you've already gone over some of this and I
16  don't want to rehash what you've already
17  testified to.
18  A  Okay.
19  Q  You had a camcorder in your
20  apartment, is that right?
21  A  Yes.
22  Q  Did you own that?
23  A  Yes, I did.

Page 66

1  Q  Do you still own it?
2  A  No, I don't.
3  Q  I just want to make sure the record
4  is clear. You have a tape recorder with you
5  today, is that right?
6  A  Yes.
7  Q  And you're taping today's
8  deposition, is that correct?
9  A  Sure, yes.
10  Q  What did you do with the camcorder?
11  A  It broke and I threw it away.
12  Q  On 3/28/05 my understanding is Wayne
13  Pelhank tried to key into your apartment. Do
14  you know about what time you -- at least
15  according to your testimony that's what you
16  said so far. Do you know about what time that
17  occurred?
18  A  I don't have an exact time, but it
19  was shortly before the incident so it was
20  probably a little bit after ten.
21  Q  10:00 a.m.?
22  A  Yeah. Ten in the morning, yes.
23  Q  At that time you didn't work, is

Page 67

1  that right?
2  A  Yes.
3  Q  Were you asleep?
4  A  Yes, I was.
5  Q  You were asleep on the couch?
6  A  On my bed.
7  Q  On your bed, okay. How did you know
8  that Wayne was trying to key in?
9  A  I heard the deadbolt unlock. I
10  jumped up. I looked. I saw he opened the
11  door. He pulled the door shut and spoke
12  through the door so I recognized him by his
13  voice.
14  Q  He actually opened the door?
15  A  Yes, but the deadbolt stopped it
16  from going any further.
17  Q  I'm sorry. The deadbolt did?
18  A  I mean, pardon me, the chain lock.
19  Q  So the chain lock was on on that
20  date as well?
21  A  A new chain lock, yes.
22  Q  Okay. The other one had been
23  broken?

Page 68

1  A  Yes.
2  Q  Had you replaced it?
3  A  Yes, I put another chain lock on
4  there.
5  Q  You didn't put the first one on, did
6  you?
7  A  It was broken. I have it still.
8  It's busted. It won't work.
9  Q  You purchased a new chain lock and
10  you installed it yourself?
11  A  No, I had a chain lock already.
12  Q  Okay.
13  A  I had an old chain lock in my tool
14  bag and I put it on there.
15  Q  You installed the second chain lock
16  on your door?
17  A  Yes, I did.
18  Q  Did you get permission to install
19  that second chain lock on your door?
20  A  No, I did not.
21  Q  By permission, what I meant was did
22  you ask Heartland Apartment Management or
23  Wayne Pelhank whether or not you could install

Page 69

1  the chain lock on your door?
2      A  No, I didn't.
3      Q  Was it your understanding that you
4  could install a chain lock on your door?
5      A  Sure, yes.
6      Q  Was it your understanding there was
7  anything in your lease, either your
8  pre-existing lease or the one that Heartland
9  Apartment Management has that you produced
10 that's this lease entitled Heartland Apartment
11 Management Lease, that there's anything
12 prohibiting you from installing a lock in the
13 door?
14     A  Not that I know of.
15     Q  You heard the deadbolt unlock and
16 you were in bed.  Was your bed in the same
17 room?
18     A  Yes.
19     Q  And it's the front door?
20     A  Yes.
21     Q  Was that the only entranceway into
22 your apartment?
23     A  No, there was another door in the

Page 70

1  kitchen, but I didn't use it.  It's a door.
2  You could use it if you wanted to.
3      Q  Prior to you hearing the deadbolt
4  unlock, did you hear any knocking?
5      A  It was simultaneous knocking
6  opening.  It was not an official knock or wait
7  it was just one, two, and open at the same
8  time.
9      Q  Was anything announced?
10     A  No.
11     Q  So nothing stated by Mr. Pelhank or
12 whoever was attempting to open your door?
13     A  Oh, as he knocked, I believe he said
14 landlord and he knocked and keyed in at the
15 same time.
16     Q  Did he say anything other than
17 landlord?
18     A  I don't know.  I don't think so, no.
19     Q  You don't know what else he said?
20     A  I don't remember hearing anything
21 else, no.  I don't remember actually.
22     Q  You don't remember, okay.  Do you
23 recall if he gave a reason why he was knocking

Page 71

1  or trying to enter your apartment?
2      A  There was no reason given.
3      Q  That's something you recall
4  specifically, is that right?
5      A  Yes.
6      Q  At that time in March, on
7  March 28th, 2005, what was the status of your
8  rent payment to Heartland Apartment
9  Management?
10     A  I'd have to look exactly for
11 details, but I was behind in my rent.
12     Q  How many months?
13     A  I'd have to check exactly but at
14 least three months rent.
15     Q  Three months rent?
16     A  I believe so, yes.
17     Q  Between the incident that occurred
18 on May 20th, 2004, and the incident that
19 occurred on March 28th, 2005, did you sign a
20 lease with Heartland?
21     A  No.
22     Q  Was it your understanding that you
23 were still on a month to month lease?

Page 72

1      A  Yes.
2      Q  What did you pay month to month?
3      A  $375 a month.
4      Q  Who did you pay?
5      A  Heartland Apartment Management.
6      Q  Did you write checks or pay cash?
7      A  Sometimes I wrote checks and
8  sometimes I paid money order, if money order
9  is considered cash.
10     Q  And they were always drafted to
11 Heartland Apartment Management?
12     A  Yes.
13     Q  At least at --
14     A  Oh, I'm sorry.
15     Q  That's okay.  At least as of
16 sometime in 2002 when Heartland took over, is
17 that correct?
18     A  Yes, sounds right.
19     Q  When you say at least three months
20 overdue in rent or behind in rent, had you
21 paid any portion of the rent during those at
22 least three months?
23     A  There was some payments being made

Page 73

1  but the exact amounts are in my notes.  Small
2  increment of payments had been made.
3      Q   What amount just generally?
4      A   Insignificant to the whole, small
5  amounts, very small.
6      Q   Five dollars, ten dollars?
7      A   No.  Well, I was paying 50 at a time
8  but there was a very low, like $25 payment
9  too.  I don't think there was anything less
10  than $25.
11      Q   Do you know when you made the last
12  payment of 25 to 50?
13      A   I do have a record of it officially.
14      Q   How many days or months before
15  3/28/05 did you make that last incremental
16  payment?
17      A   I'm sorry.  It's in my notes but I
18  can produce that if you want.
19      Q   You don't have a recollection of
20  that?
21      A   No.
22      Q   You think it was over a month before
23  the incident occurred?

Page 74

1      A   I'm sorry.  I honestly don't
2  remember.  I'd have to look to see the exact
3  dates.
4      Q   Could it have been over a month
5  before the incident occurred?
6      A   I'm sorry.  I don't know without
7  looking at my papers.
8      Q   Had you had any conversations during
9  that at least three months prior to the
10  3/28/05 incident with either Wayne or anyone
11  from Heartland Apartment Management regarding
12  your past due rent?
13      A   Yes.
14      Q   What was the nature of those
15  conversations?
16      A   There was no conversation.  I left a
17  voice mail that I was injured and that I was
18  seeking help.  I left a handwritten note that
19  I was seeking help.  That's pretty much all.
20  I didn't go into details.  I tried to stay
21  away from details.
22      Q   You left a voice mail with Wayne
23  Pelhank?

Page 75

1      A   With the official apartment
2  management answering service, yes.
3      Q   When you say you were injured and
4  seeking help, was it a situation where you
5  were seeking medical help or financial
6  assistance, or were you specific?
7      A   I said something to the effect that
8  I was injured and I wasn't working and I was
9  trying to get financial assistance for the
10  rent.  It was strictly financial assistance
11  for rent, for his rent.
12      Q   Was the injury that you were
13  referring to in the voice mail message, was
14  that the library injury?
15      A   Yes, it was.
16      Q   At any time during the time that you
17  lived at the 620 and 1/2 North Main Street
18  apartment complex either in apartment 5 or
19  apartment 6 did you work?
20      A   Yes, I did.
21      Q   Where did you work?
22      A   Several different places.  Would you
23  like them all?

Page 76

1      Q   Sure, yes.
2      A   Let's see.  A Clothesline laundry
3  mat, a Walgreen's.  I guess that's all.
4      Q   Walgreen's in Bloomington?
5      A   Yes.
6      Q   On Main Street?
7      A   No, the one -- there's another one
8  on Veterans.
9      Q   The one on North Veterans?
10      A   GE Road.
11      Q   Where was the Clothesline?
12      A   It's up on Hershey and something.
13      Q   Do you know if --
14      A   The one that I worked -- the main
15  thing.  The one that I worked at was South
16  Center Street.  I don't know the exact
17  address.
18      Q   Do you know from when to when you
19  worked at Clothesline?
20      A   No, I don't have a record.  I might
21  be able to dig up a record, but I don't have
22  one.
23      Q   Do you know generally the last year

Page 77

1 you worked at Clothesline?
2    A   I really don't remember. I do have
3 a record. I should have a record of it.
4    Q   Do you think it was sometime before
5 2004 that you last worked at Clothesline?
6    A   Yes. Yeah, sure.
7    Q   It was?
8    A   Yes, it was.
9    Q   The last time you worked at
10 Walgreen's, was that sometime before 2004?
11    A   Yes, it was.
12    Q   The last time you were employed in
13 any capacity, was that sometime before 2004?
14    A   I was not employed in 2003. Does
15 that help?
16    Q   Okay. Let's go back to 2003.
17    A   Okay.
18    Q   Were you employed in any capacity
19 before 2003 and from 2003 through to 2005?
20    A   Okay, good. That's easy to answer.
21 Yes, I was employed before 2003 but no, I was
22 not employed after 2003.
23    Q   And why is that?

Page 78

1    A   The beginning of 2003 the
2 Bloomington police towed my car and wouldn't
3 give it back. It was February. It was
4 zero degrees so I started walking everywhere
5 that I needed to go and I could not find a job
6 right away. I did not spring back quick
7 enough in zero degree weather to find a job
8 and some time passed that year and so I did
9 not work in 2003. At the end of 2003 I got a
10 chunk of money and I wanted to try to make
11 some changes in my life so I did not work, but
12 I was very productive. In 2004 I was injured
13 so I got completely thrown on my butt with an
14 injury, and I haven't worked since. Does that
15 help?
16    Q   You got a chunk of money. Was that
17 from your inheritance?
18    A   Yes, I got a partial amount of
19 money, $20,000.
20    Q   And that's what you lived on at
21 least for the next year?
22    A   Yes.
23    Q   My understanding, at least according

Page 79

1 to your testimony, is that after Mr. Pelhank
2 attempted to key the door open, he was able to
3 unlock the deadbolt, is that right? This is
4 on 5 -- the second date, 5/28. 3/28/05, I'm
5 sorry.
6    A   I'm sorry. After he what? I'm
7 sorry. I missed the question.
8    Q   Strike the question. It was a bad
9 question.
10    A   Oh, was it? Okay, good then.
11    Q   On 3/28/05 --
12    A   Okay.
13    Q   -- it's my understanding that
14 Mr. Pelhank, at least according to your
15 testimony, your testimony is that he keyed the
16 door and my understanding from your testimony
17 is he put a key in the deadbolt lock from the
18 outside of your apartment and turned the
19 deadbolt key, is that right?
20    A   Yes.
21    Q   At that time, at least prior to
22 doing that or at the same time he was knocking
23 and saying landlord, is that right?

Page 80

1    A   Yes.
2    Q   You don't recall specific
3 conversations between you and Mr. Pelhank at
4 least before 3/28/05 in those three or
5 four months before that date, is that right?
6    A   We had no specific conversations.
7 There were none but my two communications I've
8 already told you about, leaving a note and
9 leaving a voice mail message.
10    Q   What did the note say?
11    A   I honestly don't remember but
12 something to the effect of I was here, because
13 I made a trip in person to see him, and the
14 reason for this is I was next door at
15 Community Action trying to get help with my
16 rent. So the lady said it would be a few
17 minutes and I said I'll be right back. So I
18 walked over to Heartland Apartment Management
19 but he wasn't in the office, and I wrote
20 something to the effect of, something to the
21 effect of Lynn Guevrekian was here, I'm trying
22 to get help with my late rent, my rent being
23 late or something like that, but I don't

Page 81

1  remember what I wrote, just something to that
2  effect. That was the purpose of my note, you
3  know, to show that I had been there to try to
4  communicate that I was late and that I was
5  working on it.
6     Q  Did you receive any correspondence
7  from Heartland or Mr. Pelhank prior to 3/28/05
8  regarding your late rent?
9     A  I have to look at my notes, but I
10  did receive a correspondence that said
11  something to the effect of after you catch up
12  on your rent, pay all the late fees, I'll
13  reduce your rent to 350, something like that.
14     Q  But you never verbally discussed
15  that with Mr. Pelhank?
16     A  No.
17     Q  Did you receive a five day Notice to
18  Pay Rent or Quit?
19     A  Yes.
20     Q  How did you receive that?
21     A  The police officer handed it to me.
22     Q  When did you receive that?
23     A  On the same, March 28th, 2005

Page 82

1  incident.
2     Q  Did Mr. Pelhank ever say that was
3  the reason why he was trying to enter your
4  apartment?
5     A  No, he did not.
6     Q  He was not able to enter your
7  apartment on that date, is that correct?
8     A  Yes.
9     Q  He wasn't able to open the door past
10  the chain lock, is that right?
11     A  Yes.
12     Q  And my understanding of your
13  testimony is that after he attempted to open
14  the door, he left and that's when you set up
15  the video camera, is that correct?
16     A  Yes.
17     Q  And between the time that he left
18  and the time that he returned, what did you
19  do?
20     A  I turned on the camera just in case,
21  and I went and sat down at a table that was in
22  the same room. I may have made some coffee or
23  something.

Page 83

1     Q  When he first started knocking on
2  the door, did that wake you?
3     A  Yes.
4     Q  Did you say anything to him as he
5  was attempting to open the deadbolt lock?
6     A  Something to the effect of you don't
7  just key in. I was angry that he was keying
8  in.
9     Q  Did he respond to that?
10     A  Yes.
11     Q  What did he say?
12     A  "I'll come in any time I want,
13  bitch." It was completely hostile and that's
14  why there was no communication because it was
15  hostile from the getgo.
16     Q  When you say the getgo, what do you
17  mean?
18     A  Well, he didn't say something like I
19  have a five-day notice I want to give you and
20  I could have cracked the door and just took
21  the notice or he could have left it there or I
22  could have went to his office to get it, just
23  something normal. Because of the hostility,

Page 84

1  there was no communication.
2     Q  So you didn't respond to that?
3     A  No, I just set up the video camera
4  after he left.
5     Q  Did he say that and then leave?
6     A  Yes.
7     Q  So he made that statement and then
8  he left, is that correct?
9     A  He said he was coming back to break
10  down the door after that and then he left.
11     Q  Did he say anything else?
12     A  I don't think so.
13     Q  My understanding is he said
14  landlord, he said I'll come in any time I
15  want, bitch, and he said I'm coming back to
16  break down the door, is that correct?
17     A  Yeah, he said you watch it.
18     Q  You watch it?
19     A  Like afterwards, as if you watch me
20  break down the door.
21     Q  But you watch it was what he said?
22     A  Yeah, you watch it, something like
23  that, yeah.

Page 85

1 Q Did he say anything else?
2 A I don't think so.
3 Q How long was he gone?
4 A I don't know exact time.
5 Q It was enough time for you to set up
6 the video camera?
7 A Yes.
8 Q It was enough time for you to
9 contact the police?
10 A Yes, I could have, sure.
11 Q Did you?
12 A No.
13 Q Did you still have your guns at that
14 time?
15 A Yes, I did.
16 Q Did you keep them loaded?
17 A Yes, they were loaded with the
18 safety on. You bet.
19 Q Tell me what happened next. The
20 video camera was on?
21 A I called 9-1-1.
22 Q When did you call 9-1-1; before he
23 came back?

Page 86

1 A Okay. When he came back -- no, I
2 stayed. I turned on the video camera just in
3 case he was serious about breaking open the
4 door, and when he came back I called 9-1-1 as
5 he started to crowbar the door.
6 Q Did you see him with the crowbar?
7 A No, but I saw the crowbar.
8 Q Did you see it through the door?
9 A Yes.
10 Q Was your door deadbolted by that
11 time? Did you re-deadbolt the lock?
12 A Yes, I always kept my door
13 deadbolted.
14 Q Was it still chained?
15 A Yes, it was chained.
16 Q Had you gone up and closed the
17 deadbolt again after he opened it?
18 A He closed it himself with a key I
19 guess.
20 Q Do you recall if he closed it or if
21 you closed it?
22 A He closed it.
23 Q When you saw him come back, and my

Page 87

1 understanding is you have a videotape of this,
2 is that when you saw the crowbar?
3 A You can see the crowbar on the
4 videotape.
5 Q Where did you see it?
6 A Inside through the door crowbarring
7 to get the door open, sticks through into the
8 apartment.
9 Q Was it at the area where the chain
10 lock was?
11 A I'd actually have to view the video
12 to get the exact location, but it was inside
13 the apartment having to do with trying to open
14 the door.
15 Q Was he saying anything at that time?
16 A I'd have to review the transcript
17 because it is on the transcript word for word,
18 but off the top of my head I don't have it
19 memorized or anything.
20 Q I'm just asking what you recall from
21 that date. This is about a year ago.
22 A I asked him if he understood what he
23 was -- I told him that I didn't want him to

Page 88

1 come in and I asked him if he understood and
2 he said, well, you don't understand, we're
3 coming in. Off the top of my head, that's one
4 thing I remember him saying.
5 Q Was there more than one person
6 outside your door?
7 A I believe there was another person,
8 yes.
9 Q Do you know if it was someone from
10 Heartland?
11 A I don't know. I guess that it was a
12 utility guy, but I have no idea.
13 Q When this was taking place, the
14 second attempt to try to get into your
15 apartment, where were you?
16 A I was in the same room but standing
17 back from the door.
18 Q Behind the video camera obviously?
19 A Actually I was to the side of the
20 video camera, probably alongside the video
21 camera.
22 Q How long did that second attempt
23 take place? How much time elapsed; a minute,

Page 89

1 two minutes?
2    A  I honestly don't know.  More than
3 two minutes.
4    Q  Other than the crowbar, did
5 Mr. Pelhank or anybody else from Heartland
6 make it into your apartment at that time?
7    A  No, they did not.
8    Q  Okay.  What did you do while those
9 attempts were being made?
10    A  I stayed on the line with the 9-1-1
11 operator.
12    Q  At what point did you call 9-1-1?
13    A  I have to watch the video but as
14 soon as it was established that he was
15 attacking the door, I called 9-1-1.  I gave it
16 a second to see whatever, if it was just some
17 noise outside the door, but as soon as it was
18 established he was attacking the door I called
19 9-1-1.
20    Q  And what did you say to the 9-1-1
21 operator?
22    A  That Wayne Pelhank, my landlord, was
23 attacking my door with a crowbar.  The word

Page 90

1 for word is on the transcript.  It's to the T.
2 It's recorded exactly as what's on the video.
3    Q  It's my understanding that
4 Mr. Pelhank never made it into your apartment
5 at least before the police arrived, is that
6 correct?
7    A  Yes.
8    Q  And did he discontinue his efforts
9 to try to enter your apartment at some point
10 while you're still on the 9-1-1 call or at
11 some point after you hung up?
12    A  He settled while I was still on the
13 9-1-1 call, as I recall, yes.
14    Q  He stopped trying to enter your
15 apartment, is that correct?
16    A  Yes.
17    Q  And what happened after that?
18    A  It was sort of like as the police
19 were coming there was a rest outside the door,
20 and then the police came and obviously he
21 stopped and then he was done.  When the police
22 left, he left.  He was finished.
23    Q  When the police left he left, what

Page 91

1 do you mean?  When the police arrived he left?
2    A  Well, the police arrived but then
3 after they gave me the five-day notice they
4 left, and when he left Mr. Pelhank left, Wayne
5 Pelhank left.
6    Q  Okay.  Did Mr. Pelhank enter your
7 apartment when the police arrived?
8    A  No.
9    Q  Did he ever enter your apartment on
10 that date?
11    A  No.
12    Q  He never crossed the threshold of
13 your apartment, is that correct?
14    A  He did with his crowbar.
15    Q  Okay.  Did he physically cross the
16 threshold?
17    A  No.
18    Q  Did you ever say anything to
19 Mr. Pelhank about your guns?
20    A  No, I did not.
21    Q  Did you ever threaten him?
22    A  No.
23    Q  You were handed the five-day notice

Page 92

1 when the police arrived by the police, is that
2 correct?
3    A  Yes.
4    Q  And the five-day notice is what you
5 produced in your discovery responses, is that
6 right?
7    A  Yes, that looks right.
8    Q  And the amount that's shown owing,
9 due and owing is $1,513.21, is that correct?
10 First I'm just asking you to identify the
11 document.  Is that the correct amount on the
12 document?
13    A  Okay.  The amount on the document
14 that you're saying is the right amount that
15 you're saying, but it's not what I owed him.
16    Q  Okay.  What did you owe Heartland on
17 March 23rd, 2005, or March 28th, 2005?
18    A  I can produce that information but I
19 have no idea right now.
20    Q  You think it was less than 1,513.21?
21    A  Yes, it was.  Yes, it was.
22    Q  Do you know how much less?
23    A  I can produce exact figures but I

Page 93

```
 1  have to have my notes and stuff.
 2      Q  Do you think it was more than $100
 3  less?
 4      A  I can produce the exact figures and
 5  be glad to send them to you if you would like
 6  to have them.
 7      Q  Sure.  Is one of your allegations
 8  that the amount that at least was indicated in
 9  the Notice to Pay Rent or Quit that's dated on
10  March 23rd, 2005, that you admit was served on
11  you on March 28th of 2005 is an incorrect
12  amount?
13      A  That's right, yes.
14      Q  And by incorrect, it's too high an
15  amount, is that correct?
16      A  Yes.
17      Q  Did you pay that amount?
18      A  No, I did not.
19      Q  Did you pay any amount?
20      A  On the five-day notice, no.
21      Q  Okay.  Did you leave the apartment?
22      A  Yes, I did.
23      Q  When?
```

Page 94

```
 1      A  I'd have to check my calendar but it
 2  was like that first week of May I left.  The
 3  exact date, I don't have it.  I have the exact
 4  date but I don't have it in front of me, but
 5  it was the first week in May.
 6      Q  Did you pay any amount between
 7  March 28th and the first week of May?
 8      A  No.
 9      Q  Have you paid any of the amount that
10  you owed, either the amount that you had in
11  your mind that you owed Heartland or the
12  amount that they indicated that you owed?
13      A  No.
14      Q  And you haven't paid that today, to
15  date as of today's date, is that right?
16      A  Yes.
17      Q  Have you ever been sent to
18  collections with regard to that amount owed?
19      A  Not that I know of.
20      Q  Did you have any conversations with
21  Mr. Pelhank after March 28th, 2005?
22      A  No.
23      Q  Did you leave any more messages with
```

Page 95

```
 1  Mr. Pelhank with regard to paying or agreeing
 2  to pay any amount?
 3      A  No.
 4      Q  Did you receive any other
 5  correspondence from Mr. Pelhank regarding your
 6  leaving the apartment after March 28th, 2005?
 7      A  No.
 8      Q  How did you come to leave on the
 9  first week of May?
10      A  How did I come to leave?
11      Q  What were the circumstances of you
12  leaving on that week?
13      A  I left and went to a homeless
14  shelter.  I exited the apartment.  I was no
15  longer there.  I went to a homeless shelter.
16      Q  Was this something you were told to
17  do or just something you took upon yourself to
18  do?
19      A  I had nowhere to go and I didn't
20  have any money so I went ahead and went to the
21  homeless shelter.
22      Q  You stayed there through the month
23  of April of 2005 though, is that right?
```

Page 96

```
 1      A  Yes, I did.  I stayed in the
 2  apartment in April, yes.
 3      Q  During that time were there any
 4  conversations between you and anyone from
 5  Heartland with regard to you either paying the
 6  past due amount or April's rent?
 7      A  No.
 8      Q  I don't know if anybody told you,
 9  but at any time you need to take a break, just
10  let us know.
11      A  I would love to have one right now.
12      Q  Let's take one.  Is that okay with
13  everybody?
14          MS. WATSON:  Yeah, definitely.
15
16      (Whereupon a 10-minute break was taken.)
17      (Last question and answer read.)
18  BY MR. BERG:
19      Q  My understanding is that the
20  allegations with regard to the second
21  incident, the March 28th, 2005 incident at
22  least against Heartland Apartment Management
23  and Wayne Pelhank included the following,
```

Page 97

1   violence to which you demand the arrest and
2   official police report filed against
3   Mr. Pelhank, is that correct?
4     A   Yes.
5     Q   Did you ever actually file any
6   criminal charges against Mr. Pelhank?
7     A   I attempted to file a disorderly
8   conduct report but the police wouldn't allow
9   me to. I attempted to file an attempted
10   illegal entry to make reference to the
11   separate or same report or however it does,
12   but the police would not allow me to. Other
13   than that, no. I don't know where I would go
14   other than the police.
15     Q   You attempted to file those on the
16   date of the incident?
17     A   Yes, it's on the video.
18     Q   Okay. With the police that
19   responded to the scene?
20     A   Yes.
21     Q   Did you ever go to the Bloomington
22   Police Department after the police left the
23   scene?

Page 98

1     A   No.
2     Q   So the only attempts were verbal
3   attempts with the officers that responded?
4     A   Yes.
5     Q   You didn't ever file a written
6   complaint against Mr. Pelhank or Heartland
7   Management, is that correct?
8     A   Yes.
9     Q   Is the violence that you're
10   referring to in your allegations in your
11   complaint, is that specifically the attempts
12   to open your door?
13     A   Yes.
14     Q   Is that what you're referring to?
15     A   Yes.
16     Q   There was no actual physical
17   violence against you, is that right?
18     A   Yes, there was. That is against me.
19   That's my door. If I live there, if I occupy
20   it, that's my space. That's an extension of
21   me. If you're smashing my door, you're in my
22   space. You're violently attacking something
23   that's in my space.

Page 99

1     Q   It would be violence against your
2   door?
3     A   Yes.
4     Q   Is that right?
5     A   Yes.
6     Q   You also allege harassment and
7   malice. What's the basis for those
8   allegations?
9     A   Well, I do need to elaborate on a
10   lot of stuff. I do have a lot of work that I
11   put into text. It's chicken scratch but it
12   goes into text. That's a hate crime what he
13   did. Malice is defined as -- you know,
14   violently attacking somebody's door is the
15   root of a hate crime. It's malice. It's an
16   ugly thing to do to someone, and that's the
17   basis that I'm viewing it as.
18     Q   This happened on more than one
19   occasion?
20     A   No, it was just the one.
21     Q   Just the one occasion. And it's my
22   understanding the attempts to open your door
23   discontinued when the police were notified, is

Page 100

1   that right?
2     A   Actually they kept up a little bit
3   while I was on the 9-1-1 operator's telephone.
4   They were still going on. As the operator was
5   on the telephone with me, they were still
6   keeping up, but the operator asked me, "Is
7   that him?" And I said yes. "Is that banging
8   sound him?" And I said yes.
9     Q   What's the basis for your
10   interference with peace and enjoyment of the
11   apartment allegation?
12     A   Everybody that rents an apartment is
13   granted that, something having to do with the
14   covenant of peaceful enjoyment or something
15   like that. I don't know the exact technical
16   citation for that yet, but I've got it in
17   notes.
18     Q   The basis for that interference was
19   the pounding on your apartment or the attempts
20   to open the door?
21     A   The acting like a maniac, yeah. I
22   would say that attacking a door was not
23   reasonable or peaceful or nice, a nice thing

Page 101

1 to do.  So that's the upsetting of it.  It's
2 not an enjoyable thing.
3     Q    The illegal key entry attempt,
4 what's the basis for that allegation?
5     A    There's no reason that he should
6 just key in.
7     Q    And you're asserting at least that
8 there was no --
9     A    It's reasonable if there was an
10 emergency but other than that, it's not
11 reasonable.
12     Q    So if there's an emergency, it would
13 have been reasonable for him to key in, is
14 that right?
15     A    I believe so, yes.  If there was a
16 real actual emergency, actual emergency, yes,
17 I think that would be okay.
18     Q    But it's your position at least that
19 if it wasn't an actual emergency, then it's an
20 illegal attempt?
21     A    Yes.
22     Q    All right.  Inappropriate delivery
23 of the five-day notice to evict to which there

Page 102

1 was no announcement.  What's the basis for
2 that allegation?
3     A    Well, the inappropriate is just side
4 by side with the whole smashing of the door
5 thing.  It's an inappropriate way to deliver
6 and if he had, before he started if he had
7 said something like I want to give you a
8 five-day notice or I want to give you a paper,
9 I have to give you this paper or something
10 like that, he would have been giving an
11 announcement as to what he was doing.  I
12 didn't know why he was doing it.  I thought he
13 was just on a power trip or I think he's
14 crazy.  Maybe he was just doing it because he
15 was crazy and crazy people do crazy things.
16         So I don't know why but there was no
17 announcement.  He didn't say I have to give
18 you a paper for the apartment, I have to serve
19 you a five-day notice, you know, or something
20 like that.  There was no announcement.
21     Q    The basis for you saying that you
22 think he's crazy are just the actions that you
23 believe he took on the May -- strike that; the

Page 103

1 March 28th, 2005, date?
2     A    No, there's a little bit more to it.
3     Q    What's more?
4     A    He polices up and down.  He was
5 policing up and down the hallway quite a bit,
6 and I don't know what he was doing but the guy
7 that lived before me had a video camera
8 outside his door and there was something going
9 on that wasn't quite right, and I heard him
10 knock and key into other places a couple times
11 and that's not right.  That's not the way to
12 handle things.  It's not professional.  It's
13 not business like.  There's no need to do it.
14         All the laws that are in place will
15 allow you to do everything right with your
16 business without you having to do erratic
17 behavior.  Everything is there.  You don't get
18 ripped off.  Things are in place.  There's no
19 reason to be in people's business like that or
20 anything like that.  He did a lot of policing
21 up and down the hallway.
22     Q    What do you mean?
23     A    Walking up and knocking on doors,

Page 104

1 "landlord, landlord," and he did a lot of
2 that.
3     Q    Knocking on your door?
4     A    No, he left my door alone; the doors
5 to the side of me, but it's very loud.  If you
6 don't just knock regularly and you like pound
7 on a door, it echoes throughout the hallway so
8 like you hear right away somebody else
9 knocking, boom, boom, boom, if you pound hard
10 on the door.
11     Q    Prior to March 28th, 2005, he never
12 knocked on your door before.  Is that what
13 you're saying?
14     A    No, but he is a very rude man.  He
15 taped a rent escalation notice to my door.  He
16 taped a rent escalation on my door, didn't
17 mail it to me in the mail.  He didn't say
18 anything verbally.  It's very rude to do that.
19 He raised my rent by $40 a month just because
20 he could.  It's a rudeness to it.  Here's the
21 place that I live in.  I'm paying my rent
22 every month.  I'm a good tenant.  I don't
23 bother anybody and he's taping a rent

Page 105

1 escalation notice to my door. It's rude.
2  Q  When was that done?
3  A  I don't know the exact date, but I
4 actually have a copy of the notice so it would
5 be dated on that.
6  Q  Sometime before March 28th, 2005?
7  A  Yes, but you're asking me are there
8 reasons why I would think that he would, you
9 know, be a little crazy or erratic behavior
10 type thing and I'm telling you the reasons.
11 I'm giving you other examples.
12  Q  Sure. Any other examples that you
13 can think of?
14  A  Not that I can think of, no.
15  Q  At some point prior to March 28th,
16 2005, he taped a rent escalation notice on
17 your door, is that right?
18  A  Yes.
19  Q  And that was the notice that he
20 increased the rent by $40 a month, is that
21 right?
22  A  Yes.
23  Q  Do you know if it was more than a

Page 106

1 year before this event?
2  A  I have to look at the exact dates.
3 I have to look at the exact dates. I don't
4 know.
5  Q  You don't know?
6  A  I don't know offhand. I can produce
7 the exact date and answer your question
8 precisely and factually, but I don't have it
9 in front of me.
10  Q  You have no independent recollection
11 other than it occurred sometime before
12 March 28th, 2005, is that right?
13  A  Yeah.
14  Q  You also allege discrimination.
15 What do you mean?
16  A  I thought it was pretty clear when I
17 wrote it. He's charging somebody else in the
18 building with the same kind of apartment as me
19 350 and he's charging me 375 per month, and
20 the exact apartment that I just left and paid
21 $375 for he's now renting to somebody else for
22 350. That's discrimination.
23  Q  How do you know that?

Page 107

1  A  Because I'm smart. I'm a smart
2 girl. When you pick and choose, when you pick
3 and choose of the same goods of services,
4 you're discriminating.
5  Q  Maybe you misunderstood my question.
6 How do you know he's charging a different
7 amount to other tenants?
8  A  Oh, pardon me. Yeah, I heard that
9 wrong. Newspaper. It was in the newspaper.
10  Q  It was in the newspaper that he
11 advertised at a different rate per month?
12  A  For the apartments, yeah.
13  Q  Do you know if he actually rented at
14 that rate?
15  A  He advertised it for a different
16 rate and then I know that he rented the
17 apartment. That's all.
18  Q  And this was sometime after the
19 incident, is that correct?
20  A  Actually I think it was before the
21 incident, but I have to look at my dates. It
22 was just a coinci -- I had bought some things.
23 I made some purchases out of some papers and I

Page 108

1 left a stack. I accumulated a stack and when
2 I went back to check some stuff, I just
3 noticed it. I wasn't really keeping track but
4 I looked for it. I noticed it by accident and
5 then I looked for it in a pile of newspapers
6 and I found it.
7  He allowed me to pay 375 and then
8 the next person that moved in after raising my
9 rent $40, the next person that moved in he
10 advertised at 350 and apparently he rented the
11 place because they moved in. Emily Elber,
12 Matt Corbensen, a couple different names, I
13 remember seeing them on the mailbox. They
14 rented.
15  Q  My understanding is you paid $375 or
16 that was what you were supposed to pay as of
17 March 2005, is that correct, as far as your
18 monthly rate of rent?
19  A  Yes. When he increased it, yes. He
20 put it in writing so it was official.
21  Q  So there was an agreement between
22 you and Heartland that you were going to be
23 paying $375 a month sometime before 3/28/05,

Page 109

1  correct?
2      A  There was no agreement. I wrote my
3  check for 375. If I want to stay there, I
4  want the roof over my head, pay 375. If you
5  want to leave, then leave, honey. That's how
6  it goes. There was no agreement. There was
7  no discussion. There was no communication.
8  There was no polite letter. There was
9  nothing. It was just I'm raising your rent.
10  You pay it or leave. That's what you do in
11  life. What am I going to do? Hey, that's too
12  much money, I don't want to pay it? Then
13  move, then move out.
14      Q  The only notice you got of that was
15  a posting on your door?
16      A  Yes.
17      Q  You never had a conversation with --
18      A  No.
19      Q  -- with anyone from Heartland
20  regarding the increase in your rent?
21      A  No.
22      Q  And it increased from, you say it
23  increased $40 up to 375?

Page 110

1      A  Yes.
2      Q  And you don't know when that
3  increase took place?
4      A  No, I do, but I don't have it in
5  front of me. I mean --
6      Q  It wasn't in 2005; it was before
7  2005?
8      A  Yes. It was before 2005, yes.
9      Q  So you were paying 335 and then it
10  increased to 375 and your contention is that
11  because someone who rented an apartment after
12  you left and paid or may have paid less than
13  375, that's in some way discrimination. Is
14  that what you're saying?
15      A  Yes.
16      Q  Because they are being charged a
17  different amount than you were being charged?
18      A  Yes, a lesser amount.
19      Q  A lesser amount?
20      A  Yes.
21      Q  Do you know if that -- strike that.
22      Any other basis for that
23  discrimination claim other than whoever moved

Page 111

1  in after you left may be paying less than you
2  were paying?
3      A  I think it was a sexual
4  discrimination going on as far as gender based
5  male/female, and I tried to put that together
6  in the amended complaint, because he's calling
7  me a bitch. He's treating me with hostility,
8  and I've never done anything wrong to this
9  man. I've never treated him unkindly, never
10  talked to him impolitely. I did not scream in
11  his face or anything when the guy vomited all
12  over himself. I've always been a cooperative,
13  peaceful renter who tried to pay my rent on
14  time every month. Where is it coming from?
15  Does he have a bad marriage? Does he have a
16  bad life? Oh, well, whatever. I say it was a
17  gender discrimination that he's calling me a
18  bitch and he's screaming at me because it's a
19  male/female thing. I didn't participate in it
20  so I would say the discrimination was gender
21  based as well.
22      Q  You believe the discrimination is
23  the fact that he may have charged a lesser

Page 112

1  amount to a tenant that moved in after you
2  moved out?
3      A  No. I'm sorry, I didn't mean to cut
4  you off. Go ahead. But no, you're saying is
5  there any other discrimination that I think
6  was present and I'm saying yes but not in
7  connection with the rent, no.
8      Q  Okay. There was no discrimination
9  in connection with the rent. Is that what
10  you're saying?
11      A  No. I was saying there's
12  discrimination in connection with the rent but
13  a different type of discrimination in
14  connection with Wayne Pelhank himself. I
15  think he just has discriminations flying all
16  over the place.
17      Q  I'm trying to get to the root of
18  your complaint. I'm trying to figure out why
19  you're alleging that, a count of
20  discrimination. You have allegations of
21  discrimination against my clients and I'm
22  trying to figure out why, what the basis for
23  that is. And I don't want to misstate what

Page 113

1 you've already testified to, but it's my
2 understanding the basis for your testimony is
3 that you were being charged $375 in rent at
4 least at the time that you still lived at that
5 location. Am I right so far?
6    A   Yes.
7    Q   And that you learned, and this is
8 what I'm not clear on, sometime after you
9 moved out that someone was being charged less
10 than $375, is that correct?
11    A   Yes.
12    Q   Okay. And you learned that from a
13 newspaper ad that was advertising an apartment
14 at the same location for 350 a month, is that
15 correct?
16    A   Yes.
17    Q   Do you know if it was the same
18 apartment, the one that you lived in?
19    A   Yes.
20    Q   Okay. How do you know that?
21    A   Because I lived there and it was the
22 only one free and it was in the paper and then
23 somebody moved in.

Page 114

1    Q   And how long after you moved out in
2 May of 2005 did you see that ad?
3    A   Actually the ad is from before the
4 May incident.
5    Q   Okay. The ad was before you moved
6 out?
7    A   Uh-huh.
8    Q   Do you know how long before you saw
9 that ad in the paper?
10    A   No, the actual newspaper articles
11 are dated for when they are.
12    Q   Okay. What you're saying is there
13 was an ad in the paper before you even left
14 the apartment for your apartment?
15    A   Yes.
16    Q   And how do you know it was your
17 apartment?
18    A   Because it was the only empty -- it
19 gave the address and it was the only empty
20 apartment in the building and I had just
21 exited. Everybody else had a name on their
22 mailbox, and somebody moved in and brought all
23 their furniture up the stairs and moved in and

Page 115

1 then the ad went out of the newspaper because
2 I was right there and that's how I know.
3    Q   I guess I'm not understanding your
4 testimony because you said yours was the only
5 empty apartment but you saw the ad before you
6 moved out, is that correct?
7    A   I'm sorry. I got confused on that
8 one. Well, I had moved from apartment 5 to
9 apartment 6. So when I moved from 5 to 6,
10 there was one empty apartment and that's what
11 I'm referring to. I'm still in the building
12 but I'm not in the apartment that I lived in.
13 So I'm right next to it. I'm at the end of
14 the hall and that's when it happened. That's
15 what I'm referring to.
16    Q   Okay. My understanding is you moved
17 from apartment 5 to apartment 6 in early March
18 of 2005, is that right, or was it 2004?
19    A   It was 2004.
20    Q   On March 1st, 2004, you moved from
21 apartment 5 to apartment 6, correct?
22    A   Yes. Around that time, yes.
23    Q   And around that time that's when you

Page 116

1 saw an ad for apartment 5 for 350 a month, is
2 that right?
3    A   Yes.
4    Q   And that's when you saw somebody
5 move into apartment 5 and that's why you
6 assumed that the people that moved into
7 apartment 5 that replaced you next to the
8 vomiting guy; right?
9    A   Yes.
10    Q   -- were paying 350 a month as
11 opposed to 375, is that right?
12    A   Yes.
13    Q   So what you're saying is sometime
14 before you moved from apartment 5 to apartment
15 6 your rent had already been increased to 375?
16    A   Yes, and I -- yes.
17    Q   And what you're saying is that
18 somehow discriminates against you because
19 whoever moved in paid less money?
20    A   Yes.
21    Q   And the basis for that is an
22 advertisement that you saw in the newspaper as
23 opposed to knowing personally from the people

Page 117

1  that moved in what they were paying per month,
2  is that correct?
3     A   Yes.
4     Q   Have you ever discussed it with the
5  people that moved into apartment 5?
6     A   No.
7     Q   Do you know who moved into apartment
8  5?
9     A   Emily Elber.
10    Q   That's a female?
11    A   Uh-huh.
12    Q   Is that a yes?
13    A   Yes.  I'm sorry.
14    Q   How well do you know Emily?
15    A   Only very -- I do not know Emily.
16  It's very acquaintance, just a passing hi, how
17  are you doing, in the building.  That's all.
18    Q   Does she still live there?
19    A   No.
20    Q   Do you know where she lives now?
21    A   I don't know.
22    Q   At the time of either the first
23  incident in 2004 or the second incident in

Page 118

1  2005 were you living with anyone?
2     A   No, single, by myself.
3     Q   And when you say that there was some
4  sex discrimination, what you're saying is that
5  has nothing to do with the increase in rent,
6  is that correct?
7     A   Yes.
8     Q   Okay.  The basis for your allegation
9  of discrimination at least is that someone
10  else in another apartment was being charged a
11  lesser amount when they moved in after you
12  vacated that apartment?
13    A   Yes.
14    Q   Is that correct?
15    A   Yes.
16    Q   Do you have any allegations of
17  sexual discrimination against Mr. Pelhank?
18    A   No.  The reference I made was a
19  gender discrimination only, not some kind of
20  sexual discrimination.  It was a gender based
21  discrimination on sex, male or female, not
22  sexual.
23    Q   Okay.  Gender based discrimination?

Page 119

1     A   Yes.
2     Q   And specifically do you have any
3  allegations with regard to gender based
4  discrimination against Mr. Pelhank?
5     A   Yes, I do.  The hostility coming out
6  of him was ridiculous.  That's discrimination.
7  It's ridiculous.
8     Q   Hostility that he expressed on the
9  date at least on 3/28/05 when he was knocking
10  on your door?
11    A   Yes.
12    Q   And when he said the word bitch?
13    A   Yes.
14    Q   Is that correct?
15    A   The whole of the situation, not just
16  one particular part.
17    Q   Did he say anything other than that
18  term to give you the indication that there was
19  a gender based discrimination?
20    A   I don't think he would have been
21  doing that to a man.  I think he may have
22  feared the man opening the door and like doing
23  something in retaliation directly to him.  I

Page 120

1  don't think he would have the nerve or the
2  guts or the spine to do it to a man.  I think
3  he did it because I was female.  He thought he
4  could get away with it and he's not right in
5  his head.  I don't think he would have done it
6  to a man, and this way I say gender based in
7  this fashion.  So sex has to do with it, male
8  and female.
9     Q   Did you observe him doing it to
10  anyone else?
11    A   No.
12    Q   But you did observe him knocking on
13  other people's doors?
14    A   I observed him being like obnoxious
15  I would say is the word.
16    Q   To men and women?
17    A   Yes.
18    Q   You also alleged that he didn't
19  return your deposit, is that correct?
20    A   Yes.
21    Q   What was the deposit amount?
22    A   $335.
23    Q   Was that the amount that you

Page 121

1  deposited when you first moved into the
2  apartment and were paying $335 per month?
3     A   Yes.
4     Q   So it was like a one month rent as a
5  deposit, damage deposit?
6     A   Yes.
7     Q   Was there any indication in the
8  original lease that you signed about the
9  return or reasons for not returning a deposit?
10    A   I don't know without looking at it
11 and studying it.  I don't know for sure but
12 there was no indication that I shouldn't have
13 been returned my lease upon exit of the
14 apartment, and I had rented that apartment
15 before from the Moran Estate and they returned
16 my deposit when I left.  So there was no
17 reason I wouldn't expect that building to not
18 return my deposit.
19    Q   When was it managed by a different
20 apartment managing company and you had been
21 returned that amount before?
22    A   W.J. Moran Estate, yeah.
23    Q   When was that?

Page 122

1     A   Just over the years I lived in the
2  building, like a total of 11 years.
3     Q   That same building?
4     A   Yeah.
5     Q   How many other apartments did you
6  live in?
7     A   I was in No. 4.
8     Q   So you've been --
9     A   Briefly in No. 9 and the No. 5 and
10 the No. 6.  I was familiar with the building.
11    Q   Did you live there continuously?
12    A   For eight years straight and then I
13 left the state, and when I came back I tried
14 to rent a couple of apartments around town and
15 rented some paper mache place, and I went back
16 there because it was very solid there.  It's
17 small but I had always been happy on the third
18 floor and it's solid.
19    Q   And that's where apartments 4, 5,
20 and 6 are, on the third floor?
21    A   Uh-huh.
22    Q   That's a yes?
23    A   Yes, I'm sorry.

Page 123

1     Q   At least when you moved back in
2  sometime in 2001 or 2002, that's when you left
3  the deposit, is that correct?
4     A   Yes.
5     Q   What condition did you leave the
6  apartment in?
7     A   Immaculate, clean, sparkling, steam
8  cleaned, dusted and shiny clean windows.
9     Q   Steam cleaned?
10    A   Yes, sir.
11    Q   Did you rent a steam cleaner or did
12 you pay somebody?
13    A   I own a steam cleaner.
14    Q   Do you still have that?
15    A   No.
16    Q   Have you filed a lawsuit against the
17 library?
18    A   Yes, sir, I have.
19    Q   What's the status of that suit?
20    A   It's on appeal.
21    Q   Was it dismissed and then you
22 appealed that dismissal?
23    A   Yes.

Page 124

1     Q   Are you represented in that case?
2     A   No.
3     Q   You're pro se?
4     A   Yes.
5     Q   It's filed in state court?
6     A   It was originally the county court
7  and it would have to be moved to the Fourth
8  District of Springfield Appellate Court the
9  way that I understand it.
10    Q   What injuries or damages are you
11 claiming from the second incident?
12    A   Again my civil rights were
13 drastically violated.  Laws that rightfully
14 belong to me were broken.  The situation
15 itself was terribly distressful.  I think that
16 covers it.
17    Q   Okay.  The distress that you
18 experienced, has that impacted your life in
19 any way?
20    A   Yes, it has.
21    Q   In what way?
22    A   It stands still until it's fixed.
23 When you allow somebody to abuse you or

Page 125

1 violate you, it stands still in time until
2 justice comes. You cannot allow the world to
3 kick you in the face in that fashion and
4 continue life as a regular person like nothing
5 happened. It stands still until it's fixed.
6 Time passing will not fix it. It needs to be
7 fixed.
8  Q  What specifically are you referring
9 to as far as what needs to be fixed?
10  A  Wayne Pelhank needs to be arrested
11 for attacking my door. Somebody needs to tell
12 me they're sorry, and I want a large sum of
13 money for my pain and for being treated for
14 such a ridiculous, just being treated
15 ridiculously like garbage, like not a regular
16 person that has a life and values and
17 concerns. I want vindication. The reports
18 have to be clarified, the first reports. They
19 could have fixed those a long time ago
20 without -- there's a very easy way to do it.
21 If I can think of it, I don't know why they
22 can't think of it. They need to be clarified,
23 and that social worker should not become,

Page 126

1 should not be a social worker. Any social
2 worker that tries to hurt somebody doesn't
3 belong in the field.
4  Q  What pain have you experienced?
5  A  I am totally alienated from a town
6 that I've lived in for over 15 years. I
7 cannot trust the police in this town. I can
8 never use the human resources place and
9 they've got a record over there calling me a
10 mental patient. If I should ever get in a
11 funny or tricky situation, they've got a funny
12 record over there with me. I would never be
13 able to explain myself. It would be
14 ridiculous.
15  I have no future in Bloomington. I
16 want to make that clear. Everybody should see
17 it. I have no future in Bloomington. I can't
18 trust the city I live in, City Hall, the
19 police. I can never get help anywhere. I
20 have no future. God forbid I ever even want
21 to walk into the Normal Public Library again
22 because I've sued them. There's no future
23 here. They've totally made it so I can't live

Page 127

1 in a town. That's huge. That's ridiculous.
2 That's also absurd. I want vindication for
3 being just me to leave a town because you've
4 been so abused and there's been just so much
5 wrongdoing.
6  Q  Other than the two incidents that
7 you're alleging against my clients, Heartland
8 and Wayne Pelhank, were there any other
9 situations or any other occurrences that
10 you're alleging alienated you or caused you
11 pain?
12  A  Yes. Every party, including the
13 Normal Public Library, have alienated me and
14 caused me a great deal of pain besides an
15 actual physical injury that causes me a great
16 deal of pain every day. Every day that I get
17 up in the morning I deal with pain throughout
18 the whole day every day. In my sleep I deal
19 with the pain. That's why I'm not letting go.
20 My life has turned into a day of pain.
21  Q  The pain that you're experiencing is
22 physical pain?
23  A  It's emotional and physical.

Page 128

1  Q  At least the physical pain you're
2 experiencing, you're attributing that to your
3 incident at the library, is that correct?
4  A  Yes, it's a physical injury. It's
5 completely on a physical level.
6  Q  And it's completely unrelated to the
7 lawsuit that you brought against the parties
8 in this case, is that right?
9  A  Yes, it is.
10  Q  As far as the alienation that you
11 feel from the police department at least, did
12 you also feel that alienation when they
13 impounded your car prior to this incident?
14  A  Yes, I did. I absolutely did. You
15 bet. You bet your boots I did.
16  Q  And that's one of the reasons, at
17 least according to your testimony, as to why
18 you weren't able to work for a time after that
19 incident, is that right?
20  A  I was able to work. I just did
21 not -- I didn't get with the program with it,
22 no. I was able to work. I tried to find
23 jobs. I had put applications out but it was

Page 129

1 like a ridiculous struggle without my car to
2 just be thrust into that situation from one
3 day to the next.
4    Q And then after the inheritance you
5 didn't need to work for a time period, is that
6 right?
7    A Right.
8    Q You were able to pay your rent on
9 time?
10    A Yes.
11    Q And then after the library incident,
12 that's when you had problems paying your rent,
13 is that right?
14    A Yes.
15    Q But again the library incident had
16 nothing to do with anything that Heartland
17 Management did or Wayne Pelhank did, is that
18 right?
19    A I went to the library to find out
20 legal information about what happened to me on
21 May 20th. I went to the library to find out
22 law books, to check out law books. That's the
23 only relation that there is. I went to the

Page 130

1 library to find out information and while I
2 was looking up something on the card catalog,
3 this sign fell.
4    Q The sign fell on your arm?
5    A While I was researching personal
6 injury topics and law topics, the sign fell on
7 me.
8    Q Okay. That was sometime after
9 May 20th, 2004?
10    A A hop, skip, and a jump after May
11 20th, right, because it was June 7th, so it
12 would have been about whatever that is,
13 two weeks or so.
14    Q It was well before March 28th, 2005,
15 correct?
16    A Yes.
17      MR. BERG: I may have some
18 more, but go ahead. You've got to go.
19      MR. SALVATI: All right.
20      MR. BERG: Do you need to turn
21 your tape over?
22      MS. GUEVREKIAN: No, there's
23 still -- thank you.

Page 131

1      DIRECT EXAMINATION
2 BY MR. SALVATI:
3    Q My name is Dominic Salvati and I
4 represent the Center for, McLean County Center
5 for Human Services. Do you have a cell phone?
6    A I don't currently have them. I've
7 had them in the past.
8    Q But not currently?
9    A No.
10    Q From May 20th up until the present
11 time have you had -- I know you said you
12 weren't married, but have you had a
13 significant other or dated anyone?
14    A No.
15    Q You initially said that you were --
16 how many siblings do you have?
17    A I have five siblings, four living.
18    Q Okay. And were you I guess in an
19 argument with all those other siblings as to
20 your father's inheritance?
21    A Yes.
22    Q Okay. And did you call, were you
23 making calls to each of them regarding that?

Page 132

1    A No. I only had my two sisters'
2 phone numbers. I didn't have my brothers'
3 phone numbers. They had different numbers.
4 There was no argument per se but they weren't
5 responding and I was leaving them messages
6 like, hey, what's going on over there type
7 thing and also just calling to talk.
8    Q So there wasn't a point when you
9 were I guess fairly upset about what was going
10 on?
11    A Oh, I was upset. There was quite a
12 duration of time that I was upset. You bet.
13 I was very upset. I felt very left out from
14 my family.
15    Q But today as you sit here and
16 testify, you're testifying that you never said
17 anything about shooting anybody?
18    A Certainly not.
19    Q You never left a message on
20 anyone's --
21    A I certainly did not.
22    Q You never left a message on anyone's
23 voice mail or answering machine?

Page 133

1  A  No.
2  Q  So if your sister, Anna, would come
3  forward with a tape, a tape out of her
4  answering machine that had that type of
5  message, how would you explain that?
6  A  You're funny.  No such thing exists.
7  It never happened.
8  Q  When the police arrived, and I'm
9  strictly talking about the May 20th, 2004
10  alleged incident, you said you heard loud
11  banging before you got into the shower on the
12  door?
13  A  No, it was after I was in the
14  shower.  I was already in the shower.  I could
15  hear the banging from the shower and loud
16  voices.
17  Q  Did you ever hear a telephone ring?
18  A  Yes, my phone rang once and I turned
19  off the ringer.
20  Q  When did it ring?
21  A  It rang around that time but I don't
22  know exactly.  It rang around that time.  It
23  was a little while or longer, I don't really

Page 134

1  know, but my phone rang and there was somebody
2  in the hallway.  I've lived in the building
3  for a long time and there was just something
4  not right in the hallway.  That's all I could
5  put it.  I got an idea that there wasn't
6  something right because there was steps in the
7  hallway that were funny and when my phone
8  rang, I turned off my ringer because I was,
9  like, something is going on in the hallway and
10  I actually was wondering if my sister might
11  call me that day and I didn't want to talk, I
12  didn't want to converse with something going
13  on in the hallway and be distracted.  I just
14  turned my ringer off and I was going to get to
15  it later, turn it back on later I mean.
16  Q  Did the phone ring before or after
17  the knocking?
18  A  The phone rang before the knocking,
19  one ring.
20  Q  And then you shut it off?
21  A  Yeah.
22  Q  What was the duration of time
23  between the telephone ringing and the door

Page 135

1  knocking?
2  A  I don't know.
3  Q  Would you say seconds?
4  A  No, not seconds, but there was a
5  lapse of time but I don't know.  I don't know.
6  My cell, they called my cell phone too.
7  Q  Did you have a home residence
8  telephone too?
9  A  Yeah, two phones.  I had a cell
10  phone.
11  Q  Okay.  Your home phone rang as well?
12  A  My home phone was the main line.
13  That's the one that rang once and I turned it
14  off because I had no answering machine.  My
15  answering machine broke and I just didn't get
16  another one so I turned off the ringer, and I
17  also had a cell phone and I turned off the
18  ringer of the cell phone too but for another
19  reason.  I was just in a computer system and
20  they kept calling me every day and ringing it.
21  It's called CCI.  It's for the Pantagraph.  I
22  had to call them up and ask them to stop it.
23  I just had the ringer off that because it was

Page 136

1  annoying for a computer to keep calling the
2  phone, so until that resolved my phone just
3  lit up when it rang.
4  My other phone just had a regular
5  ringer.  Because there was something weird
6  going on in the hallway, I didn't want to
7  answer the phone or have a conversation.  I
8  turned the ringer off for a second, and they
9  called my cell phone too, but I didn't see it.
10  I didn't see it lit up and nobody left a voice
11  mail message either.  It lights up only.
12  Actually it might even beep once but if you're
13  doing something, you won't hear it.
14  Q  Did the two phones ring pretty close
15  in proximity in time to each other?
16  A  I don't know the exact time since I
17  didn't see the phone go off for the one that
18  was light, but the other phone just rang one
19  time.  There was a ring and then I turned it
20  off.  It rang exactly one time.
21  Q  And the reason you shut off the
22  ringer on the other phone is because something
23  funny was going on in the hallway?

Page 137

```
 1     A   I didn't want to answer my phone.  I
 2   didn't want to sit there and listen to it
 3   ringing because I was afraid of being
 4   disturbed during a telephone conversation.  I
 5   thought it might be my sister, Anna, calling.
 6   I hadn't talked to her for a long time.  I
 7   left her a message that morning that I was --
 8   I just said I'm cleaning up my apartment.  I
 9   should be here all day.  You can give me a
10   call if you want.  It was a very nice,
11   sisterly, regular normal message just telling
12   her that I would be home and that she could
13   call me.  I received a phone call shortly
14   before the incident as well that there's
15   somebody on the line, but they didn't say
16   anything and I hung up.  Maybe an hour before
17   everything happened I received a phone call.
18   There was nobody on the line and I hung up.
19        So then after there was something
20   funny in the hallway, I was just wondering if
21   it could be Anna.  I didn't want to go, like I
22   hadn't talked to her in years, pick up the
23   phone and go something is going on in the
```

Page 138

```
 1   hallway, like disrupt the phone conversation
 2   and have it be like awkward and stuff so I
 3   just turned off the ringer so I won't have to
 4   hear it ringing.  I was going to just let
 5   whatever was going on in the hallway finish
 6   and I'd probably turn my phone back on.
 7     Q   So you had left messages for -- when
 8   was the last time you had talked to your
 9   sister?
10     A   I think it was 2001.  It might have
11   been 2000 or it was maybe between 2000 and
12   2001.
13     Q   And you had left messages for her
14   from that time up until May 20th, 2004, on her
15   answering machine?
16     A   Yes, I had.
17     Q   And then on this particular day you
18   thought that it was going to be her and you
19   didn't want to answer because there was
20   something funny going on in the hallway?
21     A   Yes.
22     Q   Okay.  Why do you think -- explain
23   why you thought something funny was going on
```

Page 139

```
 1   in the hallway.
 2     A   There was weird stepping and there
 3   was several people in the hallway and there
 4   was weird stepping and there was just a
 5   shuffle or a scuffle in the hallway.  I
 6   thought something might have been going on
 7   with the mental like patient in the No. 4
 8   apartment that was vomiting on himself.  That
 9   was my best guess, and I just didn't want an
10   excursion to be happening so I just turned off
11   the ringer and waited another minute.
12     Q   Okay.
13     A   I didn't want to be distracted by
14   something funny going on in the hallway.
15     Q   And I guess when -- did I guess the
16   funniness in the hallway, did that stop at
17   some point and then you got in the shower?
18     A   Yeah, everything -- it just seemed
19   like, yeah, it did.  It got quiet.  There
20   wasn't anything weird going on.
21     Q   So at that point in time you got
22   into the shower?
23     A   Yes.
```

Page 140

```
 1     Q   Okay.  It wasn't until you were in
 2   the shower that you actually heard the
 3   knocking on the door?
 4     A   Yes.
 5     Q   Did you know it was your door that
 6   they were knocking on?
 7     A   Yes.
 8     Q   And you didn't yell anything at that
 9   point in time?
10     A   There was no time to yell but no, I
11   didn't yell.
12     Q   How long did the knocking occur?
13     A   It was less than 30 seconds I would
14   say.
15     Q   And you can't estimate how long
16   after your phones had rung that the knocking
17   had begun?
18     A   There was some kind of lapse of time
19   but I honestly don't know.  It wasn't like two
20   minutes or anything.  There was a lapse of
21   time, but I don't know.
22     Q   Did the phone ever ring again while
23   you were in the shower?
```

Page 141

1    A  No, I turned the ringer off.
2    Q  Once -- who was the person that you
3  saw, the first person you saw once they had
4  gotten into your apartment?
5    A  The door came open, a police
6  officer.
7    Q  Do you know who it was that
8  actually, and I think we may have hinted on
9  this, but who it was that actually broke into
10  the door?
11    A  No.
12    Q  In some of your pleadings you have
13  that it was the police, Bloomington Police
14  Department that battered, I think battered and
15  rammed your door was one of the -- but you
16  don't know for sure that it was them?
17    A  No, I didn't see it.
18    Q  So the first person you saw when you
19  were in the bathroom was one of the
20  Bloomington policemen?
21    A  Yes.
22    Q  What did you say to him?
23    A  What is this about?

Page 142

1    Q  That's when he told you to get
2  dressed and come out and talk to him?
3    A  Yes.
4    Q  What did you do at that point?
5    A  I finished, I got the shampoo out of
6  my hair. I hurried. I put on clothes. I
7  went to go out to get clothes and I was in too
8  much of a hurry. There was a shirt hanging on
9  a metal, on a bar that goes across. I grabbed
10  the shirt. I actually put on -- I didn't get
11  fresh clothes. I actually put on the clothes,
12  except for the shirt, I put them on and I came
13  straight out like it was an emergency.
14    Q  So you just grabbed clothes that
15  were in the bathroom?
16    A  No, there was a shirt hanging. I
17  meant to go out to the front room but it was
18  awkward and there was people that just came
19  in, so I grabbed the shirt that was hanging on
20  a hanger already that was unironed and put the
21  stuff that I discarded, I put it back on
22  because it was an emergency. I just needed to
23  get dressed.

Page 143

1    Q  Okay. Could you see the kitchen
2  area from the bathroom?
3    A  No.
4    Q  Could you see the living room area
5  from the bathroom?
6    A  No, not unless you're in the doorway
7  to look.
8    Q  How did you know there were other
9  people in the apartment at that point in time?
10    A  I only know that there was one other
11  person because I could hear. She spoke to me
12  from my kitchen area.
13    Q  How do you know she was in your
14  kitchen area?
15    A  Because I've lived in the building
16  for years and when you hear somebody's voice,
17  you understand that they're on the interior of
18  your apartment or in the hallway or at the
19  doorway or maybe it's a dubious spot in
20  between the two or maybe they're in the
21  doorway. You can differentiate that. It's a
22  smaller place and I've spent years living in
23  the building.

Page 144

1    Q  How far is the kitchen area where
2  you are, I guess, alleging she was from the
3  door?
4    A  I don't know an exact measurement.
5    Q  You testified your apartment was
6  small so it probably wasn't that far away
7  from --
8    A  No, that's the whole idea. It's
9  very small. It's two rooms, a hallway, a
10  walk-in closet and a bathroom, but it is
11  small. That's why there was no mistake. It's
12  too small to mistake. They're either in your
13  apartment or they're not. They're in your
14  apartment or they're in the hallway. It's not
15  something that you miss.
16    Q  But you never saw her in the kitchen
17  area?
18    A  No.
19    Q  And then when you came out into the
20  living room area, you invited the social
21  workers in at that point in time?
22    A  Yes.
23    Q  Because they were out in the

Page 145

1   hallway?
2       A   Yes.
3       Q   Just so I have this correct, you
4   never actually observed the social workers in
5   the apartment?
6       A   No.
7       Q   When you did come out, then you
8   invited them into your home?
9       A   Yes.
10      Q   Your first cause of action against
11  the McLean County Center for Human Services is
12  trespass, illegal entry into a residence
13  without permission, the breaking of the Fourth
14  Amendment rights and also the Illinois State
15  Bill of Rights, correct?
16      A   Yes, that sounds right.
17      Q   As you sit here today, you can't
18  tell me who broke in, who I guess broke your
19  chain on your door, correct?
20      A   No, I didn't see that.
21      Q   The police report that was discussed
22  earlier by Sergeant Randall Wycoff, the
23  narrative portion of that, he states in there

Page 146

1   that it was actually he that determined that
2   forceable entry was appropriate so he pushed
3   the door open until the chain gave way.
4       A   Oh, right.  He says he did it, yes.
5       Q   Would that be one of the statements
6   that you would say that he has falsified?
7       A   No, I wouldn't use that.  I saw --
8   no.  I answered you, okay?  No.
9       Q   So as far as that statement in this
10  police report goes, you would testify that
11  that's accurate?
12      A   I wouldn't testify to the accuracy
13  of it but I wouldn't use it as a false
14  statement.  I'm not interested in making that
15  true or false.  I would just leave that alone.
16      Q   Well, if you're alleging that
17  someone illegally entered your apartment, I'm
18  just trying to figure out how you would make
19  that allegation since you didn't see it.
20      A   I heard the banging.  A man came
21  into my bathroom wearing a police uniform and
22  then he was sweating, I mean he was just
23  sweating and it appeared that he's the one

Page 147

1   that broke the door because there was too
2   much -- the other police officer wasn't
3   sweating like that.  He was just all, I mean
4   he was labored and his attitude and his
5   disposition were all worked up like he was
6   just like pumped, you know.  So I speculated
7   because he was just pumped up, he was all
8   worked up and he was dripping, so I just
9   speculated that he was the one because I saw
10  him, he came into the bathroom, that pounded
11  open the door and came in.  It seemed
12  reasonable to assume that.
13          If he says in the report that he did
14  it and there was a police officer that I saw
15  come into my bathroom, I suppose that it's
16  true.  Basically he can lie about anything he
17  wants.  I don't care.  Just take my name off
18  that report.  I'm not here to find the truth
19  or the falseness of everybody and correct the
20  whole world.  Just don't lie about me.  Leave
21  me out of it is my point.  So if he lies
22  throughout that report, it's not so much my
23  concern.  It's my concern that he put my name

Page 148

1   on a terrible report and by showing the
2   falseness of the things that he says, I may
3   also show that he's lying about me.  That's
4   all.
5       Q   How can you show that what he says
6   is false?
7       A   I have it in my notes.  You will get
8   it through the court, through the process.
9       Q   Now, you've mentioned the group of
10  notes throughout the deposition today.  So
11  you're going to send all the counsel involved
12  all of the notes that you have, correct?
13      A   I have to do a statement and I have
14  to make it official, yeah.  If I'm going to
15  file it, you have to have everything that's
16  mine.  I don't believe I'm allowed to withhold
17  anything.  Yes, it has to be out in the open.
18  It has to be clear.
19      Q   Right, but I want to make sure it's
20  clear.  I don't want you to summarize what you
21  have and only give us the summary.  You can do
22  both if you want but --
23      A   I'm sorry.  What?

Page 149

1    Q    It sounds like what you're going to
2 do is summarize what notes you have.
3    A    Okay.
4    Q    And then give us the summary.  We
5 can actually go off for a second.
6
7       (Whereupon an off the record
8        discussion was held.)
9
10       MR. BERG: I would agree with
11 counsel that you've been referring to notes
12 throughout the course of today's deposition in
13 saying that I can't testify accurately, I'd
14 have to consult my notes to give accurate
15 testimony, is that correct?
16       MS. GUEVREKIAN: Yeah, sure.
17       MR. BERG: Okay.
18       MS. GUEVREKIAN: Yes.
19       MR. BERG: I think as part of
20 the discovery process, what we're doing and
21 I'm joining with counsel --
22       MS. WATSON: I will also.
23       MR. BERG: -- that you produce

Page 150

1 those notes; that you referring to the fact
2 that you didn't come prepared with them today
3 leaves us at a loss today because you're not
4 able to answer questions because you're not
5 able to specifically refer to those notes.  So
6 what we'd like to see are those notes as well
7 as a couple of other things that we referred
8 to during the course of the deposition.
9       MS. GUEVREKIAN: Papers that
10 are missing.
11       MR. BERG: Papers that are
12 missing in your discovery and the second and
13 third pages from your lease from previously.
14       MS. GUEVREKIAN: The receipts
15 from March and April, yeah, I'm aware.  I've
16 got a list.
17       MR. BERG: Great.  Just so that
18 we have that understanding and that
19 understanding is on the record --
20       MS. GUEVREKIAN: Okay, sure.
21       MR. BERG: -- that you will
22 produce that.
23       MS. GUEVREKIAN: Sure, yes.

Page 151

1 BY MR. SALVATI:
2    Q    So the first time that you saw
3 anyone from the McLean County Center for Human
4 Services when you got out of the shower, they
5 were still in the hallway, correct?
6    A    I'm going to turn my tape.
7       (Short pause.)
8    A    I'm good.  Thank you.
9    Q    And I'll repeat the question.  The
10 first time that -- you came out of the shower
11 on May 20, 2004, and the first time that you
12 saw anyone from the McLean County Center for
13 Human Services they were out in the hallway
14 outside of your apartment, correct?
15    A    Yes, that's -- yes.
16    Q    And you never saw or observed who
17 actually forced the entry into your apartment?
18    A    Right, yes.
19    Q    The second count you have against
20 the Center for Human Services is malpractice,
21 fraud and false accusation of crime.  I guess
22 in your pleadings you make mention of some
23 objective evidence you have that will prove

Page 152

1 that the statements are false.  What objective
2 evidence do you have that proves that the
3 Center for Human Services' statements were
4 false?
5    A    It's part of the notes, and you have
6 a lot of it.  If you look at it and you can
7 sort it out in your head, you can see some of
8 it yourself, but you probably can't.  You
9 probably don't see it.
10    Q    Okay.
11    A    But I have to make it clear.  You
12 must explain everything and that's what I mean
13 by notes.  They're in my head.  I'm going to
14 put them down on paper.  I have reference to
15 them.  It's not any kind of notes.  It's just
16 a reference, like each one I've listed on a
17 list what I gave you and that's what I'm
18 calling my notes too.  It's very simple.  It's
19 just a reference and so far you don't
20 understand the significance maybe of
21 everything just because you don't, but I do,
22 and when I put it all together it shows.  It
23 shows.  It's objective.  It's a fact

Page 153

1 objectively with evidence that shows.
2    Q   So the objective facts you have are
3 the list that you don't have with you today,
4 correct?
5    A   Yes, and to be still put down. I've
6 still got work to do.
7    Q   Okay. What objective, and this may
8 be the same answer, but what objective answer
9 do you have that proves the reports were
10 deliberately falsified with the intention to
11 mislead?
12    A   I think it's an accumulation of my
13 stuff. I really couldn't tell you. I really
14 can't answer you right now. It's accumulation
15 of the body of stuff that I have that will
16 show it.
17    Q   And these are things that you have
18 not disclosed to us as of yet?
19    A   Yeah. Tactic and technique haven't
20 really been made known because it's not time
21 yet.
22    Q   Okay.
23    A   Not appropriate. It's not time. I

Page 154

1 laid a whole bunch of stuff on the table so
2 you can see it but you don't give everything.
3 You wait. It's not proper for the procedure
4 of the litigation.
5    Q   So there's a lot of discoverable
6 information that you have not provided to
7 counsel yet?
8    A   There's some. There's not a lot.
9 There's some simply, not really -- I'm not
10 really trying to withhold anything. I just
11 wasn't organized enough and didn't include it.
12    Q   Because as far as the May 20th, 2004
13 incident would go, the only thing I saw in
14 your discovery were the actual reports that
15 the Center for Human Services had created.
16    A   Actually discovery is not completed.
17 You're talking about disclosure.
18    Q   No, I'm just trying to figure out,
19 I'm asking you what objective evidence you
20 have and you're saying it's an accumulation of
21 things and what you've already provided as far
22 as this allegation goes, what you've already
23 provided us with is just the reports that the

Page 155

1 Center for Human Services did.
2    A   Oh, I see what you're saying. Well,
3 I'll give you an example of what I'm talking
4 about. Abraham Lincoln did a case and there
5 was a man that said he saw a murder and he
6 said that he saw another man do a murder and
7 the man was going to be in trouble. Well,
8 when they went to trial, how he proved that
9 the man was lying is he used the Almanac.
10    So if somebody said give us your
11 stuff during the course of litigation, he
12 probably wouldn't have gave it to him, but he
13 picked up the Almanac and the way he proved
14 him false was the man said that he saw him by
15 the moonlight. That's how he saw the man kill
16 the other man, and there was no moon out
17 there. There wasn't even a slither. There
18 was no moon out that night; therefore, the man
19 was lying. That's how he won his case.
20    So when you say objective evidence,
21 you're showing something to be false and the
22 truth is something that's absolute. That's
23 how you prove it to be wrong. The truth is an

Page 156

1 absolute defense or prosecution so you're
2 showing something to be false. So what I'm
3 saying, I will show the objective evidence.
4 For instance, as an example, I don't have
5 three siblings. I have four siblings. If
6 that woman had sat down and talked to me,
7 where is she getting three siblings from? I
8 didn't graduate high school, a G.E.D. Those
9 are two examples right now I'm giving you,
10 that I'm showing you that she's writing down
11 false things. She's making up stuff as she
12 goes. If she had actually sat down and talked
13 to me, she would have different information.
14    I offered to sit down and talk with
15 this woman and clear things up and she didn't
16 want to do that, and this is part of how I'll
17 show that it was like purposely or
18 intentionally involved because why wouldn't
19 she come down, sit down and talk to me? If
20 she felt that her life is threatened, she
21 could have got some help from her place or
22 something like that. We could have had a
23 discussion or conversation. She could have

Page 157

1  been covering two bases at once, herself as a
2  job and if she had any kind of doubts or
3  whatever, she could have clarified them right
4  then and there. She chose not to and the
5  choosing of not doing it, she's showing that
6  they're intentionally done. She doesn't care
7  about anybody but God knows what. She didn't
8  care about me. She decided to just write
9  everything down and just go to town with it,
10  and this way you show that's intentionally
11  done. It's an intentional thing. She refused
12  to come in and speak with me. It's an
13  intentional type thing.
14      So I would elaborate on -- those
15  would be starters and I would elaborate minus
16  maybe some of the -- I'm going to make a
17  statement. It's going to be a doozy but I
18  would be able to edit it on my own because
19  I'll sit down so you don't get all the extra
20  crap. I get to take that out and make it a
21  little bit less taxing.
22      Q   Okay. I guess with the third
23  allegation in the complaint that has to do

Page 158

1  with the professional incompetence, negligence
2  and malice, I guess what were the instances of
3  the professional incompetence?
4      A   Yes, the making of the report
5  incorporates -- first of all, the not checking
6  out valid information is an incompetent act,
7  period.
8      Q   Are you talking about as far as when
9  she didn't check out whether or not what your
10  sister had said to them was true?
11      A   Yeah, you bet, and then next when
12  I'm telling her it's a prank, why isn't she
13  listening to me? What's up with that? And
14  then when she continues to make the report, it
15  just incorporates this thing.
16      What she did was a very like
17  malicious thing. If you write a report
18  calling somebody a mental patient, say they
19  have scary symptoms of something and then they
20  had criminal behavior with prior criminal
21  behavior, that's malice. You're doing
22  something very bad to someone. That's hurting
23  them. You don't say somebody is a mental

Page 159

1  patient when they're not. You don't say
2  they're a criminal when they're not. You
3  don't make reports that are false. That's
4  malice. That's what I'm saying. I'm
5  incorporating malice. It's a malicious act.
6      Q   As far as the objective evidence
7  that you said you had regarding those
8  allegations, that will be in the statement, in
9  the notes?
10      A   Yes.
11      Q   Okay. The last one looks like it
12  was defamation, and I guess how were you
13  defamed?
14      A   We dispute the meaning of that. The
15  first thing that she did, the first thing that
16  was done by the McLean Center anyway was that
17  without checking out the validity of a very
18  serious charge or accusation of threat, they
19  told officials. They spread it first to the
20  police officer. Now, those written reports, I
21  believe, are a written form of defamation
22  because if they should pop out at any time,
23  they would hurt me. Those are bad things.

Page 160

1  She said bad things about me. They're bad
2  things. They're understood by all as being
3  bad and in this way it's harmful.
4      Q   Other than what you said that the
5  defamatory statements, whether they're written
6  or oral, were communicated to the police
7  officers, do you have any personal knowledge
8  of them being communicated to any other
9  person?
10      A   No.
11      Q   Do you have any explanation or why
12  that you believe that the office for the
13  Center for Human Services falsified all these
14  reports?
15      A   I don't know. I speculate that they
16  thought they were going to get in trouble and
17  so they had to come up with a good reason for
18  what they did so they just ran with it. They
19  probably thought I would never see the
20  reports. That's my speculation. It's only
21  speculative. I really don't know. I don't
22  know why they did it.
23      Q   Were you on any medications on

Page 161

1 May 20th, 2004?
2    A   No.
3    Q   Do you know your sister's, Anna's
4 current phone number?
5    A   I don't know any numbers by heart.
6 I may still -- I have something on it with a
7 number that I did actually call her with.
8 That's all.
9    Q   Have you tried to call her since
10 these occurrences?
11    A   Yes, I did.
12    Q   Did you get her answering machine?
13    A   Yes.
14    Q   When was the last time you tried to
15 call her?
16    A   I don't know, but I did try. I
17 tried like you would not believe to get with
18 my family. I wanted them to come forward and
19 clear them in the family. I tried both
20 sisters repeatedly. I tried to communicate
21 with them. I told them that there would be a
22 way that we could clear it up and they
23 wouldn't get in trouble and could at least

Page 162

1 come forth. I was concerned about it being in
2 our family.
3      Other than just the concern about it
4 being something written about me, I was
5 concerned about it, an ugly thing like that.
6 My sister did a very ugly thing and it's in
7 our family so I tried to talk to them
8 repeatedly. I made repeated attempts, I
9 didn't write down the dates or anything, but
10 repeated attempts since May 20th.
11    Q   So by your sister doing an ugly
12 thing, it sounds like you don't have, you
13 don't I guess -- you accept the fact that she
14 called the Center for Human Services and made
15 those allegations?
16    A   I don't know, but I'm going to guess
17 that it was accurate, yeah. I don't know.
18 You want to know the funny thing? It could
19 have been Anna. It could have been Sarah. It
20 could have been Natalie, okay? I don't know.
21 It could have been any one of them. They're
22 all capable of doing something like that. It
23 could have been my sister, Sarah, my sister

Page 163

1 Anna, or my sister-in-law Natalie. They all,
2 each one of them could have done it and I
3 wouldn't know. No indication of who actually
4 did it. I'm just going to go with it
5 because --
6    Q   Have your sisters ever lived in
7 Bloomington?
8    A   Yes.
9    Q   They have?
10    A   Oh, yes.
11    Q   They still have friends here that
12 you have personal knowledge of?
13    A   Oh, no, not that I know of.
14    Q   Do you have any other family that
15 lives in Bloomington?
16    A   No.
17    Q   On May 20th, 2004, when the police
18 came to your apartment and when you initially
19 got to speak with them, they explained to you
20 that the reason they were there was that your
21 sister, Anna, had called the Center for Human
22 Services, correct?
23    A   No, they didn't explain anything.

Page 164

1    Q   At no point in time they told you
2 what the reason for them being there was?
3    A   No.
4    Q   Did the Center for Human Services?
5    A   Yes, the Center for Human Services
6 spoke, sure.
7    Q   And they were the ones that
8 explained to you that the reason they were
9 here, the reason that they had all shown up at
10 your apartment was because your sister, Anna,
11 had called them and had stated that you had
12 threatened to shoot them?
13    A   Yes.
14      MR. SALVATI: Okay. That's all
15 I have.
16      MR. BERG: Go off the record
17 for a second.
18    (Whereupon an off the record
19      discussion was held.)
20
21      REDIRECT EXAMINATION
22 BY MS. WATSON:
23    Q   I have just a couple follow-ups. As

Page 165

1 we sit here today with the information you
2 have before you today, you cannot, it's my
3 understanding that you cannot point to any
4 specific falsehoods in the Bloomington Police
5 Department reports, correct?
6     A   Not without my notes, right, sure.
7     Q   Also --
8     A   I could but I don't want to mess up
9 my tactic for presentation. I'll be glad to
10 say something. I would glad to say anything.
11 It's just not proper. It's not an appropriate
12 time. It should be organized and displayed
13 properly and not kind of blotched off. I
14 didn't just recently move into my apartment.
15 I remember this off the top of my head. I had
16 been there since March. Why would I tell them
17 I just moved over there? Why would I tell
18 them I had an argument with my sister when I
19 didn't even speak to my sister, okay, that
20 type of thing.
21     I've got a couple of them, but I
22 have a way to put it together that makes it
23 easy and non-taxing and I don't want to just

Page 166

1 put it over there. You can spend time and
2 pick it apart if you want. I'll give it to
3 you but it just seems it's disorganized to
4 just do it that way.
5     Q   One thing that has been said
6 numerous times today, and I've looked over
7 this report and maybe I'm misunderstanding and
8 maybe you're just speaking about one of the,
9 what is it, health services reports, I'm not
10 sure, that was completed by the social worker,
11 but on numerous occasions you said that I
12 believe the police report terms you as a
13 mental patient. I simply don't see it in the
14 report. I mean if I gave this to you, could
15 you point it out to me where that is?
16     A   I don't recall ever saying that.
17     Q   Okay.
18     A   But criminal, there's a criminal
19 accusation in there. Anybody that threatens
20 to kill -- if the police, if a police officer
21 walks into a bank and somebody is robbing the
22 bank and then they find out and then he goes,
23 oh, hi, how are you doing, I was just having a

Page 167

1 bad day or, shoot, there was no bullets in the
2 gun, the police officer doesn't just walk out
3 of the bank and they say, oh, heck, he's
4 having a bad day, there was no bullets in the
5 gun. He didn't mean to do it. There was no
6 means for him to actually shoot anybody in
7 that robbery and walk away.
8     Here this police officer says she's
9 threatening to kill her entire family with a
10 gun but everything will be okay because she
11 has no means to get over there to Florida to
12 do it. I don't think so. That's not how it
13 works. There's an arrest made or you need to
14 do something about it because they're
15 dangerous. So he's labeling me as being
16 somebody that's not right. If you're going to
17 threaten to kill anybody and especially your
18 family, you are not right. You are mentally
19 not right. There's something wrong with you.
20 So I don't recall saying anything about a
21 mental patient because this is separate from
22 the McLean Center.
23     Q   Uh-huh.

Page 168

1     A   But he's making me out to be a
2 criminal and in this criminal charge too
3 you're a nut job. I'm sorry but if you
4 threaten to kill your entire family, you're a
5 nut job and a half, okay? And so if I
6 insinuated, that's only an insinuation but no,
7 he really doesn't say anything about me being
8 some kind of mental patient.
9     Q   Would you agree though that he said,
10 and you would agree with this statement that
11 you had no plans, no intentions, and no means
12 to go to Florida to carry out any such action?
13     A   I had plenty of means. I had a car.
14 I had money. I can get on an airline. I can
15 go to Florida in five seconds. I lived in
16 Florida. I know the streets of Florida. I
17 can make my way anywhere around Florida. I
18 can drive there with 16 guns if I wanted to
19 go.
20     Q   Okay. So you're saying --
21     A   But I don't agree, no.
22     Q   You don't agree with that statement?
23     A   No, absolutely not. I had plenty of

Page 169

1  means to go to Florida. I can go to Florida
2  any time I wanted, whole bunch of money in the
3  bank.
4    Q  Okay.
5    A  I want that report gone. I want it
6  like it didn't exist. I want my name off that
7  report. It just seems the opportune time to
8  mention it. I don't mean to interrupt you.
9    Q  That's okay. That's okay. You
10 agree though that again he reports, "Crisis
11 was content that she posed no threat?" Do you
12 agree with that statement in the report?
13   A  Yeah, because everybody was content.
14 Nobody said anything to me like there was a
15 problem or anything, no. They laughed. I
16 made a joke. I made a joke about something
17 and they laughed about it, and they said go
18 finish your shower because they knew they
19 pulled me out of it and they said thank you
20 for talking to us. That's what they said and
21 they left.
22   Q  And he also notes, "There was no
23 compelling reason to seize her weapons," and

Page 170

1  you would agree with that statement; there was
2  no compelling reason to seize your weapons?
3    A  Sure. Yes, I agree.
4    Q  As to March 28th, 2005, the more
5  recent date, you said that you had requested
6  the police to file a report making claims
7  against Wayne Pelhank that day, correct?
8    A  Yes.
9    Q  Okay. And one of the officers had
10 said to you, you need to see legal or the
11 legal department to do that, correct?
12   A  His exact words are on the
13 transcript. You need to do that through legal
14 I think it was.
15   Q  But you admit that you never
16 followed up with filing a report?
17   A  Yes.
18   Q  Why did you not follow up?
19   A  I don't trust the Bloomington
20 police. This is the second incident. No way.
21   Q  Also I want to clear up, and you may
22 have stated this before, but that you
23 mentioned the towing of your car. In neither

Page 171

1  of these two claims, neither of these two
2  complaints though are you seeking damages for
3  that; that's not a part of these two claims,
4  correct?
5    A  Right. It's only being used to show
6  custom.
7    Q  Generally do you have any reason to
8  believe why, a reason to think that anyone in
9  the Bloomington Police Department or the City
10 of Bloomington would falsify any report or not
11 include your statements in any report?
12   A  Yes.
13   Q  And what are those?
14   A  Because it's such a liability. It
15 opens them up to liability, whereas in
16 changing the statements they make it -- they
17 cover the liability. In saying, oh, she was
18 going to harm herself, they changed the nature
19 of the situation like they did me a favor. We
20 were only looking out for your well being. We
21 were only caring about you. We were only
22 busting open your door because we were
23 concerned about you.

Page 172

1    Those people really weren't
2  concerned about anything. They were on like a
3  witch hunt. They were chasing down the fox is
4  what they were doing, you know, and when they
5  made their reports afterwards, they just
6  validated that they weren't concerned about
7  anybody. There was no real genuine caring or
8  concern, you know. They did what they did and
9  the law protects them from that error but
10 apparently they did not know the law. The law
11 will say you may make blunders, you may make
12 errors and we're not going to persecute you
13 for it.
14   Q  Are you alleging that the human
15 services or the police department should
16 have -- because you've already admitted that
17 someone, a family member called and made some
18 allegations and that's how the human services
19 and police department got involved. Are you
20 alleging that those allegations that were made
21 against you should have been investigated more
22 before acted upon by the police department?
23 Is that what you're alleging?

Page 173

1    A    That's part of it, yes. It
2  definitely is. You bet.
3    Q    Lastly for my side, have you made
4  any, have you spoken to anyone that we haven't
5  talked about today about your claims, made any
6  statements to anybody about these claims?
7    A    I'm shooting my mouth off as fast
8  and as big as I possibly can because I don't
9  want to be swept under the carpet. If
10  somebody wants to bring justice to my front
11  door, I'll shut my mouth up. It's not a
12  problem. I'm not an activist, a Civil Rights
13  leader or anything like that, but I'm gun-ho.
14  These are terrible things that happened in my
15  life and I'm not going to just let them
16  happen. That's it. So, yeah, everywhere all
17  over the place, churches -- well, lawyers are
18  an exception because you're supposed to when
19  you seek legal help; churches, organizations,
20  just small organizations. I need help. I'm
21  sleeping on the ground for three weeks. I'm
22  sleeping in a shed, okay? I've got to get
23  help. I want what's mine.

Page 174

1    Q    Are you saying you've made numerous
2  statements?
3    A    Oh, yeah.
4    Q    To numerous parties about these
5  cases?
6    A    Oh, yeah, all over the place. I'm
7  going as fast as I can. I can only do so much
8  at once. I have a web site. You want my web
9  site address? I have a web site.
10    Q    Certainly.
11    A    I'm packing it on. It's just the
12  http thing.
13    Q    Do you know it?
14    A    Yeah.
15    Q    By heart?
16    A    Yeah.
17    Q    Can you give it to us now?
18    A    Yeah. It's
19  ladybugsflyhi.50megs.com.
20    Q    Is 50 numeric?
21    A    5-0, 5-0 dot M-E-G-S. So it's
22  ladybugsflyhi, H-I, dot 50megs.com.
23    Q    Is 50megs one word, or I mean is

Page 175

1  there any period?
2    A    50megs is one word.
3    Q    Okay.
4    A    But there's a dot before that when
5  you go ladybugsflyhi.50megs.com.
6         MR. BERG: Just so I'm clear,
7  it's 50, M as in Mary?
8         MS. GUEVREKIAN: Yeah.
9         MR. BERG: E-G-S?
10         MS. GUEVREKIAN: Yeah.
11         MR. BERG: Dot com?
12         MS. GUEVREKIAN: Yeah, yes.
13         MR. BERG: Thank you.
14  BY MS. WATSON:
15    Q    Has your communication with these
16  numerous parties been through letters or
17  telephone calls or face to face meetings?
18    A    Some face to face and some through
19  E-mails. I've been trying the E-mails. I've
20  been going to the churches and talking to the
21  pastors. Pastors are holy people. Most of
22  them won't care about any of this. They don't
23  care about anything. They just care about

Page 176

1  what's right and what's wrong and what's going
2  on in God's land. So I'm cutting through all
3  the chase. I'm going to the churches. I need
4  help. I need somewhere to stay. I'm 42 years
5  old.
6    Q    Have you made any statements to the
7  newspapers or anything like that?
8    A    I've tried to make, not statements
9  but I've tried to say look at this court file,
10  look at this court file, and they haven't
11  touched it. I've written every paper and
12  said, like through the E-mail and said like
13  look at this case number, McLean County and
14  stuff like that, but as far as I know,
15  nobody's taken it.
16    Q    Now, you realize that if any of
17  that -- I mean if you have any of that in
18  print and everything, that's all discoverable
19  and should be disclosed to us if you've got
20  copies of letters. If you've got copies of
21  E-mails, I mean I'm going to request that we
22  get copies of all of that if you have it.
23    A    I should have some E-mails if you

Page 177

1 want it but the rest of the stuff I don't
2 have, and in person is actually a confidential
3 thing. It's actually a confidential thing
4 with everything I say to a pastor. Can't
5 touch it. That's why I'm there.
6    Q   Can you describe what's on your web
7 site?
8    A   Sure.
9    Q   With regards to these two cases?
10   A   Yeah, it's simple reference. It
11 includes the complaint in full, the names of
12 the parties. A little bit of reference to the
13 library too is on there but that doesn't
14 really follow. It's extra. I guess that's
15 it. It's got the complaint, the initial
16 complaints for those two cases. I guess
17 that's really it. I'm not messing with that
18 right now because it's where it should be.
19 It's proper so I'm not messing really with it.
20   Q   Where do you access the internet?
21   A   The Bloomington Public Library.
22 They don't hang anything from the ceiling. I
23 hope that it's safe. I've been going there

Page 178

1 for 15 years.
2    Q   Would there be any other references
3 that you know of on the internet regarding
4 these two cases?
5    A   Yes, there's also some other web --
6 there's also some other web sites that I made.
7 I started writing them like -- I don't know.
8 There's several. There's a number of them. I
9 went to an Armenian site and made an ad.
10   Q   Sorry. Armenian?
11   A   I'm Armenian.
12   Q   Oh, the nationality?
13   A   Yeah. So I went to an Armenian site
14 and there's a couple other sites. There's a
15 site that I started but I couldn't figure out
16 how to use their editor, so there's a little
17 notation there but like I dumped it because it
18 was too much work. I've only got so much
19 time. I was like, oh, okay. Wait 20 minutes
20 for that? No.
21   Q   Do you know the addresses to any of
22 these sites or could you disclose them to us
23 later if you don't have them?

Page 179

1    A   If you punch in my name, you can get
2 some yourself. It comes up on the search.
3    Q   So say I google Lynn Guevrekian?
4    A   Yeah, you will get googled.
5    Q   So specifically you can recall two
6 other sites? Other than the ladybugsflyhi
7 site, there's at least two other sites where
8 references were made to these two cases?
9    A   Yeah.
10   Q   Okay. And possibly more than those
11 two?
12   A   Yeah, but I've written everything
13 down. I'd have to find where it is. I've
14 kept track of everything. That's a password
15 to everything so everything can be taken down
16 too if you want it down. If somebody wants it
17 down, it can be taken down is the thing I
18 guess.
19        MS. WATSON: Okay. That's all
20 I have for right now.
21        MR. BERG: Just a couple
22 follow-up.
23

Page 180

1        REDIRECT EXAMINATION
2 BY MR. BERG:
3    Q   Damage to the door on 3/28/05, at
4 least according to your prior testimony, was
5 done when the police arrived, is that right?
6    A   Yes.
7    Q   Did the police break the door open
8 further when they arrived on 3/28/05 or did
9 you let them in?
10   A   They didn't break it open further
11 and I never let them in because the issue
12 never arose. They just handed me the paper
13 through the door and then they left.
14   Q   The chain holding the door closed
15 was still intact when the police arrived?
16   A   Yes.
17   Q   You never had to replace the second
18 chain, is that correct?
19   A   Yes.
20   Q   And the damage to the door, was that
21 ever repaired?
22   A   I don't know.
23   Q   What damage was there to the door?

Page 181

1    A   The original lock was just bent like
2  it was unusable so I put in another lock.
3    Q   You put in another deadbolt?
4    A   Yes. The one that was in it was not
5  usable. It was just too bent out of shape.
6    Q   Did you have permission from the
7  landlord to put in another deadbolt?
8    A   No.
9    Q   Did you tell the landlord about
10  damage to the deadbolt?
11    A   No.
12    Q   So sometime between 3/28/05 and the
13  time you moved out sometime in that first week
14  of May of 2005 you had a different deadbolt
15  with a different key to the apartment No. 6
16  that you lived in, is that correct?
17    A   I didn't understand the question.
18  Sorry.
19    Q   What didn't you understand about it;
20  any of the question?
21    A   I didn't understand the question.
22  I'm sorry. If you repeat it, I'll try again.
23    Q   I'm going to have her repeat it

Page 182

1  because I don't remember what I said.
2        (Record read as requested.)
3    A   Okay. Yes.
4    Q   Did you ever give the landlord or
5  anyone from Heartland Apartment Management a
6  key to your apartment?
7    A   Yes.
8    Q   When?
9    A   The day I moved out I sent it to him
10  Registered Mail.
11    Q   But not prior to that date, is that
12  correct?
13    A   Yes.
14    Q   Did you ever inform anyone from
15  Heartland Apartment Management that you had
16  changed the lock on your door after 3/28/05?
17    A   No.
18    Q   And the only reason you changed the
19  lock was because the deadbolt was damaged or
20  bent, is that right?
21    A   Yes, I left it in the apartment. It
22  was broken.
23    Q   Anything other than the deadbolt

Page 183

1  bent as far as damage to the door?
2    A   The frame was just wrecked. It was
3  completely wrecked. I wouldn't even trust the
4  deadbolt that I put on because it was fried,
5  needed to be fixed and repaired. It was a
6  mess. It was just chipped away and bent out
7  of shape and partially gutted out, excuse me.
8  So the door was a mess. The door frame, the
9  actual door frame and like the part of the
10  door itself, it was just a mess. It was a
11  beat up mess.
12    Q   And it wasn't like that before
13  3/28/05?
14    A   No.
15    Q   It was in perfect condition before
16  that date?
17    A   Actually, no. It looked to me that
18  it was a little bit beat up. There was some
19  stuff going on there. It was not in perfect
20  condition, no. It's an old building. It's
21  been there for a long time. It's at least
22  100 years old, but it was intact and
23  functionable and after the incident it was not

Page 184

1  functionable.
2    Q   Until you replaced it?
3    A   It was dramatically chipped and it
4  was not functionable.
5    Q   Until you replaced the deadbolt?
6    A   No. Actually, no. I replaced the
7  deadbolt because it didn't work but I didn't
8  trust the deadbolt. I felt you could just
9  push it open and it would just go on in. It
10  was not reliable. It wasn't sound, no. Does
11  that answer it? I'm sorry.
12    Q   I don't know. It was not sound.
13  Did it keep the door closed?
14    A   Yes, it kept the door closed but not
15  secure.
16    Q   Did it keep the door locked?
17    A   It didn't keep the door secure, no,
18  but closed, yes.
19    Q   Did it keep the door locked?
20    A   Yes.
21    Q   As far as your sisters and your
22  sister-in-law, Anna, Sarah, and Natalie, did
23  you have a good relationship with any of them?

Page 185

1    A  Yes.
2    Q  Do you still have a good
3  relationship with any of them?
4    A  No, there's no relationship.
5    Q  Okay.  When did the relationship
6  between any of them sour; after the
7  inheritance after your dad died?
8    A  No.  There was a barrier when I left
9  Florida.  I lived in Florida for a while and
10  they didn't like me leaving.  There was a
11  resentment for me to leave.
12    Q  Why is that?
13    A  I don't know.
14    Q  You have absolutely no history of
15  mental illness, is that right?
16    A  Yes.
17    Q  And no history of psychological or
18  psychiatric treatment, is that correct?
19    A  Yes.
20    Q  You've had no medical or psychiatric
21  treatment since either the 5/20/04 incident or
22  the 3/28/05 incident, is that correct?
23    A  Yes, and I don't expect to have any.

Page 186

1    Q  Okay.  You weren't physically
2  injured in either the 5/20/04 incident or the
3  3/28/05 incident, is that correct?
4    A  No.
5    Q  That's not correct?
6    A  No.  My injury happened after the
7  first incident on May 20th, two weeks or so,
8  from May 20th to June 7th.  I was already
9  injured from June 7th.  That's why I fell
10  behind on my rent.
11    Q  My question is were you physically
12  injured in either the 5/20/04 incident or the
13  3/28/05 incident?
14    A  Oh, I'm sorry.  There's a double
15  meaning to that.  I heard it wrong because I
16  have a physical injury.  There's a double --
17  that question can be interpreted two ways.
18  Okay, no problem.
19    Q  Do you understand my question?
20    A  Yes.  You're asking was I injured in
21  each of the incidents, and of course I was
22  injured.
23    Q  Were you physically injured -- let

Page 187

1  me break up the question, okay?
2    A  Oh, I see.
3    Q  Were you physically injured in any
4  way in the 5/20/04 incident that we're here
5  today to discuss?
6    A  No.
7    Q  Were you physically injured in any
8  way in the 3/28/05 incident?
9    A  No.
10    Q  I understand you had a physical
11  injury in the library?
12    A  Yes, and I ran it together so your
13  question had another meaning.  You're saying
14  were you physically injured and I'm saying
15  yes, I have a physical injury.  See how it
16  carried over?  Okay.
17    Q  Okay.  But you weren't physically
18  injured as a result of either --
19    A  No, sir.
20    Q  -- the 5/20/04 or 3/28/05 incidents,
21  is that correct?
22    A  Yes.
23    Q  Do you currently have a cell phone?

Page 188

1    A  No.
2    Q  Did anyone from the Heartland
3  Apartment Management repair your door after
4  3/28/05 and before you moved out?
5    A  No, but there was an offer to repair
6  the door.
7    Q  When was that made?
8    A  I may have it written down but I
9  don't know.  A maintenance, a person
10  announcing themselves as maintenance offered
11  to come and repair the door.
12    Q  Okay.  And did you decline that
13  offer?
14    A  I asked him what his name was and he
15  wouldn't answer me and then didn't really
16  decline.  He kind of just went away.
17    Q  But sometime after 3/28/05 the offer
18  was made by someone who represented themselves
19  as being maintenance from Heartland Apartment
20  Management?
21    A  Yes.
22    Q  And the offer was to repair your
23  door, is that correct?

Page 189

1   A   Yes.

2   Q   But as far as you know, the door was
3   never repaired after 3/28/05 at least until
4   you moved out in May of 2005, correct?

5   A   Yes.

6   Q   Other than the repairs that you made
7   yourself?

8   A   Yes.

9        MR. BERG:  Okay.

10        MS. WATSON:  I have no more.

11        MR. BERG:  Signature?

12        MS. WATSON:  I'll waive.

13        MR. BERG:  As far as do you
14   want to explain it to her?

15        MS. WATSON:  You can reserve
16   signature which means that you can review the
17   transcript prior to signing off on its
18   accuracy.  You can't make substantive changes
19   but if there's like grammatical errors and
20   things like that, you can change that before
21   signing off on the transcript.

22        MS. GUEVREKIAN:  Okay.  I would
23   like to reserve or review.  Is that what it's

Page 190

1   called?

2        MS. WATSON:  Yeah, reserve
3   signature.

4        MS. GUEVREKIAN:  Reserve
5   signature.

6        MR. BERG:  The only issue is
7   that the court reporter needs to know, and she
8   has your post office box number, where to mail
9   the transcript and you will need to return the
10   transcript to her after you've had an
11   opportunity to review it and make any changes
12   as far as grammatical changes, spelling
13   changes.  You understand that you can't make
14   changes to the substance of your testimony?

15        MS. GUEVREKIAN:  Yes.

16        MR. BERG:  Okay.  And if that's
17   okay to mail it to your post office box and
18   you will agree to return it back to the court
19   reporter in a timely fashion.

20        MS. GUEVREKIAN:  Yes, that's
21   fine.

22        WITNESS FURTHER SAYETH NOT:

23        BY AGREEMENT, SIGNATURE NOT WAIVED.

Page 191

1   STATE OF ILLINOIS     )
                          )
2   COUNTY OF PEORIA      )

3        I, PAULA A. MORSCH, Certified
4   Shorthand Reporter and Officer of the Court
5   authorized to report depositions, do hereby
6   certify that heretofore, to-wit, on the 6th
7   day of September, 2006, at the hour of
8   1:00 p.m., LYNN T. GUEVREKIAN personally
9   appeared before me at 207 West Jefferson, in
10   the City of Bloomington, County of McLean,
11   State of Illinois.

12        I further certify that the said
13   witness was by me first duly sworn to testify
14   to the truth, the whole truth and nothing but
15   the truth in the cause aforesaid, that the
16   testimony then given by said witness was
17   reported stenographically by me in the
18   presence of said witness and afterwards
19   reduced to typewriting, and the foregoing is a
20   true and correct transcript of the testimony
21   so given by said witness as aforesaid.

22        I further certify that the signature
23   of the witness to the deposition was not

Page 192

1   waived by agreement of counsel.

2        I further certify that I am not
3   counsel for nor in any way related to any of
4   the parties to this suit, nor am I in any way
5   interested in the outcome thereof.

6

7

8   _____  C.S.R.

9

**E-FILED**
Monday, 04 December, 2006  02:45:46 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION


Lynn T. Guevrekian

    Plaintiff,

Vs.                                                  Case No. 05-1369

City Of Bloomington, Mclean County
Center For Human Services, Heartland
Apartment Management; Wayne Pelhank

    Defendants


Enclosed, please find documents numbered ①- ⑬⑨ for a disclosure order. These

documents are to be used as evidence in the future but are not labeled Exhibit A, B, C,

etc. at this time and will be organized in the future at Discovery, accompanying

explanation and direct application.

At this time, monetary charges are "open" regarding specific laws and statutes that were

broken as all specific laws are subject to individual fines. Any immunity rights will be

dispersed under "willful and wanton reckless disregard and malice." The City of

Bloomington will be charged with Compensatory damages of $500,000.00; requested as

relief to the Plaintiff in light of the nightmarish nature of the situation and the additional

fact that the City of Bloomington had opportunity to correct promptly and humbly an

error within its own jurisdiction and chose not to. The Bill of Rights grants The Right To

Prompt Remedy under the law, not delays and denials. The City of Bloomington will be

charged with Punitive Damages of $1,000,000.00 in an effort to ensure that it doesn't

**EXHIBIT**

2

happen again to other people in society.   The malpractice charge regarding the Center

For Human Services will be capped at $75,000.00.  No punitive charges will be directed

at the Center For Human Services; the completion of the trial will afford removal of the

social workers license.  The Forgery Charge for Wayne Pelhank is $40,000.00.

$50,000.00 Compensatory charge is directed at Wayne Pelhank in light of the fact that an

individual's wrong-doing is not on the same level as a police officer belonging to the City

who has a moral and ethical duty to society.   Punitive Damages are open at this time in

light of the fact that some of the charges are too closely related to The City of

Bloomington and perhaps caused by The City of Bloomington.


Lynn T. Guevrekian
P.O. Box 1114
Bloomington, Illinois
61702-1114

April 12, 2006
Date

## PROOF OF SERVICE

The undersigned certifies that a copy of the attached disclosure documents was served upon the attorneys of record by enclosing the documents in an envelope plainly addressed to the attorney's business address with postage fully prepaid and by depositing the envelope into a U.S. Post Office Box in Bloomington, Illinois on April 13, 2006.


Lynn Guevrekian
P.O. Box 1114
Bloomington, Illinois
61702-1114


## Attorneys of Record

Brian Thielen, B. Mirdo, J. Foley
Thielen, Foley & Mirdo
207 W. Jefferson Street Suite 600
Bloomington, Illinois  61701

Peter Jennetten, A.Watson
Quinn, Johnston, Henderson & Pretorius
227 N.E. Jefferson Street
Peoria, Illinois  61602

Eitan Weltman
802 N. Clinton Street Suite A
Bloomington, Illinois  61701


Casey Costigan, D. Salvati
Costigan & Wollrab
308 East Washington Street
P.O. Box 3127
Bloomington, Illinois
61702-3127

1

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
MCLEAN COUNTY

September 27, 2005

Number of total pages: <10>

Case No.  AR 05 264

Lynn T. Guevrekian

Plaintiff

vs.

Bloomington Police Department; City of Bloomington
Mclean County Center For Human Services
Heartland Apartment Management; Wayne Pelhank

Defendants

FILED

SEP 2 7 2005

CIRCUIT CLERK

### AMENDED COMPLAINT

Plaintiff, Lynn T. Guevrekian submits her Amended Complaint.

### Mclean County Center For Human Services

Causes of Action:
1) Trespass;illegal entry into residence without permission, the
breaking of the 4th Amendment Rights and also The Illinois State
Bill of Rights.

2) Malpractice; Fraud and False Accusation of Crime

3) Professional Incompetence; negligence and malice

①

4) Defamation as it pertains to the verbal utterance of false statements negative in nature, for which there was no verification of or truth in, also identifying statements of a defamatory nature as outlined in Slander.

1) Nicole Piggush, a.k.a. Nicole Wilder, a social worker who was licensed as a Social Worker in the State of Illinois for seven months at the time of the May 20th, 2004 incident entered my residence uninvited after someone violently battering rammed open my apartment door. Nicole Piggush, while clearly located in the interior of my residence as opposed to the hallway of the building, spoke to me from the vicinity of my kitchen while I was behind the shower curtain in the bathroom. I requested that everyone leave my apartment and main room located adjacent to the kitchen so that I could get to my laundry basket full of clean clothes that was located in a Rubbermaid container in the main room. Nicole Piggush answered me affirmatively that she would be outside in the hallway. I identified Nicole Piggush by her voice once I saw her in person.

2) Because of the necessity of the need to show Malpractice;fraud and false accusation which has caused distress and which produces an adverse record in society the records will be entered into evidence. These records are proof of the malpractice and will be shown to be false at arbitration. The falseness of the statements made in the report will be shown with objective evidence;objective evidence shows the reports to be false but also shows that they were deliberately falsified with intention to mislead in order to justify the wrong-doing of the social worker's actions. Please note that I obtained these reports by simply walking into the Human Services Center and asking for them. I presented no identification and I signed no authorization or paper before I obtained the reports from Center.

3) Professional Incompetence;negligence and malice will be shown at discovery with a detailed deposition and sworn statement by Lynn Guevrekian in addition to objective documents of proof.

4) Defamation occurred at the moment verbal information was delivered unto the Bloomington Police Department who then acted without any clear or imminent sign of danger. The over-zealous and negligent behavior of the police officer who violently broke open the apartment door and then entered my apartment called me by name.

3

In addition, the affidavit of Nicole Piggush created on July 19th, 2005 states that I was interviewed. This statement is false. I was never interviewed and declined an interview or services. I stated clearly that I did not require services. I literally held up my hand. Nicole Piggush acted inappropriately by trying to super impose services. Later, when I called the Human Services place requesting clarification of the incident from Nicole Piggush she refused clarification adversely. In addition, the attorney, Dominic Salvati makes a false statement at the September 1, 2005 hearing in which he portrays an interview that took place whereby Nicole Piggush "sat down." Nicole Piggush never sat down anywhere in my presence at my residence and I was only in the actual presence of Nicole Piggush for about 12 minutes. Again, and repeatedly we have an instance where Nicole Piggush makes false statements with the intention to deceive as distinguished from a false statement that is merely mistaken. Her incompetence begins with the way that she handles the initial call and beginning of incident, it is then followed by a breach of duty or standard of practice and followed by malice and malpractice for Nicole Piggush chose to create false reports rather than correct her error. There are Mental Health Acts, one of them is called the Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 110/1, which cannot be cited or used by the Defense or the Plantiff simply because there must be a "Recipient" of Mental Health Care and a "Therapist" and "Patient" relationship in order for this type of Act to be valid or used. Since there was no therapist/patient relationship this reference to the confidentiality act regarding disclosure of patients records made by the defendant does not apply because at no time was I a patient of Nicole Piggush and at no time was Nicole Piggush my therapist. Nicole Piggush superimposed her services on an individual who was objecting to her services. I have never been a patient of nor wish to be a patient of The Mclean County Center for Human Services. I will present proof that I had no verbal contract or any contract whatsoever with anyone at the Center. Though I did make a trip in person to the Center, it was only to request in writing verification of the May 20th, 2004 incident after reading the adverse record of Nicole Piggush. It will be declared now as fact that I, Lynn T. Guevrekian being of sound mind am not and have never been mentally ill, I do not have any clinical disorder, I have never been in a mental hospital. I have never had a therapist/patient relationship with the Mclean County Center for Human Services. I did willingly request from Mr. Hays, an employee of the Center that he give me verification of the falseness of May 20th incident involving the prank phone call and in lieu of a written statement Mr. Hays prepared a document. It

③

4

appears that in conversing with Mr. Hays that I answered a question that appeared to demonstrate some type of verbal contract with Mr. Hays but I made sure to cancel and void any possibility of contract via certified mail. I am not currently and have never in the past taken a psychotropic drug or any drug or medication for a mental condition or illness. I am not nor have I ever been violent. I am not, nor have I ever been a homicidal perpetrator. I have never threatened physical harm of any kind to my family. I have never threatened to kill my family. I have never threatened to kill my family even in an expression or figure of speech. I did, however state to my family via a voice mail message that I would file for my father's inheritance if they did not give me my share. More statements of facts will follow in more depositions if needed. Objective evidence will be submitted as is needed.

Bloomington Police Department

Causes of Action

1) Trespass; illegal entry into residence violating my 4th amendment rights and also the Illinois Bill of Rights.

2) Excessive Force

3) Breach of Duty

4) Libel

5) Obstruction of Justice

1) Trespass occurred when the police entered my residence, uninvited and came into the bathroom where I was taking a shower. The police officer called to me by name, so obviously he knew my name was Lynn and was looking for me. I looked around the bathroom shower curtain keeping my naked body covered and I immediately asked the officer, "What is this about?" The officer did not answer my question, he ordered me to get dressed and come out. After I asked everyone politely to allow me to get into the other room and they responded by going out into the hallway I then dressed and asked the social workers to come in, please note that I only spent about 12 minutes with the social workers while the police waited in the hallway. I speculate that it took me about 5 minutes to finish rinsing the shampoo out of my hair and then get dressed. After spending approximately 12 minutes in the company of the social workers while standing dressed but with my shoes untied

5

and my hair wet from the shower. I told the social workers that it was a prank and a stunt and I made mention of my fathers inheritance. I never spoke to any family member on the phone and there was no conversation to any family member on the phone. I never had an argument with anyone on the phone. I never made a disturbing remark to anyone on the phone. I exclaimed in a normal volume of voice though exasperated "What did you do to my door?" as I looked at the door. A dark haired police officer who I believed at the time was named Officer Melton who was out in the hallway then crossed the threshold of my door- way into my apartment uninvited and stood in front of me about six inches from my face and asked me if I had a fire arms card. I replied that I did and that it was in a locked box inside of the kitchen cabinet and then the officer asked if he could see it. I then gave full cooperation to the officer as another officer with blond hair entered my residence uninvited and the two officers stood over me while I kneeled and opened a kitchen cabinet where a locked household safety box was screwed into the floor of the cabinet. The box itself had a combination lock on it and I opened the box and produced the valid fire arms card, which I had had for about 10 years. I noticed the dark haired officer had sweat dripping down the side of his brow as he wrote down information from the fire arms card.

2) The sweat that was dripping down the side of the officer's brow is significant as it shows the amount of exertion that was used to break open the door. The door was violently battering rammed open with repeated loud banging sounds. This is excessive force and violence which was unnecessary since there was no objective evidence of anything actually being wrong, there was no clear or imminent danger. There were no exigent circumstances. Had the social worker not been incompetent and had asked questions or verified her information and given the police some type of valid information the officer would have used other protocol since there was no impending threat to the safety of anyone. The origin of the prank phone call was being made from 1100 miles away and the apartment was located on the third floor with no other exit other than what was right outside the door where the police already were.

3) The Breach of Duty was that valid information was not acquired to substantiate any need to break open a door or to even make me a valid suspect of anything at all. There were no exigent circumstances involved. There are many statements on the officers report narrative which I may prove false with objective evidence.

(5)

6

In the proving false of many statements made on the Public
Document which I obtained using the FOIA, the False statements
will be the sound basis in which I use to show that not only is
the document itself Libel, but it is also deliberately composed to
mislead.  By the way, this report also contradicts the social
workers report.


4) Libel is the written defamation of a person and the report is
Libel since it defames the plaintiff.


5)  Obstruction of justice took place when I went to the police
department and filed a harassment report about my sister who made
the prank phone call.  Someone changed my words on the report and
left it "administratively closed."  I signed nothing and I never
said the things that were written on the harassment report that I
attempted to file against my sister in order to protect myself.
According to a notation on the harassment report, the reports were
referred to Todd Greenburg at City Hall.


Heartland Apartment Management; Wayne Pelhank
Causes of Action

1) Violation of Illinois Rental Law for Entrance into residence

2) Libel

3) Fraud/Forgery

1  Except in an emergency, Renters must be given a reasonable
notice before the owner or an agent of an apartment may key in.
As far as any rule about putting a chain lock on the door, the
chain lock that was on the door was there when I moved into the
apartment and was also there in 1995; I had lived in the apartment
in 1995.


2  The minute an employee of Heartland Apartment Management became
a "witness" to the officers false report, that witness is also
part of the Libel.  If taken to trial he will commit Perjury.  The
Witness is identifiable because on the police report although the
witness information is blacked out, the magic marker used to black
out the information was low on ink and when the document is held

up to a light it reveals the identifying information of the witness.

3  I never, at any time signed a lease with Heartland Apartment Management.  Heartland Apartment Management was the buyer of the building I lived in and became the new owner of the building.  I was currently a month to month renter.  I had no intention of signing a lease and purposely did not seek a lease to sign so that exit from the building could be made easily.  Because of the incident on May 20th, 2004 whereby someone keys into my apartment opening the deadbolt lock for the police to then break open, Wayne Pelhank forges my signature on a false lease; the false lease grants permission for entry at anytime by the landlord.  Please note that I have a stack of signatures from the bank, a copy of my rental receipts and utility bills that will prove the lease to be a fraud/forgery.

Date/Time Record
Correspondence with Police and Social Workers
2004

May 20  Around 5:00 p.m. Incident Approximate time: 4:35 p.m. to 5:00 p.m.

May 21  2:18 p.m. Made call to Human Services and talked to Jennifer on telephone.  I called to clarify the falseness of the incident at which time Jennifer told me that the police were there to protect the crisis people and not there for me.  I requested that Jennifer make a note that I was calling just in case my sister were to call again.

May 21  3:30 p.m. received telephone call from Mark Benson from Human Services and he called because my sister had called once again, a second time on this date.  We talked for no more than 15 minutes although his report appears to time a one hour correspondence.  I did not talk to Benson for one hour.

May 21  3:45 p.m.  Called Bloomington Police Station and talked to Officer Melton so that I could inform him that my sister called the Human Services again, for the second time and that I had just spoken to Mark Benson.  I told Officer Melton that I had never spoken to my sister on the phone and that it had been about four years since I talked to her.  Officer Melton said that Officer

8

Wamsley would be over to my apartment to talk to me in a few minutes.

May 22  4:00 p.m. Officer Wamsley came to my apartment in person. Officer Wamsley informed me that no report was made and that only a one line description of the incident was made because a property damage report needed to be filled out.  Officer Wamsley informed me that he did not come into my apartment on May 20th but that he stood out in the hallway.

May 24  I made an in person trip to Human Services to obtain reports.  Two separate reports were handed to me over the counter without me presenting identification or signing any release form.

May 26  I called Human services in a.m. but was unable to reach anyone and left a message.

May 26  11:30 a.m. I received a Return call from Nicole Piggush who was adverse and did not want me to come to the Human Services place in person to clarify anything.  She said that it would be bad to do that.  I insisted and she again did not want me to go there and said it would be bad if I went there.  Nicole Piggush asked me: "How are you today, Lynn?" as if she was talking to a child or perhaps someone with very limited mental skills.  I replied matter-of-factly that I felt as if someone had kicked me hard in the stomach and that my chest was tight and I had to sit down.

May 26  12:00 p.m. I called again and talked to Nicole Piggush who was again adverse, I addressed the issue of her recording falsely that I had depression and she stated that she wrote that because she figured that I would be depressed because my sister had made the prank phone call.  When I asked her why she said I was depressed for months, she said that she would change it on her report but that I could not have a copy of the report because it would take a long time to process.  She said that she did not understand why I needed to have a copy of the report anyway.  She scolded as she said that this wouldn't have happened if I answered my phone and to answer my phone!

May 26  Made in person trip to Bloomington Police station and filed a disorderly conduct report about my sister.

May 27  Called Human Services in a.m. and asked to talk to the supervisor.

9

May 27  3:30 p.m. Officer Wamsley called and asked how things were.  I told Officer Wamsley that I had filed a disorderly conduct report.  Officer Wamsley asked me if I was contacting an attorney over the inheritance.

May 27  4:30 p.m.  Return call from Kim who said Mark Benson will call me back.  Received no return call from Mark Benson.

May 28  12:00 p.m. Made an in person trip to Human Services and asked for something in writing that clarified the false situation and adverse report that had been made.  I asked to talk to the supervisor who was not available.  Talked to Jennifer requesting this written clarification.  Jennifer told me to come back and talk to Chris Hays.

May 28  2:00 p.m.  Returned in person to Human Services and talked to Chris Hays, requesting to talk to the supervisor who was not available.  I then requested clarification from Chris Hays who said that he could not give me what I requested because he was not authorized to do so but that he could fill out a paper right then and there evaluating me and I agreed in order to obtain clarification of the falseness of the adverse report made by Piggush.

June 21  Made in person trip to Bloomington Police station to add to the disorderly conduct report I had filed on May 26th, not yet realizing that there was no error made on the first report but that someone was changing my words.  I signed no document and did not make the statements on the disorderly conduct report on May 26 or June 21, the report statements are the words of someone else who intervened and recorded those statements.  The report continued to remain administratively closed and upon obtaining a copy of the report, it was notated on the report that it had been referred to Todd Greenburg.

June 21  I Sent individual notes to Nicole Piggush, Mark Benson and Chris Hays via USPS registered mail which stated clearly that I had no verbal contract with them nor any contract at all.  This correspondence was made because I did not realize I had any kind of contract with them at all until I read the reports.

June 21  I Sent a letter via registered mail to Robert Keller Director of Health Services who was mistakenly taken for Director of Human Services.  Keller returned a correspondence directing me to Tom Barr, the correct director of Human Services.



July 2   I then Sent a letter via registered mail to Tom Barr, Director of Human services requesting written clarification that the incident was false and that the false reports be expunged. Tom Barr responded in a timely fashion stating in so many words that he could not give me what I asked for but that he would put my letter in my file.

Plaintiff has enclosed in her amended complaint a date/time record of correspondences with both the police department and Center For Human Services which shows the great effort taken to correct the corrupt behavior of the establishments in her community.   Many documents were generated during the correspondences and will be shown as needed.   In belief that this Court is in the proper jurisdiction to correct the wrong doing by the defendants, plaintiff continues with her demand for Justice the entitled monetary amount which is designed to offer relief to the plaintiff, who was wronged repeatedly and to such an extent as to feel anguished and unwelcome in Bloomington, Illinois.    The monetary amounts are also designed to show value and importance to the laws that exist and penalization for the breaking of laws, to discourage this type of behavior in the future.   Plaintiff also requests review of the "Motion to Default" filed originally on August 22, 2005, reviewing the procedures and events that lead up to the filing of the Motion to Default and the validity of such a motion being filed.

Lynn T. Guevrekian
1213 Royal Pointe Drive
Bloomington, Illinois
61704

## PROOF OF SERVICE

*"Amended Complaint"*

The undersigned certifies that a copy of the attached document dated _9/27/05_ was served upon the attorneys of record by enclosing the document in an envelope plainly addressed to the attorney's business address with postage fully prepaid and by depositing the envelope into a U.S. Post Office Box in Bloomington, Illinois on _11/21/05_ *(Amended Complaint is 10 pages)*

Lynn T. Guevrekian
P.O. Box 1114
Bloomington, Illinois
61702-1114

## Attorneys of Record

Casey Costigan    *D.* Salvati *et al*
308 East Washington Street
P.O. Box 3127
Bloomington, Illinois  61701

Eitan Weltman
802 N. Clinton Street Suite A
Bloomington, Illinois  61701

Peter Jenneten    A. Watson *et al*
227 N.E. Jefferson Street
Peoria, Illinois  61602

Date: 5-20-04

**McLean County Center for Human Services**
108 West Market Street • Bloomington, IL 61701
**CRISIS CONTACT NOTE / CLIENT INTAKE FORM**

☐ NPP to be mailed

**PLEASE PRINT**

Client Name: Guevrekian    Lynn
Last    First    Middle I.

Date of Birth: 6-24-64 (39 yo)

Staff Name: N. Piggush    Staff ID#: 2409    SS#:
If Different From Client ID#

| RU# | # | AACD CODE | SURCH INDCARE | REFERRAL SOURCE | TIME SPENT | TIME OF DAY | CASE NUMBER | R. SP. | A FE N | NO. RECEIV |
|---|---|---|---|---|---|---|---|---|---|---|
| 158 | 4 | 1511 | | | 1.15 | 16.00 | New # | 5 | 3 | 7 |
| | | | | | | | | | | |
| | | | | | | | | | | |

**Check Appropriate Number For Each of the Following Categories:**

**Sex:**
☐ 1 Male
☒ 2 Female

**Activity:**
☐ 1 Screening/Crisis (In-House only)
☒ 2 Crisis On-Call (mobile only)
☐ 3 Crisis On-Call (phone only)
☐ 4 Police & On-Call (mobile only)
☐ 5 Consultation (In-house only)
☐ 6 Short-term Counseling/Therapy (In-House only)
☐ 7 Crisis In-House (phone only)

**Location:**
☐ 1 CHS
☐ 2 Center St PPM
☒ 4 Client's residence
☐ 5 School/workplace
☐ 6 Public place/ comm.
☐ 7 Law enforce/jail/court
☐ 8 Day Treatment
☐ 9 Rooming House

☐ A Residential-Other
☐ B Hospital -BroMenn
☐ C Hospital-State
☐ D Hospital-Other
☐ E LTC Facility
☐ F Social Service Agency

**Referral From:**
☐ 01 Self
☒ 02 Family
☐ 03 Friend/Signif. Other
☐ 04 Church/Synagogues
☐ 05 Employer/Business
☐ 06 BroMenn ER/Other
☐ 07 BroMenn Psychiatric
☐ 08 St Joseph ER/Other
☐ 10 Other SOF
☐ 11 Other Hospital
☐ 12 Private Practitioner
☐ 13 Area Physician
☐ 14 Blm. Police Dept.
☐ 15 Normal Police Dept.
☐ 16 Sheriff Dept.
☐ 17 Other Law Enforce
☐ 18 Corrections/Court
☐ 19 Jail
☐ 20 PATH
☐ 21 DCFS
☐ 22 Baby Fold

☐ 23 Catholic Social Ser
☐ 24 Children's Found.
☐ 25 Chestnut/Lighthouse
☐ 26 DORS
☐ 27 Other-Social Serv
☐ 28 District 87 School
☐ 29 Unit 5 School
☐ 30 Other-School/College
☐ 31 Nursing Home
☐ 32 Other-CHS Program
☐ 33 Crisis Team
☐ 34 Other-MHC
☐ 35 Other:
☐ 36 McFarland

**Situation: (Check # of Primary & Underline Secondary Situations)**
☐ 01 Psychosis
☐ 02 Mania
☐ 03 Depression
☐ 04 Suicide
☐ 05 Anxiety/Panic
☐ 06 Anger/Temper
☑ 07 Violence/ Homicide
☐ 08 Domestic Violence Victim
☐ 09 Domestic Violence Perpetrator
☐ 10 Behav Prob of C/A

☐ 11 Sexual Abuse of C/A - Victim
☐ 12 Sexual Abuse of C/A - Perpetrator
☐ 13 Sexual Assault of Adult/Victim
☐ 14 Sexual Assault of Adult/Perpetrator
☐ 15 Alcohol
☐ 16 Street Drugs
☐ 17 Other:
☐ 18 ADHD

**Resolution:**
☐ 1 Client Placed
☑ 2 Client Referred
☐ 3 Only Crisis Serv.
☐ 4 Other Positive Resolution
☐ 5 Death
☐ 6 Not Located
☐ 7 Client Refused Serv

**Placement or Referral:**
☐ 02 BroMenn, vol.
☐ 03 BroMenn, invol
☐ 08 Mission/Safe Harbor
☐ 09 Access - AOP
☐ 11 Access – C/A

☐ 12 ECI In-house
☐ 13 ECI On-call
☐ 14 Comm. Support
☐ 15 CHS Psychiatrist
☐ 16 Other Psychiatrist/Therapist
☐ 17 Other Agency
☐ 18 None
☐ 19 Referral/out of county
☐ 20 Referred/CHS doesn't offer service
☐ 21 T.A. Doesn't meet eligibility
☐ 22 T.A. Problem isn't severe enough to warrant services
☐ 23 T.A. CHS at capacity
☐ 24 T.A. Other
☐ 25 McFarland vol.
☐ 26 McFarland invol.
☐ 27 Other State Hospital

**Client Status:**
☐ 1 Open/Active
☑ 2 Needs to be Opened
☐ 3 Not to be Opened

## STOP HERE IF FURTHER CLINICAL DOCUMENTATION IS NOT NEEDED

Address: 1620 N. Main    #6    McLean
Apartment/Street    County

Bloomington    IL    61701
City    State    Zip Code

Phone: (Home) (   ) 826-2803    (Work) (   ) 826-5857    DCFS #:

Emergency Contact/
Guardian:    /    Phone:
relationship

Address:
Apartment/Street    County    Township

City    State    Zip Code

Client Medicaid No:    Temporary Assistance For Needy Families:
(from back of card)

HS-01

49

**Presenting Problems (Extent, Nature, & Severity):** ☐ **Deferred – See Narrative**

**Orientation:**
Time
Place ✗3
Person

**Cognitive:**
Comprehension  OK
Memory
Reasoning

**Thought Processes:**
Hallucinations – Auditory _None_
Hallucinations – Visual
Flight of Ideas
Loose Associations
Pressured Speech
Ideas of Reference
Depressed Speech
Delusions
Paranoid Ideation
  Suicidal Ideation
  Active Intent/Plan
  Previous Ideation                     D/K
  Previous Attempts                    NO
Homicidal Ideation                   See note
History of Violence
History of Domestic Violence/Sexual Abuse
  Victim                                    D/K
  Perpetrator
Impulse Control                        fair
Contract to call Crisis              yes

**Affective:**
Depression  Yes    Duration  few months
Euphoria  NO    Duration
Sleep Disturbances    Duration
Appetite Change    Duration
Poor Concentration    Duration
Anxiety  Yes    Duration  several months
Affect  heightened/anxious

**Substance Abuse:**
Type: _____
Last Use: _____
Frequency: _____
Amount: _____
None
Reported:  X _____

Client treated in least restrictive environment:   ☒ Yes   ☐ No
Psychiatric evaluation is recommended:   ☐ Yes   ☒ No     Referred to: _____

**Clinical Narrative:**

In response to a crisis call initiated by Anna, Lynn's sister, ELI spoke y Anna. Anna reported Lynn was man labile, paranoid, + threatened to kill family "one by one" and had a gun in her possession. ELI called BPD to residence, + after locating correct apt, BPD proceded to open her door + ELI spoke y Lynn. Lynn was "in the shower" + did not open the door previously. Lynn stated her father left $300,000 - in will to other 3 siblings + nothing to Lynn. Lynn was anxious + angry b/c family will not share his possessions/money. Lynn admitted to saying she "would only get something if I killed them all" but reported it was a figure of speech + she has no intention of harming others/self. Her hygiene was fair + living conditions were also fair. Lynn contracted for safety + will call as needed. ELI phoned Anna who was unhappy y result ...

5°

CHS-01

June 21, 2004

Dear Robert Keller, / TOM BARR

Hi, how are you?

I had an unusual experience that was very disturbing and I am sure it doesn't happen every day. I have a hateful and very mean sister who is vicious. My sister is very crazy but I wouldn't say that she needs mental help; I would say she needs more love and she needs to stop being mean. My siblings cut me out of my father's inheritance. If there are some kind of reports floating around that insinuate mental incompetence on my part, this can be a blockade in acquiring my rightful share of my fathers inheritance or filing a letter of administration. In addition, although I have never actually spoken to my sister and have not seen her or spoken to her in four years I did curse her by leaving a message on her answering machine and she decided to repay me for that. My sister who lives in Florida decided to pull a stunt and a prank and called the crisis center here in Bloomington, telling them I was mentally ill and had a gun and was threatening to kill her and the family. I have no family in Illinois; I have siblings in New York and Florida. The crisis center answered the call and came to my apartment accompanied by two police officers. I have lived in my apartment building for over 10 years time. I heard people in the hallway and I knew that something strange was going on and I went into the shower to get cleaned up. There is a an individual that lives at the other end of my hallway who is most probably a mental patient at your facility and who puts out odors of vomit, filth and alcohol into the hallway; it was my idea that the excursion in the hallway had to do with that person and I thought someone may have wanted to ask me questions or something so I went into the shower. My phone rang but I didn't answer it because something very strange was going on in the apartment hallway and I did not want to take the call and be in the middle of a conversation, so I turned off my phone ringer. No one announced themselves or said my name until I was already in the shower with shampoo in my hair. While I was in the shower the police violently broke open my door. The crisis people questioned me. They were not here for more than 25 minutes. Everyone left telling me to go finish my shower. This was an entirely false situation.

I cooperated fully and answered all questions. Even though I told them it was a prank, Nicole Piggush still wanted me to set up at the crisis center and asked me for my social security number. I declined giving her my social security number because I do not just give out my social security number and I do not require mental counseling or therapy or services at the center. Regardless, the crisis team chose to create a false report anyway.

When I spoke to Nicole Piggush on the phone afterwards and asked to come in to the center and clarify things she did not want me to come in there and acted and insinuated it would be a bad thing if I did. Nicole Piggush was defensive on the phone and when she addressed me she asked me: "what is going on today, Lynn?" as if I was some kind of mental patient. In person, Nicole Piggush asked me if I had stress and I said yes. Then she asked me if I had depression and I said no, that I did not. Nicole Piggush decided to write that I had depression anyway; for several months. In her report, Nicole Piggush portrays

me being in the shower in quotation marks as if there was some other reason for me being in the shower other than me trying to get cleaned up.  In other words, the whole thing is just false.  Then she checks the box that mandates intervention by the legal system.  I have a copy of her report; there is quite a bit that is false and most definitely adverse.  I have never had mental illness, never been in a mental hospital, never been on medication, never been violent or harbored any violent ideology.  I have never threatened anyone.  I have never been arrested and I have a good driving record.  I have owned a fire-arms card for 10 years.  Nicole Piggush created her own crisis; and I am sure my sister created quite a scenario of lies, which apparently Nicole Piggush was perfectly willing to believe.  I wonder if my sister had told Nicole Piggush that I was a witch if Nicole Piggush would like to burn me at the stake?  I wish I was being humorous but I am not.  This is a very, very serious issue.

I cannot allow anyone to distort my own personal integrity.  That is simply not fair.  Would you allow such a thing to happen?


Instead of providing you with a property report sale that shows my father sold a house for $350,000 before he died or a death report or a document from my father's county that shows the estate was not probated, or the police report that I filed afterwards about my sister for harassment or copies of the crisis center notes that are adverse and false:


Instead of trying to prove my innocence with documents; which effects me in an emotionally adverse manner, I am simply requesting that you send me something in writing that says this situation was false and that the case is closed and that the adverse reports are expunged.  Nothing Nicole Piggush wrote can be proven because it is all false and it was probably written from the lies that my sister told her, I am sure my sister was very convincing.  If I have to prove myself in anyway, I am going to seek legal help or an outside source; I am not going to do it on my own. I am not interested in getting involved with the Human Services place any further and while I respect the establishment because I am sure that they do a great service for the community I will tell you that it is damaging when they try to involve a mentally healthy person in a false way or write negative false things about someone as sweet and sane as I am.


Even though Nicole Piggush did not want me to come into the crisis center I went in there anyway and spoke with Jennifer and Chris Hayes.  Please understand this situation was humiliating.  I asked that the case be closed and that I receive something in writing that states the whole situation was false.  I was very friendly and spoke candidly.  I could not get what I requested because I don't think they have the authority to do that.  Chris Hayes was very nice and gave me something that made me feel better but it just doesn't cut the mustard; in fact, the withholding of what I asked for is adverse.  I am only seeking absolute clarity and I would like to have a formal apology in writing but that is up to you.  There is no reason to apologize for answering the crisis call even though it was false because that is part of the job but writing false reports afterwards is not acceptable.  Apparently, Nicole Piggush just figured I was criminal and went ahead and made her report; she even diagnosed me.


Once again, I would like to make clear, I am writing you to request that I receive and have right away something detailed in writing that states the whole

situation was false and that the case is now closed; and that the adverse reports are expunged.  I understand that you have some kind of policy that keeps cases open for 90 days but I am a full grown adult woman and I am asking you kindly to close it.   It is frightening to me that Nicole Piggush has been given authority in the community.  False accusation in itself is disturbing and coming from a family member was very upsetting; my sister did a very ugly thing.  My sister, Anna Strien has no credibility whatsoever.  This Human Resource place has no business making reports like that without proper and further investigation.  I feel terrible that there is a false report about me, that is why I want it expunged.  Please send me something in writing that is very detailed and that states the situation is false and the case has been closed and that the false reports are expunged.  I would like to put this behind me right away.  I have had a pretty bad time because of it.  The idea that a report even exists is disturbing.


I hope to hear from you soon. I will not be making any more trips to the crisis center and if you need to meet with me in person I will decline; but will meet with you in the near future with a 3rd party after I find the appropriate party. Please understand that I have nothing to hide and I do not wish to be unfriendly but after seeing what ignorant people can do I feel that it is appropriate to protect myself.

Sincerely,




Lynn T. Guevrekian
P.O. Box 1045
Bloomington, Illinois
61702-1045

## Officers Involved

Approving SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

Reporting SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

(78)

## Incident People

Address:

Sex: ▮ Race: ▮ DOB: ▮ Age: ▮

Original Report

100434092

Interviewed    LYNN    T GUEVREKIAN

**Witness**

Sex: ▮ Race: ▮ DOB: ▮ Age: ▮ SSN: ▮

Address: ▮

Home Phone: ▮

Employment ▮

Hgt ▮

Original Report

100100701

08/14/2001

JUN 21 2004



# CITY OF BLOOMINGTON

**Request for Public Records**

**City Clerk Department**
Phone#: 309-434-2240
Fax#: 309-434-2802

To: Bloomington Police Dept.          Date: June 21, 2004

Description of requested record(s): (Please be as specific as possible.)

I have the Public incident report # 200406831 Dated 5/20/04. I Would like to have the full report for my records. I didn't file a property damage claim form because I was able to fix the door Without too Much trouble. thank you.

(this happened at My residence)

Request is made to: (check one or both)   ☐ Inspect   ☑ Copy (number of copies)   1

Do copies need to be certified?   ☐ Yes   ☐ No

If less than all need certified, please list those that need to be certified.

I certify that this request is not for the purpose of furthering any commercial enterprise and that I am subject to prosecution for making this certification falsely.

Name: Lynn T. Guevrekian
Address: P.O. Box 1045
City: Bloomington     State: IL   Zip: 61702 - 1045
Phone: 309 826 - 5857

**DO NOT WRITE BELOW THIS LINE - OFFICE USE ONLY**

Date Received: 4/21          Date Response Due: 4/30

Notes:
6/22/04 referred to Todd Greenburg

Receipt #:

79

# McLean County Public Incident Report - 200407133

te: 05/28/2004 12:43                                                    Page: 1    of 1

---

ort #    200407133              Bloomington PD

ort Date: 05/26/2004       12:44       Start Date   05/20/2004
                                       End Date:    05/21/2004

mmary:    ON WEDNESDAY, MAY 26, 2004 LYNN GUEVREKAIN CAME IN TO THE FRONT DESK OF THE BLOOMINGTON
          PD, TO FILE A DISORDERLY CONDUCT.

port Type:

---

## Incident Location

dress      620 N MAIN STR APT 6

rsection:                                          Distance              F

OOMINGTON, IL  61701-                              Beat  1    Sub Beat

## Incident Offenses

- 2890 ALL OTHER DISORDERLY CONDUCT -  - Original Report

## Incident People

EVREKIAN, LYNN - 06/24/1964 - Victim - Original Report

## Incident Businesses

CIETY -   ,  Original Report

## Incident Vehicles

## Incident Officers

proving SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

porting CSO GARY NORMAN - BPD - 7885 - Original Report

# McLean County Public Incident Report - 200406831

Date: 05/24/2004 11:39                                         Page: 1    of 1

Report #    200406831              Bloomington PD

Report Date: 05/20/2004    18:40       Start Date  05/20/2004    15:30
                                       End Date:   05/20/2004    17:00

Summary:   PATROL UNITS RESPONDED TO EVALUATE A WOMAN WHO HAD MADE A DISTURBING REMARK VIA
           TELEPHONE TO HER SISTER IN FLORIDA.

Report Type:   Damage to Facility

## Incident Location

Address      620 N MAIN STR APT 6

Intersection:                                     Distance              F

BLOOMINGTON, IL  61701- 0000                        Beat      Sub Beat

## Incident Offenses

- 6003 ASSIST OTHER AGENCY - CALL TO ASSIST CRISIS - Original Report

## Incident Vehicles

## Incident Officers

Approving SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

Reporting SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

81



# BLOOMINGTON POLICE DEPARTMENT

*A Community Partnership*

**THIS IS NOT AN OFFICIAL POLICE REPORT - IT IS FOR INFORMATION PURPOSES ONLY**

| DATE OF REPORT | LOCATION OF INCIDENT | VICTIM'S NAME |
|---|---|---|
| 5-26-04 | 620 N Main #6 | Lynn T Guevrekign |

| TYPE OF INCIDENT | REPORTING OFFICER ID/NAME | CASE NUMBER |
|---|---|---|
| Harrissment | SO Norman 7885 | 200407133 |

Your case will be on file with the Bloomington Police Department under the above Case Report Number. Refer to this number whenever you are communicating with the Police Department concerning this incident. Your case **may be** assigned for follow-up investigation based upon specific facts obtained during the initial investigation. The presence of these facts can predict whether a comprehensive follow-up investigation would likely result in the arrest and prosecution of the suspect(s) or the recovery of property. Your case will be reviewed and retained to determine if criminals active in the area can be identified. A detective will contact you if additional information is required or your further assistance is needed.

## TO REPORT ADDITIONAL INFORMATION

If you gain additional knowledge of specific facts which might assist in the investigation of your case please contact the Bloomington Police Department at (309) 434-2700.

## RECOVERY OF PROPERTY - STOLEN VEHICLE RECOVERED - MISSING/RUNAWAY PERSON LOCATED

The Bloomington Police Department must be notified **immediately** at (309) 434-2700 when:
- Property you reported lost or stolen is recovered.
- A vehicle you reported stolen is recovered or located.
- A person you have reported missing/runaway is located or has returned home.

## CREDIT CARDS - CHECKS

Immediately notify the concerned credit card issuer or bank by phone to reduce the possibility of being liable for the unauthorized use of your lost or stolen credit card or check. It is suggested that you also inform the credit card issuer or bank in writing as a follow-up measure to ensure proper notification.

## TO OBTAIN A COPY OF THE OFFICIAL POLICE REPORT

The above listed report number may suffice for insurance purposes. However, there may be instances where a copy of the Police Report is desired. A copy of the Case Report verifying an incident of injury, loss, or damage has been reported to the Police Department may be obtained by contacting the Police Records Division. The hours of Police Records are 8:00a.m to 5:00pm .

## ADDITIONAL REMARKS:



# McLean County Public Incident Report - 200407133

05/28/2004 12:43                                                    Page: 1   of   1

t #    200407133        Bloomington PD

t Date: 05/26/2004      12:44        Start Date   05/20/2004
                                     End Date:    05/21/2004

iary:   ON WEDNESDAY, MAY 26, 2004 LYNN GUEVREKAIN CAME IN TO THE FRONT DESK OF THE BLOOMINGTON
        PD, TO FILE A DISORDERLY CONDUCT.

t Type:

## Incident Location

ss      620 N MAIN STR APT 6

ction:                                          Distance              F

MINGTON, IL  61701-                             Beat  1   ·      Sub Beat

## Incident Offenses

390 ALL OTHER DISORDERLY CONDUCT - - - Original Report

## Incident People

REKIAN, LYNN - 06/24/1964 - Victim - Original Report

## Incident Businesses

ETY -   ,  Original Report

## Incident Vehicles

## Incident Officers

ving SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

ing CSO GARY NORMAN - BPD - 7885 - Original Report

# McLean County Incident Report - 200407133

: 06/22/2004 13:41                                                      Page: 1   of  4

rt #:   200407133          · Bloomington PD                        ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
rt Date:  05/26/2004   12:44      Start Date:  05/20/2004                    200407133
                                  End Date:   05/21/2004       Status: 09 - Administratively closed
nary:   ON WEDNESDAY, MAY 26, 2004 LYNN GUEVREKAIN CAME IN
        TO THE FRONT DESK OF THE BLOOMINGTON PD, TO FILE A
        DISORDERLY CONDUCT.

rt Type:

## Incident Location

ess: 620 N MAIN STR APT 6

ection:                                              Distance:              F

OMINGTON, IL  61701-                                 Beat: 1      Sub Beat:

## Incident Offenses

Original Report     2890   ALL OTHER DISORDERLY CONDUCT

narks:

## Officers Involved

oving SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

rting CSO GARY NORMAN - BPD - 7885 - Original Report

oving LIEUTENANT JOSEPH BUTCHER - BPD - 853 - Supp. #2

lemental Reporting CSO GARY NORMAN - BPD - 7885 - Supp. #2

## Incident People

tim      **LYNN   T GUEVREKIAN**                          ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
x:     Race:     DOB:      Age:          Original Report          100434092

ldress:

t:

spect     **ANNA    STRIEN**                             ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
x:     Race:     DOB:      Age:          Original Report          100446906

ldress:

ome Phone:



# McLean County Incident Report - 200407133

Date: 06/03/2004 11:49                                                      Page: 1  of  3

Report #:   200407133              Bloomington PD

Report Date:  05/26/2004    12:44    Start Date: 05/20/2004                     200407133
                                     End Date:   05/21/2004      Status: 09 - Administratively closed

Summary:    ON WEDNESDAY, MAY 26, 2004 LYNN GUEVREKAIN CAME IN
            TO THE FRONT DESK OF THE BLOOMINGTON PD, TO FILE A
            DISORDERLY CONDUCT.

Report Type:

## Incident Location

Address:  620 N MAIN STR APT 6

Intersection:                                                   Distance:              F

BLOOMINGTON, IL  61701-                                         Beat: 1      Sub Beat:

## Incident Offenses

#1    Original Report      2890   ALL OTHER DISORDERLY CONDUCT

Remarks:

## Officers Involved

Approving SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

Reporting CSO GARY NORMAN - BPD - 7885 - Original Report

## Incident People

**Victim**      **LYNN   T  GUEVREKIAN**

Sex:    Race: ▉   DOB▉   Age:▉      Original Report         100434092

Address: ▉

Hgt: 502, Wgt: 120, Brown Eyes, Brown Hair      12/16/2003

**Suspect**     **ANNA   STRIEN**

Sex: ▉   Race: ▉   DOB▉   Age:▉      Original Report         100446906

Address: ▉

Home Phone: ▉

85

# McLean County Incident Report - 200407133

te: 06/22/2004 13:41

### Incident Narrative 2  06/21/2004 13:29

### Supplemental Reporting CSO GARY NORMAN - BPD, ID # 7885

Monday, June 21, 2004 Lynn Guevrekain came to the front desk of the Bloomington Pd, with a copy of the police report that she had ially filed.

m stated that the report was vague and that there were 2 points that needed to be added. Lynn stated that her sister Anna Strien had rmed Crisis that she had a gun and would harm herself, along with family members. Lynn also stated that her family has told Crisis that has mental problems and that she is a harm to society. Lynn states that she has no history of mental problems and that all the information is provided to Crisis is false.

# McLean County Incident Report - 200407133

Page: 1   of  3

Date: 06/03/2004 11:49

Report #:   200407133            Bloomington PD

Report Date:  05/26/2004   12:44      Start Date:  05/20/2004              200407133
                                       End Date:   05/21/2004      Status: 09 - Administratively closed

Summary:    ON WEDNESDAY, MAY 26, 2004 LYNN GUEVREKAIN CAME IN
            TO THE FRONT DESK OF THE BLOOMINGTON PD, TO FILE A
            DISORDERLY CONDUCT.

Report Type:

## Incident Location

Address:  620 N MAIN STR APT 6                              Distance:              F

Intersection:                                              Beat: 1    Sub Beat:

BLOOMINGTON, IL  61701-

## Incident Offenses

#1    Original Report    2890   ALL OTHER DISORDERLY CONDUCT

Remarks:

## Officers Involved

Approving SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

Reporting CSO GARY NORMAN - BPD - 7885 - Original Report

## Incident People

**Victim**      **LYNN  T  GUEVREKIAN**

Sex: ▮  Race: ▮  DOB: ▮  Age: ▮      Original Report          100434092

Address: ▮▮▮▮▮▮

Hgt: 502, Wgt: 120, Brown Eyes, Brown Hair    12/16/2003

**Suspect**     **ANNA   STRIEN**

Sex: ▮  Race: ▮  DOB: ▮  Age: ▮      Original Report          100446906

Address: ▮▮▮▮▮▮

Home Phone: ▮▮▮▮▮

⑧⑦

# McLean County Incident Report - 200407133

Date: 06/03/2004 11:49

## Incident Businesses

**SOCIETY**

Address:

240066004

Original Report    **Victim**

## Incident Property    Total Value

# McLean County Incident Report - 200407133

### Incident Narrative  1  05/26/2004 12:42

### Reporting CSO GARY NORMAN - BPD, ID # 7885

On Wednesday, May 26, 2004, Lynn Guevrekian came to the front desk of the Bloomington PD, to file a Disorderly Conduct report.

Lynn stated that on Thursday, May 20, 2004 and Friday, May 21, 2004,  Lynn's sister Anna Strien called Crisis to report that Lynn was going to harm herself and others.  Lynn stated that this has been going on for a few weeks and she is tired of it.  Lynn stated that Crisis is aware of the situation with Anna.  Lynn stated that when Anna calls now, that Crisis just calls Lynn and talks with her.

No further information could be provided.

89

# McLean County Incident Report - 200406831

ort #:   200406831          Bloomington PD

ort Date:  05/20/2004   18:40          Start Date:  05/20/2004   15:30          200406831
                                       End Date:    05/20/2004   17:00    Status: 09 - Administratively closed

mary:    PATROL UNITS RESPONDED TO EVALUATE A WOMAN WHO
         HAD MADE A DISTURBING REMARK VIA TELEPHONE TO HER
         SISTER IN FLORIDA.

ort Type:   Damage to Facility

## Incident Location

ress: 620 N MAIN STR APT 6

section:                                                      Distance:              F

OMINGTON, IL  61701- 0000                                     Beat:          Sub Beat:

## Incident Offenses

Original Report     6003    ASSIST OTHER AGENCY

marks:  CALL TO ASSIST CRISIS

## Officers Involved

roving SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

orting SERGEANT RANDALL WIKOFF - BPD - 3879 - Original Report

## Incident People

terviewed   **LYNN  T  GUEVREKIAN**

ex:      Race:       DOB             Age:            Original Report          100434092

ddress:

itness

ex:      Race:      DOB:          Age:          SSN:          Original Report      100100701

ddress:

ome Phone:

Employment                                                                                  08/14/2001

gt:

# McLean County Incident Report - 200406831

Date: 06/22/2004 13:41

### Incident Narrative 1  05/20/2004 18:47

### Reporting SERGEANT RANDALL WIKOFF - BPD, ID # 3879

On the afternoon of Thursday, 5-20-2004 approximately 1530 hours, patrol units were dispatched to 620 N. Main, in response to a call from PATH/CHS/Crisis Team.  The inital call was that the resident of apartment 5 had said she was going to start shooting people.

I responded from BPD along with several other Officers.  Eventually it was determined that Lynn Guevrekian was the lady who had made the remark to a third party, her own sister.  The sister had called CHS/Path. The apartment in question is a thrd floor unit located above HobbyLobby and an upholstery shop at 618-622 N. Main.  I found out that the building is owned and operated by Heartland Management.  I telephoned their number and made arrangements for a maintenance man to come unlock the two apartments, 5 and 6, for us, so that we could check the welfare of the lady.  No responses were ever gained from knocking.  We were able to learn for sure that Lynn Guevrekain lives in unit 6, and we could hear her phone ringing, per our request to MetCom.

Maintainence opened apartment 5, we searched and it was empty.  Maintainence opened number 6, and it was chain-locked from the inside. Maintainence advised there was no other working door for that unit, so we surmised that some person was most likely inside the apartment. Maintainence also advised that tenants are prohibited from affixing supplemental locks (i.e. the chain lock) to the doors, and if we felt the need to force it open, he would repair it without complaint.

Myself, and Officers Wamsley, Day and Melton knocked and called to Guevrekian by name.  She did not repond.  I determined that forcing entry was appropriate, so I pushed the door open until the chain gave way.  We entered the unit.  Ms. Guevrekian was in the shower.  I called to her, and she agreed to come out, get dressed and talk to us.  I did not look behind the shower curtain or stay in the bathroom after speaking to her.  She had poked her head around the edge of the curtain.  I called Crisis forward, but we stood by in the hallway reference the gun threat, after she had dressed herself.

Crisis interviewed her as we listened.  Guevrekian advised that she had just had an argument via telephone with her sister Anna, in Flordia, over the settling of the estate of her recently deceased father.  Guevrekian advised that she was cut out of the will, and she is furious over the behavior of the rest of her family.  She said she had just moved out of apartment 5 and into apartment 6.  She admitted, word for word, what Crisis had been advised of...to wit that the only way she could  get even with her family for treating her so badly would be to start shooting them.  She also said that she had no plans, no intentions and no means to go to Florida to do it.

She advised she owns two handguns for fun and personal safety.  I inspected her FOID card.  MetCom advised it was valid.

She also said that she had heard us knocking at her door, and at #5, and chose not to answer it.
Crisis was content that she posed no threat.  There was no compelling reason to seize her weapons.
Officer Wamsly advised that he would make contact with the sister in Florida.
This ended BPD's involvement with this call.

(91)

**E-FILED**
Monday, 04 December, 2006  02:46:07 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| LYNN T. GUEVREKIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-1369 |
| | ) | |
| BLOOMINGTON POLICE DEPARTMENT, | ) | |
| CITY OF BLOOMINGTON, McLEAN | ) | |
| COUNTY CENTER FOR HUMAN | ) | |
| SERVICES, HEARTLAND APARTMENT | ) | |
| MANAGEMENT and WAYNE PELHANK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AFFIDAVIT OF SERGEANT RANDALL WIKOFF

The undersigned Affiant being first duly sworn under oath deposes and states:

1.    My name is Randall Wikoff.  I am a Sergeant for the Bloomington Police Department and was such on May 20, 2004.

2.    On May 20, 2004, I was one of the officers dispatched to 620 N. Main.  The dispatch was in response to a call from the McLean County Center for Human Services Crisis Team.  The initial call was that the resident of apartment 5 had said she was going to start shooting people.

3.    It was eventually determined that Lynn Guevrekian, who now lived in apartment 6, was the person that had made the threatening remarks and they were made to her sister, who in turn called the McLean County Center for Human Services Crisis Team.

4.    Upon arrival at the location, no response was received from knocking.  I had Metcom call Ms. Guevrekian via telephone, which we heard ringing from the hallway.

5.    I telephoned Heartland Management and made arrangements for a maintenance man to come unlock the apartment so we could check on the welfare of Ms. Guevrekian.  Maintenance arrived and unlocked the apartment door at my direction.  The door was chain-locked and maintenance advised that tenants are prohibited from affixing chain-locks to the doors.  Since there was no other working door to the unit, we surmised that someone was in the apartment.  He told me that if we felt the need to force it open, he would repair it without complaint.

**EXHIBIT**
3

6.      Officers Wamsley, Day, Melton and I knocked on the door and called to Ms. Guevrekian by name. She still did not respond. At this time I determined that forced entry was appropriate so I pushed the door open until the chain gave way.

7.      Upon entry to the apartment, we discovered that Ms. Guevrekian was in the shower. I called to her and she poked her head around the shower curtain and agreed to get dressed and speak to us. I did not look behind the shower curtain or stay in the bathroom after speaking to her.

8.      I then called Crisis forward into the apartment. The other officers and I stood in the hallway because of the gun threat.

9.      Crisis interviewed her as we listened. Guevrekian told Crisis that she had just had an argument via telephone with her sister, Anna, in Florida over her recently deceased father's estate. Ms. Guevrekian stated she had been cut out of the will and that she was furious over the behavior of the rest of her family. Ms. Guevrekian admitted that she had said the only way she could get even with her family for treating her so badly would be to start shooting them. She also stated that she had no plans, intentions or means to go to Florida to do it.

10.     On the date of this incident, Ms. Guevrekian possessed two handguns and presented a valid FOID card. Therefore, these weapons were not confiscated by myself or the other officers.

11.     All of the officers including myself and Crisis felt that Ms. Guevrekian posed no threat and left the residence.

12.     I have read the foregoing and the matters contained herein are made on my personal knowledge and if called to testify to these matters, I can competently do so.

FURTHER AFFIANT SAYETH NOT.

_Sergeant Randall Wikoff_

Subscribed and sworn to before me
This 31st day of October, 2006

_Notary Public_

OFFICIAL SEAL
KENNETH A BAYS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 10/03/10

Amanda J. Watson
Quinn, Johnston, Henderson & Pretorius
227 NE Jefferson
Peoria, Illinois 61602
Phone:      (309) 674-1133
Facsimile:  (309) 674-6503